# EXHIBIT A

23-1 dtd 5|20|10

| UNITED STATES BANKRUPTCY COURT SOUTHERN | DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Triple R, Inc. | Case Number<br>10-11728 (AJG) (Jointly Administered) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>144 Spring Realty LLC     41 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |  |
|---|---|---|
| Name and address where notices should be sent:<br>c/o Gregg M. Ficks, Esq.<br>Coblentz, Patch, Duffy & Bass LLP<br>One Ferry Building, Suite 200<br>San Francisco, CA 94111<br>Telephone number: 415-391-4800 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | USBC SOUTHERN DIST OF NEW YORK<br>ROCK & REPUBLIC ENTERPRISES INC. et al<br>CHAPTER 11 CASE NO. 10-11278 (AJG)<br>CLAIM NUMBER: 00023<br>THIS SPACE IS FOR COURT USE ONLY |

| Account or other number by which creditor identifies debtor: | Check here<br>if this claim   ☐ replaces    a previously filed claim, dated:_____<br>      ☐ amends |
|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other   Commercial Real Property Lease

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  - Your SS #: _____ _____ _____
  - Unpaid compensation for services performed
  - from _____ to _____
  -       (date)          (date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**    $ __$4,287,643.52*__

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
   ☐ Other_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>May 20, 2010 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Coblentz, Patch, Duffy & Bass LLP<br>By: _____<br>Gregg M. Ficks, Attorneys for Creditor |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

*Plus unliquidated amounts. See Attachment.

1422145v2

127600023001

## ATTACHMENT TO 144 SPRING REALTY LLC'S PROOF OF CLAIM
## (LEASE CLAIM)

### In Re Rock & Republic Enterprises, Inc., et al.
### Case No. 10-11728 (AJG) (Jointly Administered)[1]
### United States Bankruptcy Court, Southern District of New York

144 Spring Realty LLC ("Landlord") files this claim for amounts owing from Debtor Triple R, Inc. ("Debtor" or "Tenant") to Landlord under a commercial real property lease (the "Lease") for the property located at 144 Spring Street, New York, New York (the "Premises"). A true and correct copy of the Lease is attached as Exhibit A to the Complaint (the "Complaint") attached hereto as Exhibit A.

### A.    Lease Termination Damages.

Landlord's claim is based, in part, on lease termination damages as calculated and capped in accordance with 11 U.S.C. § 502(b)(6) (the "Lease Termination Damages"). Pursuant to Bankruptcy Code Section 502(b)(6), Landlord is entitled to damages for the rent reserved by the Lease for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of the Lease following the earlier of: (i) the date of the filing of the bankruptcy petition; and (ii) the date the Landlord repossessed or Tenant surrendered the Premises. The Lease was terminated, and Landlord repossessed the Premises, on March 17, 2009 (the "Termination Date").[2] The remaining term of the Lease as of the Termination Date was 186 months (15½

---

[1] Landlord files this claim under this case number as the Court has ordered joint administration of this case with Case No. 10-11729 (*See* April 5, 2010 order). Landlord reserves the right to amend this claim to assert these and any other amounts owing to Landlord in Case Nos. 10-11728 and 10-11729.

[2] Under Court order dated April 21, 2010, Debtor formally rejected the Lease in these bankruptcy cases effective April 1, 2010. (Docket Entry 17 in Case No. 10-11278 and Docket Entry 14 in Case No. 10-11729.) However, the Lease was terminated on the Termination Date pursuant to a pre-petition Notice of Default and Notice of Termination. (See Complaint at Exhibits C and D.)

years) (Lease, Article 2). Landlord therefore calculates its Lease Termination Damages based on the rent reserved for 15 percent of the remaining Lease term, which is equivalent to 2.325 years. As set forth in Article 2 of the Lease, the amount of prospective minimum monthly rent owing under the Lease as of the Termination Date is $22,318,697. (See also, Rent Summary attached hereto as Exhibit B.) That sum, capped at 2.325 years in accordance with Section 502(b)(6), is $3,347,804.55 In addition, Landlord is entitled to Lease Termination Damages for: (1) Tax Rent due under the Lease for that same 2.325 year period of not less than $75,311.40 (Tax Rent owing under the Lease is $32,392 per year) (see Lease, Article 28 and Tax Statement attached hereto as Exhibit C); and (2) insurance payments owing under the Lease for that same 2.325 year period totaling not less than $1,069.50 ($460 per year).

**B.** **Other Damages.**

Landlord's claim against Tenant in these bankruptcy cases includes damages in addition to Lease Termination Damages. Tenant's breaches, defaults, and complete non-performance under the Lease, even before the Lease was terminated, has caused damages to Landlord, including the following:

First, Landlord incurred commission costs of not less than $562,386.16 in connection with leasing the Premises to Tenant. (See Brokerage Agreement and invoice collectively attached hereto as Exhibit D.) Under the circumstances of this matter, Landlord claims all such sums.

Second, Landlord incurred not less than $164,730.70 in professional fees and costs of not less than $44,500 in A.C.E. contributions in connection with the Lease, in large part performing "Landlord's Work" as described in Article 4 of the Lease. (See summaries and invoices

collectively attached hereto as <u>Exhibit E</u>.[3]) Tenant is obligated to pay these sums to Landlord due to Tenant's breach of the Lease, and its complete non-performance thereunder.

Third, the Lease entitles Landlord to recovery of its attorneys' fees and costs incurred in enforcing the Lease. (Lease, Article 18D.) Landlord has incurred not less than $80,090.21 in such fees and costs. (See fee and cost summary and consultant's invoice collectively attached hereto as <u>Exhibit F</u>.[4]) These fees and costs will continue to accrue. Landlord intends to seek recovery of all of them after they are liquidated, and reserves all rights to do so.

Fourth, Landlord has incurred $11,751.00 in assistant construction management costs/damages in connection with the Lease. (See summary attached hereto as <u>Exhibit G</u>.)

Finally, Tenant's breaches and defaults under the Lease have caused Landlord significant additional damages in lost income and in lost value to the Premises. Landlord reserves all rights to claim additional sums for all such damages after they are known and liquidated, which may not be until, and if, the Premises is re-leased. Despite Landlord's best efforts, Landlord has not, as of the filing of this claim, been able to re-lease the Premises. (See, e.g., marketing materials attached hereto as <u>Exhibit H</u>.)

In sum, the total amount of Landlord's claim as currently asserted, capped in accordance with 11 U.S.C. § 502(b)(6) where appropriate, is:

---

[3] Invoices for legal services are not attached hereto in order to protect the attorney-client privilege and the attorney work product doctrine. Landlord will provide further evidence of legal fees and costs to the Court and appropriate representatives of the estate, if necessary, under a Protective Order and/or other means to protect the attorney-client privilege and the attorney work product doctrine.

[4] See footnote 3.

| | |
|---|---|
| Prospective rent owing under the Lease, as limited by 11 U.S.C. § 502(b)(6) | $3,347,804.55 |
| Prospective Tax Rent owing under Lease, as limited by 11 U.S.C. § 502(b)(6) | $75,311.40 |
| Prospective Insurance payments owing under Lease, as limited by 11 U.S.C. § 502(b)(6) | $1,069.50 |
| Damages for commission costs | $562,386.16 |
| Damages for professional fees and other "Landlord's Work" under the Lease | $209,230.70 |
| Attorneys' fees and costs and expenses Landlord has incurred in enforcing the Lease | $80,090.21 |
| Damages for assistant construction management costs | $11,751.00 |
| Lost income and value | Unliquidated |
| **TOTAL** | **$4,287,643.52[5]** |

This claim currently does not specify the attorneys' fees and costs that Landlord will continue to incur enforcing the Lease in this bankruptcy case, which are recoverable pursuant to Article 18D of the Lease and *Travelers* and its progeny. It also currently does not specify the Lease commissions, post-surrender build-out costs, tenant improvement expenses, and other costs that Landlord will incur in connection with re-leasing the Premises. It also does not specify damages for currently unliquidated lost income and lost value to the Premises resulting from Tenant's breaches and defaults under the Lease. Landlord reserves the right to amend this claim to include all such additional fees and costs after they are liquidated. It also reserves the right to amend this claim to assert any different and/or additional amounts owing to Landlord in these bankruptcy cases, and to reclassify any amounts owing to Landlord hereunder.

---

[5] Plus additional unliquidated amounts.

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------X   Index No.                    /2009
144 SPRING REALTY LLC, ,

                              Plaintiff,          **COMPLAINT**

        -against-

TRIPLE R, INC. and ROCK & REPUBLIC
ENTERPRISES, INC.,

                              Defendants.
------------------------------------------------------X

      Plaintiff, 144 SPRING REALTY LLC ("Plaintiff"), by its attorneys Axelrod, Fingerhut &

Dennis, as and for its Complaint respectfully alleges:

      1.     Plaintiff is a limited liability company formed and existing under the laws of the

State of New York, with a business address c/o Centaur Properties, 35 East 21st Street, New

York, NY 10010, and is the landlord of that certain lease described herein.

      2.     Defendant TRIPLE R, INC. is a corporation organized and existing under the

laws of the State of California.

      3.     Defendant ROCK & REPUBLIC ENTERPRISES, INC. is a corporation

organized and existing under the laws of the State of California.

      4.     On or about July 18, 2008, Plaintiff, as landlord, and Defendant TRIPLE R, INC.,

as tenant, entered into that certain Agreement of Lease (the "Lease"), a copy of which is attached

hereto as Exhibit A, for premises located at 144 Spring Street, New York, NY.

      5.     In order to induce Plaintiff to execute the Lease, Defendant ROCK & REPUBLIC

ENTERPRISES, INC. executed that certain Guaranty, a copy of which is attached hereto as

Exhibit B, on or about July 18, 2008.

6. The Lease, at Paragraph 38, required Defendant TRIPLE R, INC. to deposit the sum of $125,000.00 on January 31, 2009. Defendant TRIPLE R, INC. failed to make that deposit.

7. In accordance with the terms of the Lease, Plaintiff caused Defendants to be served with a Notice of Default of Lease, a copy of which is attached hereto as Exhibit C, on February 17, 2009. Defendants did not cure said default.

8. In accordance with the terms of the Lease, Plaintiff caused Defendants to be served with a Notice of Termination, a copy of which is attached hereto as Exhibit D, on March 11, 2009.

9. The Lease terminated, in accordance with Article 18 thereof and the Notice of Default and Notice of Termination, on or about March 17, 2009.

## AS AND FOR THE FIRST CAUSE OF ACTION

10. Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 9 of the Complaint as though set forth at length herein.

11. Defendant TRIPLE R, INC. breached the Lease by failing to make the deposit due on January 31, 2009, and the Lease thereafter terminated.

12. As a proximate result of the breach of the Lease by defendant TRIPLE R, INC., Plaintiff has suffered damages in an amount to be proven at trial, but which exceed the sum of $5 million.

13. Pursuant to Article 19 of the Lease, Plaintiff is entitled to recover from Defendant TRIPLE R, INC. all costs and expenses incurred in this action, including but not limited to reasonable attorneys fees and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION

14. Plaintiff repeats and reiterates each and every allegation contained in Paragraphs 1 through 13 of the Complaint as though set forth at length herein.

15. Defendant ROCK & REPUBLIC ENTERPRISES, INC. is liable under the Guaranty for all amounts due under the Lease, and for all damages resulting from Defendant TRIPLE R, INC.'s breach of the Lease.

16. As a proximate result of the breach of the Lease by Defendant TRIPLE R, INC., Plaintiff has suffered damages in an amount to be proven at trial, but which exceed the sum of $5 million, and defendant ROCK & REPUBLIC ENTERPRISES, INC. is liable in that same amount.

17. Pursuant to Paragraph 6 of the Guaranty, Plaintiff is entitled to recover from Defendant ROCK & REPUBLIC ENTERPRISES, INC. all of its costs and expenses, including, without limitation, attorneys' fees, incurred in enforcing the Guaranty.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a) On the First Cause of Action, a judgment in favor of Plaintiff in an amount to be proven at trial, but at least $5 million;

(b) On the Second Cause of Action, a judgment in favor of Plaintiff in an amount to be proven at trial, but at least $5 million.

(c) On both Causes of Action, for an award of all costs and disbursements, including attorneys' fees; and

(d) Such other and further relief as this Court deems just and proper, together with interest, costs and disbursements of this action.

Dated: New York, New York
       March 25, 2009

AXELROD, FINGERHUT & DENNIS

By:    Osman Dennis, Esq.
Attorneys for Plaintiff
260 Madison Avenue
New York, New York  10016
(212) 702-0900

EXHIBIT A



**AGREEMENT OF LEASE**

Between

**144 Spring Realty LLC**
**Landlord**

and

**Triple R, Inc.**

**Tenant**

**Premises:**

**144 Spring Street**
**New York, New York**

# TABLE OF CONTENTS

Page

ARTICLE 1         DEFINITIONS ................................................................................2

ARTICLE 2         DEMISED PREMISES, TERM, RENT, RENEWAL TERM, OUTSIDE DATE ................................................................4

ARTICLE 3         USE AND OCCUPANCY ..............................................................9

ARTICLE 4         ALTERATIONS................................................................................10

ARTICLE 5         REPAIRS - FLOOR LOAD ..........................................................15

ARTICLE 6         REQUIREMENTS OF LAW ........................................................17

ARTICLE 7         SUBORDINATION; ESTOPPELS................................................18

ARTICLE 8         RULES AND REGULATIONS ....................................................21

ARTICLE 9         PROPERTY LOSS OR DAMAGE; REIMBURSEMENT; TENANT'S INSURANCE ......................................................21

ARTICLE 10       DESTRUCTION; FIRE OR OTHER CAUSE................................25

ARTICLE 11       EMINENT DOMAIN....................................................................27

ARTICLE 12       ASSIGNMENT, MORTGAGE, ETC ............................................28

ARTICLE 13       TENANT'S SIGNS ........................................................................33

ARTICLE 14       ACCESS TO PREMISES..............................................................33

ARTICLE 15       CERTIFICATE OF OCCUPANCY ..............................................34

ARTICLE 16       CONSENTS....................................................................................34

ARTICLE 17       DEFAULT ......................................................................................35

ARTICLE 18       REMEDIES AND DAMAGES ....................................................36

ARTICLE 19       FEES AND EXPENSES ................................................................42

ARTICLE 20       NO REPRESENTATION BY LANDLORD ................................43

ARTICLE 21       END OF TERM..............................................................................43

ARTICLE 22       QUIET ENJOYMENT ..................................................................44

ARTICLE 23       FAILURE TO GIVE POSSESSION ............................................44

ARTICLE 24       NO WAIVER ..................................................................................44

ARTICLE 25       WAIVER OF TRIAL BY JURY....................................................45

ARTICLE 26       INABILITY TO PERFORM..........................................................46

ARTICLE 27       BILLS AND NOTICES................................................................46

ARTICLE 28       ADDITIONAL RENT ....................................................................47

ARTICLE 29       SERVICES ......................................................................................49

i

ARTICLE 30    VAULT SPACE ...................................................................50
ARTICLE 31    CAPTIONS..........................................................................50
ARTICLE 32    PARTIES BOUND..............................................................50
ARTICLE 33    BROKER..............................................................................51
ARTICLE 34    INDEMNITY........................................................................51
ARTICLE 35    ADJACENT EXCAVATION - SHORING ................................52
ARTICLE 36    MISCELLANEOUS.............................................................53
ARTICLE 37    HAZARDOUS SUBSTANCES .............................................54
ARTICLE 38    SECURITY...........................................................................56

A/72586982.3

**AGREEMENT OF LEASE,** made as of this 18th day of July, 2008, between 144 Spring Realty LLC, a New York limited liability company (hereinafter called "Landlord"), having an office for purposes hereof c/o Centaur Properties LLC, 35 East 21st Street, New York, New York 10010 and Triple R, Inc., a California corporation, having its principal place of business at 3523 Eastham Drive, Culver City, CA 90232, (hereinafter called "Tenant").

## WITNESETH:

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Lease, the following terms shall have the meanings indicated:

"<u>Affiliate</u>" means as to any designated Person, any other Person which controls, is controlled by or is under common control with such designated Person.

"<u>Alterations</u>" shall mean the making or performance of any alterations, installations, improvements, additions or other physical changes, including, but not limited to, the installation of an air-conditioning unit or cooling system or part thereof or other apparatus of like or other nature, in or about the Premises to the extent expressly permitted by the terms of this Lease.

"<u>Building Equipment</u>" shall mean all machinery, equipment, fixtures and systems now or hereafter attached to or used in connection with the operation or maintenance of the Premises, including, without limitation, all electrical, heating, mechanical, sanitary, sprinkler, utility, power, plumbing, cleaning, fire prevention, refrigeration, ventilating, air cooling, air conditioning and elevator equipment, and any and all renewals and replacements; Building Equipment does not include Tenant's Property or equipment/leasehold improvements installed by Tenant and property of other tenants, contractors servicing the Premises or any public utility company or governmental agency or body.

"<u>Building</u>" shall mean the building to be constructed by the Landlord.

"<u>Business Days</u>" shall mean all days except Saturdays, Sundays and the days observed by either the City, State or Federal government as legal holidays, or holidays, as defined under Landlord's contract with any union representing employees in the Premises.

"<u>Commencement Date</u>" shall mean the date Landlord delivers possession of the Premises to Tenant with "Landlord's Work" (as hereinafter defined) substantially complete.

"<u>Control</u>" (including "is controlled by" or "is under common control with") shall mean (i) the ownership, directly or indirectly, of more than fifty (50%) percent of the voting stock of a corporation, or (ii) the possession, directly or indirectly, of the power to direct or cause the direction over the management and policies of such Person.

"<u>DOB</u>" shall mean the City of New York Department of Buildings.

"Env. Reqts." shall mean Legal and Insurance Requirements that apply to the use, storage, disposal, transportation and sale of Toxins.

"Estimated Commencement Date" shall mean July 18, 2010.

"HVAC" shall mean the heat, ventilation and air conditioning systems now or hereafter servicing the Premises.

"Insurance Requirements" shall mean all requirements or recommendations of any insurance policy covering or applicable to all or any part of the Premises or the use thereof, all requirements and recommendations of the issuer of such policy and all orders, rules, regulations, and other requirements of the New York Board of Fire Underwriters or the Insurance Service Office or other body exercising the same or similar functions and having jurisdiction over any part of the Premises.

"interest" or "Interest" or "Applicable Rate" shall have the meaning described in Article 19 hereof.

"Land" shall mean the plot of land on which the Premises is located.

"Lease" shall mean this Lease, including the Exhibits and Riders, if any, attached hereto, and all replacements, renewals, modifications, substitutions, supplements and extensions thereof.

"Lease Year" shall mean a period of twelve (12) months, provided that the first Lease Year shall commence on the Commencement Date and shall end (i) if the Rent Commencement Date is the first day of a month, on the day immediately prior to the first anniversary of the Rent Commencement Date, or (ii) if the Rent Commencement Date is not the first day of a month, on the last day of the month in which the first anniversary of the Rent Commencement Date occurs. Each Lease Year after the first Lease Year shall commence immediately subsequent to the prior Lease Year. The Lease Year commencing on the Commencement Date is referred to as the first Lease Year and each subsequent Lease Year shall be numbered consecutively and referred to accordingly.

"Legal Requirements" shall mean laws, statutes and ordinances (including, without limitation, building codes and zoning regulations and ordinances) and the orders, rules, regulations, directives and requirements of all federal, state, county, city and borough departments, bureaus, boards, agencies, offices, commissions and other subdivisions thereof, including, without limitation, business improvement district rules, regulations and requirements or rules, regulations and requirements of the other governmental, public or quasi-public authority, having jurisdiction over the Real Property and the terms, provisions and conditions of any permits or licenses issued in connection with the operation of Tenant's business, whether now or hereafter in force, which may be applicable to the Land and/or the Premises or any part thereof or the sidewalks, curbs or areas adjacent thereto, including, without limitation, laws relating to asbestos or asbestos containing materials and handicapped access.

"Minimum Rent" shall have the meaning described in Article 2B hereof.

"Person" shall mean any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, any incorporated association, business trust, tenancy in common or other entity, or any governmental authority.

"Premises" shall have the meaning set forth in Article 2, except that nothing contained therein or in this Rider shall be construed as a letting by Landlord to Tenant of the land below the sub-base of the cellar, if any, or air rights above the Premises.

"Real Property" shall mean the Land and building.

"Re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meaning.

"Repair Costs" shall mean the total costs and expenses of a repair (including, without limitation, all fees or other charges to architects or other professionals and all permits fees and taxes).

"Sublease" or "sublease" shall mean each sublease or subletting of the Premises, in whole or in part, including without limitation, each modification or extension of any sublease of all or part of the Premises.

"Tenant's Plans" shall mean drawings, plans and specifications for Alterations, prepared by or on behalf of Tenant.

"Tenant's Property" shall mean any and all trade fixtures and any and all movable or removable equipment and personalty purchased by, belonging to or leased from third parties by Tenant and installed within the Premises, excluding fixtures and non-movable equipment.

"Toxins" shall mean all hazardous or toxic substances or waste or other materials (including, without limitation, asbestos, lead paint and urea formaldehyde) regulated by environmental, health or safety laws or regulations.

"Unavoidable Delay" shall have the meaning described in Article 26, provided the inability to obtain financing or obtain funds or make any payments hereunder shall not be deemed an Unavoidable Delay.

## ARTICLE 2
## DEMISED PREMISES, TERM, RENT, RENEWAL TERM, OUTSIDE DATE

A.    (i)    Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, (hereinafter collectively referred to as the "Premises"), the building to be constructed by Landlord, consisting of the lower level, ground floor, second, third, fourth and fifth floors, at 144 Spring Street, New York, New York (the "Building"). The term of this Lease (hereinafter referred to as the "Initial Term" or "Term") shall commence on the Commencement Date and shall end on the last day of the fifteenth (15th) Lease Year (the "Expiration Date"), both dates inclusive, unless the Term shall sooner end pursuant to any of the terms, covenants or conditions of this Lease or pursuant to law.

(i)     Landlord hereby agrees to deliver possession of the Premises on the Commencement Date with "Landlord's Work" (as hereinafter defined) substantially complete. The acceptance by Tenant of the Premises shall constitute an acknowledgement by Tenant that the Premises were in the condition required by the terms of this Lease.

B.     Tenant shall pay the minimum and additional rent (hereinafter collectively called "Rent") reserved under this Lease, for the Term, which shall be and consist of:

(i)     annual minimum rent ("Minimum Rent") commencing on the Rent Commencement Date, as hereinafter defined, as follows:

| Months | Annual Minimum Rent | Monthly Minimum Rent |
|---|---|---|
| 7-18 | $    1,200,000 | $    100,000.00 |
| 19-30 | 1,236,000 | 103,000.00 |
| 31-42 | 1,273,080 | 106,090.00 |
| 43-54 | 1,311,272 | 109,272.67 |
| 55-66 | 1,350,611 | 112,550.92 |
| 67-78 | 1,391,129 | 115,927.42 |
| 79-90 | 1,432,863 | 119,405.25 |
| 91-102 | 1,475,849 | 122,987.43 |
| 103-114 | 1,520,124 | 126,677.00 |
| 115-126 | 1,565,728 | 130,477.33 |
| 127-138 | 1,612,700 | 134,391.17 |
| 139-150 | 1,661,080 | 138,423.33 |
| 151-162 | 1,710,913 | 142,576.08 |
| 163-174 | 1,762,240 | 146,853.33 |
| 175-186 | 1,815,108 | 151,259.00 |

(ii)     in the event that the Rent Commencement Date is other than the first day of a calendar month, then, for purposes of the foregoing, month 7 shall be deemed to be the first full calendar month following the Rent Commencement Date, and Tenant shall pay, in addition to the Minimum Rent identified above, Minimum Rent for the period of time from the Rent Commencement Date to the last day of the month in which the Rent Commencement Date occurs, prorated in accordance with Article 2D, below.

(iii)     all other sums and charges required to be paid by Tenant under the terms and conditions of this Lease which shall be deemed to be and are sometimes referred to hereafter as additional rent ("Additional Rent").

C.     (i)     Tenant shall have the option of extending the Lease Term for one additional term ("Renewal Term") of five (5) years, on the same terms and conditions as provided herein except for Minimum Rent which shall be at the rates set forth in this Article 2C.

Notice of the exercise of such option shall be delivered by Tenant to Landlord, in writing, no later than the twelfth (12th) month prior to the Expiration Date of the Initial Lease Term ("Extension Notice"). Time shall be of the essence as to the aforesaid for giving the Extension

4

Notice. Tenant's right to extend the Lease Term pursuant to this Article 2C shall be conditioned upon there being no default by Tenant which remains uncured after applicable notice and cure periods in the observance or performance of any of the material or financial terms, covenants and conditions of this Lease either at the time of the exercise of the option or on the expiration of the Initial Lease Term. It is expressly agreed and understood that in the event that Tenant exercises its option hereunder, Tenant shall pay to Landlord, in addition to the Minimum Rent stated herein, the Taxes pursuant to Article 28 hereof.

(ii) (a) If Tenant has elected to renew the Term of this Lease, as provided in subparagraph (i) above for the Renewal Term, then at least 4 months prior to the commencement of the Renewal Term, Landlord shall give to Tenant a notice ("Landlord's Notice") setting forth Landlord's statement of the fair market rental value for the Premises during the Renewal Term, 95% of which shall be conclusive and binding as the basis for determining the annual Minimum Rent to be paid during the Renewal Term unless (a) within 15 days after the giving of the Landlord's Notice, Tenant shall notify Landlord that Tenant disputes Landlord's statement of the fair market rental value, specifying Tenant's statement ("Tenant's Statement") of the fair market rental value for the Premises during the Renewal Term and (b) if such dispute shall not be resolved by the commencement of the Renewal Term, Landlord and Tenant shall within twenty (20) days after the commencement of the Renewal Term, submit the dispute to arbitration pursuant to the provisions of subparagraph (iv) below. In the event such dispute is submitted to arbitration, the arbitrators shall determine the annual fair market rental value for the Premises during the Renewal Term in accordance with the instructions set forth in subparagraph (iv), and a sum equal to 95% of said amount, subject to the provisions of this Lease, shall be the annual Minimum Rent payable by Tenant during the Renewal Term; provided, however, that in no event shall the annual Minimum Rent payable by Tenant during each year of the Renewal Term be less than $1,869,561 per annum ("Initial Term Escalated Rent").

(b) If upon the commencement of the Renewal Term the annual Minimum Rent to be paid during the Renewal Term shall not have been determined (by arbitration or by agreement of Landlord and Tenant), Tenant, effective as of the commencement of the Renewal Term, shall pay on account of annual Minimum Rent, 95% of the sum set forth in Landlord's statement as to the fair market value, subject to adjustment upon determination of such annual Minimum Rent. Under such circumstances, upon the determination of the annual Minimum Rent for the Renewal Term, Tenant shall pay to Landlord within thirty (30) days after demand, any underpayment of annual Minimum Rent by Tenant since the beginning of the Renewal Term and, in the event of any overpayment of such annual Minimum Rent by Tenant since the beginning of the Renewal Term, Landlord shall credit the amount of such overpayment against the payments of annual Minimum Rent next coming due hereunder until such time as the overpayment has been fully credited to Tenant.

(c) Nothing in this Article 2C shall affect Tenant's obligations to pay Additional Rent under this Lease. During each Renewal Term, Tenant shall pay (a) Additional Rent in accordance with the provisions of Article 28, without change in any other provision of Article 28, and (b) all other Additional Rent payable under this Lease in accordance with the terms hereof, all of which shall be taken into account in determining fair market rental value for the Premises for the Renewal Term.

(iii)     In the event that, pursuant to the provisions of subparagraph (ii), the determination of the annual Minimum Rent to be paid during the Renewal Term is submitted to arbitration, then within twenty (20) days after submission, Landlord and Tenant shall each appoint a person as arbitrator on its behalf and shall notify the other party of such appointment. The arbitrators thus appointed shall appoint a third person who shall be impartial to act as an arbitrator hereunder, and such three arbitrators shall as promptly as possible determine the annual fair market rental value for the Premises during the Renewal Term in accordance with the provisions of subparagraph (iv); provided, however, that if the two arbitrators appointed by the parties shall be unable to agree within ten (10) days after the appointment of the second arbitrator, they shall give written notice to the parties of such failure to agree, and the parties shall attempt to agree on the appointment of an impartial third arbitrator. If the parties fail to agree upon the selection of such impartial third arbitrator within ten (10) days after the arbitrators appointed by the parties have given notice as aforesaid, then within fifteen (15) days thereafter, either of the parties upon notice to the other party may request such appointment by the American Arbitration Association (or any organization successor thereto), or in its absence, refusal, failure or inability to act, may apply for a court appointment of such third arbitrator.

(iv)     The arbitration shall be conducted, to the extent consistent with this Lease, in accordance with the then prevailing rules of the American Arbitration Association (or any organization successor thereto) and the arbitrators shall be bound by the instructions set forth in this subparagraph (iv). The first and second arbitrators appointed pursuant to subparagraph (iii) shall submit their respective determinations in writing to the third arbitrator within twenty (20) days after the appointment of the third arbitrator and such third arbitrator shall, within ten (10) days after submission of the first and second arbitrator's respective determinations, determine the annual fair market rental value (taking into account all relevant factors, including, without limitation, those set forth in this Article 2C(iv)). The decision by the third impartial arbitrator shall be in writing and shall be conclusive and binding on both Landlord and Tenant. In rendering such decision and award, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Lease. Judgment may be had on the decision and award of the arbitrator(s) so rendered in any court of competent jurisdiction. The arbitrators shall make their respective determinations based on the following, and the arbitrators shall be so instructed:

(a)     The annual fair market rental value for the Premises during the relevant Renewal Term shall be 95% of the then annual fair market rental value of the Premises, (i) without any reduction to reflect that Tenant saves moving expenses by exercising the renewal option, (ii) without any reduction to reflect any discount for the length of the Renewal Term for comparable space in comparable buildings in Soho, (iii) taking into consideration any increases or possible increases in rental during the Renewal Term then being included in leases for space in such comparable buildings based on changes in price indices, including the Consumer Price Index, cost of living or other similar increases, or periodic rental adjustments, (iv) taking into account that the Premises is leased in its then "as is" condition, (v) assuming that the Premises are leased vacant and unencumbered by this Lease, (vi) shall not be reduced to reflect the economic effect of savings which will inure to Landlord by reason of the renewal of this Lease in contrast to new and original tenancies such as savings in brokerage commissions, (vii) taking into account the size and condition of the Premises and the condition of the Building, and (viii) taking into account all other relevant factors as may be material and relevant to a proper determination of the annual fair market rental value for the Premises during the Renewal Term.

A/72586982.3

(b)     The Additional Rent payable by Tenant under this Lease shall continue to be payable during the Renewal Term without any change in any provisions of Article 8 or any other provisions of this Lease relating to Additional Rent.

(c)     Such other factors not inconsistent with the foregoing as may be material and relevant to a proper determination of the annual fair value for the Premises during the Renewal Term.

(v)     The annual Minimum Rent determined by such arbitration shall increase periodically, as determined by the arbitrators, taking into consideration increases in rental then being included in leases for retail space in comparable buildings in the vicinity of the Premises, but in no event less than 3% per annum.

(vi)     Each party shall pay the fees and expenses of the one of the two original arbitrators selected by such party. The fees and expenses of the third arbitrator and all other expenses of the arbitration (other than the fees and disbursements of attorneys or witnesses for each party) shall be borne by the parties equally.

(vii)     Each arbitrator appointed pursuant to this Article 2C shall have at least 10 years experience in the City of New York as a licensed retail appraiser or retail real estate broker in the City of New York.

(viii)     Upon determination of the annual Minimum Rent for the Renewal Term (by agreement of Landlord and Tenant or by arbitration), Landlord and Tenant, upon the demand of either of them, shall enter into a supplementary agreement to set forth the annual Minimum Rent for such Renewal Term; provided, however, that failure to execute such supplementary agreement shall not affect the determination of the annual Minimum Rent for the Renewal Term pursuant to the foregoing provisions of this Article 2C.

(ix)     The provisions of this Article 2C, (iii), (iv), (v), (vi), (vii) and (viii) shall be inapplicable and have no force or effect in the event that Landlord notifies Tenant in Landlord's Notice that the annual Minimum Rent for the Renewal Term shall be the Initial Term Escalated Rent.

(x)     Except as provided in Article 2C hereof, Tenant's occupancy of the Premises during the Renewal Term shall be on the same terms and conditions as were in effect immediately prior to the expiration of the Initial Term of this Lease, except that Tenant shall have no further right to renew or extend the Term of this Lease.

D.     The Minimum Rent shall be payable by Tenant to Landlord in lawful money of the United States, in advance, on the first day of each and every month during the term hereof at the office of Landlord set forth in this Lease or such other place as Landlord may designate, in writing, without previous demand or any setoff, offset, abatement or deduction whatsoever except as otherwise provided in this Lease, and except that if the Rent Commencement Date shall be other than the first day of a month, Minimum Rent for such month shall be prorated on a per diem basis based on the actual number of days in such month.

E.     The "Rent Commencement Date" shall mean the date occurring 180 days after the Commencement Date. After the determination of the Commencement Date, each party shall, upon the request of the other, execute, acknowledge and deliver to the other an instrument in form and substance satisfactory to Landlord and Tenant, setting forth the Commencement Date, the Rent Commencement Date and the Expiration Date, respectively, but the failure of Landlord and Tenant to execute such instrument shall not affect the Commencement Date, Rent Commencement Date or Expiration Date as determined by Landlord.

F.     If any payment of Rent shall be more than ten (10) days late, in addition to all of Landlord's other rights and remedies, Tenant shall pay to Landlord, concurrently with such late payment of Rent, a late charge of four cents ($.04) for each dollar ($1.00) that is more than ten (10) days late, to help defray Landlord's administrative expenses in processing such late payment.

### ARTICLE 3
### USE AND OCCUPANCY

A.     Tenant shall use (the "Permitted Use") the Premises as a retail store for the following purposes: the sale at retail of apparel, footwear and fashion accessories and incidentally thereto, office and showrooms above the second floor, and the Premises shall not be used for any other purpose without the prior written consent of Landlord, which consent shall not be unreasonably withheld; *provided, however,* in no event shall Tenant use the Premises for the Prohibited Uses described in Exhibit B annexed hereto. Tenant shall use, occupy, operate and maintain the Premises throughout the Term, in a reputable manner which shall not detract from the character, appearance or dignity of the Premises.

B.     The statement as to the nature of the business to be conducted by Tenant in the Premises or use and occupancy permitted therein shall not constitute a representation or guaranty by Landlord that such business may be conducted in the Premises or is lawful or permissible under any certificate(s) of occupancy issued for the Premises or is otherwise permitted by law or regulations. Notwithstanding the foregoing, Landlord shall be responsible for obtaining a temporary certificate of occupancy or similar governmental approval (to the extent obtainable without Tenant completing "Tenant's Work" (as hereinafter defined)) required in order to enable Tenant to pull its building permits and perform Tenant's Work.

C.     Tenant shall in all events comply with all Legal Requirements governing the disposal of wastes and waste products of Tenant at the Premises, including, without limitation, so-called environmental laws, rules and regulations.

D.     Tenant covenants and agrees, as its expense, to complete "Tenant's Work" (as hereinafter defined) and to open for business (fully fixtured) in the Premises within fifteen (15) months after the Commencement Date, subject to Unavoidable Delay.

E.     Tenant shall not (i) conduct or permit any fire, auction, going-out-of-business or bankruptcy sale in the Premises, or (ii) distribute or permit to be distributed handbills or other matter to customers outside the Premises.

F.      (i)      Tenant shall (1) engage, at its expense, a rubbish removal contractor of Tenant's selection, for the removal of all rubbish, debris and waste from Tenant's operation; (2) place such refuse outside for collection (in areas designated by Landlord in accordance with Landlord's rules and regulations) and (3) cause all waste to be placed in securely sealed plastic bags or similar containers.

(ii)      Tenant shall not use or permit to be used the sidewalks or other space outside the Premises for any display, sale or similar undertaking or storage unless the same is permitted by applicable Legal Requirements. In addition, Tenant shall not use or permit to be used any loudspeaker, phonograph or other sound system or advertising device which may be heard outside the Premises.

(iii)      No video games, pinball machines or other amusement devices or coin operated gaming devices shall be installed in or used at the Premises, but nothing contained herein shall prohibit the sale of any of the foregoing items from the Premises for use solely by employees, containing food, beverages or snacks.

(iv)      A default under this subparagraph F shall be a material default of Tenant under this Lease.

G.      Tenant acknowledges and understands that the value of the Premises and the reputation of the Landlord will be seriously injured if the Premises are used for any obscene or pornographic use or as any sort of commercial sex establishment. Accordingly, Tenant shall not permit or conduct any use of the Premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor."

H.      Tenant acknowledges that Landlord's damages resulting from any breach of the provisions of this Article 3 are difficult, if not impossible, to ascertain and concedes that, among other remedies for such breach permitted by law or the provisions of this Lease, Landlord shall be entitled to enjoin Tenant from any violation of said provisions.

## ARTICLE 4
## ALTERATIONS

A.      Prior to the delivery of possession of the Premises as Tenant, Landlord shall construct the Building and perform the work ("Landlord's Work") described in Exhibit A annexed hereto.

B.      Tenant shall not make or perform, or permit the making or performance of, any Alterations (as distinguished from Tenant's Work) in or about the Premises without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Tenant may, without Landlord's prior consent, make interior non-structural Alterations which do not adversely affect the Premises' electrical, plumbing or HVAC Systems and other utility lines and services to the Premises. Tenant acknowledges that no Alterations may be made to the exterior of the Premises.

C.      Tenant, at Tenant's sole cost and expense, shall perform Alterations as shall be necessary or desirable to open the Premises, and shall initially fixture, the Premises, as a Rock &

Republic retail store and to initially fully equip and complete the Premises for the operation of Tenant's store in accordance with the provisions of Article 3 hereof ("Tenant's Work"). Tenant agrees to promptly make application for all necessary permits for Tenant's Work to prepare the Premises for Tenant's occupancy.

D.     As a material inducement for Landlord to enter into this Lease, Tenant hereby agrees, promptly following the Commencement Date, to commence and diligently prosecute to completion, Tenant's Work. Before commencement of Tenant's Work, Tenant shall submit to Landlord, for its approval, within thirty (30) days after delivery to Tenant of Landlord's plans for the Premises, two (2) sets of complete working plans, drawings and specifications (collectively, "Tenant's Plans"), including, but not limited to, all mechanical, electrical, air conditioning and other utility systems and facilities for Tenant's Work, prepared by an architect or engineer licensed as such in the State of New York ("Tenant's Architect"). Promptly after Landlord's receipt of Tenant's Plans, and the delivery to Landlord of all additional information reasonably requested by Landlord, Landlord shall review or cause the same to be reviewed and shall thereupon return to Tenant one (1) set of Tenant's Plans with Landlord's approval or disapproval noted thereon, and if same shall be disapproved in any respect Landlord shall state the specific reasons for such disapproval. Following the approval of Tenant's Plans, as aforesaid, the same shall be final and shall not be changed by Tenant without the prior approval of Landlord which shall be given or withheld in accordance with this Lease. Tenant shall employ only licensed persons and firms (where required by law). In any event, all contractors or materialmen Tenant proposes to employ shall be reputable, fully licensed and shall maintain the insurance described in Section 9D(ii), (iii) and (v) hereof which shall comply with the provisions of Section 9F hereof. Tenant shall advise Landlord of the name of such contractor at least ten (10) days prior to the commencement of any work in the Premises.

E.     Landlord intends to use Rizzo Group, Metropolis Group, Inc., Melrose Consultants, Inc., or Outsource Consultants, Inc. as the Building Department filing consultants (commonly know as an "expeditor") to file all Landlord's applications with the New York City Department of Buildings and other governmental agencies having jurisdiction over Landlord's Work. Tenant agrees to use such of the foregoing consultants, as Owner may use, as Tenant's Building Department filing Consultants ("expeditor") to file all of Tenant's Alterations, provided such expeditor's fees are competitive.

F.     (i)     Promptly following Landlord's approval of Tenant's Plans, Tenant shall, as a condition to the construction of Tenant's Work, secure or cause to be secured, at Tenant's sole cost and expense, all necessary approvals of Tenant's Plans from all government authorities having jurisdiction thereover and shall also secure or cause to be secured all permits and licenses necessary to perform Tenant's Work and shall furnish Landlord with copies of Tenant's Plans as approved by such governmental authorities and copies of such permits and licenses; provided, however, that simultaneous with Tenant or any contractor of Tenant filing any applications with any governmental authorities for such approval or for any permits or licenses required to perform Tenant's Work, Tenant shall submit copies of such applications to Landlord. Landlord shall reasonably cooperate with Tenant by executing any New York City Department of Buildings applications in connection with Alterations approved by Landlord as provided herein.

10
A/72586982.3

(ii)     If the estimated cost of any Alteration shall be in excess of Five Hundred Thousand and 00/100 ($500,000.00) DOLLARS, Tenant, before commencement of work, at Tenant's sole cost and expense, shall, for the purpose of guaranteeing or securing the completion thereof and payment therefore within a reasonable time, free and clear of all liens, encumbrances, chattel mortgages, and conditional bills of sale, other title retention or security agreement or other charges, and substantially in accordance with the plans and specifications therefore, furnish to Landlord either (i) a surety company completion and payment bond, in form and amount and issued by a surety company reasonably acceptable to Landlord, or, (ii) a letter of credit in an amount and issued by a United States commercial bank reasonably acceptable to Landlord, which letter of credit shall be in a form reasonably acceptable to Landlord.

G.     (i)     All Tenant's Property installed by Tenant at its own cost and expense prior to and during the Term shall remain the property of Tenant and upon the Expiration Date or earlier termination of the Term or any renewal thereof, shall be removed from the Premises by Tenant and Tenant shall return the Premises to Landlord, "broom clean", and Tenant shall repair any damage to the Premises or caused by such removal of Tenant's Property.

(ii)     All Tenant's Work and Alterations in and to the Premises which may be made by Tenant at its own cost and expense, or by Landlord on Tenant's behalf, shall remain the property of Tenant during the Term and upon the Expiration Date or earlier termination of the Term, shall become the property of Landlord and shall remain upon and be surrendered with the Premises, unless Landlord, by notice to Tenant given at the time Landlord approves Tenant's Plans, notifies Tenant that such of Tenant's Alterations (except those which this Lease expressly provides Tenant shall not be required to restore or remove), as Landlord may direct, shall be removed by Tenant at the expiration or earlier termination of the Term, in which event the same shall be removed from the Premises by Tenant prior to the Expiration Date or within thirty (30) days after the earlier termination of the Term and Tenant shall repair and restore, in a good and workmanlike manner to the condition existing prior to the performance of such work (reasonable wear and tear excepted), any damage to the Premises caused by such removal, unless Landlord, by notice to Tenant at least one hundred eighty (180) days prior to the Expiration Date or within ten (10) days after the earlier termination of the Term, elects not to have Tenant remove such of the foregoing in Landlord's sole discretion. Notwithstanding anything herein to the contrary, Landlord will not require removal of any Alterations (including Tenant's Work) other than Specialty Alterations that do not become Qualified Alterations (as both of those terms are defined below) in accordance with subparagraph (iii) below.

(iii)     On or prior to the Expiration Date, Tenant, at Tenant's expense, shall remove Tenant's Property from the Premises, and Tenant shall repair and restore in a good and workerlike manner to good condition any damage to the Premises or the Building caused by such removal. Landlord, upon notice to Tenant given at least thirty (30) days prior to the Expiration Date, may require Tenant to remove any "Specialty Alterations" (hereinafter defined) from the Premises, and to repair and restore in a good and workerlike manner to good condition any damage to the Premises or the Building caused by such removal; provided, however, that Landlord shall not have the right to require Tenant to remove any Qualified Alterations (as hereinafter defined). Prior to Tenant's performance of a Specialty Alteration, Tenant shall have the right to request (simultaneously with Tenant's submission to Landlord of Tenant's Plans for such Specialty Alteration) that Landlord designates that Tenant shall not be required to remove

11

(or pay the cost to remove) such Specialty Alteration upon the expiration or earlier termination of the Term. Landlord shall have the right to approve or deny any such request in Landlord's sole discretion. If Tenant makes any such request, and Landlord fails to respond to Tenant's aforesaid request on or prior to the fifteenth (15th) Business Day after the date that Tenant gives such request to Landlord, then Tenant shall provide a second written notice to Landlord specifying Landlord's failure to respond to the initial notice. If Landlord either approves such request or fails to respond to such second notice on or prior to the fifteenth (15th) Business Day after the date Tenant gives such second request, then Landlord shall not have the right to require Tenant to remove (or pay the cost to remove) such Specialty Alteration upon the expiration or earlier termination of the Term (any such Specialty Alteration which Tenant shall not be required to remove (or to pay the cost of removal) as aforesaid being referred to herein as a "Qualified Alteration"). As used herein, the term "Specialty Alteration" shall mean any Alteration to the extent involving (i) the installation, perforation or removal of a floor slab, (ii) the movement or material reinforcement of a structural component of the Building, or (iii) the installation of material plumbing connections.

    (iv) Any Tenant's Property or Alterations required to be removed by Tenant, as aforesaid, not removed by Tenant at or prior to the Expiration Date or earlier termination of the Term, as provided in this Paragraph F, shall be deemed abandoned and either (1) may be retained by Landlord as its property, or (2) may be disposed of by Landlord, without accountability to Tenant, in such manner as Landlord may see fit. Whether Landlord retains such abandoned property as its property, or disposes of it as aforesaid, and all costs of removal and repair to the Premises incurred by Landlord in connection with said abandoned Tenant's Property shall be paid by Tenant to Landlord, together with Interest thereon, on demand, which payment obligation shall survive the Expiration Date or earlier termination of the Term.

    H. Prior to making any Alterations requiring Landlord's consent, as provided herein, or any filing with the DOB or other governmental agency having jurisdiction, Tenant shall (1) submit to Landlord detailed plans and specifications (including, without limitation, drawings for layout, architectural, mechanical, structural, interior design, fixturing and finishing work) for each proposed Alteration prepared by Tenant's Architect, and shall not commence any such Alteration without first obtaining Landlord's approval of such plans and specifications, and (2) at Tenant's expense, engage an architect, engineer, contractor or consultant (hereinafter "Professionals") to obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies. Prior to performing Tenant's Work, and prior to making any Alterations, Tenant shall, at Tenant's expense, carry the insurance described in Section 9D(ii), (iii) and (v) hereof, which builder's risk and commercial general liability insurance policies shall be in such form, for such periods and in such amounts as Landlord may reasonably require, naming Landlord, its agents, any lessee under a "Superior Lease" (as hereinafter defined) and any holder of a "Mortgage" (as hereinafter defined) as additional insureds. Within 180 days after the completion of Tenant's Work and within 180 days after completion of any Alteration, Tenant, at Tenant's expense, shall deliver to Landlord letters of completion, relating to such work from all governmental agencies having jurisdiction (including, without limitation, the DOB) and all other required approvals from all governmental agencies having jurisdiction over Tenant's Work or such Alterations.

I.     Tenant's Work and any Alterations requiring Landlord's consent shall be made and performed in accordance with the approved plans and specifications (and Tenant shall not make any amendments or additions thereto without the prior consent of Landlord, which shall be granted or withheld in accordance with the terms of this Lease). All materials to be incorporated in the Premises as a result of Alterations shall be new and of first quality. No such fixtures, equipment or articles which are attached to the Premises, shall be subject to any liens, encumbrances, chattel mortgages or security interests (as such terms are defined in the Uniform Commercial Code as in effect in New York on the date hereof) or any other title retention or security agreement.

J.     Tenant shall not, at any time prior to or during the Term, directly or indirectly employ, or permit the employment of, any contractor, mechanic or laborer or permit any materials in the Premises, whether in connection with any Alteration or otherwise, if in Landlord's opinion such employment or such materials would interfere, cause any conflict, or create any difficulty, strike or jurisdictional dispute with other contractors, mechanics, or laborers engaged in the construction, maintenance or operation of the Building by Landlord, Tenant or others, or would in any way disturb the construction, maintenance, cleaning, repair or management of the Building. In the event of any such interference or conflict, Tenant, upon demand of Landlord, shall cause all contractors, mechanics or laborers causing such interference, conflict, difficulty, strike or jurisdictional dispute to leave the Building immediately.

K.     The granting by Landlord or Landlord's Professionals of its approval to any plans and specifications submitted to it under this Lease and of any alterations shall be in no manner constitute or be deemed to constitute a judgment or acknowledgment by Landlord or Landlord's Professionals as to their legality or compliance with governmental, quasi-governmental or other requirements. Tenant shall reimburse Landlord for its reasonable out-of-pocket costs for review of Tenant's Plans in connection with any proposed Alterations, other than Tenant's Work.

L.     Tenant hereby indemnifies, defends and saves harmless Landlord against liability for any and all mechanic's and other liens filed in connection with any Alteration or repairs undertaken by or on behalf of Tenant hereunder, including, without limitation, the liens of any conditional sales of, or chattel mortgages, title retention agreements, security agreements or financing statements, upon any materials, fixtures, furniture or equipment installed in and constituting a part of the Premises. Any mechanic's or other lien filed against the Premises, or the Real Property, for work claimed to have been performed, or materials claimed to have been furnished to, Tenant shall be discharged by Tenant within thirty (30) days after notice to Tenant of the filing of any such lien. If Tenant shall fail to cause any such lien to be discharged within the period aforesaid, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge same either by paying the amount claimed to be due or by deposit or bonding proceedings, and in any such event Landlord shall be entitled, if it elects, to compel the prosecution of an action for the foreclosure of such lien and to pay the amount of the judgment in favor of the lienor, with interest, costs and allowances. Any amount so paid by Landlord, and all reasonable third party costs and expenses incurred by Landlord in connection therewith (including without limitation, counsel fees and disbursements), together with interest thereon at the Applicable Rate, shall constitute, and shall be collectible by Landlord as, Additional Rent, in accordance with the provisions of Article 19 hereof.

M. IF THE PREMISES, OR ANY PART THEREOF, IS OR IS PART OF AN IMPROVEMENT OR PROPERTY THAT IS A LANDMARK, INTERIOR LANDMARK OR IS LOCATED ON A LANDMARK SITE OR WITHIN AN HISTORIC DISTRICT (AS SUCH TERMS ARE USED IN CHAPTER 3 OF TITLE 25 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK, AND HEREINAFTER REFERRED TO AS THE "LANDMARKS LAW"), THEN, THE FOLLOWING SHALL APPLY: IN ACCORDANCE WITH SECTIONS 25-305, 25-306, 25-309 OR 25-310 OF THE LANDMARKS LAW AND THE BLUES SET FORTH IN TITLE 63 OF THE RULES OF THE CITY OF NEW YORK, ANY DEMOLITION, CONSTRUCTION RECONSTRUCTION, ALTERATION OR MINOR WORK AS DESCRIBED IN SUCH SECTIONS AND SUCH RULES MAY NOT BE COMMENCED WITHIN OR AT THE PREMISES WITHOUT THE PRIOR WRITTEN APPROVAL OF THE LANDMARKS PRESEVATION COMMISSION. TENANT IS NOTIFIED THAT SUCH DEMOLITION, CONSTRUCTION, RECONSTRUCTION, ALTERNATIONS OR MINOR WORK INCLUDES, BUT IS NOT LIMITED TO, [A] WORK TO THE EXTERIOR OF THE PREMISES INVOLVING WINDOWS, SIGNS, AWNINGS, FLAGPOLES, BANNERS AND STOREFRONT ALTERATIONS AND [B] INTERIOR WORK TO THE PREMISES THAT [I] REQUIRES A PERMIT FROM THE DEPARTMENT OF BUILDINGS OR [II] CHANGES, DESTROYS OR AFFECTS AN INTERIOR ARCHITECTURAL FEATURE OF AN INTERIOR LANDMARK OR AN EXTERIOR ARCHITECTURAL FEATURE OF AN IMPROVEMENT THAT IS LANDMARK OR LOCATED ON A LANDMARK SITE OR IN A HISTORIC DISTRICT.

## ARTICLE 5
## REPAIRS - FLOOR LOAD

A. Tenant shall, at Tenant's sole cost and expense, throughout the Term, take good care of the Premises, the fixtures and appurtenances therein (including, without limitation, the "sprinkler-system" and any of its appliances, Alterations, equipment and any Personal Property installed by Tenant in accordance with the provisions of Section 29C hereof), the store front and entrance doors thereto and the sidewalks adjacent to the Premises, and, at Tenant's sole cost and expense, clean the sidewalks and curbs adjacent to the Premises, and remove all ice, snow and standing water therefrom, and make all repairs, whether structural or non-structural, foreseen or unforeseen, ordinary or extra-ordinary, to the Premises (including, without limitation, the slab, load bearing walls, columns, supports, and the exterior and interior of all windows, plate glass, showcases, doors, door frames and bucks) as and when needed to preserve the same in good working order and first class condition. Notwithstanding the foregoing, Tenant shall not be obligated to make repairs required as a result of defective construction of the Building, which repair shall be made by Landlord at Landlord's expense, provided Landlord is notified of such condition within one year of the Commencement Date. From and after the expiration of the tenth Lease Year, to the extent any of such repairs are capitalized on Tenant's federal income tax returns, Tenant shall advise Landlord and, at Landlord's option, Landlord shall make such repairs ("Capital Repairs"). Landlord and Tenant shall allocate the cost of any of such Capital Repairs, based upon the useful life of such Capital Repairs and Tenant shall be responsible for a fraction of the cost of such repairs, the numerator of which is the number of months then remaining in the terms of the Lease, including any unexercised renewal options, and the denominator of which is the useful life of such Capital Repairs, expressed in months. Landlord

14

shall be responsible for the balance of such Capital Repairs. Pursuant to the foregoing, if Tenant elects to make such Capital Repairs, Landlord shall reimburse Tenant for Landlord's share of such Capital Repairs within thirty (30) days after demand and presentation of evidence of the cost of such Capital Repairs. If Landlord performs such Capital Repairs, Tenant shall reimburse Landlord for Tenant's share of such Capital Repairs, as additional rent, within thirty (30) after demand and presentation of evidence of the cost of such Capital Repairs. If Landlord fails to reimburse Tenant for Landlord's share of the cost of such Capital Repairs, interest on the unpaid amount due Tenant shall accrue thereon at the Applicable Rate and Tenant shall be entitled to its reasonable attorneys' fees in collecting said amount. If Tenant fails to reimburse Landlord for Tenant's share of the cost of such Capital Repairs, interest on the unpaid amount due Landlord shall accrue thereon at the Applicable Rate and Landlord shall be entitled to its reasonable attorneys' fees in collecting said amount.

B.     All the aforesaid repairs shall be of quality or class substantially equal to the original work or construction and shall be made in accordance with the provisions of Article 3 hereof. If Tenant fails after twenty (20) days' notice to proceed with due diligence to make repairs required to be made by Tenant, the same may be made by Landlord, at the expense of Tenant, and the expenses thereof incurred by Landlord, with interest at the Applicable Rate, shall be collectible by Landlord as Additional Rent, within ten (10) days after demand.

C.     Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which such floor was designed to carry and which is allowed by law. There shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance, interruption of, or injury to business arising from Landlord, Tenant or others making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Premises, or in or to fixtures, appurtenances, or equipment thereof.

D.     The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other substances shall be deposited therein.

E.     Tenant acknowledges that Landlord may install scaffolding or a sidewalk bridge adjacent to the Premises, if necessary, in Landlord's reasonable judgment, in connection with work Landlord may be performing to the Building or portions thereof. Such scaffolding or bridge shall be promptly removed upon completion of such work and such work is performed, subject to Unavoidable Delays, with due diligence and completed as soon as is commercially reasonable as possible. Landlord agrees that such scaffolding shall be "double height" and not block any entrance to the Premises. In addition, Tenant, at Landlord's reasonable cost and expense, shall be permitted to install its signs, no larger than the signs being blocked, on the scaffolding in front of the Premises. Tenant agrees that the installation of such sidewalk bridge or scaffolding shall not subject Landlord to any liability to Tenant or give Tenant any right of offset, reduction or claim against Landlord.

F.     Tenant shall not clean nor require, permit, suffer or allow any window in the Premises to be cleaned, from the outside in violation of Section 202 of the Labor Law, or any

other applicable law, or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction.

## ARTICLE 6
## REQUIREMENTS OF LAW

A.    Tenant at its sole cost and expense shall comply with all Legal and Insurance Requirements in respect of the Premises or the use and occupation thereof, abate any nuisance in, on or about the Premises, comply with any order or duty on Landlord or Tenant, and discharge any violations of any Legal or Insurance Requirements. Tenant shall pay all the costs, expenses, fines, penalties and damages imposed on Landlord or any Superior Lessor by reason of or arising out of Tenant's failure to fully and promptly comply with and observe the provisions of this Article. Tenant shall not do or permit to be done any act or thing upon the Premises which will invalidate or be in material conflict with any insurance policies covering the Premises and fixtures and property therein or any covenants, restrictions, easements or other agreements of record affecting the Real Property or any part thereof or interest therein disclosed to Tenant prior to the execution of this Lease or subsequently recorded against the Land (provided, however, that, as to subsequently recorded covenants, restrictions, easements or other agreements of record, Landlord shall not have the right to record or suffer the recordation against the Land of any such item that would increase the costs to Tenant or materially decrease the rights of Tenant; and shall not do, or permit anything to be done in or upon the Premises, or bring or keep anything therein, except as now or hereafter permitted by the Fire Department having jurisdiction over the Premises, New York Board of Fire Underwriters, New York Fire Insurance Rating Organization or other authority having jurisdiction and then only in such quantity and manner of storage as not to increase the rate for fire insurance applicable to the Premises, or use the Premises in a manner which shall increase the rate of fire insurance on the Premises or on property located therein, over that in similar type buildings or in effect prior to this Lease. Any work or installation made or performed by or on behalf of Tenant or any person claiming through or under Tenant pursuant to this Article shall be made in conformity with, and subject to the provisions of, Article 4 hereof.  If by reason of the failure of Tenant to comply with the provisions of this Article, the fire insurance rate shall at the beginning of this Lease or at any time thereafter be higher than it otherwise would be, then Tenant shall reimburse Landlord, as Additional Rent hereunder, for that part of all fire insurance premiums thereafter paid by Landlord which shall have been charged because of such failure or use by Tenant, and shall make such reimbursement upon the first day of the month following such outlay by Landlord. In any action or proceeding wherein Landlord and Tenant are parties, a schedule of "make up" rates for the Premises issued by the New York Fire Insurance Rating Organization, or other body fixing such fire insurance rates, shall be presumptive evidence of the facts therein stated and of the several items and charges in the fire insurance rates then applicable to the Premises. From and after the expiration of the tenth Lease Year, to the extent the cost of compliance with Legal or Insurance Requirements is capitalized on Tenant's federal income tax returns, Tenant shall advise Landlord and, at Landlord's option, Landlord shall effectuate such compliance ("Capitalized Compliance Work").  Landlord and Tenant shall allocate the cost of any of such Capitalized Compliance Work, based upon the useful life of such Capitalized Compliance Work and Tenant shall be responsible for a fraction of the cost of such compliance work, the numerator of which is the number of months then remaining in the terms of the Lease, including any unexercised renewal options, and the denominator of which is the useful life of such Capitalized

Compliance Work, expressed in months. Landlord shall be responsible for the balance of such Capitalized Compliance Work. Pursuant to the foregoing, if Tenant elects to make such Capitalized Compliance Work, Landlord shall reimburse Tenant for Landlord's share of such Capitalized Compliance Work within thirty (30) days after demand and presentation of evidence of the cost of such Capitalized Compliance Work. If Landlord performs such Capitalized Compliance Work, Tenant shall reimburse Landlord for Tenant's share of such Capitalized Compliance Work, as additional rent, within thirty (30) after demand and presentation of evidence of the cost of such Capitalized Compliance Work. If Landlord fails to reimburse Tenant for Landlord's share of the cost of such Capitalized Compliance Work, interest on the unpaid amount due Tenant shall accrue thereon at the Applicable Rate and Tenant shall be entitled to its reasonable attorneys' fees in collecting said amount. If Tenant fails to reimburse Landlord for Tenant's share of the cost of such Capitalized Compliance Work, interest on the unpaid amount due Landlord shall accrue thereon at the Applicable Rate and Landlord shall be entitled to its reasonable attorneys' fees in collecting said amount.

B.      Tenant shall at all times comply with the provisions of Americans with Disabilities Act, Title III ("ADA") and make all changes and modifications to the Premises required thereby, whether structural or non-structural, in accordance with the provisions of Article 4 hereof. Landlord shall be responsible for compliance with ADA in connection with Landlord's Work.

C.      Tenant, at Tenant's expense, after prior written notice to Landlord, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any Legal Requirement or Insurance Requirement, provided that: (a) Tenant shall first make all contested payments, under protest if Tenant desires, unless such proceedings shall suspend the collection thereof from Landlord, from any Rent and from the Premises; (b) neither the Premises, nor any part thereof or interest therein, nor any Rent would be in any danger of being sold, forfeited, foreclosed upon, lost or interfered with; (c) no mortgagee, insurer or proposed purchaser of the Land or Improvements shall require same to be paid and the same would not constitute a default under any agreement to which Landlord is a party affecting the Premises; and (d) in the case of a Legal Requirement, Landlord would not be in any danger of any additional civil or criminal liability for failure to comply therewith and the Premises would not be subject to the imposition of any lien as a result of such failure. Landlord shall cooperate with Tenant in any such contest; provided, however, that Tenant shall promptly reimburse Landlord, as additional rent, for any reasonable attorneys' fees and expenses incurred in connection therewith and the same shall be deemed to be Additional Rent under this Lease.

## ARTICLE 7
## SUBORDINATION; ESTOPPELS

A.      Subject to the provisions of subparagraph C hereof, this Lease and all rights of Tenant hereunder are and shall be subject and subordinate in all respects to (a) all present and future ground leases, operating leases, superior leases, overriding leases and underlying leases and grants of term of the Real Property, or any portion thereof and any and all renewals, extensions, supplements, amendments, modifications, replacements and substitutions thereof (collectively the "Superior Lease"), (b) to the lien of each and every trust indenture and mortgage including leasehold mortgages and spreader and consolidation agreements and any and all

renewals, extensions, supplements, amendments, modifications, replacements and substitutions thereof (collectively the "Mortgage") which may now or hereafter affect the Real Property or any Superior Lease and the leasehold interest created thereby, whether or not the Mortgage also shall cover other lands or buildings or leases and (c) to each and every advance made or to be made under any Mortgage. Subject to the provisions of subparagraph C below, this clause shall be self-operative and no further instrument of subordination shall be required to make the interest of any lessee under a Superior Lease, or trustee or mortgagee of a Mortgage superior to the interest of Tenant hereunder. In confirmation of such subordination, however, Tenant shall execute promptly any certificate confirming such subordination that Landlord may reasonably request. If, in connection with the obtaining, continuing or renewing of financing for which the Real Property, any portion thereof, or the interest of the lessee under the Superior Lease represents collateral, in whole or in part, lender shall request reasonable modifications of this Lease as a condition of such financing, Tenant shall not unreasonably withhold its agreement thereto, provided that such modifications do not either materially increase the obligations of Tenant hereunder, or impair the rights of Tenant under this Lease. Any increase in cost to Tenant as a result of such modifications shall be deemed to be a material increase in the obligations of Tenant unless Landlord agrees to reimburse Tenant for such cost.

B.    If a lessor or mortgagee or any person or entity shall succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action, or the delivery of a new lease or deed, then at the request of the successor landlord and upon such successor landlord's written agreement to accept Tenant's attornment and to recognize Tenant's interest under this Lease, Tenant shall be deemed to have attorned to and recognized such successor landlord as landlord under this Lease. The provisions of this subparagraph B are self-operative and require no further instruments to give effect thereto; provided, however, that Tenant shall promptly execute and deliver any instrument that such successor landlord may reasonably request (1) evidencing such attornment, (2) setting forth the terms and conditions of Tenant's tenancy, and (3) containing such other terms and conditions as may be required by such mortgagee or lessor, provided such other terms and conditions do not materially increase Tenant's obligations or materially and adversely affect Tenant's rights under this Lease. Upon such attornment, this Lease shall continue in full force and effect as a direct lease between such successor landlord and Tenant upon all of the terms, conditions and covenants set forth in this Lease except that such successor landlord shall not:

(i)    be liable for any act or omission of Landlord, unless such act or omission continues from and after the date on which the successor landlord shall succeed to the rights of Landlord under this Lease;

(ii)    be subject to any defense, claim, counterclaim, setoff or offset which Tenant may have against Landlord;

(iii)    be bound by any prepayment of Rent to any prior landlord more than one month in advance;

(iv)    be bound by any obligation to make any payment to Tenant which was required to be made prior to the time such successor landlord succeeded to Landlord's interest;

18
A/72586982.3

(v)     be bound by any obligation to perform any work or to make improvements to the Premises except for repairs to the Premises as a result of damage by fire or other casualty, or partial condemnation, pursuant to the provisions of this Lease, but only to the extent that such repairs can reasonably be made from the net proceeds of any insurance or condemnation awards actually made available to such successor landlord;

(vi)     be bound by any modification, amendment or renewal of this Lease made without successor landlord's consent (or, if the successor landlord is a purchaser at a foreclosure sale, made without the consent of the lender), except any renewal made in accordance with the terms hereof; or

(vii)     be bound to return to Tenant any security deposited under this Lease, except to the extent actually received by the successor landlord.

C.     Landlord represents to Tenant that there are not presently any existing Mortgages or Superior Leases. The subordination of this Lease to any future Mortgage or Superior Lease shall be conditioned on the agreement of the mortgagee or lessor, on its standard form, that (i) so long as Tenant complies with all the terms, provisions and conditions of this Lease (i.e., is not in default thereunder beyond any applicable grace, notice and cure periods), any mortgagee or ground or other underlying lessor, as the case may be, in the exercise of its rights or remedies, shall not deprive Tenant of possession or the right of possession of the Premises during the term of this Lease, (ii) in the event of any foreclosure, sale under a power of sale, ground or other underlying lease termination or transfer in lieu of any of the foregoing or the exercise of any other remedy, as the case may be, this Lease shall automatically be preserved and become a direct lease between any fee owner or successor to Landlord's interest, as Landlord, and Tenant, as if such fee owner or successor were the Landlord originally named hereunder and (iii) may contain such other terms and provisions as set forth in this Article 7 or as may be reasonably required by the holder of such Superior Lease or Mortgage. Upon the request of Landlord, Tenant agrees to execute and return a subordination, nondisturbance and attornment agreement confirming the foregoing within ten (10) business days after delivery of same to Tenant.

D.     From time to time, within ten (10) business days next following a request by either Tenant or Landlord (the "Requesting Party"), Tenant or Landlord, as the case may be, shall deliver to the other party or its designee a written statement executed and acknowledged, in form reasonably satisfactory to such party, (i) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (ii) setting forth the amount of, and date to which the Rent, and other charges hereunder have been paid, (iii) stating whether or not, to the actual knowledge of such party, the Requesting Party, is in default under this Lease, and, if so, setting forth the specific nature of all such defaults, (iv) stating the expiration date of this Lease and (v) any other matters reasonably requested by the Requesting Party. Tenant acknowledges that any statement delivered by Tenant pursuant to this subparagraph D may be relied upon by any purchaser or owner of the Real Property or the Premises, or Landlord's interest in the Real Property or the Premises or any Superior Lease, or by any mortgagee of a Mortgage, or by an assignee of any mortgagee or a Mortgage, or by any lessor under any Superior Lease.

A/72586982.3

## ARTICLE 8
## RULES AND REGULATIONS

Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply with, the Rules and Regulations annexed hereto and made a part hereof as Exhibit C.

## ARTICLE 9
## PROPERTY LOSS OR DAMAGE; REIMBURSEMENT; TENANT'S INSURANCE

A.     Any Building employee to whom any property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor its agents shall be liable for any damage to property of Tenant or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Tenant by theft or otherwise. Neither Landlord nor its agents shall be liable for any injury or damage to persons or property or interruption of Tenant's business resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Premises or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in the Premises or caused by construction of any private, public or quasi-public work.

B.     In the event Tenant moves any safe, heavy machinery, heavy equipment, freight, bulky matter or fixtures into or out of the Premises, Tenant agrees to employ only persons holding a Master Rigger's License to do said work. All such work shall comply with all Legal Requirements.

C.     Tenant shall provide and maintain and keep in full force and effect during the Term:

(i)     insurance upon all property owned by Tenant or for which Tenant is legally liable, or which is installed by or on behalf of Tenant, and which is located within the Premises, including, without limitation, on all leasehold improvements made by or on behalf of Tenant, for full replacement value against damage by fire and extended coverage peril;

(ii)     workers' compensation insurance as required by any applicable law or regulation and in accordance with the laws of the state, territory or province having jurisdiction over Tenant's employees; and employer's liability insurance with limits of $1,000,000;

(iii)     commercial general liability insurance protecting Tenant and Landlord against any and all liability customarily covered thereby in or about the Demised Premises or any part thereof, or the Improvements now or hereafter erected thereon, or adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways, or any appurtenances thereto, in amounts reasonably approved from time to time by Landlord, which amounts at the date hereof shall be, in the case of commercial general liability, $5,000,000 combined single limit. Such insurance shall provide coverage for (a) bodily injury, property damage, personal injury and advertising injury, (b) contractual liability, not only for bodily injury and property damage but also for personal injury and advertising injury, and (c) cross liability. Such insurance may be provided by a commercial general liability policy only, or by a combination of a commercial general liability

policy and an umbrella liability and/or excess liability policy; provided, however, that the following sentence in this section shall apply only to the commercial general liability insurance. Such insurance shall include Landlord, its subsidiaries and affiliates, its managing agents, mortgagees and Superior Lessors of which Tenant has notice, and their respective directors, officers, shareholder, employees and agents as additional insureds, but only to the extent of liabilities falling within Tenant's indemnity obligations pursuant to the terms of this Lease;

        (iv)    explosion insurance in respect of any steam and pressure boilers and similar apparatus located on the Demised Premises in amounts reasonably approved by Landlord, which amount at the date hereof shall be $4,000,000;

        (v)    business automobile liability insurance covering all owned, rented and non-owned vehicles used in connection with this Lease or the Premises. Such insurance shall have limits of $1,000,000 for each accident for bodily injury and property damage. Such insurance shall include Landlord, its subsidiaries and affiliates, and their respective directors, officers, shareholders, employees and agents as additional insureds, but only to the extent of liabilities falling within Tenant's indemnity obligations pursuant to the terms of this Lease;

        (vi)    during the period of Alterations, builder's risk insurance, covering all physical loss and other risks covered by the usual extended coverage and "all risk" endorsements.

        (vii)    insurance against such other hazards and in such amounts as is customarily carried by prudent Landlords and operators of similar properties, and as Landlord reasonably may request and available at commercially reasonable rates;

        (viii)    insurance against loss or damage by fire, with extended coverage, special extended coverage and "all risk" perils (or its equivalent), in an amount that will comply with the co-insurance clause applicable to the location and character of the Demised Premises and the improvements now or hereafter erected thereupon, and equal to the full replacement value thereof (exclusive of excavations and foundations); and

        (ix)    rent insurance in the amount of at least two years rent and additional rent payable hereunder.

The foregoing insurance shall:

        (a)    be written on a replacement cost basis without deduction for depreciation, with a commercially reasonable deductible for each occurrence;

        (b)    comply with any changes in co insurance requirements applicable to the Premises and the improvements now or hereafter erected thereupon, by the Fire Insurance Rating Organization, or any similar body, or by statute;

        (c)    except for the insurance described in (ii), above, name Landlord, and, to the extent Tenant is instructed and provided with the name and address of, all Leasehold Mortgagees and all Superior Mortgagees, as additional insureds, as their respective interests may appear, and include a standard mortgagee endorsement; and

(d)    the property insurance shall provide that the respective interests of Landlord and all such Superior Mortgagees shall not be subject to cancellation by reason of any act or omission of Tenant.

At Landlord's option, if the Premises are not used for the Intended Use, Landlord may elect to carry the casualty and rent insurance required pursuant to subsections (viii) and (ix) above and/or Landlord's liability insurance. In such event, Tenant shall pay to Landlord, as additional rent, the cost of such insurance within thirty (30) days after demand, as Additional Rent.

D.    All insurance maintained by Tenant pursuant to this Article 9: (a) shall, except for worker's compensation insurance and casualty insurance carried by Landlord, name Landlord, Landlord's managing agent, Landlord's mortgagee, and such other parties as may be designated by Landlord, as additional insureds, as their respective interests may appear, and shall include, to the extent available without additional premium, an effective waiver by the issuer of all rights of subrogation against any named insured or such insured's interest in the Demised Premises or any income derived therefrom; (b) shall provide that (1) with respect to property damage insurance proceeds payable for other than Tenant's personal property and equipment, all such insurance proceeds shall be payable to any first mortgagee which shall agree to hold such proceeds in trust to be used for rebuilding in accordance with such mortgagee's customary disbursement procedures, or, if none, to Landlord, to be held in trust in a segregated bank account, to be used for rebuilding unless this Lease is terminated as a result of such property damage, and (2) all other insurance shall be paid to Tenant; (c) the property insurance shall provide that any losses shall be payable notwithstanding any act or failure to act or negligence of Landlord or Tenant or any other person; (d) if obtainable, shall provide that the insurance carrier shall provide at least thirty (30) days written notice to Landlord of any cancellation (ten (10) days if for non-payment); and (e) shall be satisfactory in all other respects to Landlord acting reasonably. Any such insurance, at Tenant's option, may be provided through a blanket or umbrella policy or policies, provided such policies shall provide for specific allocation to the Premises of the coverage afforded by such blanket policy or policies, and provided further that such blanket or umbrella policy or policies give to Landlord no less protection than that which would be afforded limited in the proof of damages to the amount of the insurance premium not paid by Tenant for such insurance.

E.    Prior to the Commencement Date of this Lease and thereafter not less than fifteen days prior to the expiration date of any policy delivered pursuant to this Article 9, Tenant shall deliver to Landlord certificates of the insurer, together with proof of payment thereof, in form and substance reasonably satisfactory to Landlord, as to the issuance and effectiveness of such policies and the amounts of coverage afforded thereby, and shall name the parties required in subsection (a) of the preceding paragraph. The current form of an Accord 27 (or equivalent) with respect to property and casualty insurance and Accord 25 (edition §993, or equivalent) with respect to liability as currently promulgated, shall be satisfactory to Landlord and Tenant.

F.    The parties hereto shall procure an appropriate clause in, or endorsement on, any fire or extended coverage insurance covering the Premises and personal property, fixtures and equipment located thereon or therein, pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery or permit any other form of release. Each

party shall not make, and hereby waives, on its behalf and on behalf of its insurer(s), any claim against or seek to recover from the other for any loss or damage to its property or the property of others resulting from fire or other hazards covered or required by this Lease to be covered by such fire and extended coverage insurance to the extent coverage is or would be afforded thereby (or, in the case of damage to the Building, would have been covered by insurance but for Landlord's, election not to, or Tenant's failure to, carry insurance against all risk or special coverage perils covering the full replacement cost of the Building), provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by, and coextensive with, the terms and provisions of the waiver of subrogation clause and/or endorsements consenting to a waiver of right of recovery or other form of release. If such waiver of subrogation, consent to a waiver of right of recovery or other form of release is unobtainable, each party shall advise the other of such fact and the other party, subject to the provisions of this paragraph, shall be named as an additional insured in the policy (and to the extent Landlord elects that Tenant not carry such insurance, Landlord shall maintain a policy of property damage insurance against all risk or special coverage perils covering the full replacement cost of the Building). If the payment of an additional premium is required for the inclusion of such waiver of subrogation, consent to a waiver of right of recovery or other release provision, or if same are not obtainable and the other party is proposed to be named as an additional insured, each party shall advise the other of the amount of any such additional premiums and the other party at its own election may but shall not be obligated to pay the same. If such other party elects not to pay the same, such other party shall notify the party obtaining the insurance of such fact, in which event the party obtaining the insurance shall have no further obligation to obtain such clauses and/or endorsements or to name such other party as an additional insured under the policy. If the other party is named as an additional insured, the policy shall contain a provision, if obtainable, that same shall be noncancellable with respect to such other party unless thirty (30) days' prior written notice shall be given to such other party, by certified mail, return receipt requested, which notice shall contain the policy number and the names of the insureds or ten (10) days notice of non-payment.

G.     Notwithstanding the foregoing or anything to the contrary contained herein, Landlord shall have the right to require Tenant, from time to time (but no more frequently than every twenty four (24) months, to carry higher insurance coverage limits with respect to any policy expressly required hereunder, or such other insurance, which in Landlord's commercially reasonable discretion, is at the time customarily required by landlords land and buildings in Manhattan, New York, comparable to the Demised Premises and all improvements then erected thereupon.

H.     If at any time Tenant shall neglect or fail to provide or maintain insurance or to deliver insurance policies in accordance with this Article 13 within fifteen (15) days after notice by Landlord, Landlord may effect such insurance as agent for Tenant, by taking out policies in companies selected by Landlord, and the amount of the premiums paid for such insurance shall be paid by Tenant to Landlord, as Additional Rent. Landlord, in addition to Landlord's other rights and remedies, shall be entitled to recover as damages for any breach of this Article 13 the resulting uninsured amount of any loss, liability, damage, claim, costs and expenses suffered or incurred by Landlord, and shall not be limited in the proof of damages to the amount of the insurance premium not paid by Tenant for such insurance. Any amount so advanced shall bear interest at a rate equal to the Prime Rate plus 3%.

I.     All insurance maintained pursuant to the terms of this Lease shall provide that it is primary to and noncontributory with any and all insurance maintained by or afforded to an additional insured under such insurance, but only to the extent of liabilities falling within the indemnity obligations of the Named Insured under such insurance pursuant to the terms of this Lease.

## ARTICLE 10
## DESTRUCTION; FIRE OR OTHER CAUSE

A.     Tenant shall give prompt notice to Landlord in case of fire or other casualty in or about the Premises, promptly after learning of the same. If the Premises shall be damaged by fire or other insurable casualty, the damages to the core and shell of the Premises (exclusive of the leasehold improvements, Tenant's improvements and betterments and Tenant's property) ("Core and Shell"), shall be repaired by and at the expense of Landlord, promptly after the collection of the insurance proceeds attributable to such damage.  Except as provided in subparagraph C of this Article 10, the Rent, until such repairs to the Core and Shell shall be made, shall be abated in the proportion which the area of the part of the Premises which is not usable, and not used by Tenant, bears to the total area of the Premises (if less than the entire Premises shall be rendered untenantable as a result of Core and Shell damage, or, if all of the Premises shall be rendered untenantable, all of the Rent shall be abated, in either event, from the date of such damage to the date when the repair of such damage to the Core and Shell shall have been substantially completed and the Premises (or portion thereof) made tenantable and accessible).  Landlord will not carry insurance of any kind on, and shall have no obligation to repair any damage to, or to replace, any of Tenant's leasehold improvements or any Tenant's Property; the obtaining of insurance coverage for loss of such leasehold improvements, Tenant's Property shall be at the sole cost and expense of Tenant.

B.     Anything in subparagraph A of this Article 10 to the contrary notwithstanding, if the Premises shall be so damaged by fire or other casualty that, in Landlord's reasonable opinion, demolition, or substantial reconstruction of the Premises shall be required (whether or not the Premises shall have been damaged or rendered untenantable), then in any of such events, Landlord, at Landlord's option, may, within ninety (90) days after the date of such fire or other casualty, give Tenant a notice in writing terminating this Lease.  If Landlord elects to terminate this Lease, the Term shall expire upon the thirtieth (30th) day after such notice is given, and Tenant shall vacate the Premises and surrender the same to Landlord.  Upon the termination of this Lease under the conditions provided for in the preceding sentence, Tenant's liability for Rent accruing after the date of such termination shall cease and any unearned Rent or other charges paid in advance by Tenant shall be promptly refunded to Tenant.

C.     Nothing contained in this Lease (with the exception of Section 9F) shall relieve Tenant of any liability to Landlord or to its insurance carriers which Tenant may have under law or the terms of this Lease in connection with any damage to the Premises by reason of fire or other casualty.

D.     No penalty, abatement or other credit shall accrue to Tenant's benefit for reasonable delay which may arise by reason of adjustment of fire insurance proceeds on the part of Landlord and/or Tenant, and for reasonable delay on account of Unavoidable Delays.

A/72586982.3

E.     Notwithstanding the foregoing, if such damage or destruction to the Premises shall occur during the last two (2) years of the Term, and either (i) shall amount to fifty percent (50%) or more of the replacement cost of the improvements constructed by Tenant within the Premises from time to time (including any additions, replacements or renovations thereto), or (ii) shall take more than one hundred eighty (180) days to repair this Lease may be terminated at Tenant's election, provided that Tenant shall inform Landlord of such election within sixty (60) days after the occurrence of such damage or destruction. Upon termination as aforesaid, this Lease and the Term hereof shall cease and come to an end, any unearned rent or other charges paid in advance by Tenant shall be promptly refunded to Tenant, any and all insurance proceeds paid with respect to the leasehold improvements constructed by Tenant in the Premises from time to time (including any additions, replacements or renovations thereto) and not reimbursed by Landlord, shall be paid to Landlord, and any insurance proceeds payable with respect to Tenant's Property, shall be paid to Tenant.

F.     Except where prohibited by law, each party's insurers providing any fire or extended coverage insurance covering the Premises and personal property, fixtures and equipment located thereon or therein, waive all rights of recovery or subrogation against the other party, their Affiliates, and their respective officers, directors, shareholders, employees and agents. If such waiver of rights of recovery or subrogation is unobtainable each party shall advise the other of such fact and the other party, subject to the provisions of this Paragraph F, shall be named as an additional insured in the policy. If the payment of an additional premium is required for the inclusion of such waiver of rights of recovery or subrogation and the other party is proposed to be named as an additional insured, each party shall advise the other of the amount of any such additional premiums and the other party at its own election may but shall not be obligated to pay the same. If such other party elects not to pay the same, such other party shall notify the party obtaining the insurance of such fact, in which event the party obtaining the insurance shall have no further obligation to obtain such clauses and/or endorsements or to name such other party as an additional insured under the policy. If the other party is named as an additional insured, the policy shall contain a provision that same shall be noncancellable with respect to such other party unless thirty (30) days' prior written notice shall be given to such other party, which notice shall contain the policy number and the names of the insureds.

G.     Within sixty (60) days following request after any damage which Landlord is required to repair pursuant to Section A above, Landlord shall notify Tenant of Landlord's good faith estimate of the time required to repair such damage ("Landlord's Repair Notice"). If, pursuant to Landlord's Repair Notice, the repair of any damage which affects the Premises will take in excess of eighteen (18) months following the casualty, Tenant shall have the right, by written notice to Landlord delivered within 30 days following the delivery of Landlord's Repair Notice to terminate this Lease, effective on the 30th day after such notice is given by Tenant. Additionally, if Tenant has not terminated this Lease pursuant to the provisions set forth above and the repairs are not actually completed on or before eighteen (18) months following the casualty, Tenant shall have the right, delivered at any time following such date and prior to the date that Landlord completes such repair, upon not less than thirty (30) days notice to Landlord, to terminate this Lease and this Lease shall terminate on the date set forth in such notice, unless Landlord substantially completes such repairs within such thirty (30) day period. Upon termination as aforesaid, this Lease and Term hereof shall cease and come to an end, any unearned Rent or other charges paid in advance by Tenant shall be promptly refunded to Tenant

and any and all insurance proceeds paid with respect to the leasehold improvements in the Premises from time to time (including any additions, replacements or renovations thereto), and any insurance proceeds payable with respect to Tenant's Property shall be paid to Tenant.

H. The parties agree that this Article 10 constitutes an express agreement governing any case of damage or destruction of the Premises by fire or other casualty, and that any law which provides for such contingency in the absence of an express agreement, now or hereafter in force shall have no application in any such case.

## ARTICLE 11
## EMINENT DOMAIN

A. If the whole of the Premises shall be acquired or condemned for any public or quasi-public use or purpose, this Lease and the Term shall end as of the date of the vesting of title with the same effect as if said date were the Expiration Date. If only a part of the Real Property shall be so acquired or condemned then, (a) except as hereinafter provided in this subparagraph A, this Lease and the Term shall continue in force and effect but, if a part of the Premises is included in the part of the Real Property so acquired or condemned, from and after the date of the vesting of title, the Rent shall be reduced in the proportion which the area of the part of the Premises so acquired or condemned bears to the total area of the Premises immediately prior to such acquisition or condemnation (provided, however, that, solely for purposes of calculating such proportion, each square foot of ground floor space within the Premises shall be deemed to be the equivalent of two square feet, and the total square footage of the Premises shall be calculated by deeming the ground floor to have twice as many square feet as are actually located within the Premises, it being acknowledged by Landlord and Tenant that this is a reasonable method of acknowledging the higher value of the ground floor Premises); and (b) if the part of the Premises so acquired or condemned shall contain more than thirty percent (30%) of the total ground floor area of the Premises immediately prior to such acquisition or condemnation, or if, by reason of such acquisition or condemnation, Tenant no longer has reasonable means of access to the Premises, Tenant, at its option, may, within sixty (60) days next following the date Tenant shall have received notice of vesting of title, terminate this Lease and the Term shall come to an end and expire upon the expiration of said thirty (30) days with the same effect as if the date of expiration of said thirty (30) days were the Expiration Date. If a part of the Premises shall be so acquired or condemned and this Lease and the Term shall not be terminated pursuant to the foregoing provisions of this subparagraph A, Landlord, at Landlord's expense, shall restore that part of the Premises not so acquired or condemned to a self-contained rental unit and, during the course of the restoration, Tenant's obligations for Rent shall be adjusted as provided in this subparagraph A. In the event of any termination of this Lease and the Term pursuant to the provisions of this subparagraph A, the Rent shall be apportioned as of the date of sooner termination and any prepaid portion of Rent for any period after such date shall be promptly refunded by Landlord to Tenant.

B. In the event of any such acquisition or condemnation of all or any part of the Real Property, Landlord shall be entitled to receive the entire award, with respect to the Premises for any such acquisition or condemnation, Tenant shall have no claim against Landlord or the condemning authority for the value of any unexpired portion of the Term and Tenant hereby expressly assigns to Landlord all of its right in and to any such award. Nothing contained in this

subparagraph B shall be deemed to prevent Tenant from making a claim in any condemnation proceedings against the condemning authority for the value of any furnishings and fixtures installed by and at the sole expense of Tenant and the cost of Tenant's move included in such taking provided such claim does not diminish or adversely affect Landlord's award.

C.    If the whole or any part of the Premises is acquired or condemned temporarily during the Term for any public or quasi-public use or purpose, Tenant shall give prompt notice thereof to Landlord and the Term shall not be reduced or affected in any way and Tenant shall continue to pay in full all items of Rent payable by Tenant hereunder without reduction or abatement, and Tenant shall be entitled to receive for itself any award or payments for such use, provided, however, that:

(i)    If the acquisition or condemnation is for a period not extending beyond the Term and if such award or payment is made less frequently than in monthly installments, the same shall be paid to and held by Landlord as a fund which Landlord shall apply from time to time to the Rent payable by Tenant hereunder, except that if, by reason of such acquisition or condemnation, changes or alterations are required to be made to the Premises which would necessitate an expenditure to restore the Premises, then a portion of such award or payment appropriate to cover the expenses of the restoration shall be retained by Landlord, without application as aforesaid, and applied toward the restoration of the Premises as provided in Article 11A; or

(ii)    If the acquisition or condemnation is for a period extending beyond the Term, such award or payment shall be apportioned between Landlord and Tenant as of the Expiration Date; Tenant's share thereof, if paid less frequently than in monthly installments, shall be paid to Landlord and applied in accordance with the provisions of clause (i) above; provided, however, that the amount of any award or payment allowed or retained for restoration of the Premises shall remain the property of Landlord if this Lease expires prior to the restoration of the Premises.

## ARTICLE 12
## ASSIGNMENT, MORTGAGE, ETC.

A.    Subject to the provisions of subparagraph C hereof, Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, covenants that, without the prior written consent of Landlord in each instance, it shall not (i) assign, or otherwise transfer, pledge, mortgage or otherwise encumber its right, title or interest in this Lease, in whole or in part, or (ii) sublet, or permit the subletting of, the Premises or any part thereof, or (iii) permit the Premises or any part thereof to be occupied or used for desk space, mailing privileges or otherwise, by any person other than Tenant.

B.    If Tenant's interest in this Lease is assigned, whether or not in violation of the provisions of this Article 12, Landlord may collect rent from the assignee; and if the Premises or any part thereof are sublet to, or occupied by, or used by, any person other than Tenant, whether or not in violation of this Article 12, Landlord, after the occurrence of an Event of Default by Tenant under this Lease, may collect rent from the subtenant, user or occupant. In either case, Landlord shall apply the net amount collected to the Rent reserved in this Lease, but neither any

such assignment, subletting, occupancy, or use, whether with or without Landlord's prior consent, nor any such collection or application, shall be deemed a waiver of any term, covenant or condition of this Lease or the acceptance by Landlord of such assignee, subtenant, occupant or user as tenant. The consent by Landlord to any assignment, subletting, occupancy or use or to any mortgage, pledge or encumbrance, shall not relieve Tenant from its obligation to obtain the express prior consent of Landlord to any further assignment, subletting, occupancy or use or to any mortgage, pledge or encumbrance by Tenant, which shall be given or withheld in accordance with the terms of this Lease. Tenant shall reimburse Landlord for any reasonable third party costs that may be incurred by Landlord in connection with said sublease or assignment, including reasonable attorneys' fees and disbursements, the reasonable costs of making investigations as to the acceptability of a proposed subtenant or assignee and the preparation and review of any documents relating to such transaction or any mortgage, pledge or encumbrance. Neither any assignment of Tenant's interest in this Lease nor any subletting, occupancy or use of the Premises or any part thereof by any person other than Tenant, nor any collection of Rent by Landlord from any person other than Tenant as provided in this subparagraph B, nor any application of any such rent as provided in this subparagraph B shall, in any circumstances, relieve Tenant of its obligation fully to observe and perform the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed.

C.     As long as Tenant is not in default beyond any applicable notice and grace period under any terms, covenants, or conditions of this Lease on Tenant's part to be observed or performed, Landlord shall not unreasonably withhold or delay its consent to an assignment of this Lease or subletting by Tenant of all of the Premises, or portions of the Premises above the ground floor of the Premises, in all instances, only for the uses permitted hereunder. At least thirty (30) days prior to any proposed assignment or subletting for which Landlord's consent is required, Tenant shall submit to Landlord a statement ("Tenant's Statement") containing the name and address of the proposed assignee or subtenant and all of the principal terms and conditions of the proposed assignment or subletting including, but not limited to, the proposed commencement and expiration dates of the term of the sublease, the nature of the proposed assignee's or subtenant's business, and such financial and other information with respect to the proposed assignee or subtenant as Landlord may reasonably request. Landlord shall not be deemed unreasonable in withholding its consent to any sublease or assignment if:

(i)     a purpose for which the proposed subtenant or assignee intends to use the Premises is not a purpose permitted by this Lease or is a Prohibited Use;

(ii)     the proposed occupancy shall impose an increase in the demand (above Tenant's then demand) upon the Premises' mechanical, electric, sanitary, plumbing, utility or other service systems or the Premises services;

(iii)     the proposed sublease shall not prohibit any further assignment or subletting without the compliance with the terms of this Section regarding the consent of Landlord, which shall be given or withheld in accordance with the terms of this Lease;

(iv)     the proposed subtenant or assignee shall be entitled, directly or indirectly, to diplomatic or sovereign immunity or shall not be subject to the service of process in, and the jurisdiction of the courts of the State of New York;

28
A/72586982.3

(v) the proposed subtenant or assignee (or, if a closely held entity with under ten (10) owners, any principal thereof) has been convicted of any felony;

(vi) the proposed subtenant or assignee, as the case may be, or a principal thereof has not been engaged in the business proposed to be conducted on the Premises for at least seven (7) years;

(vii) the proposed subtenant or assignee, as the case may be, does not have the financial capability to comply with the terms of its sublease or the lease, as applicable (and, in connection with Landlord's determination of whether it shall grant consent, Tenant shall deliver to Landlord a detailed statement of the financial condition of the proposed subtenant or assignee dated within twelve (12) months of the date of the proposed subletting or assignment, prepared in accordance with generally accepted accounting principals applied on a consistent basis, sworn to by such proposed subtenant or assignee, or if such proposed subtenant or assignee is a partnership by a partner thereof, or if such proposed subtenant or assignee is a corporation by an executive officer of the proposed subtenant or assignee, and, if the financial statements of such proposed subtenant or assignee are typically certified by independent certified public accounts, such statement shall be so certified, which statement shall reflect the current financial condition of the aforesaid proposed subtenant or assignee);

(viii) Tenant shall have failed to deliver to Landlord the information and documentation required by Paragraph D of this Article 12, or the form and substance of the assignment or sublease and all ancillary documents shall not have been reasonably approved by Landlord.

D. (i) Tenant shall, prior to any assignment or subletting, give notice ("Sublease/Assignment Notice") thereof to Landlord, which notice shall be accompanied by (a) a conformed or photostatic copy of the proposed assignment or sublease, the effective or commencement date of which shall be at least 45 business days after the giving of such notice, (b) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the premises, and (c) current financial information with respect to the proposed assignee or subtenant, including, without limitation, its most recent financial report. Such notice shall be deemed an offer from Tenant to Landlord whereby Landlord (or Landlord's designee) may, at its option (i) if the Sublease/Assignment Notice concerns a proposed sublease of all or any portion of the ground floor of the Premises or more than two floors above the Premises (whether in one or more than one series or related or unrelated transactions), sublease such space from Tenant upon the terms and conditions hereinafter set forth, (ii) if the Sublease/Assignment Notice concerns a proposed sublease of all or any portion of the ground floor of the Premises or more than two floors above the Premises (whether in one or more than one series or related or unrelated transactions) or an assignment, terminate this lease. Said option may be exercised by Landlord by notice to Tenant at any time within 30 days after such notice has been given by Tenant to Landlord; and during such 30 day period Tenant shall not assign this lease or sublet such space to any person.

(ii) If Landlord exercises its option to terminate this lease in the case where Tenant desires either to assign this lease or sublet all of the Premises, then, this Lease shall end and expire on the date that such assignment or sublet was to be effective or commence, as the

case may be, and the Minimum Rent and Additional Rent shall be paid and apportioned to such date.

(iii)    If Landlord exercises its option to sublet the portion(s) of the Premises which Tenant desires to sublet, such sublease to Landlord or its designee (as subtenant) shall be at the lower of (i) the rental rate per rentable square foot of Minimum Rent and Additional Rent then payable pursuant to this Lease, or (ii) the rentals set forth in the proposed sublease, and shall be upon the same terms and conditions as those contained in the proposed sublease, except such as are irrelevant or inapplicable and except that such sublease shall give the sublessee the unqualified and unrestricted right, without Tenant's permission, to assign such sublease or any interest therein and/or to sublet the space covered by such sublease or any part or parts of such space and to make any and all changes, alterations, and improvements in the space covered by such sublease; provided, however, that, in the event Landlord assigns such sublease or sublets all or a portion of such space, Tenant shall have no liability for the failure of the assignee or sub-subtenant to pay rent or otherwise comply with the terms of the sublease or this Lease.

(iv)    In the event that (a) Landlord fails to exercise any of its options under Section D(i) and consents to a proposed assignment or sublease, and (b) Tenant fails to execute and deliver the assignment or sublease to which Landlord consented within 45 days after the giving of such consent, or the proposed economic terms of the proposed sublease or assignment vary from those set forth in the Sublease/Assignment Notice, then Tenant shall again comply with all of the provisions and conditions of this Section D before assigning this Lease or subletting all or part of the Premises.

E.    Tenant shall, on or at least ten (10) days prior to the effective date thereof, deliver to Landlord a fully executed counterpart of the assignment or sublease and all ancillary documents thereto in which any assignee assumes the observance and performance of all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed.

F. ·    For purposes of this Article 12, each modification, amendment or extension of any subleases to which Landlord shall have consented shall be deemed a new sublease.

G.    In the event that (i) Landlord fails to exercise any of its options under Section 12D, and (ii) Tenant fails to execute and deliver the assignment or sublease to which Landlord consented within ninety (90) days after the giving of such consent, then, Tenant shall again comply with all of the provisions and conditions of this Article 12 before assigning its interest in this Lease or subletting the Premises.

H.    If Tenant shall enter into any sublease or assignment permitted hereunder and consented to by Landlord (where such consent is required to be obtained), Tenant shall, within a reasonable time after the effective date of such assignment or sublease, deliver to Landlord, a complete list of Tenant's reasonable third-party brokerage fees, construction costs and legal fees incurred in connection with the proposed assignment or sublease ("Property Costs"). Tenant agrees to submit to Landlord evidence of such costs prior to the effective date of an assignment or sublease. In consideration of such assignment or subletting, Tenant shall pay to Landlord, as Additional Rent hereunder:

(i)     In the case of a sublease, during the term of such sublease, as and when received by Tenant, 50% of any consideration paid under the sublease to Tenant or any affiliate of Tenant by the subtenant which exceeds, on a per square foot basis, Rent paid by Tenant to Landlord during the preceding month for which the said consideration was paid (together with any sums paid for the sale or rental of Tenant's Property [less, in the case of Tenant's Property, the unamortized costs of the Tenant's Property, as set forth on Tenant's tax returns which sums shall be amortized monthly over the term of such sublease]), after first deducting Property Costs in connection with such transaction, all of which Property Costs shall be recovered first by Tenant before sharing any consideration with Landlord.

(ii)     In the case of an assignment, as and when sums are received by Tenant, an amount equal to 50% of all sums and other consideration paid to Tenant or any affiliate of Tenant by the assignee for or by reason of such assignment, (including sums paid for the sale or rental of Tenant's Property and leasehold improvements, [less, in the case of Tenant's Property, the unamortized costs of the Tenant's Property, as set forth on Tenant's tax returns]), after first deducting all Property Costs.

I.     Notwithstanding anything contained herein to the contrary, the other provisions of this Article 12 shall not apply to transactions with a corporation or other entity (1) into or with which Tenant is merged or consolidated or (2) to which substantially all of Tenant's assets or stock, or other interests are transferred, so long as, in each of the foregoing instances (i) such transfer was made for a legitimate independent business purpose and not for the principal purpose of transferring this Lease, and (ii) the successor to Tenant and any guarantor of this Lease has a net worth and debt/equity ratio computed in accordance with generally accepted accounting principles at least equal to the net worth and debt/equity ratio on the date preceding such transaction. Tenant shall deliver proof reasonably satisfactory to Landlord of such net worth to Landlord within twenty (20) days after the effective date of any such transaction. Tenant may also, upon prior notice to, but without the consent of Landlord, and without otherwise complying with the other provisions of Article 12, permit any Affiliate to sublet all of the Premises for the Permitted Use or assign this Lease to any Affiliate. Such sublease shall not be deemed to relieve, release, impair or discharge any of Tenant's obligations hereunder. In addition, Tenant may, without the consent of Landlord and without notice to Landlord, permit any Affiliate or licensee to use all or any portion of the Premises for uses permitted hereunder. Further, no consent of Landlord shall be required in connection with any public offering of the stock or securities of Tenant. Notwithstanding anything contained herein to the contrary, the sale of the stock or beneficial ownership of any Affiliate which is the subtenant or assignee of this Lease shall be deemed an assignment for the purposes of this Lease unless such transfer was made for a legitimate independent business purpose and not for the principal purpose of transferring this Lease.

## ARTICLE 13
## TENANT'S SIGNS

A.     Tenant shall not install any storefront signs, awnings, canopies, flags, banners, laser lights, blade signs, marquees, exterior decorations and/or projections, or lettering on the storefront glass (including any changes thereto) (together, "Signage") unless Tenant shall have complied with all Legal Requirements. Tenant agrees to maintain all signs in a first-class

condition and to maintain, replace and/or renovate the same and Tenant also agrees to pay for all registration, permit or license fees required by applicable governmental authorities and exhibit to Landlord the paid receipts therefore within thirty (30) days after Landlord's request. On default thereof, Landlord may pay the same and Tenant shall reimburse Landlord for the costs incurred by Landlord, as Additional Rent, together with interest thereon, within fifteen (15) days after demand. Tenant shall, unless otherwise directed by Landlord in writing, at the expiration or termination of this Lease, remove all signs, lights or other forms of inscription so affixed or displayed and shall repair any damage to the Premises caused by such affixing, display or removal. All Tenant's Signage on the exterior of the Premises shall be located on the exterior of the ground floor, and only on or above Tenant's storefronts. All signs shall comply with all Legal Requirements, including, without limitation, the rules and recommendations of the Landmarks Preservation Commission (or any successor thereto). All signage shall be maintained in a first-quality, neat, clean, safe and hazard-free condition. The obligations of Tenant in this Section 13A shall survive the expiration of this Lease.

B.      Notwithstanding Article 13A above, Tenant shall not place in the windows or in any display or other area visible to public view from the outside of the Premises, or otherwise in or about the Premises, any paper or flashing, blinking, neon or animated sign or one which otherwise has variations in the intensity of illumination, without consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

C.      As used in this Article 13 the word "sign" shall be constructed to include any placard, poster, light or other advertising symbol or object irrespective of whether the same be temporary or permanent.

D.      In the event Landlord shall deem it necessary to remove temporarily any sign or Signage of Tenant in order to make any repairs, alterations or improvements in, to or upon the Premises, Landlord shall have the right to do so, provided the same shall, at Landlord's expense, be removed, and promptly upon completion of such repair, alterations or improvement, be replaced.

## ARTICLE 14
## ACCESS TO PREMISES

Upon twenty-four (24) hours prior written notice to Tenant, Landlord or Landlord's agents shall have the right to enter the Premises at all reasonable times during business hours (i) to examine the same, (ii) to show them to prospective purchasers, mortgagees or lessees of the entire Premises (or portions thereof), or (iii) to make such repairs or alterations in the Premises, which Landlord may elect to perform following Tenant's failure to make repairs or perform any work which Tenant is obligated to perform under this Lease. In connection with the access to the Premises pursuant to clauses (i) or (ii) above, Landlord agrees to use commercially reasonable efforts, without being required to use overtime labor, to minimize any interference with the conduct of Tenant's business on the Premises, and shall be allowed to take all material and equipment into and upon the Premises that may be required therefore (but shall remove the same at the end of the laborer's workday to the extent commercially reasonable) without the same constituting an eviction or constructive eviction of Tenant in whole or in part and the Rent shall in no wise abate while said repairs, alterations, improvements, or additions are being made, by

reason of loss or interruption of business of Tenant, or otherwise. During the one year prior to the Expiration Date or the expiration of any renewal or extended term, Landlord may exhibit the Premises to prospective tenants thereof. If Tenant shall not be personally present to open and permit an entry into the Premises, at any time, when for any reason an entry therein shall be necessary due to an emergency (with Landlord giving such notice to Tenant as may be possible under the circumstances), or permissible hereunder (after prior notice to Tenant), Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same without rendering Landlord or such agents liable therefore provided that during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's Property, and without in any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care, supervision or repair of the Premises or any part thereof, other than as herein provided.

## ARTICLE 15
## CERTIFICATE OF OCCUPANCY

Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy issued for the Premises and, in the event that any department of the City of New York or State of New York shall hereafter at any time contend and/or declare by notice, violation, order or in any other manner whatsoever that the Premises are used for a purpose which is a violation of such certificate of occupancy, Tenant shall, upon five (5) days' written notice from Landlord, immediately discontinue such use of the Premises. Failure by Tenant to discontinue such use after such notice shall be considered a default in the fulfillment of a covenant of this Lease.

## ARTICLE 16
## CONSENTS

If Tenant requests Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent; it being intended that Tenant's sole remedy in such event shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord agreed not to (or as a matter of law Landlord may not) unreasonably withhold its consent. If Tenant disputes the reasonableness of Landlord's withholding of consent where Landlord has agreed not to (or as a matter of law may not) unreasonably withhold its consent, Tenant may request that the reasonableness of such consent be submitted to "expedited arbitration" in accordance with the following provisions. Such expedited arbitration shall be conducted in accordance with the Expedited Procedures provisions (Rules 53 through 57 in the current edition) of the commercial arbitration rules of the American Arbitration Association ("AAA"); provided, however, that with respect to any such arbitration: (i) the list of arbitrators referred to in Rule 54 shall be returned within 5 Business Days from the date of mailing; (ii) the parties shall notify the AAA, by telephone, within 4 Business Days of any objections to the arbitrator so appointed and will have no right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Rule 54; (iii) the Notice of Hearing referred to in Rule 55 shall be 5 Business Days in advance of the hearing; and (iv) the hearing shall be held within 7 Business Days after the appointment of the arbitrator. Each

arbitrator shall be duly sworn to determine such matter fairly and impartially. If any arbitrator shall die, be disqualified or incapacitated, or shall fail to refuse to act, before such matter shall have been determined, then, in place of such arbitrator, an arbitrator shall promptly be appointed in the same manner as the arbitrator who shall have died, become disqualified or incapacitated, or who shall have failed or refused to act. Judgment on such determination of the arbitrator may be entered by either party, upon notice to the other party, in any court having jurisdiction.

## ARTICLE 17
## DEFAULT

A.      The occurrence, at any time prior to or during the Term, of any one or more of the following events shall be an "Event of Default" hereunder:

(i)      if Tenant shall default in the payment when due of Rent, and such default shall continue for a period of five (5) days after notice by Landlord to Tenant of such default; or

(ii)      if Tenant shall default in the observance or performance of its obligations under Article 15 hereof; or

(iii)      if the Premises shall become deserted or abandoned; or

(iv)      if this Lease or the estate of Tenant hereunder shall be assigned, subleased, transferred, mortgaged of encumbered, whether by operation of law or otherwise, except as expressly permitted under Article 12 hereof; or

(v)      if Tenant, or any guarantor of this Lease, shall admit, in writing, that it is unable to pay its debts as such debts become due; or

(vi)      if Tenant, or any guarantor of this Lease, shall make an assignment for the benefit of creditors; or

(vii)      if Tenant, or any guarantor of this Lease, shall file a voluntary petition under Title 11 of the United States Code or if such petition is filed against Tenant and an order for relief is entered, or if Tenant, or any guarantor of this Lease, shall file any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, or shall seek or consent to or acquiesce in or suffer the appointment of any trustee, receiver, custodian, assignee, sequestrator or liquidator or other similar official of Tenant or of all or any substantial part of its properties or of the premises or any interest of Tenant therein or if Tenant shall take any corporate action in furtherance of any action described in subparagraph A(v), (vi) or (vii) of this Article 17; or

(viii)      if within ninety (90) days after the commencement of any proceeding against Tenant, or any guarantor of this Lease, seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within ninety (90) days after

the appointment, without the consent or acquiescence of Tenant, or any guarantor of this Lease, of any trustee, receiver, custodian, assignee, sequestrator or liquidator or other similar official of Tenant, or any guarantor of this Lease, or of all or any substantial part of its properties or of the Premises or any interest of Tenant, or any guarantor of this Lease, therein, such appointment shall not have been vacated or stayed on appeal or otherwise, or if, within sixty (60) days after the expiration of any such stay, such appointment shall not have been vacated; or

(ix)    if a levy under execution or attachment shall be made against Tenant, or any guarantor of this Lease, or its or their property and such execution or attachment shall not be vacated or removed by court order, bonding or otherwise within ninety (90) days; or

(x)    if Tenant shall default in the observance or performance of any other term, covenant or condition of this Lease on Tenant's part to be observed or performed and Tenant shall fail to remedy such default within fifteen (15) days after notice by Landlord to Tenant of such default, or if such default is of such a nature that it cannot be completely remedied within said period of fifteen (15) days and Tenant shall not commence within said period of fifteen (15) days, or shall not thereafter diligently prosecute to completion, all steps necessary to remedy such default.

## ARTICLE 18
## REMEDIES AND DAMAGES

A.    (i)    If an Event of Default (1) described in subparagraph A(v), (vi), (vii), (viii) or (ix) of Article 17 hereof shall occur, or (2) described in subparagraphs A (i), (ii), (iii), (iv) or (x) of Article 17 thereof shall occur, Landlord, at any time thereafter, at its option, may terminate this Lease and the Term by giving Tenant five (5) days notice of Landlord's intention to do so, and upon the giving of such notice, this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as if the date on which the Event of Default described in clause (1) above occurred or the date specified in the notice given pursuant to clause (2) above, as the case may be, were the date herein definitely fixed for the expiration of the Term and Tenant immediately shall quit and surrender the Premises, but Tenant shall remain liable for damages as hereinafter provided.  Anything contained herein to the contrary notwithstanding, if such termination shall be stayed by order of any court having jurisdiction over any proceeding described in subparagraph A(vii) or (viii) of Article 17 hereof, or by federal or state statute then, following the expiration of any such stay, or if the trustee appointed in any such proceeding, Tenant or Tenant as debtor-in-possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefore by law or within 120 days after entry of the order for relief or as may be allowed by the court, or if said trustee, Tenant or Tenant as debtor-in-possession shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the completion and continuous future performance of Tenant's obligations under this Lease as provided in Section L of this Article 18, Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on five days' notice to Tenant, Tenant as debtor-in-possession or said trustee, and upon the expiration of said five day period this Lease shall cease and expire as aforesaid and Tenant, Tenant as debtor-in-possession and/or said trustee shall immediately quit and surrender the Premises as aforesaid.

A/72586982.3

(ii)     If an Event of Default described in Section A subparagraph (i) of Article 17 hereof shall occur, or if this Lease shall be terminated as provided in Section A(i) of this Article 18, Landlord, in addition to any other rights or remedies it may have, shall, after five days written notice to Tenant, have the immediate right of reentry and may remove all persons and property from the Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost and for the account of Tenant (without using any force), without being deemed guilty of trespass, or, provided Landlord exercises due care in effecting such removal, becoming liable for any loss or damage which may be occasioned hereby.

B.     (i)     If this Lease shall be terminated as provided in subparagraph A (i) of this Article 18 and/or Tenant shall be dispossessed by summary proceedings or otherwise as provided in subparagraph A(ii) of this Article 18:

(a)     Tenant shall surrender possession and vacate the Premises immediately, and deliver possession thereof to Landlord, and hereby grants to Landlord full and free license to enter into and upon the Premises in such event with process of law and to expel or remove Tenant and any others who may be occupying or within the Premises, and to remove any and all property therefrom, (without using any force) without being deemed in any manner guilty of trespass, eviction or detainer, and without relinquishing Landlord's rights to Rent or any other right given to Landlord hereunder or by operation of law. Tenant expressly waives the service of any demand for the payment of Rent or for possession and the service of any notice of Landlord's election to terminate this Lease or reenter the Leased Premises, except as provided for in subparagraph A(i) of Article 17;

(b)     If Landlord elects to terminate Tenant's right to possession only, without terminating this Lease, Landlord may, at Landlord's option, enter into the Premises, remove Tenant's signs and other evidence of tenancy, and take and hold possession thereof without such entry and possession terminating this Lease or releasing Tenant, in whole or in part from Tenant's obligation to pay the Rent hereunder for the full Term. Upon and after entry into possession of the Premises without termination of this Lease, Landlord may, but need not relet the Premises or any part thereof, with or without any furniture that may be therein, as the agent of Tenant, to any person, firm or corporation other than Tenant for such Rent, for such time and upon such terms as Landlord in Landlord's sole discretion shall determine; and Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant about such reletting. In any such case, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent deemed by Landlord necessary or desirable, and Tenant shall, upon demand, pay the cost thereof, together with Landlord's expenses of the reletting. If the consideration collected by Landlord upon any such reletting for Tenant's account is not sufficient to pay monthly, the full amount of the Rent reserved in this Lease, together with the costs of repairs, alterations, additions, redecorating and Landlord's expenses, Tenant shall pay to Landlord the amount of each monthly deficiency upon demand; and if the consideration so collected from any such reletting is more than sufficient to pay the full amount of the Rent reserved herein, together with the costs and expenses of Landlord, Landlord, at the end of the said Term of this Lease, shall retain the surplus.

(c)     Any and all property which may be removed from the Premises by Landlord pursuant to the authority of this Lease or of law, to which Tenant is or may be entitled,