shall be deemed abandoned by Tenant, and may be handled, removed, stored, sold or otherwise disposed of, by Landlord at the risk, cost and expense of Tenant, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay to Landlord, upon demand, all expenses incurred in such removal and all storage charges against such property so long as the same shall be in Landlord's possession or under Landlord's control. Landlord may place such property in storage for the account of, and at the expense of Tenant, and if Tenant fails to pay the cost of storing such property after it has been stored for a period of ten (10) days or more, Landlord may sell any or all of such property in such manner and at such times and places as Landlord in its reasonable discretion may deem proper, without notice to or demand upon Tenant for the payment of any part of such charges or the removal of any of such property and shall apply the proceeds thereof, first to such sale, including reasonable attorneys' fees; second, to the payment of the costs and charges of storing any property; third, to the payment of any other sums of money which may then or thereafter be due to Landlord from Tenant under any of the terms hereof, and fourth, the balance, if any, to Tenant.

(d)     If Landlord terminates the Lease or Tenant's right to possession only, due to default by Tenant, Landlord may repair and alter the Premises in such manner as Landlord may deem necessary or advisable without relieving Tenant of any liability under this Lease or otherwise affecting any such liability, and/or let or relet the Premises or any parts thereof for the whole or any part of the remainder of the Term or for a longer period, in Landlord's name or as agent of Tenant, and out of any rent and other sums collected or received as a result of such reletting Landlord shall: (i) first, pay to itself the cost and expense of terminating this Lease, reentering, retaking, repossessing repairing and/or altering the Premises, or any part thereof, and the cost and expense of removing all persons and property therefrom, including in such costs, brokerage commissions, legal expenses and attorneys' fees and disbursements, (ii) second, pay to itself the cost and expense sustained in securing any new tenants and other occupants, including in such costs brokerage commissions, legal expenses and attorneys' fees and disbursements and other expenses of preparing the Premises for reletting, and, if Landlord shall maintain and operate the Premises, the cost and expense of operating and maintaining the Premises, and (iii) third, pay to itself any balance remaining on account of the liability of Tenant to Landlord and Tenant's liability to Landlord shall be reduced by such amount. Landlord in no way shall be responsible or liable for any failure to relet the Premises or any part thereof, or for any failure to collect any rent due on any such reletting, and no such failure to relet or to collect rent shall operate to relieve Tenant of any liability under this Lease or to otherwise affect any such liability;

(e)     Tenant shall be liable for and shall pay to Landlord, as damages, any deficiency (hereinafter referred to as "Deficiency") between the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of subparagraph B(i)(2) of this Article 18 for any part of such period (first deducting from the rents collected under any such reletting all of the payments to Landlord described in subparagraph B(i)(4) of this Article 18); any such Deficiency shall be paid in installments by Tenant on the days specified in this Lease for payments of installments of rent, and Landlord shall be entitled to recover from Tenant each Deficiency installment as the same shall arise, and no suit to collect the amount of the Deficiency for any installment period shall prejudice Landlord's right to collect the Deficiency for any subsequent installment period by a similar proceeding; and

(f) No termination of this Lease pursuant to subparagraph A(i) or (ii) of this Article 18, and no taking possession of and/or reletting the Premises, or any part thereof, pursuant to subparagraph A(ii) and subparagraph B(i)(2) and (5) of this Article 18, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

C.      Intentionally omitted.

D.      The Rent payable by Tenant hereunder and each and every installment thereof, and all costs, reasonable attorneys' fees and disbursements and other actual expenses which may be incurred by Landlord in enforcing the provisions of this Lease or on account of any delinquency of Tenant in carrying out the provisions of this Lease shall be and they hereby are declared to constitute a valid lien upon the interest of Tenant in this Lease and in the Premises.

E.      Suit or suits for the recovery of damages, or for a sum equal to any installment or installments of Rent payable hereunder or any Deficiencies or other sums payable by Tenant to Landlord pursuant to this Article 18, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the Term would have expired by limitation had there been no Event of Default by Tenant and termination.

F.      Nothing contained in this Article 18 shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by a statute or rule of law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount shall be greater than, equal to or less than the amount of the damages referred to in any of the preceding sections of this Article 18.

G.      No receipt of monies by Landlord from Tenant after the termination of this Lease, or after the giving of any notice of the termination of this Lease (unless such receipt cures the Event of Default which was the basis for the notice), shall reinstate, continue or extend the Term or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payment of Rent payable by Tenant hereunder or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper remedy, except as herein otherwise expressly provided. After the service of notice to terminate this Lease or the commencement of any suit or summary proceedings, or after a final order or judgment for the possession of the Premises, Landlord may demand, receive and collect any monies due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of the use and occupation of the Premises or, at the election of Landlord, on account of Tenant's liability hereunder.

H.      Except as otherwise expressly provided herein, or as prohibited by applicable law, Tenant hereby expressly waives the service of any notice of intention to reenter provided for in any statute, or of the institution of legal proceedings to that end, and Tenant, for and on behalf of itself and all persons claiming through or under Tenant, also waives any and all right of redemption provided by any law or statute now in force or hereafter enacted or otherwise, for re-

entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease, and Landlord and Tenant waive and shall waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or any claim of injury or damage. The terms "enter", "re-enter", "entry" or "re-entry" as used in this Lease are not restricted to their technical legal meaning.

I.    No failure by Landlord or Tenant to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or the Rules and Regulations or to exercise any right or remedy consequent upon a breach thereof, and no acceptance by Landlord of full or partial Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by Tenant or Landlord and no breach thereof, shall be waived, altered or modified except by a written instrument executed by the party against whom enforcement is sought. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

J.    In the event of any breach or threatened breach by Landlord or Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, the other party shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though, in the case of Landlord, re-entry, summary proceedings, and other remedies were not provided for in this Lease.

K.    Each right and remedy of Landlord or Tenant provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord or Tenant, as the case may be, of any one or more of such rights or remedies shall not preclude the simultaneous or later exercise by Landlord of any or all the other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

L.    If an order for relief is entered, or if any stay or other act becomes effective in favor of Tenant or Tenant's interest in this Lease in any proceeding which is commenced by or against Tenant under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, Landlord shall be entitled to invoke any and all rights and remedies available to it under such bankruptcy code, statute, law or this Lease, including, without limitation, such rights and remedies as may be necessary to adequately protect Landlord's right, title and interest in and to the Premises or any part thereof and adequately assure the complete and continuous future performance of Tenant's obligations under this Lease. Adequate protection of Landlord's right, title and interest in and to the Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease shall include, without limitation, the following requirements:

39

(i)     that Tenant comply with all of its obligations under this Lease;

(ii)    that Tenant pay to Landlord, on the first day of each month occurring subsequent to the entry of such order, or the effective date of such stay, a sum equal to the amount by which the Premises diminished in value during the immediately preceding monthly period, but, in no event, an amount which is less than the aggregate rent payable for such monthly period;

(iii)   that Tenant continue to use the Premises in the manner required by this Lease;

(iv)    that Landlord be permitted to review the performance of Tenant's obligations under this Lease;

(v)     that Tenant pay to Landlord within thirty (30) days after entry of such order or the effective date of such stay, as partial adequate protection against future diminution in value of the Premises and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, a security deposit in an amount equal to twelve months Rent then payable hereunder; and

(vi)    that Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease.

M.     If Tenant's trustee, Tenant or Tenant as debtor-in-possession assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. 5365, or as the same may be amended) to any person who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the trustee, then notice of such proposed assignment, setting forth (1) the name and address of such person, (2) all of the terms and conditions of such offer, and (3) the adequate assurance to be provided Landlord to assume such person's future performance under this Lease, including, without limitation, the assurances referred to in Title 11 U.S.C. §365(b)(3), as it may be amended, shall be given to Landlord by the trustee, Tenant or Tenant as debtor-in-possession no later than thirty (30) days after receipt by the trustee, Tenant or Tenant as debtor-in-possession of such offer, but in any event no later than ten (10) days prior to the date that the trustee, Tenant or Tenant as debtor-in-possession shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to the trustee given at any time prior to the effective date of such proposed assignments, to accept, or to cause Landlord's designee to accept, an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person less any brokerage commissions which may be payable out of consideration to be paid by such person for the assignment of this Lease.

## ARTICLE 19
## FEES AND EXPENSES

If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in

any Article of this Lease, Landlord may on five (5) days notice perform the same for the account of Tenant (provided, however, that notice under this Article shall not be required in the event of an imminent danger to health or safety or in the event that the failure to promptly remedy such default may result in potential criminal or other liability or default by Landlord under a mortgage, ground lease or other agreement), and if Landlord makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding (including, without limitation, any arbitration or mediation) such sums paid or obligations incurred with interest (at an annual rate ("Applicable Rate", "interest" or "Interest") which shall be the lower of (i) four (4) percentage points higher than the "prime rate", "base rate" or "reference rate" of Citibank, N.A., and (ii) the highest rate of interest permitted to be charged under the laws of the State of New York) and costs, shall be deemed to be Additional Rent hereunder and shall be paid by Tenant to Landlord within twenty (20) days of rendition of any bill or statement to Tenant therefore. If Landlord shall default in the observance or performance of any term or covenant on Landlord's part to be observed or performed under or by virtue of any of the terms or provisions in any Article of this Lease and (a) such failure continues for thirty (30) days after notice from Tenant to Landlord (or, in the event that the failure of Landlord poses a material adverse impact on Tenant's business, such shorter period of time as shall be reasonable under the circumstances), or (b) if the time required to remedy the default requires a longer period than as aforesaid, Landlord does not commence cure within the aforesaid time period and thereafter diligently prosecute such cure to completion, Tenant may, on five (5) days notice to Landlord, perform the same for the account of Landlord and if Tenant makes any expenditures or incurs any obligations for payment of money in connection therewith, including, but not limited to, reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any action (including, without limitation, any arbitration or mediation), such sums together with interest at the Applicable Rate shall be paid by Landlord to Tenant within twenty (20) days after rendition of any bill or statement therefore. If either party shall institute any action or proceeding against the other, the nonprevailing party shall pay to the prevailing party all costs and expenses incurred by the prevailing party, including but not limited to, reasonable attorneys' fees and disbursements in connection with such action or proceeding, and such costs and expenses, if those of Tenant, shall be deemed to be Additional Rent hereunder and in all events shall be paid by the nonprevailing party to the prevailing party within ten (10) days of rendition of any bill or statement to the nonprevailing party therefor.

## ARTICLE 20
## NO REPRESENTATION BY LANDLORD

Tenant acknowledges that neither Landlord nor any representative or agent of Landlord has made any representation or warranty (express or implied) as to the physical condition, state of repair, layout, footage or use of the Premises or any matter or thing affecting or relating to the Premises except as specifically set forth in this Lease. Tenant has not been induced by and has not relied upon any statement, representation, whether express or implied, not specifically set forth in this Lease. Tenant shall not be liable or bound in any manner by any oral or written statement, broker's "set-up", representation, agreement or information pertaining to the Premises, the building or this Lease furnished by any real estate broker, agent, servant, employee or other personal, unless specifically set forth herein and no easements, licenses or other rights are or shall be acquired by Tenant by implication or otherwise unless expressly set forth herein.

A/72586982.3

All references in this Lease to the consent or approval of Landlord shall be deemed to mean the written approval of Landlord and no consent or approval of Landlord shall be effective for any purpose unless such consent or approval is set forth in a written instrument executed by Landlord and Landlord shall have no obligation to perform any work or make any installations in order to prepare the Premises for Tenant's occupancy, except for Landlord's Work.

## ARTICLE 21
## END OF TERM

Upon the expiration or other termination of the Term, Tenant shall quit and surrender to Landlord the Premises, broom clean, in good order and condition, ordinary wear and tear and damage, for which Tenant is not responsible under the terms of this Lease excepted, and Tenant may remove all of its property pursuant to Article 4 hereof. Tenant's obligation to observe or perform this covenant shall survive the expiration or sooner termination of the Term. If the last day of the Term or any renewal thereof falls on a Sunday, or a holiday, this Lease shall expire on the next business day.

Tenant acknowledges that possession of the Premises must be surrendered to Landlord at the expiration or sooner termination of the term of this Lease. The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant to timely surrender possession of the Premises as aforesaid will be extremely substantial, may exceed the installments of monthly Minimum Rent and Additional Rent theretofore payable hereunder, and will be impossible to accurately measure. Tenant therefore agrees that if possession of the Premises is not surrendered to Landlord on or before the expiration or sooner termination of the term of this Lease, then Tenant shall pay to Landlord for each month and for each portion of any month during which Tenant holds over in the Premises after the expiration or sooner termination of the term of this Lease, a sum equal to 125% of the monthly Minimum Rent which was payable under this Lease during the last month of the then term hereof. Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the expiration or sooner termination of the term of this Lease. The aforesaid provisions of this Paragraph shall survive the expiration or sooner termination of the term of this Lease.

## ARTICLE 22
## QUIET ENJOYMENT

Provided that Tenant pays the Rent and observes and performs all the terms, covenants and conditions set forth in this Lease on Tenant's part to be observed and performed, and is not otherwise in default hereunder, Landlord shall not do anything during the Term as to interfere with Tenant's peaceful and quiet enjoyment of the Premises, subject, nevertheless, to the terms and conditions of this Lease.

## ARTICLE 23
## FAILURE TO GIVE POSSESSION

Except as specifically set forth in this Lease, Tenant waives any right to rescind this Lease and further waives the right to recover any damages which may result from Landlord's failure to deliver possession of the Premises or any part thereof on the date specified as the

Estimated Commencement Date. If Landlord shall be unable to give possession of the Premises on the date specified as the Estimated Commencement Date, and provided Tenant is not responsible for such inability to give possession, no such failure to give possession on the Estimated Commencement Date shall in any wise affect the validity of this Lease or the obligations of Tenant hereunder or give rise to any claim for damages by Tenant or claim for rescission of this Lease, nor shall same be construed in any wise to extend the Term; provided, however, that, if the Commencement Date has not occurred by the date that is six (6) months following the Estimated Commencement Date (the "Outside Commencement Date"), Tenant shall have the right to terminate this Lease by delivering thirty (30) days prior written notice to Landlord at any time following the Outside Commencement Date and prior to the Commencement Date and if the Commencement Date has not occurred on or prior to the dates set forth in Tenant's notice, this Lease shall terminate on the date set forth in Tenant's notice. If permission is given to Tenant to enter into the possession of the Premises or to occupy premises other than the Premises prior to the Commencement Date, Tenant covenants and agrees that such occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this Lease, except the covenant to pay Rent.

## ARTICLE 24
## NO WAIVER

A.      No act or thing done by Landlord or Landlord's agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease. The delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises. In the event Tenant at any time desires to have Landlord sublet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of the obligations under this Lease, and Tenant hereby relieves Landlord of any liability for loss of or damage to any of Tenant's effects in connection with such subletting.

B.      The receipt by Landlord of Rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach. The failure of Landlord to enforce any of the Rules and Regulations set forth, or hereafter adopted, against Tenant. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be deemed to be other than on account of the earliest stipulated Rent, or as Landlord may elect to apply same, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy in this Lease provided.

C.      This Lease contains the entire agreement between the parties and all prior negotiations and agreements are merged in this Lease. Any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

43
A/72586982.3

D.     If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

E.     If there be any agreement between Landlord and Tenant providing for the cancellation of this Lease upon certain provisions or contingencies and/or an agreement for the renewal hereof at the expiration of the Term, the right to such renewal or the execution of a renewal agreement between Landlord and Tenant prior to the expiration of the term shall not be considered an extension thereof or a vested right in Tenant to such further term, so as to prevent Landlord from canceling this Lease and any such extension thereof during the remainder of the original Term; such privilege, if and when so exercised by Landlord, shall cancel and terminate this Lease and any such renewal or extension previously entered into between Landlord and Tenant or the right of Tenant to any such renewal or extension; any right herein contained on the part of Landlord to cancel this Lease shall continue during any extension or renewal hereof; any option on the part of Tenant herein contained for an extension or renewal hereof shall not be deemed to give Tenant any option for a further extension beyond the first renewal or extended term.

## ARTICLE 25
## WAIVER OF TRIAL BY JURY

**LANDLORD AND TENANT EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. IF LANDLORD COMMENCES ANY SUMMARY PROCEEDING FOR NONPAYMENT OF RENT, TENANT WILL NOT INTERPOSE ANY NON-MANDATORY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING.**

## ARTICLE 26
## INABILITY TO PERFORM

This Lease and the obligations of Landlord and Tenant to perform all of the covenants and agreements hereunder on their respective parts to be performed shall in no wise be affected, impaired or excused because such party is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed or because such party is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, if such party is prevented or delayed from so doing by reason of Unavoidable Delay. "Unavoidable Delay" means any delay caused by reason of strikes, lockouts or other labor or industrial troubles or by accident or by any cause whatsoever reasonably beyond the control of the party obligated to perform, including but not

limited to, laws, governmental preemption in connection with a national emergency or by reason of any rule, order or regulation of any federal, state, County or municipal authority or any department or subdivision thereof or any government agency applicable to the Premises or the party obligated to perform or by reason of the conditions of supply and demand which have been or are affected by war or other emergency or by reason of fire or other casualty, acts of God such as (by way of example only) tornado, earthquake, hurricane, civil disturbance, act of the public enemy, riot, sabotage, blockage, embargo, explosion, terrorist attack or any other cause beyond a party's reasonable control, whether or not similar to any of the causes hereinabove stated. The foregoing shall excuse Tenant's obligation to pay Rent as and when required by the terms of this Lease.

## ARTICLE 27
## BILLS AND NOTICES

Except as otherwise expressly provided in this Lease, any bills, statements, notices, demands, requests, approvals, consents, certificates or other communications given or required to be given under this Lease other than bills for Rent shall be deemed sufficiently given or rendered only if in writing, (a) sent by hand, overnight courier such as Federal Express, or by registered or certified mail (return receipt requested) addressed to Tenant as follows:

Rock & Republic Enterprises, Inc.
3523 Eastham Drive
Culver City, CA 90232
Attn: Michael Ball

with copies of all notices to:

Manatt, Phelps & Phillips, LLP
11355 W. Olympic Boulevard
Los Angeles, CA 90064
Attn: Martin E. Steere, Esq.

or (b) sent by hand, overnight courier such as Federal Express, or by registered or certified mail (return receipt requested) to Landlord at Landlord's address set forth in this Lease:

with copies to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10019
Attention: Ivan W. Moskowitz, Esq.

or (c) to such other address as either Landlord or Tenant may designate as its new address for such purpose by notice given to the other in accordance with the provisions of this Article 27. Any such notice, demand, request, approval, consent, certificate or other communication shall be deemed to have been rendered or given three (3) days after mailing, if sent by certified or registered mail; one (1) business day after the same is sent, if sent by overnight courier and marked for next day delivery; or on the day delivered if sent by hand before 5 p.m. on a business

day (and, if after 5 p.m. or on a non-business day, on the next business day). Notices from Landlord or Tenant may be given by such party's attorney.

## ARTICLE 28
## ADDITIONAL RENT

A.    In addition to the Minimum Rent, Tenant shall, during each Tax Year, or portion of a Tax Year occurring during the Term, as the same may be extended, pay to Landlord as Additional Rent "Tax Rent" (as hereinafter defined) for the applicable Tax Year. As used herein the term;

"Taxes" shall mean the aggregate amount of all real estate taxes, governmental levies, municipal taxes, county taxes, business and/or special improvement district taxes or similar taxes, payments in lieu of taxes pursuant to any agreement entered into by Landlord with the City of New York, or any other governmental charge, general or special, ordinary or extraordinary, unforeseen as well as foreseen, of any kind or nature whatsoever, which are or may be assessed, levied or imposed upon all or any part of the Real Property and the sidewalks, plazas or streets in front of or adjacent to the Premises, including the tax, excise or fee measured or payable with respect to any rent, levied against Landlord and/or the Real Property, under the laws of the United States, the State of New York, City of New York or any political subdivision thereof (but excluding any income, franchise, inheritance, estate, transfer or gift taxes). If because of any change in the taxation of real estate, any other tax or assessment (including, without limitation, any occupancy, gross receipts or rental tax) is imposed upon Landlord, or the owner of the Real Property or the occupancy, rents or income therefrom, in substitution for, or in addition to, any of the foregoing Taxes (such as, for example, the New York sales tax on rents, the Michigan single business tax, the City of Los Angeles gross receipts tax on rents, or the Philadelphia City or School District gross receipts tax, as such taxes are presently computed), such other tax or assessment shall be deemed part of the Taxes, provided the same shall be calculated as if the Real Property were the only property of Landlord. Further, all expenses, including, without limitation, reasonable or customary attorneys' fees and disbursements, experts, and other witnesses, fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes shall be considered as part of the Taxes for such year. The following shall be excluded from Taxes: corporate franchise, income, stock, estate, transfer taxes, late charges (unless occasioned by Tenant's failure to timely pay Tenant's Tax Rent), interest and/or penalties (unless occasioned by Tenant's failure to timely pay Tenant's Tax Rent) and special assessments levied against another tenant or occupant in the Building due to improvements made by such other tenant or occupant. The Taxes shall be initially computed on the basis of the assessed valuation in effect at the time Landlord's Statement (hereinafter defined) is rendered (as Taxes may have been settled or finally adjudicated prior to such time) regardless of any then pending application, preceding or appeal respecting the reduction of any such assessed valuation, but shall be subject to subsequent adjustment as provided in subparagraph E(i) of this Article 28.

"Assessed Valuation" shall mean the transitional amount for which the Real Property or the Unit, as the case may be, is transitionally assessed pursuant to applicable provisions of the New York City charter and of the Administrative Code of the City of New York for the purpose of imposition of Taxes.

"Tax Year" shall mean the period July 1 through June 30 (or such other period as hereinafter may be adopted by The City of New York as its fiscal year for real estate tax purposes).

"Landlord's Statement" shall mean an instrument or instruments containing a statement of Taxes for the Tax Year, pursuant to the provisions of this Article 28, together with evidence from the Taxing Authority of the amount of Taxes.

"Year" shall mean a calendar year.

"Tax Year" shall mean the period as may be adopted by the taxing authority for the fiscal year assessing taxes.

B.     Tenant shall pay to Landlord, at the time or times set forth in subparagraph C below, during each Year occurring during the Term of this Lease, all of the Taxes assessed, levied or imposed during, or with respect to, such Year or any part thereof ("Tax Rent").   At Landlord's election, Tenant shall pay Tax Rent directly to the taxing authority and deliver to Landlord within thirty (30) days after the due date thereof, evidence of payment of such Tax Rent. Taxes for the Tax Year in which the Commencement Date or Expiration Date occurs shall be appropriately adjusted so that Tenant shall be responsible only for the Taxes applicable to the portion of each Tax Year contained within the Lease Term.

C.     Landlord's failure to render a Landlord's Statement during or with respect to any Tax Year shall not prejudice Landlord's right to render a Landlord's Statement during or with respect to any subsequent Year, and shall not eliminate or reduce Tenant's obligation to pay Tax Rent pursuant to this Article 28 for such Year.

D.     Only Landlord shall have the right to contest the Assessed Valuation; provided, however, Tenant may request from Landlord, at least thirty (30) days prior to the last date that Landlord may file a protest to contest the Assessed Valuation, whether or not Landlord intends to contest Taxes. In the event Landlord advises Tenant that it will not contest Taxes, Tenant may contest Taxes in such event. In the event that, after a Landlord's Statement with respect to Taxes has been sent to Tenant, the Assessed Valuation which had been utilized in computing Taxes for a Year is reduced (as a result of settlement, final determination of legal proceedings or otherwise), and as a result thereof a refund of Taxes is actually received by or on behalf of Landlord, then, promptly after receipt of such refund, Landlord shall send Tenant a statement adjusting Taxes for such Year (taking into account the expenses mentioned in the penultimate sentence of subsection A of this Article 8) and setting forth Tenant's Proportionate Share of such refund and Tenant shall be entitled to receive such Share by way of a credit against the Rent next becoming due after the sending of such Statement (or paid to Tenant at the end of the Term, provided Tenant is not in default hereunder at such time); provided, however, that Tenant's share of such refund shall be limited to the amount, if any, which Tenant had theretofore paid to Landlord.

E.     At the option of Landlord, which may be exercised by written notice to Tenant, if Landlord is required to escrow Taxes with any lender, Tenant shall pay to Landlord, on the first day of each and every month of the Lease Term, an amount equal to the tax escrow required by

Landlord's lender. Such amount, and consequently the monthly installments, may be adjusted at any time by Landlord to the extent adjusted by Landlord's lender. Upon the expiration of the term of this Lease, Landlord shall return to Tenant, after adjustment of Tax Rent, any balance of the escrow held by Landlord's lender.

## ARTICLE 29
## SERVICES

A.    Intentionally omitted.

B.    If there shall be installed in the Premises a "sprinkler system," and such system or any of its appliances shall be damaged or injured or not in proper working order by reason of any act, omission, negligence or breach by Tenant of any obligation hereunder of Tenant, Tenant's agents, servants, employees, licensees or visitors, Tenant shall forthwith restore the same to good working condition at its own expense; and if the New York Board of Fire Underwriters or the New York Fire Insurance Rating Organization or any bureau, department or official of the state or city government, shall require or recommend that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of Tenant's manner of use of the Premises, or the locations of the partitions, trade fixtures, or other contents of the Premises, Tenant shall, at Tenant's expense, promptly make and supply such changes, repairs, modifications, alterations, additional sprinkler heads or other equipment, whether the work involved shall be structural or non-structural in nature.

C.    (i)    Landlord shall not be obligated to furnish gas or electric energy to Tenant and Tenant shall not be obligated to pay Landlord therefore. Tenant shall arrange to obtain electric energy directly from such public utility servicing the Premises. Electric energy may be furnished to Tenant by means of the then existing systems to the extent that the same are available, suitable and safe for such purposes. Landlord shall cooperate with Tenant, at no cost to Landlord, in obtaining for Tenant, additional gas and electrical service to the Premises, subject to the requirements of the utility company furnishing gas and electricity to the Premises.

(ii)    Throughout the duration of Tenant's occupancy (a) Tenant shall keep the meters, submeters and installation equipment in good working order and repair, at Tenant's own cost and expense, in default of which Landlord may, on ten (10) days' notice to Tenant, cause such meters and equipment to be replaced or repaired and collect the cost thereof from Tenant; and (b) Tenant shall pay directly to Landlord, or at Landlord's option, the service provider the cost of water consumed (and attendant sewer charges), as shown on said meters on or before the dates due.

(iii)    Landlord shall not be liable to Tenant in any way for any claims, damages, costs or expenses, directly or indirectly incurred, resulting from any use, interruption, curtailment or failure, or defect in the supply of any service provided (by Landlord or otherwise) under this Article 29 furnished to the Premises by reason of any requirement, act or omission of Landlord or of others for any other reason, except Landlord's gross negligence or willful misconduct.

D.    Intentionally omitted.

## ARTICLE 30
## VAULT SPACE

Notwithstanding anything contained in this Lease to the contrary, or indicated on any sketch, blueprint or plan, any vaults, vault space or other space outside the boundaries of the Real Property (a "Vault") are included in the Premises. Landlord makes no representation as to the location of the boundaries of the Real Property. All Vaults which Tenant may be permitted to use or occupy are being used without consideration and are to be used or occupied under a revocable license and if the amount of such space shall be diminished or required by any Federal, State or Municipal authority or by any public utility company, such revocation, diminution or requisition shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord. Any fee, tax or charge imposed by any governmental authority for any such Vaults, vault space or other space outside the boundaries of the Real Property which are being used by Tenant shall be paid by Tenant at least thirty (30) days prior to its due date. Tenant's use of any Vault is at Tenant's sole risk and Landlord shall have no obligation for the condition or maintenance thereof or otherwise, which maintenance and obligations, whether structural or non-structural shall be Tenant's sole responsibility.

## ARTICLE 31
## CAPTIONS

The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

## ARTICLE 32
## PARTIES BOUND

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, distributees, executors, administrators, successors, and, except as otherwise provided in this Lease, their assigns.

## ARTICLE 33
## BROKER

Landlord and Tenant represent and warrant that each has dealt with no broker in connection with this Lease, other than Sinvin Realty LLC ("Broker") and that no broker other than Broker, is entitled to any commission in connection therewith, and the execution and delivery of this Lease by Landlord and Tenant shall be conclusive evidence that each has relied upon the foregoing representation and warranty. Tenant shall indemnify, defend and hold Landlord harmless of and from any and all loss, costs, damage and expense (including, without limitation, attorneys' fees and disbursements) incurred by Landlord by reason of any claim of or liability to any broker, other than Broker, founded upon a claim that the aforesaid representation and warranty by Tenant is untrue. Landlord shall indemnify, defend and hold Tenant harmless of and from any and all loss, costs, damage and expense (including, without limitation, attorneys' fees and disbursements) incurred by Tenant by reason of any claim of or liability to any broker, founded upon a claim that the aforesaid representation and warranty by Landlord is untrue.

Landlord agrees to pay Broker any commission earned in accordance with a separate agreement. This Article 33 shall survive the expiration or earlier termination of this Lease.

**ARTICLE 34**
**INDEMNITY**

A.     Tenant shall not do or permit any act or thing to be done upon the Premises which may subject Landlord, or Landlord's members, managers, partners, shareholders, Affiliates, officers, directors, employees, agents (including, without limitation, leasing and managing agents) and contractors ("Indemnitees") to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of law or of any legal requirement of public authority, but shall exercise such control over the Premises as to fully protect Indemnitees against any such liability. Tenant shall indemnify, defend and save harmless Indemnitees from and against (i) all claims of whatever nature against Indemnitees to the extent arising from any reckless or willful act or negligence of Tenant, its contractors, licensees, agents, invitees, employees, or visitors, except to the extent caused by the negligence or willful misconduct of any Indemnitee, (ii) all claims against Indemnitees for bodily injury (including death) or property damage occurring during the Term in the Premises, except to the extent caused by the negligence or willful misconduct of any Indemnitee, (iii) all claims against Indemnitees for bodily injury (including death) or property damage occurring outside of the Premises but anywhere within or about the Real Property to the extent arising from negligence or reckless, or willful act of Tenant or Tenant's agents, contractors or employees, and (iv) any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of Tenant to be fulfilled, kept, observed and performed. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs and expenses of any kind or nature incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof including, without limitation, attorneys fees and disbursements.

B.     Landlord shall indemnify, defend and save Tenant and Tenant's members, managers, partners, shareholders, Affiliates, officers, directors, employees, agents and contractors (collectively, the "Tenant Indemnitees") harmless from and against all claims of whatever nature against Tenant arising from any reckless or willful act or negligence of Landlord or any Indemnitee, its contractors, agents or employees occurring outside of the Premises but anywhere within or about the Real Property; except to the extent caused by the negligence or willful misconduct of Tenant or any Tenant Indemnitee. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fires, suits, demands, costs and expenses of any kind or nature incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof including, without limitation, attorneys' fees and disbursements.

C.     In the event that an indemnified party's negligent, reckless or willful acts or omissions contributed to cause the injury or damage for which a claim of indemnity is being asserted against the indemnifying party hereunder, the damages and expenses (including, without limitation, reasonable attorneys' fees and disbursements) shall be allocated or reallocated, as the case may be, between the indemnified party and the indemnifying party in such proportion as appropriately reflects the relative fault of the parties, their subsidiaries and affiliates, and their

respective directors, officers, shareholders, employees and agents, and the liability of the indemnifying party shall be proportionately reduced.

D.    Pursuant to the terms of this Article 34, the indemnified parties shall notify the indemnifying party promptly in writing after any of the indemnified parties receives notice of a claim or loss for which indemnification is or may be sought under this Lease. Failure to provide such notice will relieve the indemnifying party of its indemnity obligations to the extent that such failure prejudices the indemnifying party. The indemnifying party will have the right to control, in a manner not adverse to the indemnified parties, the defense and settlement of any claims. The indemnified parties may employ counsel, at their own expense, with respect to any such claim (provided that if counsel is employed due to a conflict of interest or because the indemnifying party does not assume control of the defense, the indemnifying party will bear such expense). The indemnifying party will not admit liability or enter into any settlement of a claim that adversely affects the indemnified parties' rights or interests without the indemnified parties' prior written approval.

E.    The provisions of this Article 34 shall survive the expiration or earlier termination of this Lease.

### ARTICLE 35
### ADJACENT EXCAVATION - SHORING

If an excavation shall be made upon land adjacent to the Premises or any part thereof, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary or advisable to preserve the wall or the Premises from injury or damage and to support the same by proper foundations without any claim for damages, set-off, rent abatement or indemnity against Landlord. Landlord shall assign to Tenant any claim Landlord may have against such adjacent owner for damage caused to the Premises.

### ARTICLE 36
### MISCELLANEOUS

A.    This Lease shall not be binding upon Landlord or Tenant unless and until each party shall have executed and delivered a fully executed copy of this Lease to the other or to its attorney.

B.    If more than one Person executes this Lease as Tenant, the obligations of each of them under this Lease are and shall be joint and several, that the term "Tenant" as used in this Lease shall mean and include each of them jointly and severally and the act of or notice from, or notice or refund to, or the signature of, any one or more of them, with respect to the tenancy and/or this Lease, including, but not limited to, any renewal, extension, expiration, termination or modification of this Lease, shall be binding upon each and all of the persons executing this Lease as Tenant with the same force and effect as if each and all of them had so acted or so given or received such notice or refund or so signed.

C.    The obligations of Landlord under this Lease shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon

subsequent Landlord after the sale, conveyance, assignment or transfer by such subsequent Landlord) of its interest in the Premises, and in the event of any such sale, conveyance, assignment or transfer, Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord thereafter accruing hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, grantee, assignee or other transferee that such purchaser, grantee, assignee or other transferee has succeeded to the rights and obligations of Landlord hereunder. The term "Landlord", on the date as of which this Lease is made, shall mean 144 Spring Realty LLC, but thereafter, "Landlord" shall mean only the holder of the Landlord's interest (fee or leasehold, as the case may be) in the Premises at the time in question. No recourse shall be had on any of Landlord's obligations hereunder against any incorporator, subscriber of capital stock, shareholder, officer or director, past, present or future, of any corporation, or against any general or limited partner of any partnership or joint venture, or any member or manager of any limited liability company, which, in any case, shall be Landlord hereunder or other holders of any equity interest in such corporation, partnership, joint venture or limited liability company, or the shareholders, directors or officers of such entity, or the partners comprising such partnership or of any successor of any such corporation, partnership, joint venture or limited liability company, or against any principal of either of the foregoing, disclosed or undisclosed, or any affiliate of any party which shall be Landlord or included in the term "Landlord", whether directly or through Landlord or through any receiver, assignee, trustee in bankruptcy or through any other person, firm or corporation (collectively, the "Parties") whether by virtue of any constitution, statute or rule of law or by enforcement of any assessment or penalty or otherwise, and Tenant shall look solely to Landlord to enforce Landlord's obligations hereunder and shall not seek any damages against any of the Parties. The liability of Landlord for Landlord's obligations under this Lease shall not exceed and shall be limited to Landlord's interest in the Real Property and Tenant shall not look to other property or assets of Landlord or any of the Parties in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations or otherwise.

D.      This Lease may not be extended, renewed, terminated or otherwise modified and no provision waived except as expressly provided for herein or by an instrument in writing signed by the party against whom enforcement of any such extension, renewal, termination, modification, or waiver is sought.

E.      Notwithstanding anything contained in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated Minimum Rent or Additional Rent, shall constitute rent for the purposes of Section 502(b)(7) of the Bankruptcy Code.

F.      Tenant shall reimburse Landlord as Additional Rent, within ten (10) days after rendition of a statement, for all expenditures made by, or damages or fines sustained or incurred by, Landlord, due to any default by Tenant under this Lease, with interest thereon at the Applicable Rate.

G.      Concurrently with the execution of this Lease, Landlord and Tenant shall execute a memorandum of lease in the form attached hereto as Exhibit D. Either Landlord or Tenant

A/72586982.3

shall have the right to record such memorandum in the real property records, and the cost of such recordation shall be borne by the party effecting such recordation.

## ARTICLE 37
## HAZARDOUS SUBSTANCES

A.     Tenant agrees not to use, store, dispose or sell any hazardous substances at the Premises (except to the extent in "de minimis" quantities, normally used in a retail or office setting, and fully in compliance with applicable laws, rules and regulations) unless it has first taken all necessary steps to obtain any necessary permits governing the use, storage, disposal and sale of such substances and has made adequate arrangements to use, store, sell and dispose of such substances safely without contaminating the Premises in accordance with such laws, rules and regulations.

B.     If Tenant or any other occupant of the Premises receives any notice of the happening of any event involving the use, spill, discharge or cleanup of any hazardous or toxic substance or waste, or any oil or pesticide on or about the Premises or into the sewer, septic system or waste treatment system servicing the Premises (any such event is hereinafter referred to as a "Hazardous Discharge") or of any complaint, order, citation, or notice with regard to air emissions, water discharges, noise emissions or any other environmental, health or safety matter affecting Tenant (an "Environmental Complaint") from any person or entity, including, without limitation, the United States Environmental Protection Agency ("EPA"), New York State Department of Environmental Conservation ("DEC"), New York City Department of Environmental protection ("DEP"), or any other state or local department or agency having jurisdiction, then Tenant shall give prompt oral and written notice of same to Landlord, detailing all relevant facts and circumstances of which Tenant has knowledge.

C.     Without limiting the foregoing, after the occurrence of an Event of Default, Landlord shall have the right, but not the obligation, to exercise any of its rights as provided in this Lease or to enter onto the Premises or to take such actions as it deems necessary or advisable to clean up, remove, resolve or minimize the impact of or otherwise deal with any Hazardous Discharge or Environmental Complaint upon its receipt of any notice from any person or entity, including, without limitation, the EPA, DEC and DEP asserting the happening of a Hazardous Discharge or an Environmental Complaint on or pertaining to the Demised Premises.  All reasonable costs and expenses incurred by Landlord in the exercise of any such rights with respect to the occurrence of a Hazardous Discharge or an Environmental Complaint caused by the act or negligent omission of Tenant, its agents, employees, contractors or invitees shall be deemed to be Additional Rent hereunder and shall be payable by Tenant to Landlord within twenty (20) days after demand therefore.

D.     (i)     If the EPA, DEC and DEP, or any other local, state or federal department or agency ("Environmental Agency") asserts or creates a lien upon any or all of the Premises by reason of the occurrence of a Hazardous Discharge or an Environmental Complaint caused by the act or negligent omission of Tenant or if an Environmental Agency asserts a claim against the Tenant or the Premises for a Hazardous Discharge caused by the act or omission of Tenant, then, within ten (10) days of the occurrence giving rise to such lien or claim, Tenant shall commence and diligently pursue either (x) cure or correction of the event which constitutes the basis for

such lien or claim, and continue diligently to pursue such cure or correction to completion, or (y) proceedings for an injunction, a restraining order or other appropriate proceedings with respect to such lien or claim, and obtain relief within thirty (30) days of the occurrence giving rise to the claim or lien.

(ii)     If required by the Environmental Agency having jurisdiction, Tenant shall post, with such Environmental Agency, a bond, letter of credit or other security satisfactory in form, substance and amount to the Environmental Agency or entity asserting the claim to secure the proper and complete cure or correction of the event which constitutes the basis for such lien or claim.

E.     Tenant hereby agrees to defend such lien or claim and hold Landlord and any Superior Lessor or Superior Mortgagee with respect to the Premises harmless from and against any and all claims, losses, liabilities, damages and expenses (including, without limitation, actual cleanup costs and any action against Tenant under this indemnity) arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of any Hazardous Discharge or Environmental Complaint occurring either (i) during or attributable to the period of this Lease and any other period of possession of the Premises by Tenant caused by Hazardous Discharge or Environmental Complaint arising from Toxins introduced into the Premises by Tenant or (ii) by reason of or attributable to the acts or negligent omissions of Tenant at or about the Premises.

F.     In the event of Tenant's failure to comply in full with this Article, then after fifteen (15) days prior notice to Tenant, Landlord may, at its option, perform any and all of Tenant's obligations as aforesaid and all reasonable costs and expenses incurred by Landlord in exercise of this right shall be deemed to be Additional Rent payable within twenty (20) days of demand therefore.

G.     The provisions of this Article 37 shall survive the expiration or termination of this Lease.

## ARTICLE 38
## SECURITY

A.     Tenant shall deposit with Landlord $500,000, as follows, which sums shall be held as security for the faithful performance and observance by Tenant of the terms, conditions and provisions of this Lease, including without limitation the surrender of possession of the Premises to Landlord as herein provided. Said security shall be deposited, by letter of credit, or cash, at the following times:

$125,000 on January 31, 2009
$125,000 on April 30, 2009
$125,000 on July 31, 2009
$125,000 on October 31, 2009

B.     If Tenant defaults in respect to any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of Minimum Rent or additional rent, Landlord may apply or retain the whole or any part of the security so deposited to the extent required for

the payment of any Minimum Rent and additional rent or any other sum as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency in the reletting of the Premises, whether such damages or deficiency accrues before or after summary proceedings or other reentry by Landlord. If Landlord applies or retains any part of the security so deposited, Tenant, upon demand, shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full deposit on hand at all times during the Term. If Tenant shall refuse or fail to replenish the security deposit, then Landlord shall have the same rights in law and equity and under this Lease as it has with respect to a default by Tenant in the payment of Minimum Rent and additional rent pursuant to Article 17 hereof. If Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the security shall be returned to Tenant after the Expiration Date and after surrender of possession of the Premises to Landlord.

C.    In the event of a sale or transfer of the Real Property or leasing of the Building, Landlord shall have the right to transfer the security to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return of such security upon notice to Tenant of such transfer and the assumption of this Lease by the assignee; and Tenant shall look solely to the new landlord for the return of said security; the provisions hereof shall apply to every transfer or assignment made of the security to a new landlord. Tenant shall not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. No interest shall be paid on the security deposited herein.

D.    If the security deposited hereunder is in the form of cash, the security shall be deposited in an interest bearing account and all interest earned thereon, less the one (1% ) percent administrative fee allowed Landlord by law, shall be added to the security and held as additional security.

E.    (i)    At Landlord's or Tenant's option, in substitution for and in lieu of the cash security deposit provided for in Article 38, Tenant shall deliver to Landlord and maintain in effect at all times during the term hereof and for at least ninety (90) days after the expiration of the term, an irrevocable letter of credit, in form and substance reasonably acceptable to Landlord, in the amount of the security required pursuant to this Article 30 issued by a banking corporation satisfactory to Landlord. Such letter of credit shall have an expiration date no earlier than the first anniversary of the date of issuance thereof and shall be automatically renewed from year to year unless terminated by the issuer thereof by notice to Landlord given not less than 30 days prior to the expiration thereof. Except as otherwise provided in this Article 30, Tenant shall, throughout the term of this Lease deliver to Landlord, in the event of the termination of any such letter of credit, replacement letters of credit in lieu thereof (each such letter of credit and such extensions or replacements thereof, as the case may be, is hereinafter referred to as a "Security Letter") no later than 30 days prior to the expiration date of the preceding Security Letter. The term of such Security Letter shall be not less than one year and shall be automatically renewable from year to year as aforesaid. If Tenant shall fail to obtain any replacement of a Security Letter within the time limits set forth in this subparagraph (i), Landlord may draw down the full amount

of the existing Security Letter and retain the same as security hereunder. If such a letter of credit is posted, any cash security deposit posted with Landlord shall be returned to Tenant.

(ii)     In the event that Landlord utilizes all or any part of the security represented by the Security Letter but does not terminate this Lease as provided in Article 17 hereof, Landlord may, in addition to exercising its rights as provided in Articles 17 and 18 retain the unapplied and unused balance of the principal amount of the Security Letter as security as provided in this Article 38. In the event Landlord applies or retains any portion or all of the security delivered hereunder, Tenant shall forthwith restore the amount so applied or retained so that at all times the amount deposited shall be not less than the security required by Article 30 of this Lease.

(iii)    In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the security shall be returned to Tenant after the date fixed at the end of the Lease and after delivery of entire possession of the Premises to Landlord as required by this Lease. In the event of a sale of the Land and building or leasing of the Premises, Landlord shall have the right to transfer any interest it may have in the Security Letter to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Letter, and Tenant agrees to look solely to the new owner for the return of said Security Letter; and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Letter to a new owner. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. In the event of a sale of the Land and building or leasing of the Premises, Landlord shall have the right to require Tenant to deliver a replacement Security Letter naming the new owner as beneficiary and, if Tenant shall fail to timely deliver the same, Landlord shall have the right to draw down the existing Security Letter and transfer the proceeds thereof to the new owner who shall retain such proceeds as security hereunder until a replacement Security Letter is delivered.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

Any payment tendered to Landlord by Tenant shall, unless Landlord and Tenant shall otherwise agree, be applied to sums due pursuant to this Article 38 and thereafter on account of all other sums due and payable under this Lease, notwithstanding any statement or direction by Tenant to the contrary.

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the day and year first above written.

LANDLORD:

144 SPRING REALTY LLC

By: _____

Name:

Title:

TENANT:

TRIPLE R, INC.

By: _____

Name:

Title:

## EXHIBIT A

### Landlord's Work Letter

Building to be constructed by Landlord shall consist of a five story structure (above ground) with full basement containing not less than 9,600 square feet of space, and shall comply with each of the following:

#### Design Criteria:

a.  Design of structure shall be a modern glass structure to meet Landmark requirements.

b.  Frontage shall not be less than 18-20 feet wide on one side and 75-80 feet deep on the other.

c.  Basement ceiling height shall not be less than 10 feet from slab to slab.

d.  Ground level slab to slab height shall not be less than 16 feet [being verified].

e.  Second and third floor slab to slab height shall not be less than 12 feet.

f.  Fourth and fifth floor slab to slab height shall not be less than 10 feet per floor.

g.  Internal egress staircase shall be at rear of space, if required by Code. A convenience stair will be included by the Tenant at his own cost.

h.  Landlord's Work shall comprise of a code compliant, waterproof Premises. All work shall be done utilizing new material.

i.  Premises shall meet compliance with all code requirements

#### Demising Wall:

a.  Landlord shall install a level 3/4" "Dragonboard Wall" or gypsum board metal partition finished wall from slab to slab at all demising walls; taped, spackled and one coat of primer paint.

#### Vertical Transportation:

a.  Landlord shall install (1) ADA compliant elevator extending from basement level to fifth level (6 stops). Location shall be mutually agreed upon. This shall be a c. 2500lb c. 7x7 traction or hydraulic elevator, Otis or City Elevator equivalent having a 40" doorway opening. Cab finishes by Tenant: Equipment to be located on the roof or in the Basement.

### Fire and Life Safety:

a.  Landlord shall fireproof or create a rating of all structural members in compliance with code requirements.

b.  Landlord to provide a stub-up connection to demised space for a class E alarm system or code required alternative into the demised space.

### Barricade:

a.  Landlord shall furnish and install a 12'-0" plywood barricade or equal protection at entire storefront. Tenant will remove at its sole cost.

### Structural System:

a.  Building shall be comprised of steel and concrete construction.

b.  Floor loads must hold 100 pounds per square foot per floor.

### Floors:

a.  Concrete slab, grade or above grade level shall be a minimum 4" thick, minimal strength of 3,500 psi.

b.  Elevation requirements: Concrete slab to be 1.5 inches lower than finished concrete sidewalk, from the highest point of concrete sidewalk.

c.  Concrete slab shall be uniformly level within industry standards.

### Roof:

a.  Roof to be inverted construction with membrane covering.

### Doors & Windows:

a.  Landlord to furnish and install rear service door on Wooster St elevation, in addition to one (1) entrance door in the curtain walling system. Egress doors shall be provided to meet required codes. Provide standard hardware to hollow metal service door with (1) peep hole and a panic hardware device, Insulated and weather-stripped for exterior doors for egress to the exterior.

b.  There are no windows required beyond the curtain walling to two (2) elevations unless required by Landmarks Preservation Commission.

### Signage:

a.  Tenant shall have the exclusive right to signage on the Building, subject to all applicable codes, ordinances and regulations.

Heating Ventilation & Cooling:

a.  Landlord shall provide a HVAC system installed to a point of distribution outside the Tenant's space and partial cellar.

b.  Landlord to provide one (1) ton per 300 square feet of leasable space.

c.  HVAC equipment shall be by the manufacture; TRANE or equal.

d.  HVAC equipment shall have a DBA rating equal to or less than code for similar spaces.

e.  All HVAC equipment and assemblies provided by the Landlord shall be factory warranted for parts and labor for a period of one (1) year after acceptance. Any warranties received for HVAC equipment and components shall be transferred to the Tenant.

Sprinkler System:

a.  If required by code to meet Use Group 6 occupancy (retail use); Landlord shall size, supply and install a complete and operational sprinkler main that is in compliance with all current codes and NFPA requirements to ensure that Tenant receives a Building Permit and Certificate of Occupancy. The sprinkler main shall be inclusive of backflow preventor and detector and all associated control wiring. Branch work is by Tenant.

b.  If required by building or local code, Landlord shall monitor system until a temporary certificate of occupancy is obtained.

c.  All sprinkler mains and branches shall be installed to the underside of structural members and or ceiling deck and coordinated with all other services.

Water and Sewer:

a.  Water lines, of size required as required by current codes (25 psi residual pressure at flushing, minimum 1" required for pressure assisted tank, 1 1/4" for single flush valve, 1 1/2" for two flush valves, and 2" for five or more flush valves), stubbed into the premises.

b.  Sewer line of size as required by code (minimum 4"). Sewer line shall be stubbed into the premises.

Plumbing:

a.  Landlord shall provide utility services stubbed to restroom location, Tenant shall provide all fitting out and sanitary fixtures.

Electrical:

a. Provide and install one single incoming electrical service to the Tenant space.

b. Provide and install a Distribution panel, which shall be installed with main circuit breaker sized per building requirements.

c. Consolidated Edison, at Tenant's request, to furnish and install electrical meter with outside utility service tap.

d. Landlord to supply a minimum 18 watts p.s.f. electrical service, subject to Tenant's delivery of a load letter if required by Consolidated Edison..

Telephone:

a. Landlord shall furnish and install an empty 2" conduit with pull wire from Telephone Company switching equipment to fire rated backboard.

Warranty:

a. All warranties received from contractors shall be transferred to the Tenant.

Advertising/Marketing:

a. Landlord shall agree allow Tenant to post advertising or marketing material on construction barricade indicating Tenant's plans for opening.

Sidewalks:

a. All sidewalks in front of new structure / storefront shall be replaced where damaged to existing visible specification if required by Code.

Temporary Certificate of Occupancy

a. Landlord to obtain temporary certificate of occupancy for building shell.

Attached hereto as Exhibit E is a preliminary layout of the Premises and schematics for the exterior of the Premises. Landlord agrees that its final plans, subject to the approval of all governmental authorities having jurisdiction, including the Landmarks Preservation Commission, will be consistent with Exhibit E, subject to modifications required on account of changes required or recommended by the aforesaid governmental approvals. Landlord agrees to consult with Tenant in the design process and to submit to Tenant its preliminary and final plans. Tenant shall respond to all submissions within ten business days after receipt of such plans. In the event that changes to the exterior of the Premises from the preliminary schematics shown on Exhibit E are required or recommended by the aforesaid governmental authorities, Landlord and Tenant shall work collaboratively in good faith in an effort to arrive at a mutually acceptable design.

In addition, Tenant shall, within ten business days after Landlord's request, reasonably designate the locations of all Building systems, including, without limitation, elevator, electrical service, plumbing risers and HVAC equipment, subject to Landlord's approval, which approval Landlord agrees not to unreasonably withhold or delay provided (i) the construction costs of Landlord are not increased as a result thereof, unless Tenant agrees to pay all such increased costs, (ii) the relocation of such Building Systems will not delay the then estimated completion date of the construction of the Building and (iii) the location of such systems will not adversely affect the use or desirability of the Building for future retail tenants, in Landlord's reasonable discretion.

It is the intention of the parties that the curtain walls will be of a quality that is as close to a cost (including secondary steel supports) equal to $150/square foot without exceeding the same as can reasonably be accomplished using a competitively priced contractor. Landlord shall be responsible for such cost of constructing the curtain walls (including secondary steel supports) up to a maximum of $150/square foot. If Landlord anticipates that such cost will exceed the foregoing maximum, Landlord shall promptly notify Tenant, and Landlord and Tenant shall meet in good faith to discuss ways in which to reduce such cost. If, despite such efforts, the cost of the curtain walls exceeds $150/square foot, Tenant shall reimburse Landlord for the excess cost upon completion of the Building. In addition, Landlord, at the request of Tenant, shall supply to Tenant, Landlord's plans and specifications and Tenant shall be entitled to consult with Tenant in connection with the same.

As used herein, the terms "substantial completion," "substantially complete" and words to that effect shall mean that the Building has been completed in accordance the approved working drawings and specifications, with the exception of minor "punch list" items, the incompletion of which will not interfere with the ability of Tenant to complete Tenant's Work (as defined in the Lease). When Landlord believes that substantial completion has been achieved, Landlord shall inform Tenant in writing, and Landlord and Tenant shall promptly thereafter meet at the Building with Architect to perform a walk through and to identify the items that still require completion. If Landlord, Tenant and Architect agree that substantial completion has been achieved, they shall jointly prepare and initial a punch list of the remaining items to be completed, and Landlord shall promptly thereafter, and in no event later than thirty (30) days following preparation of the punch list, complete each of such punch list items in a good and workmanlike manner at Landlord's sole cost and expense.

Tenant to take out separate building department application for Tenant's interior work.

## EXHIBIT B

### Prohibited Uses

Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

Any "second hand" store, "surplus" store;

Any central laundry, dry cleaning store, or laundromat;

Any bowling alley or skating rink;

Any live performance theater, movie theatre, auditorium, meeting hall, sporting event, or other entertainment use;

Any living quarters, sleeping apartments, or lodging rooms;

Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

Any mortuary or funeral home or chapel;

Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class Buildings in the State in which the Premises is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class Buildings in the State in which the Premises is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder; .

Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption;

Any catering or banquet hall;

Any check cashing service which is not an incidental use to a bank

Any delicatessen

Any restaurant or business selling food for on-premises or off premises consumption.

Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Premises;

Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.

Any pawn shop, gun shop, or tattoo parlor;

Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

Any carnival, amusement park or circus;

Any office use, other than office space used in connection with and ancillary to a permitted retail use hereunder in the New York metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency);

Daycare center;

Veterinary office;

Karate center;

Agency, Department or Bureau of any governmental authority;

Alcohol or Narcotics Treatment Center, Day Care Center or Homeless Shelter;

Athletic Facility in the ground floor of the Premises;

Auction House or for the conduct of a public auction of any kind (provided that nothing contained herein shall prohibit Tenant from holding a charity auction in the Premises from time to time);

Automobile or Truck showroom or sale of automobile or truck parts or accessories;

Ballroom, Dance Hall, Discotheque Social Club or other club or Night Club with live or recorded music (provided that nothing contained herein shall preclude Tenant from offering dance lessons or holding a dance event in the Premises from time to time);

Bicycle, roller blades, skateboard or any other type of sporting goods sale or rental;

Billiard or Pool Hall or Parlor;

Bowling Alley, Ping Pong Parlor, Amusement Arcade or other business deriving income from coin operated games, a shooting gallery or the use of any type of video game, slot machine, pinball machines or related equipment;

Church or any other House of Worship;

Community Center;

Dating or Escort Service;

Discount sale (but not seasonal general sales or sales to employee) of clothing or general merchandise;

Dry Cleaning and/or Laundry and/or valet service;

Drug store and/or health and beauty aid store;

Electronics Store;

Employment Agency;

"Flea Market" type of business;

Fruit or vegetable store;

Fund raising or solicitation for other purposes by means of telephone "bank" calls to the public from the Premises;

Funeral Parlor or Chapel;

Garage;

Gypsy, Fortune Teller or Palm Reader or Card Reader (except, from time to time, as part of a special event, party or promotion held in the Premises);

Laboratory;

Labor Union;

Liquor store or wine shop;

Manufacturing, or a Factory, or any kind;

Massage Parlor;

Medical and/or Dental offices on the ground floor of the Premises or any clinics, or the rendition of psychiatric, counseling or any diagnostic or therapeutic services of any nature whatsoever anywhere in the Building;

Messenger Service;

Municipal or other Government Office;

Nursing Home;

Office, Store, Reading room, Headquarters, Center or other facility devoted or opposed to the promotion, advancement, representation, purpose or benefit of: (a) any political party, political movement or political candidate, (b) any religion, religious group or religious denomination or (c) any foreign government;

Pet Shop;

Print shop, reproduction or blueprinting establishment;

Public stenographic/public typist;

School or Conference Facilities or as a place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers (provided that, nothing contained herein shall preclude Tenant from offering cooking, manners, arts and crafts or similar classes at the Premises);

Shoe repair;

Social Services Center;

Spiritualist services;

Surplus, Salvage, or "odd lot" or warehouse type of store;

Tax Exempt or Charitable, Educational, Religious, Union or other not-for-profit uses (provided that nothing contained herein shall prohibit Tenant from holding a charity auction in the Premises from time to time);

Telephone or Telegraph Agency;

Thrift Shop;

Tombstones, Monuments;

Variety Store;

Video Game or other Arcade or Game Room;

Any business which, as its featured or primary operation regularly sells merchandise of the types or qualities now commonly known as "off price" (such as odd lot, "99 cent" retailers, "factory reject", "sample", "floor model", "demonstration" or "distressed".

# EXHIBIT C

## RULES AND REGULATIONS

1.    If Tenant is permitted to sell food or beverages, Tenant shall cause all refuse and rubbish in the Premises to be stored in sealed, watertight, metal containers having rubber wheels and bumpers fashioned to prevent damage to the Premises and to be removed daily from the Premises, and Tenant shall not permit Tenant's employees or any persons making deliveries to or from the Premises or removing refuse and rubbish therefrom, to leave any food, refuse and rubbish containers or other matter on the streets or sidewalks adjacent to the Premises.

2.    Tenant shall not use any garbage disposals, but shall collect and dispose of all garbage in accordance with this Lease.

3.    Tenant shall not use the Premises, or any part thereof, or allow them to be used, for any business, nor store or keep glues, cements, paints, varnishes or any other inflammable or hazardous or other substances, which in any of the foregoing cases shall be deemed extra hazardous by the New York Board of Fire Underwriters or any similar organization having jurisdiction, except as otherwise permitted in the Lease or otherwise used in connection with Tenant's operation or the cleaning of the Premises.

4.    Tenant, at Tenant's sole cost and expense cause the Premises to be exterminated as reasonably required by using reputable exterminators.

EXHIBIT D

## MEMORANDUM OF LEASE

Landlord:     144 Spring Realty LLC
c/o Centaur Properties
35 East 21st Street
New York, New York 10010

Tenant:     Triple R, Inc.
3523 Eastham Drive
Culver City, CA 90232

Date:     July  , 2008

Premises:     144 Spring Street, New York, New York as described on
Schedule A annexed hereto

Term:     Fifteen (15) years with an option for one (1) additional five (5) year term.

Memorandum of     This instrument is intended to be Memorandum only of the Lease
Lease Only:     between Tenant and Landlord and this Memorandum shall not be
construed to change, vary, modify or interpret said Lease or any of the
terms, covenants, conditions or provisions or any part thereof which are
set forth or summarized herein.  The said Lease sets forth all of the terms,
covenants, conditions, provisions, rights, obligations, options and
privileges for the leasing of the Premises and reference should be made to
said Lease for the full terms thereof.

[Signatures continued on next page]

IN WITNESS WHEREOF, the parties have hereto respectfully executed this Memorandum of Lease this _____ day of July, 2008.

144 SPRING REALTY LLC

BY:_____

    Name:

    Title:

TRIPLE R, INC.

BY:_____

STATE OF NEW YORK )

)  ss.:

COUNTY OF NEW YORK )

On the _____ day of July in the year 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

**Acknowledgment by a Person OUTSIDE New York State (RPL § 309 b)**

STATE OF                    )

)ss:

COUNTY OF                    )

On the _____ day of _____ in the year 2008, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the _____(insert the city or other political subdivision and the state or country or other place the acknowledgement was taken).

_____  Notary Public

EXHIBIT E

<u>PRELIMINARY LAYOUT AND SCHEMATICS</u>

41299833.2

A/72586982.3



GROUND FLOOR PLAN
Sc. = 1'-0"

CELLAR PLAN
Sc. = 1'-0"

Spring Street

Wooster Street

ENTRY

ELEV

ELEV

UP

DN

DN

UP

UP

SERV DOOR

LIFT UP "GARAGE" DOOR

LIFT UP "GARAGE" DOOR

LIFT UP "GARAGE" DOOR

Refuse/Recycl Rm

Gas Mtr

Elect Rm

80'

8.92'

17.77'

17.77'

17.77'

17.77'

20'

13.33'

6.67'

PleskowRael Architect(ure)s



THIRD, FOURTH AND FIFTH FLOOR PLAN

SECOND FLOOR PLAN

PleskowRael Architect(ure)s



ROOF PLAN
1/8" = 1'-0"

PleskowRael Architecture(s)



EXTENDED FRAME (Outdoor "Room" at Roof) - HIGH ENTRY

WOOSTER STREET ELEVATION

SPRING ST ELEVATION

NOTE: Elevations per architectural concept
Refer to "Landlord's Work Letter" for
minimum floor-to-floor requirements

PleskowRael Architecture(s)



SPRING ST ELEVATION

NOTE: Elevations per architectural amount
Refer to "Landberg Main Lattice for
Museum floor-to-floor requirements

WOOSTER STREET ELEVATION

EXTENDED FRAME (Outdoor "Room" at Roof) - LOW ENTRY

PleskowRael Architecture(s)



SPRING ST ELEVATION

NOTE: Elevations per architectural consultation. Refer to "Schedules" work sheet for maximum floor-to-floor requirements.

WOOSTER STREET ELEVATION

NORMAL PARAPET - HIGH ENTRY

PleskowRael Architect(ure)s

ROCK&REPUBLIC



SPRING ST ELEVATION

NOTE Greystone per architectural concept.
Refer to "Landon's" Work table for
number their/hollow representents

WOOSTER STREET ELEVATION

NORMAL PARAPET – LOW ENTRY

PleskowRael Architecture(s)

ROCK&REPUBLIC



EXTENDED FRAME - HIGH ENTRY
Wooster Street "Garage" Doors Closed

NORMAL PARAPET - HIGH ENTRY
Wooster Street "Garage" Doors Open




ROOK & REPUBLIC

**PleskowRael** Architecture(s)



HIGH ENTRY
Wooster Street "Garage" Doors Open

HIGH ENTRY
Wooster Street "Garage" Doors Closed




ROCK & REPUBLIC

PleskowRael Architecture(s)



NORMAL PARAPET - LOW ENTRY
Wooster Street "Garage" Doors Closed

LOW ENTRY
Wooster Street "Garage" Doors Closed




rock&republic

PleskowRael Architecture(s)



HIGH ENTRY – Brushed Steel Finish
Wooster Street "Garage" Doors Open



EXTENDED FRAME, HIGH ENTRY – Brushed Steel Finish
Wooster Street "Garage" Doors Closed



ROCK & REPUBLIC

PleskowRael Architecture(s)

EXHIBIT B



| | |
|---|---|
| **OWNER:** | **144 Spring Realty LLC** |
| **DATE:** | **July 18, 2008** |
| **TENANT:** | **Triple R, Inc.** |
| **PREMISES:** | **144 Spring Street, New York, New York** |

**GUARANTOR'S INTEREST IN TENANT: Guarantor is the owner of the issued and outstanding shares of stock of Tenant**

THIS LIMITED GUARANTY, dated as of the date set forth above made by the undersigned, whose principal residence is set forth below ("Guarantor") for the benefit of the Owner set forth above, having an office c/o Centaur Properties LLC, 35 East 21st Street, New York, New York 10010 ("Owner").

WHEREAS, Guarantor's interest in the tenant named above ("Tenant") is as indicated above;

WHEREAS, Guarantor has requested that Owner grant Tenant a lease (the "Lease") of a store (the "Premises" or Building") located at the street address referred to above (the "Building");

WHEREAS, Guarantor will receive economic benefits by virtue of the Lease from the business Tenant will be conducting at the Premises; and

WHEREAS, Owner is unwilling to enter into the Lease unless the Guarantor enters into this Guaranty.

NOW, THEREFORE, to induce Owner to enter into the Lease with Tenant, and for other good and valuable consideration, each to the other in hand paid, the receipt and sufficiency of which being hereby acknowledged, and in consideration of the premises, Guarantor for itself and Guarantor's successors and assigns, covenants and agrees as follows:

1.      All terms not otherwise defined in this Guaranty shall have the same meaning that they have in the Lease.

2.      (a)      Guarantor, for itself and Guarantor's successors and assigns, absolutely, irrevocably and unconditionally guarantees to Owner, its successors and assigns, (i) the full and faithful payment and performance and observance of all obligations to be performed and observed by Tenant under the Lease, including, without limitation, the prompt and punctual payment of all Annual Base Rent, additional rent and other sums payable under the Lease, including, without limitation, reasonable costs of collection and enforcement (including reasonable legal fees and disbursements) and the compliance and observance by Tenant of all obligations set forth in Article 43 of the Lease with the same force and effect as if Guarantor had

A-1

been signatory to the Lease, jointly and severally liable thereunder with Tenant and (ii) the payment to Owner of any and all damages arising from the rejection of the Lease in a bankruptcy or insolvency proceeding.

(b)     The guaranteed obligations shall include, without limitation, Annual Base Rent and additional rent, claims in any bankruptcy or insolvency proceeding, late charges, interest, reasonable costs of collection and enforcement (including reasonable legal fees and disbursements) and damages for any failure by Tenant to pay or perform any of its obligations under the Lease or otherwise.

(c)     The term "Tenant" means all persons or entities at any time holding the tenant's interest in the Lease, including, without limitation, the Tenant named in the Lease, its successors and assigns, a trustee of a Tenant's estate in any bankruptcy or insolvency proceeding, an assignee of Tenant's interest in the Lease by assignment pursuant to any bankruptcy or insolvency laws, and their respective successors and permitted assigns, not-withstanding that the Tenant named in the Lease may no longer be in possession and that the Owner may not have consented to such assignment.

3.     (a)     The validity and enforceability of this Guaranty and the obligations of Guarantor hereunder shall not terminate and not be affected or impaired by reason of the commencement or continuation of any bankruptcy or insolvency action or proceeding or the granting of relief thereunder, including, without limitation, the granting of any stay or limitation on the collection of rent or other rights and remedies of Owner, the rejection of the Lease by a trustee in a bankruptcy or insolvency proceeding, the assertion by Owner against Tenant (or Owner's failure, waiver or delay in asserting) of any of the rights or remedies reserved to Owner pursuant to the provisions of the Lease, or allowed at law or in equity.

(b)     Without limiting the generality of the foregoing, the obligations of Guarantor under this Guaranty shall not be affected or impaired by (i) the release or discharge of Tenant in bankruptcy or other insolvency proceeding, (ii) the impairment, limitation or modification of Tenant's liability or estate, or of any remedy for the enforcement of Tenant's obligations under the Lease, in any bankruptcy or other insolvency proceeding or by the operation of any present or future provisions of bankruptcy laws or other statues or decisions of any court, or (iii) the rejection of the Lease, or the assignment, transfer or assumption of the Lease, by Tenant or any trustee in bankruptcy or other insolvency proceeding.

(c)     Guarantor hereby agrees its liability hereunder shall be unaffected by (i) any amendment or modification of the provisions of the Lease or any other instrument made to or with Owner by Tenant, (ii) any extension of time for performance required thereby, (iii) any sale or other disposition of the Real Property or any part thereof, (iv) the release of any other guarantor from any obligation or liability hereunder, or (v) Owner's failure to perfect, protect, secure or insure any security interest or lien given as security for Tenant's obligations under the Lease.

(d)     It is understood and agreed that Guarantor shall not be released by any act or thing which might, but for this provision of this instrument, be deemed a legal or equitable discharge of a surety or a guarantor, or by reason of any waiver, extension,