TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Attorneys for Rock & Republic Enterprises, Inc. and
Triple R, Inc.
Debtors and Debtors in Possession
425 Park Avenue
New York, New York 10022
(212) 754-9400
Alex Spizz, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| ROCK & REPUBLIC ENTERPRISES, INC., et al., | : | Case No. 10-11728 (AJG) |
| | | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF DEBTORS' MOTION TO REJECT EXCLUSIVE DISTRIBUTION AGREEMENT PURSUANT TO 11 U.S.C. § 365(a)

**PLEASE TAKE NOTICE**, that upon the motion dated August 12, 2010 (the "Motion") of Rock & Republic Enterprises, Inc. ("R&R") and Triple R, Inc. ("TR"), (collectively, the "Debtors" and/or "Debtors in Possession"), the Debtors, by their counsel, Todtman, Nachamie, Spizz & Johns, P.C. shall move this Court before the Honorable Arthur J. Gonzalez, Chief United States Bankruptcy Judge, in his Courtroom at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Alexander Hamilton Custom House, New York, New York 10004 on the **1st day of September, 2010** at **9:30 A.M.** (the "Hearing"), or as soon thereafter as counsel can be heard, for an order pursuant to section 365(a) of title 11 of the United States Code authorizing the Debtors to reject the Distribution Agreement dated March 1, 2009 (the "Agreement") between R&R as manufacturer and Simms Sigal & Co. Ltd. ("Simms") as distributor, effective as of the filing date of the Debtors' Chapter 11 cases.

258967 v1

**PLEASE TAKE FURTHER NOTICE**, that objections, if any, to the Motion and the relief requested therein must be made in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the United States Bankruptcy Court of the Southern District of New York, set forth the basis for the objection and the specific grounds therefor, and be filed with the Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Window-based word processing format (with a hard copy delivered directly to Chief Judge Arthur J. Gonzalez's Chambers), and shall be served upon (i) Todtman, Nachamie, Spizz & Johns, P.C., 425 Park Avenue, New York, New York 10022, Attn: Alex Spizz, Esq. and Arthur Goldstein, Esq., attorneys for the Debtors, and (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Richard C. Morrissey, Esq., so as to be filed and received no later than three (3) business days before the return date of the Motion.

Dated: New York, New York
August 12, 2010

<div style="margin-left:40%">

TODTMAN, NACHAMIE, SPIZZ
& JOHNS, P.C.
Attorneys for Debtors


By: ___s/ Alex Spizz_____
     Alex Spizz, Esq.
     Arthur Goldstein, Esq.
     Jill L. Makower, Esq.
425 Park Avenue
New York, New York 10022
(212) 754-9400

</div>

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Counsel to **Rock & Republic Enterprises, Inc.**
and **Triple R, Inc.**
Debtors and Debtors-in-Possession
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| ROCK & REPUBLIC ENTERPRISES, | : | Case No. 10-11728(AJG) |
| INC., et al. | | (Jointly Administered) |
| | : | |
| Debtors. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -x

## DEBTORS' MOTION TO REJECT EXCLUSIVE DISTRIBUTION AGREEMENT PURSUANT TO 11 U.S.C. § 365(a)

Rock & Republic Enterprises, Inc. ("R&R") and Triple R, Inc. ("TR"), the debtors and

debtors in possession herein (collectively, the "Debtors"), by their proposed counsel,

Todtman, Nachamie, Spizz & Johns, P.C., as and for their motion (the "Motion") for entry

of an order pursuant to section 365(a) of title 11 of the United States Code (the

"Bankruptcy Code"), substantially in the form annexed hereto as **Exhibit "A"** (the

"Proposed Order"), authorizing the Debtors to reject the Distribution Agreement dated

March 1, 2009 (the "Agreement") between R&R as manufacturer and Simms Sigal & Co.

Ltd. ("Simms") as distributor, effective as of the filing date of the Debtors' Chapter 11

cases, and respectfully represents:

## INTRODUCTION

1.     On April 1, 2010 (the "Filing Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

2.     The Debtors are authorized to remain in possession of their property and to continue in the operation and management of their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.     An official committee of unsecured creditors has been appointed to serve in these cases and are represented by counsel.

4.     The Debtors' Chapter 11 cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.     The Debtors are a wholesale and retail apparel company specializing in an avant-garde and distinctive line of clothing.   Originally started in 2002 by its Chief Executive Officer, Michael Ball, primarily as an American jeans company, the Debtors have expanded their lines to include high fashion clothing for men, women and children as well as shoes, cosmetics and accessories.  The Debtors' merchandise can be found at most high end retail stores such as Nordstrom, Neiman Marcus, Bergdorf Goodman, Bloomingdales, Lord & Taylor, Harvey Nichols and Saks Fifth Avenue, as well as in small upscale boutiques.

6.     Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the Affidavit of Geoffrey D. Lurie Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions and Applications (the "Lurie Affidavit") which was filed on the Petition Date and which is incorporated herein by reference.

## JURISDICTION

7.     Pursuant to 28 U.S.C. §1334, the Court has jurisdiction over this Motion, which is a core proceeding within the meaning of 28 U.S.C. §157(b)(2). Venue is proper under 28 U.S.C. §§1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy Code section 365(a) and Bankruptcy Rules 6006 and 9014.

## THE AGREEMENT

8.     Pursuant to the Agreement, Simms is R&R's exclusive distributor in Canada of R&R's line of denim, ready-to-wear apparel and accessories (the "Articles"). (A copy of the Agreement is annexed hereto as **Exhibit "B"**.)

9.     The Agreement expires on December 31, 2012.

10.     After the Petition Date, Simms breached the Agreement by canceling purchase orders without the consent of R&R. Following the breach R&R sent a Notice of Termination to Simms terminating the Agreement as of September 2, 2010. (A copy of Notice of Termination is annexed hereto as **Exhibit "C"**.)

11.     Sales by R&R to Simms have steadily decreased. In 2008 Simms sales were $9,248,707, in 2009 $6,795,710 and in 2010 YTD $2,228,852. A detailed schedule of the Debtors' sales to Simms is annexed hereto as **Exhibit "D"**.

## RELIEF REQUESTED

12.     The Debtors hereby seek entry of the Proposed Order authorizing the Debtors to reject the Agreement pursuant to section 365(a) of the Bankruptcy Code. As described more fully below, the Debtors have determined, in the exercise of their sound business judgment, that the Agreement is burdensome and that the rejection of the Agreement is in the best interest of the Debtors' estates. In the Debtors' judgment, rejection of the Agreement will allow the Debtors to substantially increase sales in Canada.

13.   The Debtors also request that the deadline to file a proof of claim with respect to any claim for damages arising from the rejection of the Agreement be set at the date that is thirty (30) days after service of the order approving the rejection of the Agreement.

## BASIS FOR RELIEF REQUESTED

14.   Section 365(a) of the Bankruptcy Code provides that "the trustee [or debtor in possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 521 (1984); In re Lavigne, 114 F.3d 379 (2d Cir. 1997). "[T]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993), cert. dismissed, 114 S.Ct. 1418 (1994).

15.   In deciding a motion to assume or reject an executory contract, the bankruptcy court places itself in the position of the trustee or debtor-in-possession and determines whether assumption or rejection of the contract is a reasonable business decision. Orion Pictures Corp., 4 F.3d at 1099; In re G Survivor Corp., 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994).

16.   In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate. See, e.g., In re Bildisco, 682 F.2d 72, 79 (3d Cir. 1982), aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); G Survivor Corp., 171 B.R. at 758.

17.     As the Bankruptcy Court recognized in In re Riodizio, Inc., 204 B.R. 417, 425-426 (Bankr. S.D.N.Y. 1997)(SMB), proper business reasons for rejecting an executory contract include the following: (1) the contract is uneconomical to complete according to its terms; In re RLR Celestial Homes, Inc., 108 B.R. 36, 43 (Bankr. S.D.N.Y. 1989); (2) the contract is financially burdensome to the estate; In re Minges, 602 F.2d 38, 42 (2d Cir. 1979); In re Leibinger-Roberts, Inc., 105 B.R. 208, 211 (Bankr. E.D.N.Y. 1989); (3) rejection will make the debtor more attractive to a prospective purchaser or investor, G Survivor Corp., 171 B.R. at 759 (Bankr. S.D.N.Y. 1994); (4) rejection will result in a large claim against the estate, In re Sun City Inv., Inc., 89 B.R. 245, 249 (Bankr. M.D. Fla. 1988); and (5) in the case of a stock option contract, the debtor can market the shares and receive a higher or better price than the option offers; In re III Enters., Inc. V, 163 B.R. 453, 469 (Bankr. E.D.N.Y. 1994).   See Riodizio, Inc., 204 B.R. at 425.

18.     In determining whether to authorize the rejection of an executory contract or unexpired lease, courts ordinarily defer to the business judgment of the debtor.  See e.g., Bildisco, 465 U.S. at 523 (recognizing business judgment as standard for rejection under section 365(a)); Nostas Assocs. v. Costick (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996) (same); In re Minges, 602 F.2d 38, 42-43 (2d Cir. 1979) (same); In re Enron Corp., 2003 Bankr. LEXIS 2263 (Bankr. S.D.N.Y. Dec. 1, 2003) (same); G Survivor Corp., 171 B.R. at 757 (same).

19.     The Debtors have determined, in the exercise of their sound business judgment, that the Agreement is not valuable to the Debtors and represents a burden on the Debtors' estates.  As stated above, Simms has breached the Agreement postpetition by canceling purchase orders without R&R's consent.

20.     The Debtors' sales in Canada have been declining as a result of the commitment to Simms.  Rejection of the Agreement will allow the Debtors to substantially increase sales in Canada, unburdened by the restriction of the Agreement.

21.     No previous motion for the relief sought herein has been made to this or any other Court.

## NOTICE

22.     Bankruptcy Rules 6006 and 9014 require that a motion to reject an unexpired lease or executory contract be made on notice and that the party against whom relief is sought be provided with opportunity for a hearing.  <u>BP Energy Co.</u>, 2002 U.S. Dist. LEXIS 22052 (S.D.N.Y. 2002).1

23.     The Debtors respectfully submit that service of a copy of this Motion upon (a) Simms; (b) the Office of the United States Trustee; (c) counsel for the Committee of Unsecured Creditors; and (d) all other entities which have filed and served upon the Debtors a notice of appearance would constitute good and sufficient notice of this Motion.

---

[1]  Bankruptcy Rule 6006 provides, in pertinent part:

> (a) Proceeding to assume, reject, or assign. A proceeding to assume, reject, or assign an executory contract or unexpired lease, other than as part of a plan, is governed by Rule 9014.

> ****

> (c) Notice. Notice of a motion made pursuant to subdivision (a) or (b) of this rule shall be given to the other party to the contract or lease, to other parties in interest as the court may direct, and, except in a chapter 9 municipality case, to the United States trustee.

Fed. R. Bankr. P. 6006(a),(c).

Bankruptcy Rule 9014 provides, in pertinent part:

> "(a) Motion. In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought...".

Fed. R. Bankr. P. 9014(a).

**WHEREFORE**, the Debtors respectfully request that this Court enter the Proposed Order authorizing the Debtors to reject the Agreement effective as of the Petition Date, and that the Court grant the Debtors such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 12, 2010

TODTMAN, NACHAMIE, SPIZZ
& JOHNS, P.C.
Attorneys for the Debtors and
Debtors in Possession

By:___ s/ Alex Spizz_____
Alex Spizz, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.
425 Park Avenue
New York, New York 10022
(212) 754-9400

EXHIBIT "A"

Counsel to **Rock & Republic Enterprises, Inc.**
 and **Triple R, Inc.**
Debtors and Debtors-in-Possession
425 Park Avenue
New York, NY 10022
 (212) 754-9400
Alex Spizz, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                    :        Chapter 11

ROCK & REPUBLIC ENTERPRISES, INC., et al:        Case No. 10-11728(AJG)
                                                       (Jointly Administered)

                                 Debtors.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### ORDER AUTHORIZING DEBTORS TO REJECT EXCLUSIVE DISTRIBUTION AGREEMENT PURSUANT TO 11 U.S.C. § 365(a)

Upon the motion (the "Motion") filed by Rock & Republic Enterprises, Inc. ("R&R")

and Triple R, Inc. ("TR"), the debtors and debtors-in-possession herein (collectively, the

"Debtors"), by their proposed counsel, Todtman, Nachamie, Spizz & Johns, P.C., for an

order authorizing the Debtors to reject the Distribution Agreement with Simms Sigal &

Co. Ltd dated March 1, 2009 ("Agreement")[1] pursuant to §365(a) of title 11, United

States Code (the "Bankruptcy Code"); and this Court having held a hearing on

September _____, 2010 with respect to the relief sought in the Motion (the "Hearing");

and it appearing from the affidavit of service filed with the Court that the Debtors have

given due and sufficient notice of the Motion; and after hearing the proposed attorneys

for the Debtors in support of the Motion; and upon the papers filed in connection with

the Motion; and upon the record of the Hearing; and any objections to the relief sought

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

in the Motion having been withdrawn or overruled; and due deliberation having been had and sufficient cause appearing therefor; it is hereby

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Agreement is hereby rejected effective as of April 1, 2010 pursuant to Bankruptcy Code section 365(a); and it is further

ORDERED, that any claims arising from rejection of the Agreement must be filed with the United States Bankruptcy Court no later than 30 days after service of this Order upon Simms or his counsel; and it is further

ORDERED, that if proofs of claims arising from or related to the rejection of the Agreement are not timely filed in accordance with this Order, such claims shall be forever barred; and it is further

ORDERED, that the Debtors' rights under section 502(c)(1) of the Bankruptcy Code to seek estimation of any rejection damage claim for rejection of the Agreement as a contingent and/or an unliquidated claim are reserved; and it is further

ORDERED, that nothing herein shall prejudice the right of the Debtors to object to the allowance or classification of any claim for damages arising from the rejection of the Agreement; and it is further

ORDERED, that to the extent any of the Debtors have deposited funds with Simms as a security deposit or other arrangement, such counter-party may not setoff or otherwise use such deposit without the prior authority of the Bankruptcy Court or agreement of the parties; and it is further

ORDERED, that the Debtors' claims, if any, against Simms arising under, related to the rejection of, or independent of the Agreement, are hereby preserved; the Debtors'

rights to seek a later determination of the issues of whether the Agreement has expired on its own terms, been terminated or otherwise currently is not in full force and effect, are hereby preserved; and the Debtors' rights to dispute the validity, status, characterization or enforceability of the Agreement are hereby preserved; and it is further

ORDERED, that notwithstanding the possible applicability of Bankruptcy Rule 6006(d), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED, that Local Bankruptcy Rule 9013-1(a) is hereby deemed satisfied by the contents of the Motion; and it is further

ORDERED, that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: New York, New York
      September __, 2010

_____
ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

EXHIBIT "B"

# INTERNATIONAL DISTRIBUTION AGREEMENT

### between

## ROCK & REPUBLIC ENTERPRISES, INC.

### and

## SIMMS SIGAL & CO. LTD.

**THIS INTERNATIONAL DISTRIBUTION AGREEMENT** ("Agreement") is entered into as of March 1, 2009 (the "Effective Date"), by and between **ROCK & REPUBLIC ENTERPRISES, INC.**, a California Corporation (the "**Company**"), and **Simms Sigal & Co. Ltd.**, a business entity organized under the laws of Canada (the "**Distributor**").

### Recitals

**WHEREAS,** the Company manufactures and markets certain Products (as defined below) and desires to engage a distributor of such Products in the Territory (as defined in Section 1.16);

**WHEREAS,** the Distributor has represented to the Company that it possesses the necessary expertise, experience, financial resources and stability, and marketing organization to promote and sell such Products in the Territory;

**WHEREAS,** the Company is willing to appoint the Distributor as its exclusive distributor of the Products in the Territory on the terms and conditions of this Agreement and the Distributor is willing to accept such appointment;

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and conditions contained herein, the parties agree as follows:

### ARTICLE 1

### DEFINITIONS

**1.1**  Intentionally omitted.

**1.2**  "**Agreement**" means this Agreement and all the Exhibits attached hereto.

**1.3**  "**Approved Retailers**" has the meaning set forth in Section 2.6.

**1.4**  "**Company**" has the meaning set forth in the Preamble hereto.

**1.5**  "**Confidential Information**" has the meaning set forth in Section 8.1.

**1.6**  "**Distributor**" has the meaning set forth in the Preamble hereto.

**1.7**  "**Distributor Price**" has the meaning set forth in Section 5.1.

**1.8** "**Force Majeure**" has the meaning set forth in Section 6.8.1.

**1.9** "**Line List Price**" means the Company's wholesale prices as reflected on the Company's seasonal line sheets, which seasonal line sheets may be revised from time to time in the Company's sole discretion.

**1.10** "**Marks**" means the trademarks, service marks or trade names of the Company, including but not limited to "ROCK & REPUBLIC", whether or not registered and which may be developed in the future, and all goodwill related thereto, as well as any trademarks, trade dress, copyrights, variations, design patents, design marks, utility patents, advertising slogans, advertising labeling, and any other forms of intellectual property rights pertaining thereto and all goodwill related thereto, including any future trademark registrations and/or applications filed in the name of the Company .

**1.11** "**Pro Forma Invoice**" has the meaning set forth in Section 5.2.

**1.12** "**Products**" means the "ROCK & REPUBLIC" line of denim, ready-to-wear apparel and accessories.

**1.13** "**Sales Order Confirmation**" has the meaning set forth in Section 6.3.

**1.14** "**Taxes**" has the meaning set forth in Section 5.4.

**1.15** "**Term**" has the meaning set forth in Section 2.4.

**1.16** "**Territory**" means the country of Canada only.

## ARTICLE 2

### DISTRIBUTORSHIP

**2.1** **Grant of Distribution Rights.** Subject to the terms and conditions of this Agreement, the Company grants to the Distributor a limited, exclusive, nontransferable right to distribute, market and sell the Products only to Approved Retailers in the Territory during the Term and the Distributor hereby accepts such appointment and undertakes to perform all services necessary for the distribution, marketing and sale of the Products as well as for the development, preservation and enhancement of the Company's commercial name and goodwill in the Territory. All rights other than those expressly granted to Distributor under this Agreement are reserved to the Company, including but not limited to: (1) the right to use, license and sublicense: (a) the manufacture of Products within the Territory provided that they are sold outside the Territory; and (b) any Marks within and without the Territory; (2) the right to open stores in the Territory bearing the name "ROCK & REPUBLIC"; and (3) the right to sell directly to customers in the Territory over the Internet through a website owned or operated by the Company; provided, however, that the Company will adjust or discontinue website sales in the Territory if such sales materially adversely impact Distributor's business in the Territory.

2

**2.2** **United States Showrooms.** The Company will provide the Distributor with reasonable access to the Company's showrooms that are located in the United States in order to facilitate sales to customers located in the Territory.

**2.3** **Subdistributors.** The Distributor shall not, without the prior written approval of the Company, appoint any subdistributors or agents to promote, sell, market and/or distribute the Products. Further, notwithstanding any such appointment, or the Company's approval thereof, the Distributor shall at all times remain fully liable for the performance of its subdistributors and agents and the Distributor hereby agrees to indemnify and hold harmless the Company from all damages, losses, costs or expenses arising in any manner from any act or omission on the part of its subdistributors or agents, as further described in Section 9.1. Distributor shall ensure that each approved subdistributor will comply with all provision in this Agreement. Each approved subdistributor or agent appointed by the Distributor shall automatically be terminated upon termination or expiration of this Agreement. Nothing herein shall prevent or preclude the Company from establishing a direct business relationship with a subdistributor either before, during or after the Term of this Agreement.

**2.4** **Term.** This Agreement shall commence on the date of this Agreement and shall end on December 31, 2012 (such period, the "**Term**"), unless earlier terminated in accordance with the provisions of this Agreement or extended in writing by the written mutual consent of the parties hereto, which extension shall be agreed upon by the parties, if this Agreement is to be extended, not later than three (3) months prior to the expiration of the Term.

**2.5** **Sales Outside the Territory.** Except as otherwise expressly approved by the Company in writing, the Distributor will not solicit sales, export or sell, directly or indirectly, any of the Products outside the Territory or sell, directly or indirectly, any of the Products to any person who resells the Products outside the Territory or who exports or transships the Products from the Territory. Distributor hereby acknowledges that the Company has allocated the areas outside of the Territory to other distributors or has reserved these areas for itself. Distributor will promptly refer to the Company any and all inquiries from persons outside the Territory or other customers or person within the Territory regarding sales for delivery outside the Territory. If Distributor discovers that any of its customers have delivered or transshipped Products outside of the Territory, Distributor will provide the Company with this information. Distributor will immediately stop selling the Products to any such customer, unless this requirement is waived in writing by the Company. Distributor shall not establish any branch or maintain any distribution depot or warehouse outside the Territory for the Products.

**2.5.1** Off-Price Sales of the Products may be made solely to off-price retailers that the Company has approved in writing, and only for Products that were shipped to the Distributor at least two seasons prior to the proposed off-price sale. Additionally, Distributor may not sell any off-price Products without first obtaining the Company's written approval for each proposed off-price sale of Products by providing Company with a list of the particular Products it wishes to sell to an approved off-price retailer (identified by style and season). Company may approve or reject any such proposed off-price sales, in its sole discretion.

**2.6** **Approved Retailers.** The Distributor acknowledges that the manner and scope of distribution of the Products, and their availability, variety of selection, colors, and sizes are

critical to the promotion and enhancement of the image created by the Marks, and to the protection of the Marks and their associated goodwill. Accordingly, Distributor agrees that it shall only sell the Products to first-class, "high-end" retail department or clothing stores, such as, by way of example, Harvey Nichols, Neiman Marcus, Collette, Paul and Joe, Luisa via Roma, Biffi, Banner, and Corso Cuomo, and other similar stores (such stores, the "**Approved Retailers**"). Distributor agrees to provide a list, including names, addresses and the contact person, of all retail customers purchasing the Products within the previous 12 months at least once each spring and fall season. Such list shall be submitted in connection with the Distributor's spring and fall season's purchase order(s) (see Section 3.1.5). Company shall treat the lists of all retail customers purchasing the Products as confidential. Retail customers in duty free zones will be identified as such by the Distributor. The Distributor will supply all information about such customers, including pictures of each of their facilities or stores and information on other lines carried by the customers, which the Company may reasonably request. The Distributor will not sell or distribute any Products to wholesalers, jobbers, catalog vendors or any other person that does not operate retail stores exclusively, unless such entities have been previously submitted for written approval and approved in writing by the Company.

     **2.7    Third-Party Importation.** In no event shall the Company bear any liability to the Distributor for the importation of Products into the Territory by third parties without the approval or authorization of the Company. In the event that the Distributor notifies the Company that third parties are importing Products into the Territory, the Company shall use reasonable commercial efforts to cause such third parties to cease such importation, and/or shall provide Distributor with reasonable assistance in the event Distributor elects to take action against any third party importers, subject to the prior approval of Company.

     **2.8    Required Sales Volume and Marketing Plan.** Prior to the execution of this Agreement, Distributor will provide the Company with a summary proposed thirty six (36) month marketing and sales plan, showing projected sales volumes for the Products, and anticipated marketing and promotional efforts for the three years following the Effective Date. Distributor shall contribute no less than three percent (3%) of projected sales volumes to marketing efforts within the territory per calendar year. Such plan shall be subject to review and approval or disapproval by the Company in its sole discretion, and shall be attached as Exhibit B to this Agreement. Notwithstanding the foregoing, Distributor and Company shall meet bi-annually to, among other things, review the previous six (6) month's marketing results. At such meeting, Distributor and Company shall determine if such marketing results are mutually satisfactory. If so, regardless of actual Distributor contribution, Company shall fully and finally approve such results; if not, Company shall provide Distributor feedback, and/or provide Distributor with a notice of default pursuant to Section 7.1. Distributor shall also present Company with Distributor's six (6) month marketing plan for review and consultation.

     **2.9    No Internet Sales.** Except as otherwise expressly approved by the Company in writing, Distributor agrees it will not engage in any sales of Products over the Internet, directly or indirectly. Distributor further agrees that it will not sell Products to any retailers for eventual on-line or internet sales of Products, including but not limited to online auction sites, and that it will use commercially reasonable efforts to ensure that any purchaser of Products from Distributor does not sell any Products over the Internet. If Distributor discovers that any retailer to whom it has sold Products has engaged in on-line or internet sales of the Products without the

prior written consent of the Company and Distributor, it shall immediately notify Company of such sales, and cancel any of that retailer's pending or future orders of Products.

## ARTICLE 3

## GENERAL OBLIGATIONS OF THE DISTRIBUTOR

**3.1** **Marketing.** During the Term, the Distributor shall have the following obligations with respect to the Products:

**3.1.1** To use its best efforts vigorously and effectively to further the advertising, promotion, marketing, sale and other distribution of Products in the Territory;

**3.1.2** To maintain a limited and balanced inventory of Products, sufficient to supply the reasonable demands of Approved Retailers in the Territory;

**3.1.3** To promptly respond to all inquiries from customers (including, without limitation, complaints), process all orders, and effect all shipments of Products;

**3.1.4** To diligently investigate all leads with respect to potential customers referred to it by the Company and to promote sales to Approved Retailers;

**3.1.5** To provide the Company with a semi-annual report of all sales, on a customer-by-customer basis, identifying all customers that have purchased any Products within the prior 12 months, each such report to be submitted to the Company with Distributor's major Product or Additional Product purchase orders for the spring and fall seasons;

**3.1.6** To cooperate with the Company in dealing with any customer complaints concerning the Products within the Territory and to take any reasonable action requested by the Company to resolve such complaints with commercially reasonable industry practices;

**3.1.7** To promote the goodwill and good name of the Company and its Marks throughout the Territory;

**3.1.8** To require by written contract that Distributor's customers not ship the Products outside the Territory;

**3.1.9** To maintain throughout the Territory an adequate sales force dedicated on both a full and part-time basis, as the case may be, to the sale of the Products;

**3.1.10** To participate, at its own expense, (i) in sales or merchandising programs prepared by the Company, (ii) in all shows, fairs and exhibitions in the Territory where such participation will, in the reasonable judgment of the Distributor, after consultation with the Company, promote the Products, and (iii) develop and implement sales programs for the promotion of the Products, including, without limitation, the marketing plan prepared by the Distributor, all such participation shall be at Distributor's sole expense, unless otherwise agreed by Company and Distributor. Distributor and Company have agreed that Distributor shall participate and promote the Products in any multi-brand events or shows in the Territory

5

annually during the Term of this Agreement at Distributor's expense unless otherwise agreed in writing. Notwithstanding the foregoing, should Distributor and Company agree to host any additional parties or special events in the Territory beyond what is contemplated by this Paragraph and not included in the marketing plan attached as Exhibit B, then the costs of such additional parties or special events shall be shared equally between Company and Distributor;

**3.1.11** To assume full responsibility for all costs and expenses which it incurs in carrying out its obligations under this Agreement, including but not limited to, all rentals, salaries, commissions, compensation, advertising, promotion, demonstration, travel and accommodation expenses without the right to reimbursement for any portion from the Company;

**3.1.12** Not to copy, replicate, imitate or reverse engineer any products of the Company, including, but not limited to, the Products;

**3.1.13** Not to engage in any unfair trade practices or commit any acts or engage in any transactions which would reflect adversely upon the goodwill of the Company, the Mark or the Products;

**3.1.14** To immediately provide the Company with copies of any communication from or investigation by any government ministry, agency, department, court or other body which relates to or effects the Distributor, the Marks or the distribution of the Products;

**3.1.15** To permit the Company and its employees, agents and other representatives to visit Distributor's facilities during normal business hours, without prior notice, for the purpose of inspecting or modifying the Products, inspecting the facilities, Distributor's books, and any display of products, inspecting promotional materials and advertising for the Products and otherwise determining whether Distributor is complying with the terms and conditions of this Agreement;

**3.1.16** To give immediate written notice to the Company of any information, circumstances, or events of which it becomes aware and which (i) indicate any actual or potential danger to consumers arising out of the configuration, formulation, design, materials or other characteristic of the Products, (ii) cause Distributor to withdraw or withhold any of the Products from the market or (iii) indicate any actual or potential violation of any applicable law, rule, or regulation related to safety of the Products; and

**3.1.17** To consult with the Company, on a regular basis or whenever the Company in its sole discretion deems necessary, regarding all new styles and designs, distribution schedules or any substantive changes, new developments or other matters which would materially affect the rights, obligations and benefits of either party to this Agreement.

**3.2** **Records.** The Distributor shall maintain in reasonable detail and, where applicable, in accordance with international generally accepted accounting principles, consistently applied, records, including, without limitation: (i) books of account and records with respect to the sale of the Products; (ii) records of advertising and promotional campaigns with respect to the Products; (iii) orders, inquiries, complaints, requests for service and other correspondence with respect to the Products; and (iv) records of other services, activities and transactions of the Distributor with respect to the Products. These records shall be retained and

shall be open for inspection, copying, extracting and audit by the Company or its employees, agents or representatives during normal business hours during the Term and for at least two (2) years following termination or expiration of this Agreement. Any inspection, copying or audit by the Company or its agents shall be conducted after ten (10) business days' written notice and in such a manner as to not adversely affect the ongoing business of the Distributor.

**3.3** **Labeling and Regulatory Requirements**. The Distributor shall inform Company of labeling and other regulatory requirements to permit the importation and sales of Products in the Territory in accordance with applicable laws in a timely manner. The Company shall make such changes in its Product labeling as it deems necessary in its sole and absolute discretion. The Distributor shall not remove, conceal, enhance, change or alter in any way or add to the original labeling of the Products or the Products themselves without the express written consent of Company, which consent may be withheld in its reasonable discretion. The Distributor shall advise the Company, in writing, at the time Distributor submits each order hereunder, of any labeling and regulatory requirements applicable to the Products in the Territory that exceed or are different than the Company's customary labeling. The Company shall provide Distributor with labeling complying with such requirements as described by Distributor, and Distributor shall bear the expense of any labeling and regulatory requirements (including penalties, fees or costs resulting from failure to comply with regulatory requirements) applicable to the Products in the Territory that exceed the Company's customary labeling cost.

**3.4** **Representations and Warranties of the Distributor**. The Distributor hereby represents, warrants and covenants that:

**3.4.1** It has the full right, power and authority to enter into this Agreement, and to perform all of its obligations hereunder;

**3.4.2** It is financially capable of undertaking the business operations which it conducts and of performing its obligations hereunder;

**3.4.3** If it is an entity, then it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation; and

**3.4.4** If it is an entity, then all corporate or other formal acts have been duly taken by it to render this Agreement valid and binding upon it.

**3.5** **Obligation of the Company.** During the term, the Company shall have the following obligations:

**3.5.1** The company has and shall continue to take reasonable steps to ensure that its other customers and distributors do not ship the Products into the Territory;

**3.5.2** The Company shall give immediate written notice to the Distributor of any information, circumstances, or events of which it becomes aware and which (i) indicate any actual or potential danger to consumers arising out of the configuration, formulation, design, materials or other characteristic of the Products, (ii) cause the Company to withdraw or withhold any of the Products from the market or (iii) indicate any actual or potential violation of any applicable law, rule, or regulation related to safety of the Products.

# ARTICLE 4

## TRADEMARKS

**4.1    The Marks.** The Distributor acknowledges the Company's rights to and interest in the Marks and will never challenge the validity or ownership thereof at any time during or after the expiration or termination of this Agreement. The Distributor acknowledges that the Company is the owner of the right, title, and interest in the Marks, and that the Distributor is not acquiring a license to use or any proprietary right to or in any of the Marks. The Distributor shall not do anything or commit any act that might infringe, dilute, prejudice or adversely affect the validity of the Marks or the ownership by the Company thereof. The Distributor is merely entitled to sell products bearing the Marks and advertise such products. The Distributor may not use the Marks as part of its commercial name, including but not limited to, a corporate, partnership, assumed or fictitious name or trade name or style. Distributor will sign any documents reasonably needed to secure the Company the goodwill associated with and the rights to the Marks.

**4.2    Protection of the Marks.** Distributor will immediately advise the Company in writing of any infringement of the Marks or any relevant information which comes to its attention regarding any probably counterfeit products, infringing products and/or other activity of unfair competition relative to the Products. Distributor will assist and cooperate with the Company at no charge to the Company in resolving any intellectual property infringement problems necessary to protect the Products and the Marks and prevent infringement thereof in the Territory, and Distributor will use its best efforts to prevent infringement or counterfeiting of the Marks in the Territory and will report to the Company about any infringement identified and the actions taken to stop it. In this regard, Distributor specifically acknowledges the Company's Brand Protection 2008, which is attached hereto as <u>Exhibit C</u>, and may be updated by the Company from time to time.

**4.3    Infringement.** In the event that the Distributor learns of any infringement or counterfeiting of the Marks, act of unfair competition, imitation of the Marks, use by any person or entity of a trademark similar to the Marks, or infringement of copyright, it shall immediately notify the Company thereof. The Company thereupon may take such action as it deems advisable in its complete discretion for the protection of its rights, at its cost. If requested by the Company, the Distributor shall fully cooperate with the Company in all respects, including without limitation, being a plaintiff or a co-plaintiff and by causing its officers and employees to devote appropriate time to the litigation; it is understood that the Distributor's officers and employees will not be compensated for their time and effort. In no event shall the Company be required to take any action it deems inadvisable and the Distributor shall have no right to take any action with respect to the Marks, including but not limited to, filing any lawsuits or similar proceedings, or sending out any cease and desist letters. The Company shall have full control over any action in its sole discretion. Any recovery as a result of such action shall belong solely to the Company. The Distributor shall cooperate with the Company in enforcement of its intellectual property rights, including contributing up to 25% of all fees and costs incurred by Company in connection with counterfeit enforcement in the Territory. Any such fees or costs

contributed by Distributor shall be reimbursed to Distributor on a pro rata basis from restitution, recovery, or other compensation actually received by the Company.

**4.4     Infringement Claims of Third Parties.**  In the event a third party institutes any infringement suit or any claim of infringement against the Distributor involving the Marks in connection with the sale or distribution of the Products in the Territory pursuant to and in accordance with this Agreement, the Distributor shall give immediate notice of such suit or claim to the Company. The Company thereupon may take such action as it deems advisable in its complete discretion. If requested by the Company, the Distributor shall fully cooperate with the Company in all respects, including without limitation, by causing its officers and employees to devote appropriate time to the litigation; it is understood that the Distributor's officers and employees will not be compensated for their time and effort. Company shall bear the cost of defending against such claims unless the claim(s) is brought due to the negligence or willful misconduct of the Distributor.

**4.5     Quality.**  The Distributor acknowledges that the Company shall control the quality of the Products and the Distributor shall not alter the Products or their quality in any manner without the Company's prior written consent.

**4.6     Use of the Marks.**  The Distributor acknowledges that any rights to use the Marks granted by the Company to the Distributor under this Agreement exist only to the extent that the Company owns such Marks. The Distributor shall not use the Marks in any manner that conflicts with the rights of any third party, including but not limited to, combining the Marks with its own trademarks, logos, or business names, or with those owned by third parties. If the Distributor's use of the Marks infringes the rights of any third party or weakens or impairs the Company's rights in the Marks, as determined solely by the Company, or if it is determined at any time that the Company does not have the right to use the Marks, or any portion thereof, within the Territory, the Distributor shall immediately terminate or modify such use in accordance with the Company's instructions, and the Company shall cooperate with the Distributor to minimize the detrimental impact, if any, of such modification or termination on the Distributor's business.  In the event that the Company is notified that it is not able to register its Marks in the Territory, the Company shall have the right to revoke and terminate this Agreement at any time during the Term. If the Company elects to continue this Agreement in effect, the Company shall provide the Distributor with replacement labeling for all Products then in the Distributor's inventory. The cost of replacing the existing labeling with new labeling shall be borne by the Company. Should Company revoke and terminate this agreement pursuant to this paragraph, Distributor shall be entitled to sell any non-saleable Products to Company at the same cost paid by Distributor for such products, and Company shall be obligated to repurchase said products, and reimburse Distributor for all shipping costs incurred in connection with such Products. This shall be Distributor's sole remedy following a revocation and termination pursuant to this paragraph.

**4.7     Approval of Use.**  The Distributor shall not use the Marks or refer to the Company or the Products in any manner, directly or indirectly, without submitting all proposed uses or references in writing to the Company and obtaining prior written approval from the Company. The Distributor's uses of the Marks that require the Company's approval include, without limitation, advertising, signage, marketing materials, promotional materials, trade show

booths or showrooms, business cards, invoices, order forms, stationery, tags, labels, packaging, interviews given by the Distributor for publication and any other materials containing or referring to the Company, the Products or the Marks. All Company approvals for uses of the Marks or references to the Company or the Products by the Distributor are limited to the specific request made by the Distributor and all future uses or references by the Distributor shall require additional Company approvals. A submission for approval will be deemed disapproved unless the Company gives the Distributor notice of approval pursuant to Section 10.11 within ten (10) days after receipt of the request for approval from the Distributor. Approval by the Company will not be deemed to be a determination that the approved matter complies with all applicable regulations and laws.

**4.8    Intellectual Property**. If the Distributor develops any material pertaining to the Company, the Marks or the Products, it hereby assigns all intellectual property rights in such materials to the Company and agrees to execute any documents to confirm or reflect such assignment. If the Distributor has a third party create such material, the Distributor shall be responsible for having such third party assign all copyright rights thereto to the Company.

## ARTICLE 5

### PRICES, DISCOUNTS AND PAYMENTS

**5.1    Prices and Discounts**. The prices for the Products will be the prices set forth by the Company in U.S. dollars on the Company's applicable wholesale line list in force at the time of receipt of the purchase order by the Company. Products ordered by Distributor shall generally be subject to a 20% discount (the **"Distributor Price"**) from the prices set forth in the applicable wholesale line list; provided that such discount shall not apply to any Products designated on the applicable wholesale line list as "Runway / Collection" or "Accessories" and any discount on such Products shall be determined separately by the Company in its sole discretion. The Company shall furnish to Distributor the applicable wholesale line list with each season's collection as follows: one for the Spring/Summer seasons, one for the Fall/Winter seasons and one for any collection the Company may deem appropriate to present in any other period of the year. Notwithstanding the foregoing, the Company reserves the right to charge prices other than those indicated on the applicable wholesale line list for any special orders, including items not appearing on the most recent applicable wholesale line list, custom orders and orders of Products designated on the applicable wholesale line list as "Runway / Collection" or "Accessories," and for other co-branded products.

**5.1.1**    The Company shall furnish to the Distributor a current list of suggested retail prices for sale of the Products. The Distributor shall provide all retailers to which it sells the Products a current list of suggested retail prices. Notwithstanding the foregoing, the Distributor and retailers shall be free to determine the prices at which they sell the Products.

**5.2    Regular Payment Terms**. Distributor shall submit all purchase orders in writing, each such order complying with Section 6.2 hereof. Each purchase order shall be accompanied by payment of fifty percent (50%) of the aggregate Distributor Price of all Products ordered, with the remaining fifty percent (50%) due prior to shipment of such order as provided below. The Company shall notify Distributor in writing of acceptance, rejection or rejection in part of each

purchase order, as provided in Section 6.2. The Company shall provide notice to the Distributor pursuant to Section 10.11 when the Products ordered by the Distributor are ready to be shipped to the Distributor (the "**Pro Forma Invoice**"). The Pro Forma Invoice shall set forth information including, without limitation, the quantity of Products available for shipment to the Distributor and the Distributor Price of such Products. If the quantity of Products set forth on the Pro Forma Invoice is less than the quantity of Products set forth on the corresponding Sales Order Confirmation, the Company will provide the Distributor with a separate Pro Forma Invoice when such remaining Products are available for shipment to the Distributor. The commercial invoice will reflect the quantity of products shipped to the Distributor and the Distributor price of such Products. The Distributor shall pay the full remaining balance due for each shipment as set forth on each Pro Forma Invoice within three (3) business days after the Company gives such Pro Forma Invoice to the Distributor. The Company shall have no obligation to ship the Products set forth on each Pro Forma Invoice until the Distributor pays the Company the full amount set forth on the Pro Forma Invoice. The Distributor shall make all payments by wire transfer into the Company Bank Account (as designated from time to time by the Company), and shall include an additional $50.00 fee to cover any bank processing fees.

    **5.3**    **Samples**. Prior to each season, the Company will sell at least one sample of each of the Products to the Distributor at the Distributor Price, and payment for such samples will be made within three (3) days of the shipment. Additional samples may be purchased from the Company, in its sole discretion, at 25% above the Line List Price in effect at the relevant time.

    **5.4**    **Taxes and Fees**. All payments to be made to the Company by the Distributor pursuant to this Agreement represent net amounts that the Company is entitled to receive, shall not be subject to any deductions for any reason whatsoever and are net of all taxes (including, without limitation, sales taxes, withholding taxes, value-added or similar taxes), assessments, fees and customs duties, of whatever kind or nature levied inside or outside the United States ("**Taxes**"). In the event that any of said payments become subject to Taxes, the Distributor shall be responsible for paying any and all of such Taxes to the appropriate authorities as required by applicable law. If the Company is required to pay such Taxes notwithstanding this Section 5.4, then the Distributor's payments to the Company pursuant to this Agreement shall be increased to such an extent as to allow the Company to receive the net amounts as were due under this Agreement prior to the imposition of such Taxes. This Section 5.4 does not create any obligation on the part of the Company to pay the Taxes.

    **5.5**    **Export and Import Documentation**. The Distributor shall be responsible for obtaining all licenses and permits and for satisfying all formalities (including payment of all duties, tariffs, freight, insurance, taxes, excises and all other charges) as may be required to export the Products from the United States and import the Products into the Territory, in accordance with then prevailing law or regulations, including, but not limited to, obtaining an import license for non-denim items; provided, however, that the Company shall provide the Distributor with Country of Origin documentation for each shipment. Delivery shall be considered as effected with the loading of the Products onto the means of transport at the Company's warehouse and, regardless of what is agreed to with regard to transportation costs, the Distributor shall bear the transfer of risk.

## ARTICLE 6

## PURCHASE ORDERS

**6.1     Purchase Orders; Cut-Off Dates.** The parties anticipate that orders will be placed on a seasonal basis, and for purposes of this Agreement identify the following seasons: Spring, Summer, Fall, and Winter. Company will provide Distributor with samples, a Product order cut-off, production and delivery schedule, a reasonable time in advance of each season to accommodate delivery schedules. The dates included in the production and delivery schedules shall be approximate, and may vary somewhat based upon shipping requirements and whether the stated dates fall on business days or not.

Purchase orders not received by the Company by the applicable cut-off dates shall not be considered valid purchase orders, unless the Company elects, in its sole discretion, to honor any such purchase order notwithstanding its untimely delivery, and so notifies Distributor in writing.

**6.2     Terms of Purchase Orders.** Each purchase order submitted by the Distributor shall be given according to the notice provisions in Section 10.11 and shall be substantially similar to the form of purchase order attached hereto as Exhibit A. Each such purchase order shall set forth the information specified below, as well as such other information as the Company may reasonably request in the format specified by the Company from time to time:

**6.2.1**     An identification of the Products ordered, including line name and style numbers, color and wash (where applicable);

**6.2.2**     Quantity by size, including quantities for each size ordered. NOTE – unless otherwise agreed by the parties in writing, a minimum of 150 units of each style/wash combination must be ordered with each purchase order. A minimum of 500 units of any re-cut of a previously produced style, and a minimum of 800 units of any special make-ups ("**make-ups**" means exclusive Products that are customized at the request of the Distributor) is required;

**6.2.3**     Delivery schedule, identifying desired delivery dates as provided for such items in most current International line list sheet;

**6.2.4**     Shipping instructions and shipping addresses; and

**6.2.5**     The Distributor Price for each Product and Additional Product ordered pursuant to such purchase order.

**6.3     Acceptance of Orders.** All purchase orders are subject to acceptance in writing by the Company, which acceptance shall be given to the Distributor according to the notice provisions in Section 10.11 (the "**Sales Order Confirmation**") within ten (10) business days of receipt; provided, however, that Company shall be excused from providing the Sales Order Confirmation within such time period if extenuating circumstances, or Distributors failure to cooperate necessitates a longer response time. Each such purchase order shall be deemed an offer by the Distributor to purchase the Products pursuant to the terms of this Agreement, and, when accepted by the Company and approved by the Distributor as provided herein, shall give rise to a contract under the terms set forth herein to the exclusion of any additional or contrary

12

terms set forth in such purchase order. The Company shall accept the purchase order, if it desires, in its sole discretion, by delivering the Sales Order Confirmation to the Distributor; provided, however, that the Company's acceptance of any purchase order is conditioned upon its receipt of a copy of the Sales Order Confirmation executed by the Distributor, which the Company must receive by facsimile within three (3) business days after the Company gave such Sales Order Confirmation to the Distributor. The Company may refuse any order from Distributor, or any part thereof, for legitimate or valid business reasons, including but not limited to production or manufacturing issues, product liability issues, sourcing difficulties, excessive or unusual orders.

**6.4    Modification of Orders.** No accepted purchase order shall be modified or cancelled except upon the written agreement of both parties or as otherwise provided in the Agreement. The Distributor's purchase orders or mutually agreed change orders shall be subject to all provisions of this Agreement, whether or not the purchase order or change order so states.

**6.5    Return of Products.** The Distributor shall have twenty-one (21) days from its receipt of a shipment of Products to notify the Company (pursuant to Section 10.11) of any material non-conforming and non-repairable Products that are contained in such shipment. If the Distributor provides such notice, the Company shall, in its sole discretion, either exchange such defective Products, or accept the return of such defective Products, and provide the Distributor with a credit against future purchases. Any failure by Distributor to provide such notice within twenty-one (21) days of receipt of Products from the Company shall be deemed a waiver by Distributor of any and all claims or causes of action that it may have against the Company with respect to such material non-conforming or non-repairable Products. Except as provided in this Section 6.5, the Company shall not otherwise be obligated to accept from the Distributor any Products, make any exchange thereof, or credit the Distributor therefore. The Distributor bears full risk and responsibility for damage caused to Products during shipment and the Company has no obligation to accept returns of any such damaged Products.

**6.6    Product Changes.** The Company reserves the right, in its sole discretion and without incurring any liability to the Distributor, to: (i) make minor alterations in the specifications for any Product; (ii) discontinue the manufacture of any Product; (iii) discontinue the development of any new Product, whether or not such Product has been announced publicly; or (iv) commence the manufacture and sale of new products having features that make any Product and/or Additional Product wholly or partially obsolete. Further, the Distributor acknowledges and agrees that each Product's color, shading and edge-finish may vary, that such variances are part of the Product's appearance and that Products with such variances shall not be construed as material non-conforming and non-repairable Products as set forth in Section 6.5.

**6.7    Delivery; Common Carriers; Insurance; Delivery Dates.**

**6.7.1**    All deliveries of Products to the Distributor shall be Free on Board at the place of shipment. Whenever the Company shall deliver or cause to be delivered to a common carrier any goods ordered by the Distributor, whether the particular carrier shall have been designated in the shipping or routing instructions of the Distributor or not, the Company shall not be responsible for any delays, losses or damages in shipment and the common carrier, to which the Company shall deliver the goods shipped to the Distributor, is declared to be the agent of the

Distributor. All risk of damage to or loss or delay of the Products shall pass to the Distributor upon their delivery to the common carrier or an agent or any other person or entity specified by the Distributor acting on behalf of the Distributor. The Distributor shall be responsible for all costs associated with the export of the Products from the United States and import of the Products into the Territory, including, without limitation, shipping costs, license fees and customs broker fees. The Company shall use its best efforts to arrange for customs and shipping resources in the United States if the Distributor desires to use such resources; provided, however, that the Distributor's use of such resources is at its sole expense.

6.7.2    The Company reserves all rights with respect to delivered Products permitted by law, including, without limitation, the rights of rescission, repossession, resale, and stoppage of transit until the full amount due from the Distributor has been paid.

6.7.3    The Company shall use commercially reasonable efforts to deliver accepted orders in accordance with requested delivery dates, subject to the terms of this Agreement; provided, however, that such delivery dates shall be extended by the period of time equal to any delay by the Distributor in paying the purchase price as provided in Sections 5.2 and 5.3. The Company reserves the right to select the shipping methods and obtain bills of lading if the Distributor fails to provide or arrange for shipment as required by this Agreement. If the Company shall fail or refuse, for any reason whatsoever, to deliver all or any portion of the Products covered by an accepted purchase order then the Distributor's sole and exclusive remedy with respect to such failure or refusal shall be: (a) for each Product already paid for in whole or in part by the Distributor but not delivered, the Company shall provide the Distributor with a credit against future purchases, so long as there is at least one selling season remaining in the remaining term of the Agreement, or, in the event that the Cut-Off Date for the last remaining selling season in the term of the Agreement has passed, the Company will refund to the Distributor all amounts paid by Distributor in excess of the Products actually delivered; or (b) for each Product or Additional Product that has not yet been paid for, the Distributor shall have the right to cancel the accepted purchase order with respect to the Products not delivered, so long as such cancellation is delivered within fifteen (15) days after the Company notifies the Distributor that it is unable to deliver such Products.

6.8    **Force Majeure.**

6.8.1    **Definition.** "Force Majeure" shall mean any event or condition, not existing as of the date of this Agreement, not reasonably within the control of either party, that prevents in whole or in material part the performance by one of the parties of its obligations hereunder and that renders the performance of such obligations so difficult or costly as to make such performance commercially unreasonable. Without limiting the foregoing, the following shall include, without limitation, events or conditions of Force Majeure: acts of State or governmental action, riots, disturbance, war, attack, terrorism, strikes, lockouts, slowdowns, prolonged shortage of energy supplies or materials, epidemic, fire, flood, hurricane, typhoon, earthquake, lightning and explosion.

6.8.2    **Notice of Force Majeure.** Upon giving written notice to the other party pursuant to Section 10.11, a party affected by an event of Force Majeure shall be released without any liability on its part from the performance of its obligations under this Agreement,

14

except for the obligation to pay any amounts due and owing hereunder, but only to the extent and only for period that its performance of such obligations is prevented by the Force Majeure. Such notice shall include a description of the nature of the Force Majeure, and its cause and possible consequences. The party claiming Force Majeure shall promptly notify the other party in writing of the termination of such event.

**6.8.3 Confirmation.** A party invoking Force Majeure shall provide to the other party confirmation of the existence of the circumstance constituting the Force Majeure. Such evidence may consist of a statement or certificate of an appropriate governmental department or agency where available, or a statement describing in detail the facts claimed to constitute the Force Majeure.

**6.8.4 Suspension of Performance.** During the period that the performance by one of the parties of its obligations under this Agreement has been suspended by reason of any event of Force Majeure, the other party may likewise suspend performance of all or part of its obligations hereunder to the extent that such suspension is commercially reasonable.

## ARTICLE 7

## TERMINATION

**7.1 Termination With Notice.** In the event either party breaches any terms of this Agreement then, except as provided in Section 7.2 below, the non-breaching party may give written notice of the nature of the breach to the breaching party pursuant to Section 10.11 and the breaching party shall have thirty (30) days to cure the breach. If the breaching party does not cure a material breach of this Agreement within such thirty (30) days, then the non-breaching party may terminate this Agreement effective upon written notice to the breaching party pursuant to Section 10.11. Failure of the non-breaching party to give such written notice will not in any event constitute a waiver of such breach. Upon the giving of a notice of breach for the third $(3^{rd})$ time during the Term, for any reason, the breaching party shall no longer have the right to cure any violation, and termination shall be effective upon the giving of said third $(3^{rd})$ notice.

**7.2 Termination/No Cure Possible.** The Company may terminate this Agreement immediately, without any right to cure by the Distributor, upon the occurrence of any one or more of the following:

**7.2.1** The Distributor breaches Sections 2.5 or 2.9;

**7.2.2** Intentionally omitted;

**7.2.3** The Distributor materially breaches Section 4.7;

**7.2.4** The Distributor breaches Sections 5.2, 5.4 and/or 5.5;

**7.2.5** The Distributor reports materially incorrect or false information to the Company;

**7.2.6** If an event of Force Majeure continues for more than one hundred fifty (150) days;

**7.2.7** The Distributor fails or refuses to achieve the targets set forth in its marketing plan as established pursuant to Section 2.8; unless such failure is solely caused by Company's failure to ship sufficient Product;

**7.2.8** The Distributor breaches Section 10.2;

**7.2.9** The making by the Distributor of any warranties or representations on behalf of the Company that have not been specifically authorized in writing by the Company;

**7.2.10** Abandonment by the Distributor of its business or the activities required under this Agreement;

**7.2.11** Commission by the Distributor or its principals, affiliates, employees, agents, subdistributors, contractors or consultants of a material violation of any applicable laws in connection with the promotion, marketing, distribution or sale of the Products; or

**7.2.12** In the event Distributor becomes insolvent; or is unable to pay its debts as they become due; or files for is the subject of a proceeding in bankruptcy, reorganization or a similar proceeding for relief from creditors; or ceases to function as a going concern, or has a receiver, trustee or liquidator appointed or applied for; or makes an assignment for the benefit of creditors; or consents to an involuntary petition in bankruptcy.

**7.3** **Rights and Obligations on Termination**. In the event of termination of this Agreement for any reason, the parties shall have the following rights and obligations:

**7.3.1** Termination of this Agreement shall not release either party from the obligation to make payment of all amounts then or thereafter due and payable;

**7.3.2** The Company shall have the right, at its option, to: (i) cancel any accepted purchase order which provides for delivery after the effective date of termination; and (ii) repurchase all or any part of the Distributor's inventory of the Products in the Distributor's possession or control, directly or indirectly, as of the effective date of such termination at the Company's invoiced price to the Distributor for such Products, according to the corresponding Sales Order Confirmations, less any wear and tear, plus freight to the original Company shipping point or such other location as may be designated by the Company in its sole discretion, which shipment shall be F.O.B. at the Company's place of delivery. The Company shall exercise its option under this subsection by notifying the Distributor in writing no later than thirty (30) days after the Company receives the complete list of the Distributor's Product inventory as required by Section 7.3.6 below;

**7.3.3** Distributor releases and waives all claims, whether known or unknown, whether existing or arising in the future, based all, or in part, upon (a) any goodwill in the Marks that may be created or which it may have created; (b) that termination or expiration caused some economic harm to Distributor; (c) claims by any third parties that termination or expiration caused some economic harm to the third party (collectively the **"Claims"**). This Agreement extinguishes the Claims;

**7.3.4**    Upon expiration or termination of this Agreement, the Company or its designee may sell Products to retail stores, wholesalers and distributors within the Territory and may appoint one or more other distributors of the Products in the Territory. Distributor waives and relinquishes any rights that it may have, under the laws of the Territory or elsewhere, to seek to enjoin the Company from making such sales or appointing such other distributors and the Distributor shall not attempt to exercise any such rights. The Company shall have the right to appoint a successor or alternative distributor in the period leading up to termination or expiration of this Agreement. The Distributor shall stop all use of the Marks to promote or sell the Products;

**7.3.5**    The Distributor's obligations pursuant to this Article 7 hereof shall survive termination of the Agreement; and

**7.3.6**    Within ten (10) days after the effective date of termination of this Agreement, the Distributor shall: (i) furnish the Company with a list of all of the Distributor's customers and the place of destination of all Products sold; and (ii) furnish the Company with a complete list of the Distributor's Product inventory in its possession or control.

**7.4**    **No Compensation.** In the event either party terminates this Agreement for any reason in accordance with the terms hereof, the parties hereby agree that, subject to the provisions of Section 7.3.1 hereof and without prejudice to any other remedies which either party may have in respect of any breach of this Agreement, neither party shall be entitled to any compensation or like payment from the other as a result of such termination.

**7.5**    **Other Remedies.** Nothing herein shall be deemed to prevent a party from bringing an action for damages either prior to or in lieu of termination if a default in performance by the other party occurs and is not cured timely in accordance with the provisions of Section 7.1.

**7.6**    **Reversion.** Upon the expiration or termination of this Agreement, all of the rights of the Distributor under this Agreement shall terminate forthwith and shall revert immediately to the Company, and the Distributor shall discontinue forthwith all use of the Marks, no longer shall have the right to use the Marks or any variation or simulation thereof and promptly shall transfer to the Company, free of charge and free of all liens and encumbrances, all registrations, filings and rights with regard to the Marks which it may have possessed at any time even if unapproved. In addition, the Distributor thereupon shall deliver to the Company, free of charge and free of all liens and encumbrances, all materials (not including its inventory of Products which are addressed in Section 7.3.2) in its possession or control which were designed or approved by the Company, obtained by the Distributor from the Company and all other materials in its possession or control using the Marks or referring to the Company or the Products. After the expiration or termination of this Agreement, the Distributor shall not use or permit others to use any of said materials, or any variations or simulations thereof, in connection with the Products or any other merchandise. In addition, Distributor shall discontinue making any statements or taking any actions that might cause third parties to infer that any business relationship continues to exist between the parties hereto and, where necessary or advisable, inform third parties that the Distributor no longer has a business relationship with the Company and is no longer authorized to sell the Products in the Territory.

# ARTICLE 8

## CONFIDENTIALITY

**8.1** **Definition.** "**Confidential Information**" shall mean all information, other than information expressly designated by the producing party as non-confidential, which is directly or indirectly disclosed to the receiving party or embodied in the Products provided hereunder, regardless of the form in which it is disclosed, relating in any way to, without limitation, the producing party's patents, Marks, copyrights, trade names, trade secrets, inventions, technical information or data, financial information, projections or forecasts, business, marketing or strategic plans, procedures or methods, design or manufacturing information, sales data, assets, liabilities, distributors, organization, cost and expense information, pricing and discount information, profit margins or analyses, vendor lists, supplier lists, client lists, customer lists, marketing or customer data, product packaging plans or schematics, formulas, ingredients, prototypes, samples, patterns, sketches, drawings or other processes, procedures or documents.

**8.2** **Confidentiality.** The parties acknowledge and agree that all Confidential Information is confidential and proprietary to the producing party, that the business and success of the parties depend upon the use and protection of such Confidential Information, and that such Confidential Information constitutes a special, valuable and unique asset of the producing party. The parties agree not to use any Confidential Information produced by the other party during or at any time after the Term of this Agreement for any purpose other than as permitted or required for performance by the parties hereunder. The parties further agree not to disclose the terms of this Agreement or provide any such Confidential Information to any third party and to take all necessary measures to prevent any such disclosure by its principals, affiliates, employees, agents, subdistributors, contractors or consultants during the term hereof and for a period of five years thereafter. Nothing herein shall prevent the parties from using, disclosing or authorizing the disclosure of any Confidential Information that is, or hereafter becomes, part of the public domain through no fault of the receiving party or information required to be disclosed by order of a court of competent jurisdiction. However, to the extent that the receiving party or any of its principals, affiliates, employees, agents, subdistributors, contractors or consultants are requested or required by legal process to disclose any Confidential Information of the other party, the receiving party agrees that prior to any such disclosure it will promptly notify the producing party of such request or requirement so that the producing party may seek an appropriate protective order or take such other action as it deems appropriate. The provisions of this Section 8.2 shall survive the expiration or termination of this Agreement.

**8.3** **Publicity.** The terms of this Agreement are confidential (as provided in Section 8.2) and the Distributor shall not issue press releases or engage in other types of publicity of any nature dealing with the commercial and legal details of this Agreement without the Company's prior written approval.

18

## ARTICLE 9

### INDEMNITY AND INSURANCE

**9.1    Indemnity**.  Distributor hereby agrees to defend, indemnify, save and hold the Company, and its affiliated entities or successors, its current or former officers, managers, members, directors, shareholders, owners, parent companies, subsidiaries, affiliates, joint ventures, partners, predecessors, successors, assigns, agents, employees, attorneys or representatives, harmless from and against any and all liabilities, losses, damages and expenses (including reasonable attorneys' fees and expenses) arising out of or resulting from: (i) any act or omission that may be committed by the Distributor or any of its principals, affiliates, employees, agents, subdistributors, contractors or consultants in connection with the Distributor's performance or breach of this Agreement; (ii) any actual or alleged infringement or violation of any patents, copyrights, trademarks or other rights, including trade secrets and rights of privacy and publicity, in connection with Distributor's distribution, sale, use, advertisement or promotion of any of the Products (other than those arising from the design or manufacture of Products or other similar matters not within the control of the Distributor or from the Distributor's use of the Marks as permitted hereunder); (iii) false or misleading advertising in connection with any of the Products by the Distributor or its principals, affiliates, employees, agents, subdistributors, contractors or consultants; (iv) any violation of any applicable law or regulation in connection with the marketing, distribution, sale, advertisement or promotion by Distributor of any of the Products; (v) any use of any of the Marks in a manner not authorized by the Company; (vi) failure to pay any and all Taxes by the Distributor as required by Section 5.4; (vii) any and all liabilities (including, without limitation, reasonable legal fees) to any person or entity claiming commissions or fees in connection with this Agreement or the transactions contemplated hereby as a result of an agreement with or services rendered to the Distributor; or (viii) any breach of this Agreement by the Distributor.  The Company will have the right to retain counsel of its choice at the Distributor's expense.  Company hereby indemnifies, saves and holds the Distributor, and its affiliated entities or successors, its current or former officers, managers, members, directors, shareholders, owners, parent companies, subsidiaries, affiliates, joint ventures, partners, predecessors, successors, assigns, agents, employees, attorneys or representatives, harmless from and against any and all liabilities, losses, damages and expenses (including reasonable attorneys' fees and expenses) arising out of r resulting from: (i) any act or omission that may be committed by the Company or any of its principals, affiliates, employees, agents, contractors or consultants in connection with the Company's performance or breach of this Agreement; (ii) any actual or alleged infringement or violation of any patents, copyrights, trademarks or other rights, including trade secrets and rights of privacy and publicity, in connection with the Products sold by the Company to the Distributor pursuant to this Agreement and arising from the design or manufacture of the Products or other similar matters not within the control of the Distributor; or (iii) any breach of this Agreement by the Company.  The Distributor will have the right to retain counsel of its choice at the Company's expense.  The provisions of this Section 9.1 shall survive the expiration or termination of this Agreement.

**9.2    Insurance**.  Upon the execution of this Agreement and throughout the Term, the Distributor, at its sole cost and expense, shall obtain and maintain in full force and effect policies of insurance insuring against those risks customarily insured under broad form comprehensive general liability policies, including without limitation, product liability, completed operations,

19

personal injury, advertising injury and contractual liability for the Distributor's obligations under this Agreement. Such policies of insurance shall have endorsements or coverage with combined single limits of not less than One Million Dollars ($1,000,000) plus defense costs. Within thirty (30) days of the date of execution of this Agreement, the Distributor shall furnish to the Company current certificates of insurance issued by the insurer. During the Term, the Distributor may not engage in the sale or promotion of any Products unless the required insurance coverage is in effect.

## ARTICLE 10

## MISCELLANEOUS

**10.1    Relationship of the Parties.** The relationship of the Company to Distributor is that of an independent contractor. Nothing in this Agreement will be construed to place the Distributor in the relationship of legal representative, partner, joint venturer, franchisee, employee or agent of the Company. The parties acknowledge that this Agreement does not constitute a franchise under United States federal or state law or under the law of the Territory or any sovereignty within the Territory or anywhere in the world and does not create a fiduciary relationship between the parties. Distributor will have no power, express or implied, to obligate or bind the Company in any manner or thing whatsoever nor will it have the power to (i) make any representation, warranty or guarantee on behalf of the Company, (ii) file any document with any governmental body or server or accept legal process on behalf of the Company or (iii) settle any claim by or against the Company. All agreements entered into by Distributor will be for Distributor's sole account and risk and will not bind the Company in any respect. If Distributor extends credit to its customers in connection with the sale of the Products, it does so entirely at its own risk and the Company will not be liable for any default or bad debt incurred. The Distributor shall purchase the Products for its own account from the Company and shall re-sell the Products for its own account in the Territory. During the Term and following the termination or expiration of this Agreement, Distributor shall not claim, nor have any right to claim, in any court of law or equity or any other forum, that this Agreement or the relationship of the parties created a relationship other than independent contractor.

**10.2    Assignment.** This Agreement constitutes a personal contract and the Distributor shall not transfer or assign the Agreement or any part thereof without the prior written consent of the Company. An assignment shall include, without limitation, any sale or transfer of stock or other equity interests of the Distributor that effectively transfers control of the Distributor to the transferee thereof (by operation of law or otherwise). The Company has a complete and unrestricted right to sell, transfer, lease or assign its rights and interests in this Agreement.

**10.3    Successors.** Without in any way limiting the effect of Section 10.2 above, this Agreement shall be binding upon the parties hereto and upon their heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties hereto, and to their heirs, administrators, representatives, executors, successors and assigns.

**10.4    Right of First Negotiation Regarding "Mono-Brand" Stores in the Territory.** During the Term, Company shall grant Distributor a right of first negotiation for a license to operate "ROCK & REPUBLIC" apparel and related accessories stores in the Territory. Should

the Company decide to operate "ROCK & REPUBLIC branded stores under license in the Territory, it shall first negotiate in good faith with Distributor regarding such mono brand store license for a minimum period of two weeks. If Company and Distributor do not reach an agreement following such negotiations, the Company may engage a different entity to operate such stores, in its sole discretion, without liability of any kind to Distributor.

**10.5     Survival.** The provisions of Sections 3.1.12, 4.1, 7.3, 7.4, 7.5, 7.6, 8.2, 9.1, 10.1, 10.5, 10.7 and 10.18 shall survive the expiration or termination of this Agreement.

**10.6     Consultation With Counsel; Reasonable Time to Consider Agreement; Voluntary Participation in this Agreement.** The Distributor acknowledges that it has been advised of the opportunity to review this Agreement with an attorney, that it has had the opportunity to thoroughly discuss all aspects of its rights and this Agreement with an attorney to the extent the Distributor elected to do so, that it has carefully read and fully understands all of the provisions of this Agreement, that it has been given a reasonable period of time to consider signing this Agreement, and that it is voluntarily signing this Agreement.

**10.7     Severability, Governing Law and Attorneys' Fees.**

**10.7.1**  Should any of the provisions in this Agreement be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal, invalid or violating part, term or provision shall be deemed not to be a part of this Agreement. Notwithstanding the foregoing, if, in the Company's reasonable judgment, a material provision in this Agreement is determined to be invalid or unenforceable, then, at the Company's option, this Agreement shall be deemed to be terminated.

**10.7.2**  This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to choice of law principles, notwithstanding the fact that one or more counterparts hereof may be executed outside of the state, or one or more of the obligations of the parties hereunder are to be performed outside of the state. The rights and obligations of the parties under this Agreement shall <u>not</u> be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods or the United Nations Convention on the Limitation Period in the International Sale of Goods. The prevailing party in any action that arises out of or in connection with this Agreement shall be entitled to recover from the other party all reasonable attorneys' fees, costs and other expenses incurred by the prevailing party in connection with such action. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of reasonable attorneys' fees, costs and other expenses incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law.

**10.8     Proper Construction.**

**10.8.1**  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties. In the event any claim is made by any party relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular party or its counsel.

**10.8.2** The section headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

**10.8.3** This Agreement is executed in the English language which shall be the controlling language and no translation or restatement of the terms and conditions hereof in any other language will have any effect in the interpretation or application thereof. In case of any conflict between the English version and any translated version of this Agreement, the English version shall govern.

**10.9** **Entire Agreement and Amendment**. This Agreement and any Sales Order Confirmation(s) are the entire agreement between the Distributor and the Company and fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to its subject matters. The terms of this Agreement may not be altered, amended, waived or modified, except by a further written agreement signed by both of the parties hereto.

**10.10** **No Implied Waivers**. The failure of either party at any time to require performance by the other party of any provision hereof shall not affect in any way the right to require such performance at any time thereafter. Nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

**10.11** **Notices**. All notices concerning this Agreement must be in writing and will be deemed to have been duly given when: (a) delivered by hand (with written confirmation of delivery); (b) sent by facsimile (with written confirmation of delivery); or (c) when delivered to the addressee, if delivered by an internationally recognized overnight delivery service, in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other party):

      (a)    To the Company:

      Rock & Republic Enterprises, Inc.
      Attn: Michael Ball and Andrea Bernholtz
      3523 Eastham Drive, Suite A
      Culver City, CA 90232
      Facsimile: (310) 839-3340

      (b)    To the Distributor:


      Simms Sigal & Co. Ltd.
      Attn: Linda Sigal
      155 Beaubien Ouest
      Montreal, Quebec, H2V 1C5
      Facsimilie: (514) 844--0802

**10.12** **Execution and Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one instrument. Any or all of such counterparts

may be executed within or outside the State of California and the United States of America. Any one of such counterparts shall be sufficient for the purpose of proving the existence and terms of this Agreement, and no party shall be required to produce an original or all of such counterparts in making such proof. For purposes of delivery of executed agreements, the parties agree to accept exchange of signature pages or a document via facsimile as valid delivery of an executed document.

**10.13  Fees and Expenses.** All fees and expenses incurred by or on behalf of each party hereto in connection with the negotiation and execution of this Agreement shall be borne by such party.

**10.14  Compliance With Laws.** Nothing contained in this Agreement shall be construed to require the commission of any act contrary to law, and whenever there is a conflict between any term, condition or provision of this Agreement and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the term, condition or provision of this Agreement affected shall be curtailed and limited only to the extent necessary to bring it within the requirement of the law, provided that such construction is consistent with the intent of the parties as expressed in this Agreement. Further, the Distributor warrants and represents that it will comply with all laws, regulations, ordinances, governmental standards and the like applicable to the sale, distribution, promotion and advertisement of the Products.

**10.15  Reliance on Authority of Person Signing Agreement.** If the Distributor is not a natural person, the Company is not required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any facts or circumstances bearing upon the existence of the authority of such individual.

**10.16  Additional Documents and Acts.** Each party hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**10.17  Injunctive Relief; Specific Performance.** The parties hereby agree and acknowledge that a breach of any material term, condition or provision of this Agreement would result in severe and irreparable injury to the other party, which injury could not be adequately compensated by an award of money damages, and the parties therefore agree and acknowledge that they shall be entitled to injunctive relief in the event of any breach of any material term, condition or provision of this Agreement, or to enjoin or prevent such a breach, including without limitation an action for specific performance hereof, and the parties hereby irrevocably consent to the issuance of any such injunction. The parties further agree that no bond or surety shall be required in connection therewith.

**10.18  Arbitration.** Except for actions seeking injunctive relief, which may be brought before any court having jurisdiction, any and all disputes arising out of or in connection with this Agreement, which are not settled by agreement between the parties, shall be settled by arbitration in Los Angeles County, California by the Judicial Arbitration and Mediation Services. Each party agrees that the arbitration provisions of this Agreement are its exclusive remedy for such

claim, dispute or controversy and expressly waives any right to seek redress in another forum. Each party shall equally bear the fees of the arbitrator during the arbitration, but the fees of such arbitrator shall be ultimately borne by the losing party. In any action or proceeding arising from this Agreement the prevailing party (as determined by the arbitrator) shall be entitled to recover its reasonable attorney's fees and expenses from the other party.

**10.19 U.S. Dollars.** All monetary amounts set forth in this Agreement shall refer to U.S. Dollars and any payments required herein shall be made in U.S. Dollars unless otherwise indicated by the Company.

**10.20 Company Sales.** Any sales by the Company to the Distributor as provided herein may be shipped to the Distributor from sources other than the Company from time to time in the Company's sole discretion.

**10.21 Limitation of Remedies.**

**10.21.1** The Company shall not be liable for any loss or damage caused by delay in furnishing Products or any other performance under or pursuant to this Agreement.

**10.21.2** In no event shall the Company's liability of any kind to the Distributor include any exemplary, punitive, special, indirect, incidental or consequential losses or damages, even if the Company shall have been advised of the possibility of such potential loss or damage.

**10.22 Notice of Claims.** Except as provided in Sections 4.3 and 4.4 herein, the Distributor shall notify the Company in writing pursuant to Section 10.11 within twenty (20) days after the commencement or threat of any action, suit, proceeding or investigation or the issuance of any order, writ, injunction, award, judgment or decree before or of any court, tribunal, arbitration panel, agency or governmental instrumentality that may adversely affect the Products or the operations or financial condition of the Distributor, the Company.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**THE COMPANY:**

ROCK & REPUBLIC ENTERPRISES, INC.

By: _____

Michael Ball

Its: CEO

**THE DISTRIBUTOR:**

SIMMS SIGAL & CO, LTD:

By: _____

Linda Sigal

Its: Managing Director

EXHIBIT "C"



**ROCK & REPUBLIC**

LOS ANGELES

August 2, 2010

***VIA FEDERAL EXPRESS & FACISMILE***

Simms Sigal & Co. Ltd.
Attn: Linda Sigal/Tom Simms
155 Beaubien St. West
Montreal, Quebec, H2V 1C5
Facsimile: (514) 844-0802

Re:  Termination of International Distribution Agreement

Dear Linda and Tom:

Simms Sigal & Co. Ltd. ("Simms Sigal") and Rock & Republic Enterprises, Inc. ("R&R") are parties to that certain International Distribution Agreement dated as of March 1, 2009 (the "Agreement"). Section 6.4 of the Agreement provides that no purchase order shall be modified or cancelled except upon written agreement of both parties.

Since June 18, 2010 Simms Sigal has cancelled several orders, including without limitation the following: 1) on June 18, 2010 in the amount of $26,193.75, 2) on June 29, 2010 in the amount of $26,373.75, 3) on July 21, 2010 in the amount of $160,960.50, 4) on July 29, 2010 in the amount of $26,556.00, and 5) on July 27, 2010 in the amount of $22,011.00. These five cancelled orders alone total $261,825.00; a summary of the cancellations is attached.

R&R has not agreed to any cancellations. Simms Sigal's unilateral cancellation of orders is a material breach of the Agreement. You are hereby notified that if Simms Sigal does not cure all cancellations within thirty (30) days of today's date, R&R will terminate the Agreement pursuant to Section 7.1 thereof.

This letter is not intended to be a comprehensive recitation of the facts and circumstances involved, and R&R hereby expressly reserves all of its rights in law and equity.

Very truly yours,

Michael Ball
CEO

*3523 Eastham Drive, Culver City, CA 90232*
*Telephone (310) 839-3330  Fax (310) 424-3800*



ROCK & REPUBLIC

| Date Cancellation Submitted | Units | Dollars |
|---|---|---|
| 6/18/2010 | 479 | $ 26,193.75 |
| 6/29/2010 | 368 | $ 26,373.75 |
| 7/21/2010 | 2508 | $ 160,690.50 |
| 7/29/2010 | 500 | $ 26,556.00 |
| HL10 Cxl 7/27/10 | 353 | $ 22,011.00 |
| TOTAL | 4208 | $ 261,825.00 |



ROCK & REPUBLIC

Simms Sigal Requested Fall 10 Cancellations
Submitted 6/18/2010

| Order # | PO | STYLE | WASH | | | Original Units on Order | Original Dollars on Order |
|---|---|---|---|---|---|---|---|
| **Delivery** | | **6/15/30** | | | | | |
| 116094 | 1001865 | 5KLWB196 | DEY/T | 120 | $ 6,030.00 | 120 | $ 6,030.00 |
| **Delivery** | | **8/15/30** | | | | | |
| 116142 | 1001873 | 5KKWB211 | UNTO | 75 | $ 3,768.75 | 147 | $ 7,386.75 |
| 116142 | 1001873 | 5KLWB196 | OB8S | 120 | $ 6,030.00 | 130 | $ 6,532.50 |
| 116097 | 1001873 | BIE3850 | INDG | 39 | $ 2,340.00 | 353 | $ 21,180.00 |
| 116097 | 1001873 | NCC3850 | IFAT | 100 | $ 6,075.00 | 100 | $ 6,075.00 |
| 116097 | 1001873 | SIN5151 | ITMI | 25 | $ 1,950.00 | 339 | $ 26,442.00 |
| | | | TOTAL: | 479 | $ 26,193.75 | | |

ROCK & REPUBLIC 

Simms Sigal Fall 2010 Cancellations
Submitted on 6/29/10

| Order # | PO | STYLE | WASH | | | | Original Units on Order | Original Dollars on Order |
|---|---|---|---|---|---|---|---|---|
| 116095 | VPO-1001865 | CZB3B3 | LSEX | 120 | $ | 9,3I0.00 | 391 | $ 30,498.00 |
| 117084 | VPO-1001865 | CZB3B50 | LIMT | 24 | $ | 1,296.00 | 40 | $ 2,160.00 Shipped 6/25/10 |
| 116097 | VPO-1001873 | CZB4G52 | INPL | 40 | $ | 3,240.00 | 98 | $ 7,938.00 |
| 116097 | VPO-1001873 | PSY0136 | TERR | 40 | $ | 3,380.00 | 75 | $ 6,356.25 |
| 116097 | VPO-1001873 | PSY3B50 | UPSG | 100 | $ | 6,3I0.00 | 100 | $ 6,300.00 |
| 116097 | VPO-1001873 | BIE3B50 | INDG | 9 | $ | 540.00 | 314 | $ 18,840.00 |
| 116097 | VPO-1001873 | CZB3B50 | CTAT | 17 | $ | 1,032.75 | 443 | $ 26,912.25 |
| 116097 | VPO-1001873 | SIN5151 | ITMI | 9 | $ | 702.00 | 314 | $ 24,492.00 |
| 116097 | VPO-1001873 | SIN3B50 | LIMT | 9 | $ | 513.00 | 265 | $ 15,105.00 Shipped 6/18/10 |
| | | | TOTAL: | 368 | $ | 26,3?3.75 | 2040 | $ 138,601.50 |

**ROCK & REPUBLIC**

## LADIES

| STYLE | WASH | Original Units on Order | Original Dollars on Order | Original Units on Order | Original Dollars on Order | Notes |
|---|---|---|---|---|---|---|
| SKDWB218 | LGHY | 11 | $ 552.75 | 11 | $ 552.75 | |
| SKDWB219 | MEHH | 113 | $ 5,678.25 | 122 | $ 6,130.50 | |
| SKDWB220 | HHF | 9 | $ 452.25 | 9 | $ 452.25 | |
| SKDWB200 | DRHN | | | 300 | $ 15,075.00 | |
| SPK3850 | DRHN | 7 | $ 351.75 | 38 | $ 1,909.50 | |
| SPK3850 | INSA | 7 | $ 351.75 | 38 | $ 1,909.50 | |
| CI80137 | CNNF | 41 | $ 3,474.75 | 41 | $ 3,474.75 | |
| C2B0161 | CRNS | 6 | $ 468.00 | 36 | $ 2,808.00 | |
| DNWKT260 | SI9 | 41 | | | $ 20,493.00 | $ 20,694.75 Shipped on Monday 7/19 |
| C2BN333 | LSTX | 248 | | 531 | | |
| NOR3850 | RBHC | 598 | $ 8,174.00 | 212 | | $13,356.00 Shipped total order, 212 units, 7/2/10 |
| SIN3850 | SATR | 60 | $ 3,375.00 | 694 | $ 46,845.00 | |
| R8I0150 | CY NI | 41 | $ 228.00 | 18 | | $11,023.00 Shipped total order 7/13/10 |
| SIN3850 | LINT | | $ 342.00 | 265 | | $15,105.00 Shipped total order 265 units 6/18/10 |
| STL3851 | CRST | 194 | $ 532.75 | 194 | $ 703.50 | |
| SKWB211 | CCYT | 11 | $ 532.75 | 72 | $ 3,618.00 | |
| BIE3850 | UN'O | 11 | | 314 | $ 18,840.00 | |
| C2B3850 | INCG | 15 | $ 900.00 | 443 | $ 26,912.25 | |
| C2B4652 | CTnT | 11 | $ 668.25 | 98 | $ 7,938.00 | |
| KDS4652 | INPL | 51 | $ 4,131.00 | 48 | $ 3,720.00 | |
| PSY3850 | INHL | 9 | $ 729.00 | 622 | $ 33,688.75 | 622 units total on order, shipped all units - 500 units 6/18, 122 units 7/19 |
| KDS3850 | RBENC | 477 | $ 25,759.00 | | | |
| KSEWKR082 | CC'TR | 379 | $ 20,466.00 | 379 | $ 20,466.00 | |
| PSY0136 | 9i9 | 3 | $ 668.25 | 9 | $ 668.25 | |
| SIN0506 | TEHR | 35 | $ 2,966.25 | 35 | $ 6,356.25 | |
| SNN3850 | IFPN | 20 | $ 1,620.00 | 116 | $ 9,396.00 | |
| SNS3850 | IFPAI | 67 | $ 4,271.25 | 87 | $ 4,271.25 | |
| KDS-STCK | IFPAI | 93 | $ 7,254.00 | 313 | $ 24,492.00 | |
| KDS-STCK | ENDS | 297 | $ 18,042.75 | 297 | $ 18,042.75 | |
| | | 2777 | $144,517.75 | 6170 | $339,005.50 | |

## MENS

| STYLE | WASH | Original Units on Order | Original Dollars on Order | Notes |
|---|---|---|---|---|
| FLY3850 | BKHR | 22 | $ 1,402.50 | 564 | $ 35,892.00 | Shipped 551 units on 7/2 |
| NEL1450 | EUIT | 10 | $ 657.50 | 158 | $ 10,345.75 | Shipped total 155 units 6/25 |
| RXX3836 | RGHU | 20 | $ 1,168.50 | 155 | $ 9,056.25 | |
| H3N0567 | DDBL | 62 | $ 3,906.00 | 780 | $ 49,140.00 | |
| SIN3806 | DCHN | 24 | $ 1,926.00 | 532 | $ 42,693.00 | |
| SNN3850 | IFPAI | 67 | $ 4,271.25 | 87 | $ 24,492.00 | |
| SNS3850 | REID | 66 | $ 4,603.50 | 250 | $ 17,437.50 | |
| RPH3850A | RAPT | 27 | $ 1,802.25 | 716 | $ 47,793.00 | |
| | | 2306 | $133,117.50 | 6002 | $215,288.50 | |

**GRAND TOTAL**   2508   $160,690.50



ROCK & REPUBLIC

## Simms Sigal Fall 2010 Cancellations
### Submitted on 7/29/10

| Order # | PO | STYLE | WASH | TOTAL Units to Cancel | Dollars to Cancel | Original Units on Order | Original Dollars on Order |
|---------|-----|-------|------|------------------------|-------------------|--------------------------|----------------------------|
| 116096 | VPO-1001865 | CZB3833 | LSEX | 121 | $ 9,438.00 | 391 | $ 30,498.00 |
| 116321 | VPO-1001893 | KDS3850 | COTR | 379 | $ 17,118.00 | 317 | $ 17,118.00 |
| | | | | 500 | $ 26,556.00 | 708 | $ 47,616.00 |



ROCK & REPUBLIC

## LADIES

| PO # | STYLE | WASH | Total Units to Cancel | Dollars to Cancel |
|---|---|---|---|---|
| VPO-1002233 | 5KDWB228 | CETR | 49 | $ 2,793.00 |
| VPO-1002233 | 5KDWB229 | CMPO | 77 | $ 4,677.75 |
| VPO-1002233 | 5KDWB230 | INTE | 15 | $ 753.75 |
| VPO-1002233 | CCIWB242 | DETY | 9 | $ 546.75 |
| VPO-1002233 | CZB3851 | ADVI | 8 | $ 666.00 |
| VPO-1002233 | HAA4050 | WARF | 15 | $ 911.25 |
| VPO-1002233 | JASFDW081 | TACT | 27 | $ 1,660.50 |
| VPO-1002233 | KAS0542 | WACQ | 22 | $ 1,402.50 |
| VPO-1002233 | KDSWB240 | CMND | 8 | $ 402.00 |
| VPO-1002233 | PSY3806 | SCAT | 16 | $ 912.00 |
| VPO-1002233 | PSYWB242 | CESE | 16 | $ 804.00 |
| VPO-1002233 | SIN3860 | AMMU | 21 | $ 1,685.25 |
| VPO-1002233 | NOR3850 | SCEM | 18 | $ 1,012.50 |
| | | Total: | 301 | $ 18,227.25 |

## MENS

| PO # | STYLE | WASH | Total Units to Cancel | Dollars to Cancel |
|---|---|---|---|---|
| VPO-1002234 | NLL3851 | PARB | 11 | $ 742.50 |
| VPO-1002234 | RLH3850 | ENLI | 8 | $ 516.00 |
| VPO-1002234 | VGH0550 | ASBL | 12 | $ 855.00 |
| VPO-1002234 | VGH3806 | DETN | 13 | $ 1,082.25 |
| VPO-1002234 | VGH4651 | MIFI | 8 | $ 588.00 |
| | | Total: | 52 | $ 3,783.75 |

EXHIBIT "D"

| GROSS SALES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SIMMS SIGAL & CO., LTD | | | | | | | | |
| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG |
| *2008* | 1,124,729 | 873,949 | 388,291 | 1,162,874 | 993,769 | 540,519 | 940,996 | 1,249,325 |
| *2009* | 623,591 | 534,301 | 978,666 | 1,112,461 | 945,974 | 549,657 | 292,639 | 234,078 |
| *2010* | 261,318 | 534,978 | 346,650 | 267,803 | 363,237 | 0 | 326,750 | 128,116 |

| GROSS SALES | 2008 | 2009 | YTD 2010 |
|---|---|---|---|
| SIMMS SIGAL & CO., L | 9,248,707 | 6,795,710 | 2,228,852 |