THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re:                                                          :

                                                                :     Chapter 11

ROCK & REPUBLIC ENTERPRISES, INC., *et al.*,   :

                                                                :     Case No. 10-11728 (AJG)

                               Debtors.                :

                                                                :     Jointly Administered

                                                                :

----------------------------------------------------------------x

### DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT CONSOLIDATED CHAPTER 11 PLAN FOR ROCK & REPUBLIC ENTERPRISES, INC. AND ITS AFFILIATED DEBTOR AND DEBTOR IN POSSESSION, PROPOSED JOINTLY BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND VF CORPORATION

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Alex Spizz
Arthur Goldstein
Jill Makower
425 Park Avenue
New York, New York 10022
(212) 754-9400
*Attorneys for the Debtors and Debtors in Possession*

ARENT FOX LLP
Robert M. Hirsh
Jordana Renert
1675 Broadway
New York, New York 10019
(212) 484-3900
*Attorneys for the Official Committee of Unsecured Creditors*

WEIL, GOTSHAL & MANGES LLP
Joseph H. Smolinsky
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
*Attorneys for VF Corporation*

Dated:  December 20, 2010

NYC/559246.4

**DISCLOSURE STATEMENT**

**DATED December 20, 2010**

**WITH RESPECT TO PLAN OF LIQUIDATION**
<u>**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

> **THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON March [•], 2011, UNLESS EXTENDED BY ORDER OF THE BANKRUPTCY COURT.**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT CONSOLIDATED CHAPTER 11 PLAN FOR ROCK & REPUBLIC ENTERPRISES, INC. AND TRIPLE R, INC., DEBTORS AND DEBTORS IN POSSESSION, PROPOSED JOINTLY BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND VF CORPORATION (THE "<u>PLAN</u>") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY, IN THEIR ENTIRETY, BEFORE VOTING. IN MAKING ITS VOTING DECISION, EACH HOLDER MUST RELY ON ITS OWN EXAMINATION OF THE DEBTORS AND THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED, AND NO SUCH HOLDER SHOULD CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, VOTING, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AND ANY EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT). THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENTS BELIEVE SUCH SUMMARIES ARE FAIR AND ACCURATE, THE SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. NONE OF THE PLAN PROPONENTS WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NYC/559246.4

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. SUCH STATEMENTS ARE PROVIDED PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND IN RELIANCE UPON THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED IN THIS DISCLOSURE STATEMENT.

**THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES CONTAINED IN THIS DISCLOSURE STATEMENT.**

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS (*I.E.,* CAUSES OF ACTION), THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THESE CHAPTER 11 CASES AS TO THE HOLDERS OF CLAIMS OR INTERESTS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NYC/559246.4

## OVERVIEW OF THE PLAN

Rock & Republic Enterprises, Inc. ("R&R") and Triple R, Inc. ("Triple R", and together with R&R, each a "Debtor" and collectively, the "Debtors"), the Official Committee of Unsecured Creditors in the Debtors' cases (the "Creditors' Committee") and VF Corporation ("VF" and together with the Debtors and the Creditors' Committee, the "Plan Proponents") submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* ("Bankruptcy Code"), for use in the solicitation of votes to accept or reject the Plan proposed by the Plan Proponents, and filed with the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). A copy of the Plan is annexed hereto as Exhibit A. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

The following is a general overview only, and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements appearing elsewhere in this Disclosure Statement and the Plan. This Disclosure Statement contains, among other things, descriptions and summaries of the Plan. The Plan Proponents are reserving the right to amend or modify the Plan in accordance with the provisions of the Plan consistent with section 1127 of the Bankruptcy Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

### A.  General Structure of the Plan

The Plan contemplates and is predicated upon the sale of the Debtors' intellectual property rights to NewCo (an entity wholly owned by VF) (the "Sale Transaction"). A copy of the VF Asset Purchase Agreement is attached as an exhibit to the Plan.

The Plan provides for the transferring of a portion of the total sale consideration paid under the Sale Transaction (the "Sale Consideration") and all property of the Estates to a liquidating trust ("Liquidating Trust") that will be administered by a liquidating trust administrator ("Liquidating Trust Administrator"). The remainder of the Sale Consideration (the amount to be determined jointly by the Debtors and Creditors' Committee) will be paid to the Debtors for the purpose of satisfying certain Allowed Claims. The Liquidating Trust Administrator will, among other things, be responsible for the (a) Claims resolution process, (b) distribution to holders of Allowed Claims and Interests, (c) pursuit of objections to, and requests for estimation of, Claims against the Debtors (with certain exceptions as outlined in the Liquidating Trust Agreement), (d) payment of amounts under the Plan, including, without limitation, Administrative Expense Claims, and (e) wind down process of the Debtors including sale or abandonment of the Estates' remaining assets and the dissolution of the Post Effective Date Debtors and the filing of final tax returns.

After the Effective Date, the Bankruptcy Court will retain jurisdiction with respect to certain matters, as more fully described herein and in the Plan, that relate to, among other things, the Liquidating Trust.

### B.  Requirements for Confirmation of the Plan

The Plan places Claims against, or Interests in, the Debtors into various classes. The Bankruptcy Code requires that each claim or interest in a class be "substantially similar" to the other claims or interests in such class. Under the Bankruptcy Code, classes of claims or interests are either "impaired" or "unimpaired." In general, a class is unimpaired if the plan leaves unaltered the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest. For

NYC/559246.4

example, a claim paid in full on the effective date of a plan is unimpaired, as is a secured claim in respect of which the holder is recovering 100% of the underlying collateral.

In order for a chapter 11 plan to be approved, the Bankruptcy Court requires that each class of impaired claims vote to accept the plan, except to the extent a "cramdown" is available under section 1129(b) of the Bankruptcy Code. (In a cramdown scenario, a plan may be confirmed, notwithstanding rejection by one or more impaired classes, if (a) the plan has been accepted by at least one impaired class, (b) the plan does not "discriminate unfairly" and is "fair and equitable" as to each non-accepting class, and (c) the other requirements for confirmation are met.) Only the holders of impaired claims or interests are entitled to vote on a plan. Furthermore, if the holder of an impaired claim or interest is not receiving or retaining any property under the plan, the holder is deemed to have rejected the plan and such holder's vote will not be solicited. With respect to voting, acceptance by an impaired class of claims requires acceptances by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in the class who actually vote. Holders who are entitled to vote and who fail to vote are not counted as either accepting or rejecting the plan but may still participate in distributions under the plan to the extent of the allowed amount of their claims.

Assuming that the required votes are received, or that a cramdown is available, a plan must then be approved, or "confirmed," by the Bankruptcy Court. In order to confirm a plan, the Bankruptcy Court must make a series of determinations, including (a) that the plan has classified claims and interests in a permissible manner; (b) that the plan complies with the requirements of chapter 11 of the Bankruptcy Code; (c) that the plan was proposed in good faith, and (d) that the disclosures, as required by chapter 11 of the Bankruptcy Code, have been adequate and have included information concerning all payments made or promised under the plan. The Bankruptcy Code requires, further, that the plan be "feasible" (*i.e.*, that there be a reasonable prospect that confirmation of the plan is not likely to be followed by a liquidation or the need for further financial reorganization) and that the plan is in the "best interests" of all impaired creditors and interest holders (that is, that impaired creditors and interest holders will receive at least as much under the plan as they would in a chapter 7 liquidation). To confirm the Plan, the Bankruptcy Court must find all of these conditions are met with respect to the Plan. Thus, even if the Plan is accepted by the required number of votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it satisfies the "best interests" test before the Plan may be confirmed.

## C.      Summary of Treatment of Claims and Interests

The following is a brief summary of the treatment of Claims and Interests under the Plan. A Claim is placed in a particular Class for purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim. As described below, for a further explanation, please refer to the discussion in Article VI below entitled "Summary of the Plan" and the Plan itself.

## 1. Class of Claims

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired. On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim. | No (deemed to accept) | 100% |
| Class 2 | Factoring Agreement Claims | Unimpaired. Except to the extent that a holder of an Allowed Factoring Agreement Claim has been paid by the Debtors prior to the Effective Date and unless otherwise agreed to by the Plan Proponents, on or as soon as practicable after the Effective Date, each holder of an Allowed Factoring Agreement Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Factoring Agreement Claim, Cash in an amount equal to such Allowed Factoring Agreement Claim. | No (deemed to accept) | 100% |
| Class 3 | RKF Loan Claim | Unimpaired. The RKF Loan Claim shall be an Allowed Claim and shall accrue interest at the rate set forth in the RKF Loan Agreement until paid in full in Cash, which shall occur on or as soon as practicable after the Effective Date except to the extent that the holder of the Allowed RKF Loan Claim has been paid by the Debtors prior to the Effective Date. | No (deemed to accept) | 100% |
| Class 4 | Other Secured Claims | Unimpaired. Unless otherwise agreed to by the Plan Proponents and the holder of an Allowed Other Secured Claim, on the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Other Secured Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following distributions: (i) reinstatement of any such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (ii) the payment of such holder's Allowed Other Secured Claim in full in Cash; (iii) the surrender to the holder or holders of any Allowed Other Secured Claim of the property securing such Claim; or (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code. | No (deemed to accept) | 100% |
| Class 5 | General | Impaired. On or as soon as practicable after the Effective Date (but no earlier than the first (1st) | Yes | [•]% |

| | | | | |
|---|---|---|---|---|
| | Unsecured Claims | Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim shall receive from the Liquidating Trust its Pro Rata Share of the Net Available Cash after full and final satisfaction of or release of all Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims, Priority Non-Tax Claims, Factoring Agreement Claims, the RKF Loan Claim, and Other Secured Claims, in accordance with the terms of the Liquidating Trust and the Liquidating Trust Agreement. The Liquidating Trust shall make subsequent distributions to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed in accordance with the terms of the Liquidating Trust and the Liquidating Trust Agreement. In no event shall holders of Allowed General Unsecured Claims receive distributions in excess of 100% of the Allowed General Unsecured Claims. | | |
| Class 6 | Subordinated Claims | Impaired. On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed Subordinated Claim shall receive from the Liquidating Trust its Pro Rata Share of any and all amounts remaining from the Net Available Cash after full and final satisfaction of or release of all Allowed General Unsecured Claims as provided for in Section 4.5 of the Plan. In no event shall holders of Allowed Subordinated Claims receive distributions in excess of 100% of the Allowed Subordinated Claims. | Provisionally entitled to vote | [•]% |
| Class 7 | Existing Equity Interests | Impaired. On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed Existing Equity Interest shall receive from the Liquidating Trust any and all amounts remaining from the Net Available Cash after full and final satisfaction of or release of all Allowed General Unsecured Claims as provided for in Section 4.5 of the Plan and all Allowed Subordinated Claims as provided for in Section 4.6 of the Plan, such distributions to the holders of Allowed Existing Equity Interests to be apportioned among them in such a fashion as will not cause a disqualification for federal income tax purposes of the Debtors as qualified sub-chapter S subsidiaries or of the Existing Equity Holders as S corporations. | Provisionally entitled to vote | $[•] |

## 2. Substantive Consolidation

The Plan contemplates and is predicated upon substantive consolidation of the Debtors into a single entity solely for purposes of all actions and distributions under the Plan. Entry of the Confirmation Order shall constitute approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distribution. On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be deemed merged so that all of the assets of the Debtors (other than the Purchased Assets and a portion of the Sale Consideration in accordance with the Sale Consideration Allocation) shall be transferred to the Liquidating Trust and available to pay all of the liabilities under the Plan as if it were one company, (ii) no monetary distributions shall be made under the Plan on account of Intercompany Claims among the Debtors, (iii) no distributions will be made under the Plan on account of any Intercompany Interests of the Debtors, (iv) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed to be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtors shall be deemed one obligation of the consolidated Debtors, and (v) each and every Claim filed or to be filed in the Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the consolidated Debtors.

**THE DEBTORS AND CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN EACH DEBTOR, AND, ACCORDINGLY, <u>STRONGLY RECOMMEND</u> THAT YOU VOTE TO ACCEPT THE PLAN.**

NYC/559246.4

# TABLE OF CONTENTS

Page

ARTICLE I INTRODUCTION ..........................................................................................................................1

ARTICLE II VOTING INSTRUCTIONS AND PROCEDURES ....................................................................1
    2.1      Notice to Holders of Claims or Interests.........................................................................1
    2.2      Solicitation Package ........................................................................................................2
    2.3      Classes Entitled to Vote ..................................................................................................2
    2.4      Record Date .....................................................................................................................3
    2.5      Ballots; Voting Deadline.................................................................................................3
    2.6      Confirmation Hearing; Objections ..................................................................................3

ARTICLE III BACKGROUND OF THE DEBTORS .....................................................................................4
    3.1      Corporate Structure.........................................................................................................4
    3.2      The Debtors' Business .....................................................................................................5
    3.3      The Debtors' Prepetition Debt Structure.........................................................................5
    3.4      The Debtors' Reasons For Seeking Chapter 11 Protection .............................................6

ARTICLE IV THE CHAPTER 11 CASES ......................................................................................................6
    4.1      Commencement of the Chapter 11 Cases .......................................................................6
    4.2      First Day Orders..............................................................................................................6
    4.3      Creditors' Committee.......................................................................................................7
    4.4      Employment of Professionals .........................................................................................7
    4.5      Schedules and Statements of Financial Affairs...............................................................8
    4.6      Bar Date ..........................................................................................................................8
    4.7      Claims .............................................................................................................................8

ARTICLE V CERTAIN EVENTS THAT OCCURRED IN THE CHAPTER 11 CASES ........................9
    5.1      The Factoring Agreement ................................................................................................9
    5.2      The Debtors' Distribution Agreements .........................................................................10
    5.3      The Debtors' Leases.......................................................................................................12
    5.4      The Debtors' Sale Process .............................................................................................18
    5.5      The Debtors' Exclusivity Periods .................................................................................18
    5.6      The Sale Transaction......................................................................................................19

ARTICLE VI SUMMARY OF THE PLAN ..................................................................................................21
    6.1      Overall Structure of the Plan.........................................................................................21
    6.2      Substantive Consolidation .............................................................................................22
    6.3      Compromise of Controversies.......................................................................................22
    6.4      Treatment of Unclassified Claims .................................................................................23
    6.5      Classification of Claims and Interests...........................................................................24
    6.6      Treatment of Claims and Interests ................................................................................25

ARTICLE VII IMPLEMENTATION OF THE PLAN ..................................................................................27
    7.1      Sale of the Purchased Assets .........................................................................................27
    7.2      The Liquidating Trust and the Liquidating Trust Administrator....................................27
    7.3      Duties and Powers of the Liquidating Trust Administrator ...........................................29
    7.4      Dissolution of the Post Effective Date Debtors.............................................................30
    7.5      Appointment of Advisory Board....................................................................................30
    7.6      Rights and Powers of Advisory Board...........................................................................30
    7.7      Method of Distributions Under the Plan ........................................................................30
    7.8      Closing of the Debtors' Chapter 11 Cases .....................................................................31
    7.9      Cancellation of Existing Agreements and Intercompany Interests ................................31

| | | |
|---|---|---|
| 7.10 | Cancellation of Liens | 31 |
| 7.11 | Compromise of Controversies | 31 |

ARTICLE VIII EFFECT OF CONFIRMATION .......................................................................32

| | | |
|---|---|---|
| 8.1 | Vesting of Assets | 32 |
| 8.2 | Binding Effect | 32 |
| 8.3 | Discharge of Claims and Termination of Interests | 32 |
| 8.4 | Injunction or Stay on Claims | 32 |
| 8.5 | Terms of Existing Injunctions or Stays | 33 |
| 8.6 | Exculpation | 33 |
| 8.7 | Preservation of Causes of Action / Reservation of Rights | 33 |
| 8.8 | Injunction on Causes of Action | 34 |
| 8.9 | Releases By The Debtors | 34 |
| 8.10 | Releases By The Holders of Claims and Interests | 34 |

ARTICLE IX CERTAIN RISK FACTORS ..............................................................................35

| | | |
|---|---|---|
| 9.1 | Nature of Financial Information | 35 |
| 9.2 | Certain Bankruptcy Law Considerations–Alternatives to the Plan | 35 |
| 9.3 | Possible Adverse Effects from Delay | 36 |
| 9.4 | Possible Adverse Effects from Modification of the Plan | 36 |
| 9.5 | Unknown Claims | 37 |
| 9.6 | Dilution | 37 |

ARTICLE X CERTAIN FEDERAL INCOME TAX CONSEQUENCES .................................37

| | | |
|---|---|---|
| 10.1 | Federal Tax Consequences to the Debtors and Existing Equity Holders | 38 |
| 10.2 | Tax Treatment of the Liquidating Trust | 39 |
| 10.3 | Consequences to Holders of Certain Allowed Claims | 40 |

ARTICLE XI CONFIRMATION OF THE PLAN ....................................................................41

| | | |
|---|---|---|
| 11.1 | Classification of Claims and Interests | 42 |
| 11.2 | Acceptance of the Plan | 42 |
| 11.3 | Best Interests Test | 42 |
| 11.4 | Feasibility | 43 |
| 11.5 | Confirmation Without Acceptance by All Impaired Classes – Cramdown | 43 |
| 11.6 | Conditions Precedent to Effective Date | 44 |
| 11.7 | Retention of Jurisdiction | 45 |

ARTICLE XII RECOMMENDATION ......................................................................................47

# DISCLOSURE STATEMENT

## ARTICLE I

## INTRODUCTION

The Plan Proponents submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for use in the solicitation of votes in respect of the Plan, a copy of which is annexed hereto as <u>Exhibit A</u>.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, the need to seek chapter 11 relief, significant events that occurred during the Chapter 11 Cases, the Debtors' marketing process, the Sale Transaction and the operation of the Liquidating Trust by the Liquidating Trust Administrator in furtherance of the terms of the Plan. This Disclosure Statement also describes the terms and provisions of the Plan, including certain effects of confirmation of the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and procedures that holders of Claims and Interests entitled to vote on the Plan must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND CERTAIN RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AND INTERESTS, <u>SEE</u> ARTICLE VI BELOW, "SUMMARY OF THE PLAN," AND ARTICLE IX BELOW, "CERTAIN RISK FACTORS."

## ARTICLE II

## VOTING INSTRUCTIONS AND PROCEDURES

### 2.1    <u>Notice to Holders of Claims or Interests</u>

This Disclosure Statement is being transmitted to the holders of Claims and Interests entitled under the Bankruptcy Code to vote to accept or reject the Plan. See Section 2.3 below for a discussion and listing of those holders entitled to vote on the Plan and those not entitled to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable those holders entitled to vote to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote either to accept or reject the Plan.

[The Bankruptcy Court has approved the Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable holders of Claims and Interests who are entitled to vote on the Plan to make an informed judgment to accept or reject of the Plan. APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, NOR DOES IT CONSTITUTE AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.]

HOLDERS OF CLAIMS AND INTERESTS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE STRONGLY ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, ITS EXHIBITS, AND THE PLAN AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETIES PRIOR TO VOTING.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes on the Plan may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained in this Disclosure Statement.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except as otherwise specifically stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Further, the Plan Proponents do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY ATTACHMENT HERETO HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS AND CREDITORS' COMMITTEE AND FINANCIAL INFORMATION IS BASED UPON DATA PROVIDED BY THE DEBTORS AT THE TIME OF PREPARATION OF THE PLAN AND DISCLOSURE STATEMENT.**

## 2.2    Solicitation Package

Along with the mailing of this Disclosure Statement, as part of the solicitation of acceptances of the Plan, the Debtors and Creditors' Committee will send or cause to be sent copies of: (i) notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider confirmation of the Plan and related matters, and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); (ii) a cover letter from the Debtors and Creditors' Committee summarizing the Plan and setting forth the Creditors' Committee's support thereof; (iii) to Voting Creditors (a) the order approving the Disclosure Statement (without attachments) (the "Disclosure Statement Order"); (b) the Disclosure Statement, which shall include the Plan as an attachment; (c) a Ballot customized for such holder, in the form described below; and (iv) to Non-Voting Creditors, a Notice of Non-Voting Status, in the form described below (collectively, the "Solicitation Package"). Holders of Unimpaired Claims or Interests, or Impaired Claims or Interests in respect of which they will not receive or retain any property under the Plan, or Claims designated as disputed, contingent or unliquidated, will, in lieu of the solicitation materials described above, receive a "Notice of Non-Voting Status" in a form approved by the Bankruptcy Court, providing certain information relevant to such Claims including the date, time and place for the Confirmation Hearing and the procedure and deadline for objections to confirmation of the Plan. If you did not receive a Ballot in your package and believe that you should have, please contact the Voting Agent at the address or telephone number set forth below.

## 2.3    Classes Entitled to Vote

Only Classes of Claims that are Impaired under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims that are Unimpaired are not entitled to vote and are treated as having accepted the Plan. The Bankruptcy Court may estimate and allow a disputed, unliquidated or contingent Claim for

purposes of voting on the Plan. Any party in interest may seek an order of the Bankruptcy Court temporarily allowing, for voting purposes, a Disputed Claim.

Holders of Allowed Claims in Classes 1, 2, 3, and 4 are Unimpaired under the Plan and are deemed to have accepted the Plan. The holders of Impaired Claims in Class 5 are entitled to vote, and votes are being solicited from such holders. The holders of Impaired Claims in Class 6 and Impaired Interests in Class 7 are provisionally entitled to vote, and votes are being solicited from such holders.

## 2.4    Record Date

**January [•], 2011**, is the record date for all Claims and Interests for voting purposes (the "Voting Record Date"). Entities that did not hold such a Claim or Interest as of the Record Date will not be permitted to vote to accept or reject the Plan.

## 2.5    Ballots; Voting Deadline

Ballots are being provided only to the holders of Claims or Interests entitled to vote on the Plan. If you are entitled to vote for Claims or Interests in more than one Class, you will receive separate Ballots that must be used for each Class. Other forms of Ballots are not acceptable and will not be counted. After reviewing this Disclosure Statement, the Plan and the instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. You must complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED **NO LATER THAN MARCH [•], 2011, AT 4:00 P.M. (PREVAILING EASTERN TIME)** (THE "VOTING DEADLINE") BY DONLIN RECANO & COMPANY, INC. (THE "VOTING AGENT") AT THE FOLLOWING ADDRESS:

| IF BY REGULAR/USPS EXPRESS MAIL | IF BY HAND DELIVERY OR OVERNIGHT COURIER (FEDEX OR UPS) |
|---|---|
| Donlin, Recano & Company, Inc. Re: Rock & Republic Enterprises, Inc., et al., Attn: Voting Department P.O. Box 2034 Murray Hill Station New York, NY 10156 | Donlin, Recano & Company, Inc. Re: Rock & Republic Enterprises, Inc., et al. Attn: Voting Department 419 Park Avenue South New York, NY 10016 Telephone: (212) 771-1128 Facsimile: (212) 481-1416 |

If you have questions about voting procedures or the Solicitation Packages, please contact the Voting Agent. Further, if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy or copies of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact the Voting Agent.

## 2.6    Confirmation Hearing; Objections

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Confirmation Hearing is scheduled to commence on **March [•], 2011, at [•] _.m. (prevailing Eastern Time)**, before the Honorable Arthur J. Gonzalez, Chief United States Bankruptcy Judge, in Courtroom 523 of the

NYC/559246.4

United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Plan Proponents or the Bankruptcy Court without further notice other than by announcement of the adjournment date at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained for the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Such objections, if any, must (i) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Bankruptcy Court in these Chapter 11 Cases, (ii) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property, (iii) provide the basis for the objection and the specific grounds therefore and (iv) be filed and served so as to be *actually received* by the Bankruptcy Court and each of the following parties not later than **March [•], 2011 at 4:00 p.m. (prevailing Eastern Time)**:

| Office of the U.S. Trustee: | Counsel to the Debtors: |
|---|---|
| Office of the U.S. Trustee<br>for the Southern District of New York<br>33 Whitehall St., 21st floor<br>New York, NY 10004<br>Attn: Richard Morrissey<br>Telephone: (212) 510-0500<br>Facsimile: (212) 668-2256 | Todtman, Nachamie, Spizz & Johns, P.C.<br>425 Park Avenue<br>New York, New York 10022<br>Attn: Alex Spizz, Esq. and Arthur Goldstein, Esq.<br>Telephone: (212) 754-9400<br>Facsimile: (212) 754-6262 |
| Counsel to the Creditors' Committee: | Counsel to VF: |
| Arent Fox LLP<br>1675 Broadway<br>New York, New York 10019<br>Attn: Robert Hirsh, Esq. and Jordana Renert, Esq.<br>Telephone: (212) 484-3900<br>Facsimile: (212) 484-3990 | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: Joseph Smolinsky, Esq.<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007 |

## ARTICLE III

## BACKGROUND OF THE DEBTORS

### 3.1 Corporate Structure

R&R, a California qualified subchapter S subsidiary, is a wholly owned subsidiary of Global Domination Enterprises, Inc., a California S corporation ("Global Domination"). Triple R, a California qualified subchapter S subsidiary, is a wholly owned subsidiary of Brick and Mortar Freestanding, Inc., a California S corporation ("Brick and Mortar"). Michael Ball ("Ball") owns 100% of the stock in both

Global Domination and Brick and Mortar. A copy of the organizational chart is attached hereto as Exhibit B.

**3.2    The Debtors' Business**

The Debtors are a wholesale and retail apparel company specializing in an avant-garde and distinctive line of clothing. Originally started in 2002 by its Chief Executive Officer, Ball, primarily as an American jeans company, the Debtors expanded their lines to include high fashion clothing for men, women and children as well as shoes, cosmetics and accessories. The Debtors' merchandise can be found at most high end retail stores such as Nordstom, Neiman Marcus, Bergdorf Goodman, Bloomingdales, Lord & Taylor, Harvey Nichols and Saks Fifth Avenue, as well as in small upscale boutiques.

Prior to the Petition Date, the Debtors operated out of twelve rental locations in New York and California consisting of office space, showrooms, retail spaces, and a warehouse. The Debtors lease their corporate headquarters located at 3523-3525 Eastham Avenue, Culver City, California. As of the Petition Date, R&R employed approximately 180 employees.

**3.3    The Debtors' Prepetition Debt Structure**

As of the Petition Date, the Debtors' debt structure consisted of the following:

**(a)    *Prepetition Factoring Agreement***

Prior to the Petition Date, the Debtors operated their business primarily through a series of factoring agreements between R&R and The CIT Group/Commercial Services, Inc. (the "Factor") including (i) the Factoring Agreement dated February 18, 2005 and all amendments thereto; (ii) the Inventory Security Agreement dated as of August 18, 2006; (iii) the Letter of Credit Agreement dated June 2006; and (iv) all additional documents and agreements executed and delivered in connection therewith (collectively, the "Prepetition Factoring Agreement"). Pursuant to the Prepetition Factoring Agreement, R&R sold and assigned its receivables to the Factor on a credit risk basis and received 85% of all receivables sold and assigned. Further, the Factor extended R&R (i) a credit line of $1,000,000 based on ledger debt, (ii) letters of credit up to $1,000,000, and (iii) advances with respect to inventory up to the lesser of (a) $2,500,000, or (b) an amount equal to the sum of (x) 35% of the value of eligible inventory consisting of raw material plus (y) 50% of the value of finished inventory calculated on a first in, first out basis. The prepetition advances from the Factor were secured by a lien on substantially all of R&R's assets other than intellectual property (the "Factor Prepetition Collateral"). As of the Petition Date, the Debtors were indebted to the Factor in the approximate amount of $5,700,000 and the Factor owed the Debtors approximately $1,165,000 under the Prepetition Factoring Agreement.

**(b)    *RKF Loan***

On or about November 14, 2007, R&R entered into a Loan Agreement with RKF, LLC ("RKF") pursuant to which RKF advanced $15,000,0000 to R&R (the "RKF Loan Agreement"). The RKF Loan Agreement was secured by a lien on R&R's intellectual property assets (the "RKF Collateral"). The original maturity date of the RKF Loan was May 1, 2009, however, through various amendments, the parties agreed to extend the maturity date through and including April 2, 2010. The RKF Loan Agreement bears interest as of February 1, 2010 at the rate of 15% per annum. After the Petition Date, the Debtors began making adequate protection payments in the amount of $50,000 per month.

5

(c)      *Trade Debt*

As of the Petition Date, the Debtors also had current liabilities consisting of, among other things, accounts payable and accrued expenses, including accounts payable to the Debtors' suppliers. As of the Petition Date, the aggregate amount of the Debtors' accounts payable was approximately $15.3 million (excluding intercompany claims).

## 3.4      The Debtors' Reasons For Seeking Chapter 11 Protection

Prior to the commencement of these Chapter 11 Cases, the Debtors had experienced declining sales and profitability due to a variety of external macro-economic factors. Among those external factors were declines in discretionary spending coupled with the tightening of the credit market. These factors made it difficult for the Debtors to find a replacement lender or refinance the RKF Loan Agreement.

The Debtors were concerned that upon default in payment of the RKF Loan Agreement, RKF had the right, without further notice to the Debtors, to sell or assign the Debtors' intellectual property through a public or private sale for such amount and at such times as RKF deemed advisable. The Debtors' intellectual property assets, consisting of trademarks and trade names, are their most valuable assets. Therefore, the Debtors determined it necessary to take actions to protect their intellectual property assets prior to April 2, 2010.

In order to, *inter alia*, (a) achieve a breathing spell from the potential seizure of their intellectual property assets by RKF as described above, and (b) attract new financing for the business, the Debtors commenced these Chapter 11 Cases.

**ARTICLE IV**

**THE CHAPTER 11 CASES**

## 4.1      Commencement of the Chapter 11 Cases

On April 1, 2010, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The cases were assigned to Chief Bankruptcy Judge Arthur J. Gonzalez. The Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered under Case No. 10-11728 (AJG).

## 4.2      First Day Orders

On or shortly after the Petition Date, the Debtors filed a number of motions designed to allow them to continue operating their business in the ordinary course without unnecessary disruption as a result of the bankruptcy filings. Pursuant to those motions, the Bankruptcy Court entered orders that, among other things, granted the Debtors the authority to:

- have joint administration of the Chapter 11 Cases;

- extend the time for the Debtors to file their schedules of assets and liabilities and related schedules and their statements of financial affairs;

- pay prepetition accrued wages, salaries, medical benefits, and reimbursable employee expenses and administer their benefit plans in the ordinary course;

6

- pay prepetition customer program obligations and sales taxes;

- maintain insurance policies, including payment of premiums when due;

- maintain existing bank accounts, business forms and cash management structure;

- enter into a postpetition factoring agreement;

- establish procedures for adequate assurance of payment for utility providers and ensure continuation of service; and

- reject certain prepetition nonresidential real property leases.

## 4.3    Creditors' Committee

On April 12, 2010, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102(a) of the Bankruptcy Code.  The Creditors' Committee has retained Arent Fox LLP as its counsel and FTI Consulting Inc. as its financial advisor.  The current members of the Creditors' Committee are set forth below:[1]

| | | |
|---|---|---|
| Advance Magazines Publishers, Inc.<br>4 Times Square<br>New York, NY 10036<br>Attn: John Van de Merlen<br>Executive Director, Credit<br>Tel. No. (212) 286-8375 | New Pacific Rodeo, LLC<br>160 North Canon Drive<br>Beverly Hills, CA 90210<br>Attn: Arnold Rosenstein<br>Managing Member<br>Tel. No. (310) 273-1111 | Plains Cotton Cooperative<br>Association<br>3301 East 50th Street<br>Lubbock, TX 79404<br>Attn: Sam Hill<br>Vice President Finance and<br>Treasurer<br>Tel. No. (806) 763-80110 |
| Sanko Dis Ticaret Anonim Sirketi<br>c/o Robert L. Toms, Jr., Esq.<br>Gibson Rivera & Toms LLP<br>527 S. Lake Avenue, # 105<br>Pasadena, CA 91101<br>Attn: Cengiz Konukoglu<br>Tel. No. (626) 405-1122 | TagTrends, Inc.<br>970 S. Via Rodeo<br>Placentia, CA 92870<br>Attn: Rob Hart<br>President<br>Tel. No. (714) 524-9000 | Top Jeans Sewing Company<br>1223 E. 58th Place<br>Los Angeles, CA 90001<br>Attn: Boshra Hanna<br>Tel. No. (213) 300-3610 |

## 4.4    Employment of Professionals

Pursuant to orders entered by the Bankruptcy Court, the following professionals were retained by the Debtors and Creditors' Committee:

- Todtman, Nachamie, Spizz & Johns, P.C. as bankruptcy counsel to the Debtors;

- Atlas Strategic Advisors as financial advisor to the Debtors;

- Manderson Schafer & McKinlay LLP as special corporate counsel to the Debtors;

---

[1] On December 2, 2010, Tavex Algodonera resigned from its position on the Creditors' Committee.

NYC/559246.4

- Marvin Traub Associates, Inc. as merchandising consultant and operational advisor to the Debtors;

- Coleman Frost LLP as special litigation counsel to the Debtors;

- Stutman, Treister & Glatt Professional Corporation as special tax counsel to the Debtors;

- Moss Adams LLP as accountants to the Debtors;

- Arent Fox LLP as counsel to the Creditors' Committee; and

- FTI Consulting as financial advisor to the Creditors' Committee.

The Professionals retained by the Debtors' Estates are authorized to prepare monthly invoices and file quarterly fee applications pursuant to the order establishing interim compensation procedures entered by the Bankruptcy Court on April 29, 2010 and, upon compliance with such order, are entitled to receive monthly payment of fees and expenses subject to a twenty percent (20%) holdback for fees.

**4.5** **Schedules and Statements of Financial Affairs**

On May 3, 2010, the Debtors each filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with the Bankruptcy Court. Such Schedules and Statements, among other things, set forth the claims of known creditors of the Debtors as of the Petition Date, according to the Debtors' books and records.

**4.6** **Bar Date**

In accordance with Bankruptcy Rule 3002(c)(3), by order dated June 10, 2010 (the "Bar Date Order"), the Bankruptcy Court established July 30, 2010 at 5:00 p.m. (prevailing New York Time) as the final date for filing proofs of claim against the Debtors, subject to certain exceptions (the "General Bar Date"). The Bar Date Order established September 28, 2010 at 5:00 p.m. (prevailing New York Time) as the final date for governmental units to file proofs of claim against the Debtors (the "Governmental Bar Date" and together with the General Bar Date, the "Bar Dates"). Pursuant to Bankruptcy Rule 3003(c)(2), any creditor whose Claim was not listed on the Debtors' Schedules, or was scheduled as disputed, contingent or unliquidated, and who failed to file a proof of claim on or before the applicable Bar Date, will not be treated as a creditor with respect to the Plan or receive a distribution under the Plan. The Bar Dates do not apply to Administrative Claims, except for section 503(b)(9) Claims.

**4.7** **Claims**

As of December 20, 2010, approximately 200 proofs of claim in excess of $66 million have been filed against the Debtors. The Debtors' Schedules listed Claims in the collective amount of approximately $40 million. Based on an analysis of the Claims, the Debtors and Creditors' Committee believe that overlap exists between the Debtors' Scheduled Claims and the proofs of claim filed. The Debtors and Creditors' Committee estimated the approximate aggregate allowed amount of the Claims and have set forth such estimates in the chapter 7 liquidation analysis attached as Exhibit C to this Disclosure Statement. THESE ESTIMATES ARE PRELIMINARY AND TENTATIVE GIVEN THE LIMITED REVIEW AND ANALYSIS UNDERTAKEN BY THE DEBTORS AND CREDITORS' COMMITTEE TO DATE. THESE AMOUNTS REPRESENT ESTIMATES BY THE DEBTORS AND CREDITORS' COMMITTEE BASED ON CURRENT INFORMATION ONLY. THE DEBTORS AND CREDITORS' COMMITTEE MAKE NO REPRESENTATIONS AS TO THE EXTENT THESE

ESTIMATES ULTIMATELY PROVE ACCURATE IN LIGHT OF ACTUAL CLAIMS AND THE RESOLUTION OF CLAIMS DISPUTES, SOME OF WHICH ARE CURRENTLY PENDING. FOR INFORMATION REGARDING THE LIMITATION OF AND UNCERTANTIES RELATING TO THESE ESTIMATES, SEE ARTICLE IX BELOW ("CERTAIN RISK FACTORS").

The Plan is subject to resolution of various Claims that have been asserted. The outcome of numerous Claims remains uncertain at this time. The determinations of such Claims will have an effect on recoveries under the Plan.

## ARTICLE V

## CERTAIN EVENTS THAT OCCURRED IN THE CHAPTER 11 CASES

### 5.1     The Factoring Agreement

On the Petition Date, the Debtors sought and subsequently obtained Bankruptcy Court approval to assume, reaffirm, ratify and adopt the Prepetition Factoring Agreement with the Factor, enter into the supplement to the Prepetition Factoring Agreement, and approve the agreed thirteen week budget (collectively, the "Factoring Agreement"). Such relief was necessary for the Debtors to continue operating their business without disruption.

On May 25, 2010, the Bankruptcy Court entered an order approving the Factoring Agreement with the Factor (the "Factoring Agreement Order"). Advances under the Factoring Agreement are capped at the lesser of (a) 80% of the factor risk accounts and (b) $7.5 million, less such reserves as the Factor may deem reasonably necessary from time to time. Pursuant to the Factoring Agreement Order, the Factor was granted first priority, valid, priming, perfected, and enforceable liens on substantially all of the Debtors' assets, subject to the prepetition liens of RKF (the "Factor Postpetition Collateral"). As adequate protection for any diminution in the value of the Factor's interests in the Factor Prepetition Collateral and use of cash collateral, the Factor was granted a postpetition administrative claim against the Debtors' Estates (the "Factor Adequate Protection Claim").

Further, as adequate protection for any postpetition diminution in value of RKF's interests in the RKF Prepetition Collateral, RKF was granted a postpetition claim against the Debtors' estates, subject to all valid liens of the Factor, but junior in priority to the Carve-Out (as defined in the Factoring Agreement Order) and the Factor Adequate Protection Claim with respect to all collateral other than the RKF Prepetition Collateral (the "RKF Adequate Protection Claim"). In addition, on account of the RKF Adequate Protection Claim, the Debtors are required to make monthly payments of $50,000 to RKF, payable on the first of every month commencing as of April 1, 2010.

The entry of the Factoring Agreement Order was without prejudice to the rights of the Creditors' Committee (which was granted standing pursuant to the Factoring Agreement Order for purposes of the following) and any other person or entity with appropriate standing to commence an adversary proceeding or contested matter against the Factor and RKF for the purpose of (1) challenging the amount, validity, extent, priority, perfection, enforceability and non-avoidability of the Factor's or RKF's prepetition claims against the Debtors and or liens, (2) seeking to avoid or challenge any transfer made by or on behalf of the Debtors to or for the benefit of the Factor or RKF prior to the Petition Date, and/or (3) seeking damages or equitable relief against the Factor or RKF arising from or related to the prepetition business relationship between the Debtors and the Factor. However, the Factoring Agreement Order provided that unless the Creditors' Committee or any other party in interest with the requisite standing commenced a contested matter or adversary proceeding raising such objection or challenge against the Factor or RKF on or before July 16, 2010 (the "Challenge Period"), any and all such challenges and

objections by any party would be forever barred. No objections or actions were brought against the Factor or RKF during the Challenge Period.

Pursuant to the Factoring Agreement Order, the Factoring Agreement terminated on November 1, 2010. However, the Factoring Agreement Order provided that the Factoring Agreement could be extended without further order of the Bankruptcy Court, upon agreement by the Debtors, the Factor and the Creditors' Committee. On October 28, 2010, the parties entered into a stipulation (the "Factor Extension Stipulation") pursuant to which the Factor agreed to extend the Factoring Agreement through December 31, 2010 (the "Initial Extension"). In connection with the Initial Extension, the Debtors paid the Factor an extension fee of $30,000. The Factor Extension Stipulation provided the option to further extend the termination date of the Factoring Agreement through February 28, 2011, upon the satisfaction of certain conditions and an additional extension fee of $30,000.

## 5.2    The Debtors' Distribution Agreements

### (a)    *The Koral Distribution Agreement*

Prior to the Petition Date, Richard I. Koral Inc. d/b/a Jessica's ("Koral") was R&R's exclusive distributor in the United States of R&R's off-price merchandise (the "Off-Price Articles") pursuant to the Distribution Agreement, dated August 1, 2008, between R&R and Koral (the "Koral Distribution Agreement").

### (1)    The Amended Koral Distribution Agreement

Shortly after the Petition Date, the Debtors filed a motion seeking authority to reject the Koral Distribution Agreement pursuant to section 365(a) of the Bankruptcy Code (the "First Koral Distribution Rejection Motion"). The Debtors asserted that such relief was necessary as, after the Petition Date, Koral allegedly breached the Koral Distribution Agreement by refusing to accept certain Off-Price Articles and by failing to make the minimum required inventory purchases. The First Koral Distribution Rejection Motion asserted that upon rejection of the Koral Distribution Agreement, R&R could sell its nearly $6 million (at wholesale) of Off-Price Articles.

In an effort to consensually resolve the dispute, R&R and Koral agreed to modify the existing terms of the Koral Distribution Agreement and entered into the Amended & Restated Distribution Agreement, dated April 1, 2010 (the "Amended Koral Distribution Agreement"). On or about May 11, 2010, the Debtors filed a motion seeking authorization to enter into and assume the terms of the Amended Koral Distribution Agreement (the "Koral Distribution Agreement Assumption Motion").

Pursuant to the Koral Distribution Agreement Assumption Motion, the Debtors asserted that entry into and assumption of the Amended Koral Distribution Agreement was an exercise of the Debtors' business judgment because it would provide the Debtors with continued distribution services from Koral at favorable prices, resolve certain disputes with Koral and reduce uncertainty for the Debtors. Further, the revised agreement had the potential to increase the Debtors' cash flow and expand the channels of distribution of the Debtors' Off-Price Articles. Specifically, the revised terms included (i) an extension of the expiration date through December 31, 2010, (ii) certain discounts to Koral in the event the Off-Price Articles were untimely delivered by R&R, (iii) purchase minimums for Koral to meet within a specified timeframe, (iv) a reduction in Koral's purchase price of the Off-Price Articles, (v) the receipt by Koral of an allowed administrative claim and certain offset rights for all amounts due under the Amended Koral Distribution Agreement, (vi) a reduction in Koral's payment schedule from 60 to 30 days for purchase orders, and (vii) mutual releases of certain claims. Additionally, R&R received the right to terminate the Amended Koral Distribution Agreement upon sixty (60) days written notice to Koral in the event R&R

entered into a transaction for the sale of a portion of its business or refinancing thereof. In the event of early termination, R&R was required to pay Koral $200,000 per month for each month remaining under the Amended Koral Distribution Agreement.

By order dated May 26, 2010, the Bankruptcy Court approved the Koral Distribution Agreement Assumption Motion.

### (2) The Koral Settlement

In August 2010, R&R sent a letter to Koral terminating the Amended Koral Distribution Agreement pursuant to its terms (the "Koral Termination Letter"). Immediately thereafter disputes arose between Koral and R&R regarding respective rights and obligations of the parties under the Amended Koral Distribution Agreement. Koral alleged that R&R had materially breached the Amended Koral Distribution Agreement. However, R&R disputed such position, contending that Koral breached the Amended Koral Distribution Agreement by, among other things, failing to pay invoices when due.

After extensive negotiations, R&R and Koral entered into a stipulation terminating the Amended Koral Distribution Agreement and resolving the dispute (the "Koral Settlement"). Pursuant to the Koral Settlement (i) Koral was required to pay amounts owed to the Debtors less a $150,000 discount, with a final net payment of $2,355,955.00, (ii) Koral received the exclusive right through October 15, 2010 to liquidate the Off-Price Articles in its possession through its existing distribution network, (iii) Koral received the nonexclusive right to liquidate the Off-Price Articles in its possession through any other distribution channels through October 15, 2010, and (iv) the parties provided mutual releases of all claims against the other.

On September 22, 2010, the Debtors filed a motion seeking approval of the Koral Settlement on an expedited basis asserting that such settlement was in the best interest of the Debtors' Estates as it resulted in the immediate payment to R&R of $2,355,955.00. On September 28, 2010, the Bankruptcy Court entered an order approving the Koral Settlement and terminating the Amended Koral Distribution Agreement.

### (b) *The Simms Distribution Agreement*

Prior to the Petition Date, Simms Sigal & Co. Ltd. ("Simms") was R&R's exclusive distributor in Canada of R&R's line of denim, ready-to-wear apparel and accessories pursuant to the Distribution Agreement dated March 1, 2009 (the "Simms Distribution Agreement") between R&R and Simms. On August 12, 2010, the Debtors filed a motion pursuant to section 365 of the Bankruptcy Code seeking to reject the Simms Distribution Agreement (the "Simms Rejection Motion"). Pursuant to the Simms Rejection Motion, the Debtors alleged that after the Petition Date, Simms breached the Simms Distribution Agreement by cancelling purchase orders without R&R's consent. Following the alleged breach, R&R sent a Notice of Termination to Simms, asserting that Simms cancelled several orders since June 18, 2010 totaling $261,825.00 and as a result of such breach, R&R was terminating the Simms Distribution Agreement as of September 2, 2010.

According to the Simms Rejection Motion, sales by R&R though Simms had steadily decreased over the last couple of years. For example, in 2008, sales through Simms totaled $9,248,707, in 2009 sales through Simms totaled $6,795,710, and, in August 2010, year to date sales through Simms only totaled $2,228,852. The Debtors believed that rejecting the Simms Distribution Agreement would make available other alternative distribution channels that would result in increased sales of R&R's merchandise in Canada. Therefore, the Debtors asserted that rejection of the Simms Distribution Agreement was a valid exercise of their business judgment.

11

On September 2, 2010, Simms filed an objection to the Simms Rejection Motion arguing, among other things, that the Debtors failed to establish their required burden to reject the Simms Distribution Agreement. On September 13, 2010, the Bankruptcy Court entered an order approving the Simms Rejection Motion effective as of August 12, 2010 (the "Simms Rejection Order").

Following entry of the Simms Rejection Order, Simms filed a proof of claim seeking lost profits through the original termination date of the Simms Distribution Agreement, December 12, 2012, in the amount of $6,083,600 (the "Simms Lost Profit Claim"). In addition to lost profits, Simms has asserted an indemnity claim against R&R for certain attorneys' fees and related expenses incurred by Simms in connection with the Simms Rejection Motion. The total amount of Simms' indemnity claim is $47,303.47 ($46,131.02 of which purportedly was incurred postpetition and is being asserted as an administrative priority claim) (the "Simms Indemnity Claim" and together with the Simms Lost Profit Claim, the "Simms Proof of Claim").

On November 19, 2010, the Debtors filed an objection to the Simms Proof of Claim (the "Simms Claim Objection") asserting numerous defenses, including but not limited to the arguments that Simms failed to submit any documents or evidence to support the Simms Lost Profit Claim, the Simms Indemnity Claim is not entitled to administrative priority treatment as it arises out of the prepetition Simms Distribution Agreement and that Simms had waived all Claims pursuant to the terms of the Simms Distribution Agreement. A hearing on the Simms Claim Objection is scheduled for December 29, 2010. While it appears that the amount of the Simms Lost Profit Claim may be overstated given the Debtors' estimated sales through Simms as of August 2010, it is difficult for the Debtors and Creditors' Committee to predict the outcome of this contested matter at this time.

(c)     *The Quetico/Kontakt Distribution Agreement*

On October 12, 2010, the Debtors and Quetico, LLC and Kontakt US International ("Quetico/Kontakt") entered into a Distribution Agreement pursuant to which Quetico/Kontakt will be the exclusive distributor of R&R's merchandise in the United States and Canada beginning November 16, 2010 until the earlier of (i) the Effective Date or (ii) February 28, 2011.

## 5.3     The Debtors' Leases

As of the Petition Date, there were twelve nonresidential real property leases (the "Leases") for properties located in New York and California to which either R&R or Triple R was a party, and which were either unexpired or with respect to which there was a dispute as to whether there was a prepetition termination.

(a)     *Rejection of Unexpired Leases*

On April 6, 2010, the Debtors filed a motion (the "Lease Rejection Motion") seeking to reject three Leases for properties located at the following locations: (a) 102 Greene Street, New York, New York, (b) 319 North Rodeo Drive, Beverly Hills, California, and (c) 144 Spring Street, New York, New York (the "Rejected Leases"). The Lease Rejection Motion asserts that the Debtors were involved in prepetition litigation with the each of the landlords in connection with the Rejected Leases. It was the Debtors' position that each of the Rejected Leases was breached prepetition by the respective landlord, and as a result, the Rejected Leases were actually terminated prior to the Petition Date. However, out of an abundance of caution, the Debtors sought authority to reject the Rejected Leases.

NYC/559246.4

On April 21, 2010, the Bankruptcy Court entered an order granting the Lease Rejection Motion (the "Lease Rejection Order"). For a more detailed discussion about the Claims relating to the Rejected Leases, see Sections 5.3(d) and 5.3(e) below.

**(b)** ***Extensions of Time to Assume or Reject***
***Leases of Nonresidential Real Property***

Section 365(d)(4) of the Bankruptcy Code provides that any unexpired leases of nonresidential real property under which a debtor is a tenant will be deemed rejected on the date that is 120 days after the petition date, unless such deadline is extended for cause. On July 21, 2010, the Bankruptcy Court entered an order extending the Debtors' time to assume or reject the unexpired Leases by 90 days, through and including October 27, 2010, without prejudice to the Debtors' right to seek further extensions of time to assume or reject the unexpired Leases should the Debtors obtain written permission from the respective landlord. As of October 27, 2010, there were nine unexpired Leases to which either R&R or Triple R was a party.[2] The Debtors were successful in negotiating extensions of the 365(d)(4) deadline with several of their landlords.

(1)  3525 Eastham LLC §365(d)(4) Stipulation

On October 11, 2010, the Bankruptcy Court approved the stipulation entered into by and between the Debtors and 3525 Eastham LLC extending the time within which the Debtors must elect to assume or reject the real property lease for the premises located at 3523-3525 Eastham Avenue, Culver City, California through the earlier of such date as an order is entered confirming a plan in these Chapter 11 Cases or February 28, 2011.

(2)  Michael Ball §365(d)(4) Stipulation

On October 21, 2010, the Bankruptcy Court approved the stipulation entered into by and between the Debtors and Michael Ball extending the time within which the Debtors must elect to assume or reject the real property lease for the premises located at 250-256 Ivy Avenue, Los Angeles, California through the earlier of such date as an order is entered confirming a plan in these Chapter 11 Cases or February 28, 2011.

(3)  CPG Partners, L.P. §365(d)(4) Stipulation

On October 22, 2010, the Bankruptcy Court approved the stipulation entered into by and between the Debtors and CPG Partners, L.P. extending the time within which the Debtors must elect to assume or reject the real property leases for the premises located at (a) The Promenade at Camarillo Premium Outlets, Unit 1512, 740 East Ventura Boulevard, Camarillo, California though and including December 31, 2010, the lease expiration date, (b) The Desert Hills Premium Outlets, Unit 0231, Cabazon, California through the earlier of such date as an order is entered confirming a plan in these Chapter 11 Cases or February 28, 2011, and (c) The Woodbury Commons Premium Outlets, Unit 0842, Woodbury, New York through the earlier of such date as an order is entered confirming a plan in these Chapter 11 Cases or February 28, 2011.

---

[2] Two of the Leases were subsequently assumed (as discussed below). One Lease is on a month-to-month agreement and therefore is not subject to the deadline imposed by section 365(d)(4) of the Bankruptcy Code.

NYC/559246.4

(4) <u>SF Acquisition LLC §365(d)(4) Stipulation</u>

On October 22, 2010, the Bankruptcy Court approved the stipulation entered into by and between the Debtors and SF Acquisition LLC extending the time within which the Debtors must elect to assume or reject the real property lease for the premises located at 400 West Broadway, New York, New York through the earlier of such date as an order is entered confirming a plan in these Chapter 11 Cases or February 28, 2011.

**(c)** *Assumption of Unexpired Leases*

The Debtors were unable to successfully negotiate an extension of the §365(d)(4) deadline with respect to two Leases for premises located at 103 South Robertson Boulevard, Los Angeles, California (the "<u>103 Robertson Lease</u>") and 105 South Robertson Boulevard, Los Angeles, California (the "<u>105 Robertson Lease</u>" and together with the 103 Robertson Lease, the "<u>Robertson Leases</u>"). These two locations are contiguous and are utilized by the Debtors as R&R's flagship store. On October 21, 2010, the Debtors filed a motion seeking to assume the Robertson Leases pursuant to section 365 of the Bankruptcy Code (the "<u>Robertson Leases Assumption Motion</u>").

The 103 Robertson Lease expires on October 12, 2012, with one five year option to extend the term. The current monthly base rent is $41,200.00. The 105 Robertson Lease also expires on October 31, 2012, with one five year option to extend the term. The current monthly base rent is $33,948.80. According to the Robertson Leases Assumption Motion, no prepetition debt was owed under the Robertson Leases, and the Debtors are current on their postpetition obligations under the Robertson Leases.

On October 22, 2010, the Bankruptcy Court entered an order approving the Robertson Leases Assumption Motion. Assumption of the Robertson Leases resulted in the Debtors reaffirming their obligations under the Robertson Leases.

**(d)** *Greene Street Settlement*

Prior to the Petition Date, R&R and 102 Greene Street Realty LLC (the "<u>Greene Street Landlord</u>") entered into the Lease dated September 24, 2007, pursuant to which R&R leased certain premises consisting of the ground floor and basement at 102 Greene Street, New York for approximately 10 years (the "<u>Greene Street Lease</u>"). In February 2009, R&R sent a letter to the Greene Street Landlord stating that R&R was terminating the Greene Street Lease pursuant to its terms (the "<u>Greene Street Termination Letter</u>"). The Greene Street Landlord rejected the Greene Street Termination Letter and demanded that R&R revoke such letter. Shortly thereafter, the Greene Street Landlord served a notice of default, then a notice of termination, and then on August 4, 2009, the Greene Street Landlord commenced a landlord-tenant action in New York State Court against R&R asserting claims for rent allegedly owing under the Greene Street Lease and other damages. Upon the commencement of the Chapter 11 Cases, such litigation was stayed.

As discussed above, on April 6, 2010, the Debtors filed the Lease Rejection Motion seeking to reject the Greene Street Lease and two other Leases. On April 21, 2010, the Bankruptcy Court entered the Lease Rejection Order granting the rejection of the Greene Street Lease and two other Leases.

On or about June 11, 2010, the Greene Street Landlord filed a proof of claim against R&R (the "<u>Greene Street Proof of Claim</u>") asserting a general unsecured claim in the amount of $5,158,745.68 based on R&R's alleged prepetition breach of the Greene Street Lease. The Debtors contended that the Greene Street Proof of Claim failed to take into account the claim limitations set forth in section 502(b)6)

of the Bankruptcy Code. As a result, based on discussions with Debtors' counsel, the Greene Street Landlord recalculated the Greene Street Proof of Claim at $529,221.77 (the "Amended Greene Street Proof of Claim") after applying the limitations set forth in section 502(b)(6) of the Bankruptcy Code.

The Debtors and the Greene Street Landlord engaged in discussions regarding the Amended Greene Street Proof of Claim and agreed to a consensual resolution. Pursuant to the agreement (the "Greene Street Settlement"), in full satisfaction of the Amended Greene Street Proof of Claim, the Greene Street Landlord received an Allowed Claim in the amount of $291,071.97 and is entitled to retain the prepetition security deposit in the amount of $112,500.00. Further, the Greene Street Settlement granted mutual releases of all prepetition and postpetition claims (other than the Allowed Claim).

On October 6, 2010, the Bankruptcy Court entered an order approving the Greene Street Settlement.

**(e)**     ***Lease-Related Litigation***

Certain Claims against and by the Debtors related to the Debtors' Leases remain unliquidated and are the subject of ongoing litigation in these Chapter 11 Cases. The determination of these Claims may have a substantial effect on the Plan and the amount of distributions to holders of Claims and Interests.

      (1)    Rodeo Drive Sublease

Prior to the Petition Date, R&R was involved in litigation in California State Court related to R&R's alleged prepetition breach of a Lease Agreement dated September 6, 2007 between New Pacific Rodeo LLC ("New Pacific") as landlord and Biba International, Ltd. ("Biba") as tenant (the "Rodeo Drive Master Lease"),[3] and a Sublease dated December 7, 2007 between Biba, as sublandlord, and R&R, as subtenant (the "Rodeo Drive Sublease" and together with the Rodeo Drive Master Lease, the "Rodeo Drive Leases")[4] of premises at 319 North Rodeo Drive in Beverly Hills, California (the "Rodeo Drive Premises").

On or about March 13, 2009, New Pacific commenced an action (the "Rodeo Drive Action") in California State Court against Biba, Mashouf, R&R and Ball (collectively, the "Rodeo Drive Defendants"). New Pacific's complaint (the "Rodeo Drive Complaint") sought to recover amounts allegedly owed under the Rodeo Drive Leases and was subsequently amended to include additional causes of action against the Rodeo Drive Defendants for breach of contract, fraud and deceit, defamation and intentional interference with contract and declaratory relief.

On or about June 4, 2009, Biba and Mashouf filed a cross-complaint in the Rodeo Drive Action against R&R and Ball asserting causes of action for express indemnity, implied indemnity, contribution, apportionment of fault and declaratory relief against R&R and Ball. On August 6, 2009, R&R and Ball filed a cross-complaint in the Rodeo Drive Action against Biba and Mashouf asserting causes of action for comparative equitable indemnity, total equitable indemnity, contribution and declaratory relief against Biba and Mashouf.

---

[3] Manny Mashouf ("Mashouf") executed a guaranty of certain of Biba's obligations under the Rodeo Drive Master Lease.

[4] Ball executed a written guaranty of certain of R&R's obligations under the Rodeo Drive Sublease.

NYC/559246.4

As of the Petition Date, the Rodeo Drive Action had been set for trial on April 28, 2010. Pursuant to section 362(a) of the Bankruptcy Code, the Rodeo Drive Action was stayed as to R&R, and as a result, the California State Court stayed the Rodeo Drive Action pending an order of the Bankruptcy Court lifting or modifying the automatic stay so as to allow the Rodeo Drive Action to proceed to trial as to R&R.

As discussed above, on April 6, 2010, the Debtors filed the Lease Rejection Motion seeking to reject the Rejected Leases, including the Rodeo Drive Sublease. On April 21, 2010, the Bankruptcy Court entered the Lease Rejection Order granting the rejection of the Rodeo Drive Sublease.

Further, shortly after the Petition Date, proofs of claim were filed by various entities concerning the alleged prepetition breach of the Rodeo Drive Leases. Claimants filing claims with respect to the Rodeo Drive Premises include Mashouf, Biba, and New Pacific (collectively, the "Rodeo Drive Claims"). Mashouf and Biba's claims seek recovery of $5,528,356, consisting of $2,284,494 in prepetition rent and fees and $3,243,861 in postpetition rent under the 15% calculation required by section 502(b)(6) of the Bankruptcy Code. New Pacific's claims seek an unliquidated sum "in excess of $30 million." (See New Pacific Proof of Claim No. 25, Addendum Ex. 1 p. 21).

The Debtors and New Pacific subsequently agreed to jointly move to lift the automatic stay and then, after entry of an order lifting the automatic stay, to request the earliest possible trial date from the California State Court. On or about May 18, 2010, R&R and New Pacific filed a joint motion to modify the automatic stay to permit the Rodeo Drive Action to proceed to judgment in California State Court, which was granted by order dated June 9, 2010.

The Debtors believed that lifting the automatic stay would result in the Rodeo Drive Claims being resolved expeditiously, especially given that New Pacific had agreed to join R&R and Ball in seeking the earliest possible trial date. Despite the parties' request for a speedy trial, the California State Court scheduled the trial for April 6, 2011 and then subsequently rescheduled the trial for May 11, 2011.

In view of the substantial dollar amount of the Rodeo Drive Claims and unliquidated nature of New Pacific's Claims, the Debtors determined it was necessary to quantify the Rodeo Drive Claims prior to May 2011.[5] On June 28, 2010, the Debtors filed an objection to the Rodeo Drive Claims and alternatively, a motion to estimate the Rodeo Drive Claims in the event they were not expunged. The Debtors have asserted numerous defenses to the Rodeo Drive Claims, including but not limited to the argument that the possession date and rent commencement date with respect to the Rodeo Drive Premises never occurred, and thus R&R is not liable under the Rodeo Drive Sublease due to the failure of a condition precedent, and the argument that various components of the Rodeo Drive Claims must be disallowed pursuant to section 502(b)(6) of the Bankruptcy Code.

It is difficult to predict the outcome of this contested matter, which is presently scheduled to be tried by the Bankruptcy Court on January 24-26, 2011. Litigation is uncertain, and the Debtors and Creditors' Committee cannot determine with any level of assurance whether the Rodeo Drive Claims will be allowed in any amount.

---

[5] On July 7, 2010, the Debtors filed a motion seeking to reinstate the automatic stay with respect to the Rodeo Drive Action, which was denied by the Bankruptcy Court on July 30, 2010.

(2)  Spring Street Lease

Prior to the Petition Date, Triple R and 144 Spring Realty LLC ("Spring Street Landlord") entered into an "Agreement of Lease" dated July 18, 2008 (the "Spring Street Agreement"), pursuant to which the Spring Street Landlord would construct the shell and the core of a customized building to be constructed on vacant land at 144 Spring Street, New York, New York (the "Spring Street Premises") and delivered to Triple R, and that Triple R would lease that building from the Spring Street Landlord and construct the interior build-out of the building.  R&R executed a limited guaranty in favor of the Spring Street Landlord of Triple R's obligations under the Spring Street Agreement.  Under the Spring Street Agreement, Triple R was obligated to pay a deposit of $125,000 to the Spring Street Landlord on or before January 31, 2009 (the "Initial Deposit").  The Debtors failed to make the Initial Deposit.  Shortly thereafter, the Spring Street Landlord commenced an action against the Debtors in New York State Court alleging that Triple R breached the Spring Street Agreement by failing to deliver the Initial Deposit.  The Debtors timely answered the complaint and asserted various affirmative defenses.  Upon the commencement of the Chapter 11 Cases, the New York State Court litigation was stayed pursuant to section 362(a) of the Bankruptcy Code.

As discussed above, on April 6, 2010, the Debtors filed the Lease Rejection Motion seeking to reject the Spring Street Agreement.  On April 21, 2010, the Bankruptcy Court entered the Lease Rejection Order granting the rejection of the Spring Street Agreement.

Shortly thereafter, the Spring Street Landlord filed proofs of claim against the Debtors (collectively, the "Spring Street Proof of Claim") contending that Triple R breached the Spring Street Agreement by failing to remit the Initial Deposit.  The Spring Street Landlord seeks allowance of the Spring Street Proof of Claim in the amounts of $3,347,804 in postpetition rent under the 15% calculation required by section 502(b)(6) of the Bankruptcy Code, $75,311 in prospective tax rent, $1,069 in insurance, $562,386 in commission costs, $164,730 in professional fees for landlord's work, $80,090 in prepetition attorneys' fees and costs, $11,751 for assistant construction management costs, $2,400,000 for the estimated cost of the interior build-out (the "Build-Out Damages") and an for postpetition attorneys' fees and costs.

On June 4, 2010, the Debtors filed an objection to the Spring Street Proof of Claim.  The Debtors have advanced numerous arguments in opposition to the Spring Street Proof of Claim, including but not limited to arguing that (i) the "Commencement Date" under the Spring Street Agreement never occurred, and therefore, the lease never commenced and the obligation to pay rent never began, (ii) the Build-Out Damages claimed by the Spring Street Landlord are speculative, incapable of quantification and would create an unearned windfall for the Spring Street Landlord because the building was never constructed and therefore no build-out losses were ever incurred, (iii) the Spring Street Agreement is not a "true" lease under the applicable law of New York, and (iv) various components of the Spring Street Proof of Claim, including the Build-Out Damages, must be disallowed pursuant to section 502(b)(6) of the Bankruptcy Code.  The trial in this contested matter began on October 20, 2010 and was then put on hold by the Bankruptcy Court to allow the parties to brief certain issues.  The parties submitted briefs and the Bankruptcy Court has indicated that the trial will resume on a date to be determined.  The Bankruptcy Court rejected a contention made by the Debtors that the doctrine of anticipatory repudiation based upon an alleged failure to provide adequate assurances may be applied to limit the Spring Street Proof of Claim.

It is difficult to predict the outcome of this contested matter due to the inherent uncertainty in litigation.

NYC/559246.4

**5.4    The Debtors' Sale Process**

Since the commencement of these Chapter 11 Cases, the Debtors and their professionals have spent a considerable amount of time seeking a strategic or financial partner to assist the Debtors in formulating a chapter 11 plan.

(a)    *The Debtors' Marketing Process*

Shortly after commencing these Chapter 11 Cases, the Debtors directed their advisors to begin a marketing process to find a strategic or financial partner to invest in the Debtors' business through a potential sale of certain of the Debtors' assets.  The advisors oversaw the creation of a data room and actively solicited over sixty-six (66) potential strategic or financial parties that they believed may be interested and capable of pursuing a transaction.  Approximately thirty (30) of these parties executed non-disclosure agreements and engaged in various levels of due diligence.  Of the parties that engaged in due diligence, approximately nine (9) submitted formal bids.

After receiving the bids, the Debtors engaged in preliminary discussions with a select number of bidders that had submitted the most attractive initial indication of interest.  As a result of these efforts and after extensive negotiations with multiple parties, the Debtors determined that GR Acquisition LLC ("GR"), a newly formed subsidiary of Bluestar Alliance LLC, was the best available bidder.

(b)    *GR Letter of Intent*

The Debtors and GR entered into a Letter of Intent, dated September 16, 2010 (the "GR LOI").  The GR LOI outlined the principal terms of the non-binding proposal pursuant to which GR would acquire certain assets of the Debtors free and clear of all liens, claims and encumbrances for a purchase price of $33,000,000 which may be increased to $48,000,000 plus the issuance of certain equity interests.  The GR LOI also contained an exclusivity and stand-still provision providing GR with the exclusive right to acquire the Debtors' assets from the date of execution of the GR LOI through and including November 15, 2010 (or such date as extended by the consent of the Creditors' Committee in the event final deal documents are not executed prior to such date) or February 28, 2011 (in the event that final deal documents are executed by November 15, 2010) (the "GR Exclusivity Provision").

On September 22, 2010, the Debtors filed a motion seeking authority to commit to the GR Exclusivity Provision (the "GR Exclusivity Motion").  On September 29, 2010, the Bankruptcy Court entered an order granting the GR Exclusivity Motion in part by authorizing the Debtors to commit to the GR Exclusivity Provision through and including November 15, 2010, without prejudice to further requests for further extensions.

GR's exclusive right to acquire the Debtors' assets has since expired, as the Debtors and GR were unable to finalize deal documents by the November 15, 2010 deadline.  The Debtors have not sought a further extension of the GR Exclusivity Provision from the Bankruptcy Court.

**5.5    The Debtors' Exclusivity Periods**

Under the Bankruptcy Code, the Debtors have the right to file and solicit acceptances under a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If the Debtors file a plan within the exclusivity period, the Debtors have the exclusive right for 180 days from the filing date to solicit acceptances to their plan.  During these exclusive periods, no other party in interest may file a competing chapter 11 plan.  A court may extend these exclusivity periods upon request of a party in interest and "for cause."

NYC/559246.4

The Debtors' initial exclusive filing period would have expired on July 30, 2010, and the Debtors' initial exclusive solicitation period would have expired on September 28, 2010. On June 30, 2010, the Debtors filed a motion seeking to extend their exclusivity periods for ninety (90) days. At the request of the Creditors' Committee, the Debtors reduced such extension request to forty-five (45) days and, on July 21, 2010, the Bankruptcy Court entered an order granting the Debtors an extension of their exclusive filing period through September 28, 2010 and their exclusive solicitation period through November 27, 2010.

On September 14, 2010, the Debtors filed a motion seeking to extend their exclusive periods for an additional forty-five (45) days. The Creditors' Committee had certain issues and concerns about the additional extension request. As a result of negotiations between the Debtors and Creditors' Committee, the parties revised the proposed order to include certain benchmarks for the proposed transaction with GR and the successful completion of the Chapter 11 Cases which, if not met by the Debtors, would result in the Creditors' Committee automatically obtaining the co-exclusive right with the Debtors to file and solicit acceptances to a chapter 11 plan. On September 28, 2010, the Bankruptcy Court entered an order granting the Debtors an extension of the exclusive filing period through and including November 15, 2010 and the exclusive solicitation period through and including January 14, 2011 and approving the benchmarks outlined in the order (the "Second Exclusivity Order").

On November 12, 2010, the Debtors filed an emergency motion seeking a two-week extension of their exclusive periods (the "Third Exclusivity Motion"). On November 12, 2010, the Bankruptcy Court entered a bridge order extending the Debtors' exclusive period to file a plan through and including November 17, 2010, the hearing date on the Third Exclusivity Motion.

The Debtors failed to meet one of the benchmarks outlined in the Second Exclusivity Order, as the Debtors and GR were unable to execute an Asset Purchase Agreement by November 15, 2010. As a result, pursuant to the Second Exclusivity Order, the Creditors' Committee obtained the co-exclusive right with the Debtors to file and solicit acceptances to a chapter 11 plan.

On November 17, 2010, the Bankruptcy Court entered an agreed order proposed by the Debtors and Creditors' Committee granting both the Debtors and Creditors' Committee an extension of the co-exclusive filing period through and including December 17, 2010 and the co-exclusive solicitation period through and including February 17, 2011.

On December 16, 2010, the Bankruptcy Court entered an order further extending the Debtors' and Creditors' Committee's co-exclusive right to file a plan through and including January 15, 2011 and to solicit acceptances thereof through and including March 15, 2011.

## 5.6    The Sale Transaction

Upon obtaining the co-exclusive right to file and solicit acceptances to a chapter 11 plan, the Creditors' Committee and its professionals negotiated and finalized the terms of the Sale Transaction with VF. Upon reaching a deal, the Creditors' Committee and VF jointly approached the Debtors with the proposed transaction in an attempt to obtain a consensual deal among all parties. On December 17, 2010, the Debtors, the Existing Equity Holders, Ball, Rock Holdings, Inc. ("Rock Holdings") the Creditors' Committee and VF entered into that certain Asset Purchase Agreement (the "VF Asset Purchase Agreement") for the sale of the Debtors' intellectual property rights to NewCo (an entity wholly owned by VF) for total cash consideration of $57 million. A copy of the VF Asset Purchase Agreement is attached as an exhibit to the Plan.

Under the VF Asset Purchase Agreement, Ball and other companies controlled by him, including Rock Holdings, will be relinquishing rights to certain trademarks and other intellectual property so that they can be transferred to NewCo upon closing of the Sale Transaction, free and clear of any and all liens, claims and encumbrances. Ball and the other transferors will be receiving real and reasonably equivalent value for such assets including, without limitation: (a) the cash consideration to the Debtors under the VF Asset Purchase Agreement that will be available for distribution to the Existing Equity Holders and indirectly, Ball, under the terms of the Plan; (b) the cash consideration to be paid to Rock Holdings under the VF Asset Purchase Agreement; (c) the releases provided to Ball under the Plan including, among other things, the waiver of the Debtors' rights to seek payment under various transactions; and (d) the releases provided to Rock Holdings of the right to seek reimbursement of funds expended by the Debtors in maintaining the value of its assets. The Plan contemplates a complete resolution of matters between Ball and Rock Holdings on the one hand, and the Debtors and the Creditors' Committee, on the other hand, and resolves numerous potential litigations regarding the ownership rights to the trademarks and other intellectual property rights being sold to NewCo.

The material terms of the VF Asset Purchase Agreement are as follows (defined terms used in this section and not otherwise defined herein shall have the meanings ascribed to such terms in the VF Asset Purchase Agreement):[6]

- **Purchase Price**. The aggregate consideration paid by the Purchaser shall not exceed $57,000,000 and will consist of: (i) $55,000,000 in Cash *less* the Holdback of up to $500,000 for payment of Transfer Taxes and Qualifying Claims against Rock Holdings as provided for in Sections 11.1 and 11.7 of the VF Asset Purchase Agreement (the "Base Consideration"); (ii) $1,000,000 to Rock Holdings in consideration for the transfer of the Purchased Intellectual Property from the Ball Entities to the Debtors (the "Holdings Payment"); and (iii) an amount equal to the Lease Rejection Claims not to exceed $1,000,000 ("Contingent Lease Consideration" and, together with the Base Consideration and Holdings Payment, the "Purchase Price").

- **Purchased Assets**. Includes (i) the Purchased Intellectual Property (as defined in the VF Asset Purchase Agreement); (ii) all books and records related to the Purchased Intellectual Property; and (iii) all goodwill and other intangible assets associated with the Purchased Intellectual Property.

- **Excluded Assets**. Includes all assets of the Debtors and Ball Entities other than the Purchased Assets.

- **License**. As of the Closing Date, for a period of one hundred twenty (120) days thereafter, the Purchaser grants to the Debtors an irrevocable, worldwide, non-exclusive, sublicensable, fully paid-up, royalty-free license to use the Purchased Intellectual Property solely in connection with the marketing and sale of inventory of the Debtors in existence and owned by the Debtors on the Closing Date consistent with the Ordinary Course of Business.

- **Closing Date**. Shall take place no later than the second (2nd) Business Day after satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 of the VF Asset Purchase Agreement which include among others:

---

[6] This summary is for informational purposes only and is qualified in its entirety by the Terms of the VF Asset Purchase Agreement.

NYC/559246.4

- the Purchaser and each of the Sellers have performed or complied with all covenants, obligations and agreements required of such party under the VF Asset Purchase Agreement;

- this Court shall have entered a confirmation order that is a Final Order;

- there shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since November 1, 2010;

- the pre-closing transfer of Purchased Intellectual Property from the Ball Entities to the Debtors immediately prior to Closing.

- **Representations and Warranties**. Articles V and VI of the VF Asset Purchase Agreement contain standard representations and warranties for a transaction of this nature.

- **Termination Fee**. $2,300,000 is to be paid to the Purchaser if the VF Asset Purchase Agreement is terminated (other than as a result of a breach by Purchaser) and the Debtors enter into an Alternative Transaction within twelve (12) months of such termination.

- **Expenses**. Up to a maximum of $450,000 is to be paid in the event that the VF Asset Purchase Agreement is terminated (other than as a result of a breach by the Purchaser), whether or not the Debtors have entered into an Alternative Transaction at the time of such termination.[7]

## ARTICLE VI

## SUMMARY OF THE PLAN

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE ATTACHMENTS THERETO.

### 6.1 Overall Structure of the Plan

On the Effective Date, the Sale Consideration and all property of the Estates (other than the Purchased Assets and the portion of the Sale Consideration being transferred to the Debtors in accordance with the Sale Consideration Allocation) shall be deposited into the Liquidating Trust, from which the proceeds thereof will be utilized to administer the Plan. The Debtors shall relinquish any and all rights in and to the Liquidating Trust Assets which shall be transferred to the Liquidating Trust free and clear of all Claims and Liens in accordance with section 1141 of the Bankruptcy Code. The Liquidating Trust shall be established for the purpose of liquidating assets and winddown of the Estates for and on behalf of holders of Allowed Claims and Existing Equity Interests in the Debtors, with no objective to continue or

---

[7] Pursuant to the Joint Motion of the Creditors' Committee and Debtors for Entry of an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 2002 Approving Certain Buyer Protections and Granting Related Relief dated December 20, 2010, the Debtors and Creditors' Committee are seeking Bankruptcy Court approval of the Breakup Fee and reimbursement of Expenses under the circumstances outlined in the VF Asset Purchase Agreement.

engage in the conduct of a trade or business. The Liquidating Trust Administrator shall also make the payments required by the Plan, and wind down the Debtors.

The Plan shall become effective when, among other things, the Bankruptcy Court has entered the Confirmation Order, in form and substance acceptable to each of the Plan Proponents; the Confirmation Order has become final and non-appealable; all conditions to consummation of the VF Asset Purchase Agreement shall have been satisfied; and all other conditions to consummation have been satisfied. The Plan Proponents may, to the extent not prohibited by law, jointly elect to waive one or more of the conditions precedent to Confirmation or the Effective Date.

On the Effective Date, the Creditors' Committee will be dissolved. As soon as practicable after the Effective Date, the Post Effective Date Debtors shall be dissolved after the liquidation, administration, and distribution of the Cash and any other assets of the Debtors in accordance with the Plan and their material completion of all other duties and functions set forth in the Plan.

**6.2    Substantive Consolidation**

The Plan contemplates and is predicated upon substantive consolidation of the Debtors into a single entity solely for purposes of all actions and distributions under the Plan. Entry of the Confirmation Order shall constitute approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distribution. On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be deemed merged so that all of the assets of the Debtors (other than the Purchased Assets and a portion of the Sale Consideration in accordance with the Sale Consideration Allocation) shall be transferred to the Liquidating Trust and available to pay all of the liabilities under the Plan as if it were one company, (ii) no monetary distributions shall be made under the Plan on account of Intercompany Claims among the Debtors, (iii) no distributions will be made under the Plan on account of any Intercompany Interests of the Debtors, (iv) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed to be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtors shall be deemed one obligation of the consolidated Debtors, and (v) each and every Claim filed or to be filed in the Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the consolidated Debtors. For the avoidance of doubt, the limited substantive consolidation contemplated herein shall not be construed as substantive consolidation for any other purpose than that described in this paragraph.

In this regard, to the extent that it should appear, in light of the relative value of the assets held by each Debtor compared to the amount of Allowed Claims, that an amount of the assets attributable to one Debtor were or will be applied to Allowed Claims against the other Debtor, such amount shall be treated for federal income tax purposes as if it has been distributed by the first Debtor to its Existing Equity Holder (i.e., Global Domination Enterprises, Inc. or Brick and Mortar Freestanding, Inc., as the case may be), then distributed by that entity to the common shareholder of both Existing Equity Holders, then contributed by such shareholder to Existing Equity Holder of the other Debtor, and then contributed by such Existing Equity Holder to the other Debtor and transferred by such Debtor to the Liquidating Trust.

**6.3    Compromise of Controversies**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under

NYC/559246.4

the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

**6.4     Treatment of Unclassified Claims**

Generally, the Plan provides for the payment in full of Administrative Expense Claims, Professional Compensation and Reimbursement Claims and Priority Tax Claims.

**(a)     *Administrative Expense Claims***

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or has already been paid in respect of such claim, on the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as practicable, the Liquidating Trust shall pay to each holder of an Allowed Administrative Expense Claim, in full and final satisfaction of such Allowed Administrative Expense Claim, an amount in Cash equal to the Allowed amount of such Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtors during the Chapter 11 Cases shall be paid or performed when due in the ordinary course of business by the Debtors in accordance with the terms and conditions of the particular transaction and any agreements relating thereto.

**(b)     *Professional Compensation and Reimbursement Claims***

All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503, or 1103 of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date on which the order relating to any such Professional Compensation and Reimbursement Claim is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Professional Compensation and Reimbursement Claim and the Liquidating Trust Administrator. Holders of Professional Compensation and Reimbursement Claims that do not file and serve such application by the required deadline shall be forever barred from asserting such Professional Compensation and Reimbursement Claims against the Debtors, the Post Effective Date Debtors, their properties, or the Liquidating Trust, and such Claims shall be deemed discharged as of the Effective Date. Objections to Professional Compensation and Reimbursement Claims shall be filed no later than five (5) Business Days prior to the hearing on such Claims.

**(c)     *Priority Tax Claims***

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall receive, on account of and in full and complete settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, one of the following treatments:  (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (ii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, or (iii) upon such other terms as may be agreed to by the Liquidating Trust Administrator and the holder of such Allowed Priority Tax Claim.

NYC/559246.4

## 6.5     Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan must classify the claims against and interests in a debtor, for purposes of voting, confirmation and distributions (other than administrative claims and priority tax claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, do not need to be classified). Section 1122 of the Bankruptcy Code further requires that all claims against or interests in a particular class be substantially similar to all other claims or interests in such class. The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that holders of Allowed Claims will receive consideration based on the different rights of the holders of Claims in each Class. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, withdrawn or otherwise resolved prior to the Effective Date.

The Plan Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Plan's classifications, and that the Bankruptcy Court may find that a different classification is required in order to confirm the Plan. In that event, the Plan Proponents intend, to the extent permitted by applicable law or the Bankruptcy Court, to make such modifications to the classifications as may be appropriate to permit confirmation, and to use acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.

The amount of any impaired Claim ultimately allowed by the Bankruptcy Court may vary from any estimate of such impaired Claim in this Disclosure Statement, and, accordingly, the total Claims allowed by the Bankruptcy Court with respect to each impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired Class. Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In the event of the rejection by any Impaired Class, however, the Plan Proponents will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests.

NYC/559246.4

The Plan classifies Claims and Interests into seven (7) distinct Classes, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Factoring Agreement Claims | Unimpaired | No (deemed to accept) |
| 3 | RKF Loan Claim | Unimpaired | No (deemed to accept) |
| 4 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Subordinated Claims | Impaired | Provisionally entitled to vote |
| 7 | Existing Equity Interests | Impaired | Provisionally entitled to vote |

### 6.6    Treatment of Claims and Interests

(a)    *Priority Non-Tax Claims (Class 1)*

(1)    Impairment and Voting.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(2)    Distributions.  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim.

(b)    *Factoring Agreement Claims (Class 2)*

(1)    Impairment and Voting.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Factoring Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(2)    Distributions.  Except to the extent that a holder of an Allowed Factoring Agreement Claim has been paid by the Debtors prior to the Effective Date and unless otherwise agreed to by the Plan Proponents, on or as soon as practicable after the Effective Date, each holder of an Allowed Factoring Agreement Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Factoring Agreement Claim, Cash in an amount equal to such Allowed Factoring Agreement Claim.

(c)    *RKF Loan Claim (Class 3)*

(1)    Impairment and Voting.  Class 3 is unimpaired by the Plan.  The holder of the Allowed RKF Loan Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(2)    Distributions.  The RKF Loan Claim shall be an Allowed Claim and shall accrue interest at the rate set forth in the RKF Loan Agreement until paid in full in Cash, which shall occur on or

25

as soon as practicable after the Effective Date except to the extent that the holder of the Allowed RKF Loan Claim has been paid by the Debtors prior to the Effective Date.

**(d)     *Other Secured Claims (Class 4)***

(1)     Impairment and Voting.  Class 4 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(2)     Distributions.  Unless otherwise agreed to by the Plan Proponents and the holder of an Allowed Other Secured Claim, on the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Other Secured Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following distributions:  (i) reinstatement of any such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (ii) the payment of such holder's Allowed Other Secured Claim in full in Cash; (iii) the surrender to the holder or holders of any Allowed Other Secured Claim of the property securing such Claim; or (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code.

**(e)     *General Unsecured Claims (Class 5)***

(1)     Impairment and Voting.  Class 5 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(2)     Distributions.  On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim shall receive from the Liquidating Trust its Pro Rata Share of the Net Available Cash after full and final satisfaction of or release of all Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims, Priority Non-Tax Claims, Factoring Agreement Claims, the RKF Loan Claim, and Other Secured Claims, in accordance with the terms of the Liquidating Trust and the Liquidating Trust Agreement.  The Liquidating Trust shall make subsequent distributions to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed in accordance with the terms of the Liquidating Trust and the Liquidating Trust Agreement.  In no event shall holders of Allowed General Unsecured Claims receive distributions in excess of 100% of the Allowed General Unsecured Claims.

**(f)     *Subordinated Claims (Class 6)***

(1)     Impairment and Voting.  Class 6 is impaired by the Plan.  Each holder of an Allowed Subordinated Claim is provisionally entitled to vote to accept or reject the Plan.

(2)     Distributions.  On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed Subordinated Claim shall receive from the Liquidating Trust its Pro Rata Share of any and all amounts remaining from the Net Available Cash after full and final satisfaction of or release of all Allowed General Unsecured Claims as provided for in Section 4.5 of the Plan.  In no event shall holders of Allowed Subordinated Claims receive distributions in excess of 100% of the Allowed Subordinated Claims.

NYC/559246.4

**(g)** *Existing Equity Interests (Class 7)*

(1) <u>Impairment and Voting</u>. Class 7 is impaired by the Plan. Each holder of an Allowed Existing Equity Interest is provisionally entitled to vote to accept or reject the Plan.

(2) <u>Distributions</u>. On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed Existing Equity Interest shall receive from the Liquidating Trust any and all amounts remaining from the Net Available Cash after full and final satisfaction of or release of all Allowed General Unsecured Claims as provided for in Section 4.5 of the Plan and all Allowed Subordinated Claims as provided for in Section 4.6 of the Plan, such distributions to the holders of Allowed Existing Equity Interests to be apportioned among them in such a fashion as will not cause a disqualification for federal income tax purposes of the Debtors as qualified sub-chapter S subsidiaries or of the Existing Equity Holders as S corporations.

## ARTICLE VII

## IMPLEMENTATION OF THE PLAN

### 7.1    Sale of the Purchased Assets

**(a)** On or prior to the Effective Date, the Debtors and the other parties to the VF Asset Purchase Agreement shall execute such other documents and take such actions as are necessary and appropriate to consummate the sale of the Purchased Assets to NewCo pursuant to the terms thereof.

**(b)** On the Effective Date (and thereafter with respect to any Sale Consideration that remains contingent as of the Effective Date) following transfer of the Purchased Assets to NewCo by the Debtors and the other holders of rights and claims therein, the Sale Consideration, subject to the Sale Consideration Allocation, shall be deposited into the Liquidating Trust for application pursuant to the terms of the Plan and the Liquidating Trust Agreement. The VF Breakup Protections shall be paid in accordance with the VF Asset Purchase Agreement. The VF Breakup Protections shall constitute a first priority Lien in the proceeds of the an Alternative Transaction, if any, and shall be satisfied prior to any distributions to holders of Claims and Interests under the Plan.

### 7.2    The Liquidating Trust and the Liquidating Trust Administrator

**(a)** The Liquidating Trust Agreement shall govern the rights and responsibilities of the Liquidating Trust Administrator, who shall be selected from candidates proposed by the Creditors' Committee. Prior to appointment, the Creditors' Committee shall submit a list containing the names of three (3) potential administrators to the Debtors, with the Debtors choosing the Liquidating Trust Administrator from such list. The Liquidating Trust Administrator shall be named either in the Plan Supplement or in open court no later than the Confirmation Hearing.

**(b)** The salient terms of the Liquidating Trust Administrator's employment, including the Liquidating Trust Administrator's duties under the Liquidating Trust Agreement and compensation shall be set forth in the Plan Supplement and the Confirmation Order and shall be consistent with that of similar functionaries in similar types of bankruptcy proceedings.

**(c)** On the Effective Date, (i) the authority, power, and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned, (ii) the Liquidating Trust Administrator shall have the powers of an officer of

NYC/559246.4

the Post-Effective Date Debtors, and (iii) the Post Effective Date Debtors shall be authorized to be (and, by the conclusion of the winding up of their affairs, shall be) dissolved.

(d)     On the Effective Date, the Debtors shall assign and transfer absolutely and unconditionally to the Liquidating Trust all of their assets (other than the Purchased Assets, which shall be transferred to NewCo prior to the transfer of assets to the Liquidating Trust, and the portion of the Sale Consideration remaining with the Debtors pursuant to the Sale Consideration Allocation).

(e)     In the event the Liquidating Trust Administrator dies, is terminated, or resigns for any reason, or is terminated for cause, a successor shall be designated by the Advisory Board.

(f)     The Liquidating Trust Administrator shall carry out the duties set forth in Section 5.4 of the Plan and in the Liquidating Trust Agreement. The fees and expenses of the Liquidating Trust Administrator will be paid in accordance with the Winddown Budget. At any time after the Effective Date, the Liquidating Trust Administrator, in its reasonable judgment, may revise the Winddown Budget downward, thus creating more Net Available Cash for distribution to holders of Claims and Interests under the Plan. The Liquidating Trust Administrator shall be authorized to retain professionals necessary to carry out its duties and to compensate such professionals in accordance with the Winddown Budget.

(g)     For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation section 301.7701-4 and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Liquidating Trust and then contributed such interests to the Liquidating Trust. The Liquidating Trust Agreement shall (i) state that the primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within six (6) months of the beginning of the extended term.

(h)     The Liquidating Trust Administrator shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust. The Liquidating Trust Administrator shall file all federal tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4 unless otherwise required by applicable law. The Liquidating Trust Administrator also will annually send to each holder of a Liquidating Trust beneficiary a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidating Trust Administrator shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(i)     As soon as practical after the Effective Date, the Liquidating Trust Administrator shall determine the fair market value, as of the Effective Date, of all the Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trust Administrator, and Liquidating Trust beneficiaries) for all United States federal income tax purposes.

(j) Allocations of Liquidating Trust taxable income among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the holders of the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. No allocation of income or loss shall be made to VF or NewCo.

(k) Interests in the Liquidating Trust shall be non-transferrable and any such transfer shall be disregarded by the Liquidating Trust Administrator, except with respect to a transfer by will or under laws of descent and distribution; provided, however, that such transfer will not be effective until and unless the Liquidating Trust Administrator receives written notice of such transfer under the law of descent and distribution.

## 7.3    Duties and Powers of the Liquidating Trust Administrator

(a) General Authority. The Liquidating Trust Administrator, together with its representatives and professionals, shall administer the Plan. In such capacity, the powers of the Liquidating Trust Administrator, set forth more fully in the Liquidating Trust Agreement, shall include any and all powers necessary to implement the Plan and to administer and distribute the assets and wind up the business and affairs of the Debtors and Post Effective Date Debtors, including, but not limited to (i) overseeing the Claims resolution, distribution, and objection process (including, but not limited to, the ability to object to, seek to subordinate, compromise, or settle any or all Claims against the Post Effective Date Debtors other than Claims that are Allowed under the Plan) in accordance with the terms of the Liquidating Trust Agreement, (ii) evaluating and, if appropriate, commencing and prosecuting on behalf of the Debtors' Estates the Avoidance Actions and other Causes of Action, (iii) winding down the affairs of the Debtors, including through the sale or abandonment of the Estate's remaining assets (which, with the exception of the Purchased Assets, shall be transferred to the Liquidating Trust), (iv) dissolving the Post Effective Date Debtors at the appropriate time, (v) maintaining books and records, and (vi) investing and managing Cash of the Liquidating Trust. The Liquidating Trust Administrator shall, after the Effective Date, take all actions necessary to comply with the VF Asset Purchase Agreement; provided, however, that the costs of such actions shall be borne by VF.

(b) Tax Obligations. The Liquidating Trust Administrator shall be further authorized to (i) administer and pay any domestic and foreign taxes, including filing domestic and foreign tax returns for the Post Effective Date Debtors and the Liquidating Trust, as applicable, (ii) request an expedited determination of any unpaid tax liability of the Post Effective Date Debtors or the Estates under section 505 of the Bankruptcy Code for all taxable periods of the Debtors through the liquidation of the Post Effective Date Debtors as determined under applicable tax laws, and (iii) represent the interest and account of the Post Effective Date Debtors or the Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit.

NYC/559246.4

**7.4    Dissolution of the Post Effective Date Debtors**

The Post Effective Date Debtors shall be dissolved after the liquidation, administration, and distribution of the Cash and any other assets of the Debtors in accordance with the Plan and their material completion of all other duties and functions set forth herein as soon as practicable after the Effective Date. The Liquidating Trust Administrator shall cause to be filed with the State of California and any other governmental authority such certificate of dissolution or cancellation and other certificates or documents as may be or become necessary to implement the termination of the legal existence of the Post Effective Date Debtors.

**7.5    Appointment of Advisory Board**

An "Advisory Board" shall be created on the Effective Date which shall consist of three (3) members (two (2) members selected by the Creditors' Committee and one (1) member selected by the Debtors); provided, however, that upon the payment in full in Cash of all Allowed General Unsecured Claims, the Advisory Board shall be reconstituted to consist of one (1) member selected by the Creditors' Committee and two (2) members selected by the Ball Representative. The Advisory Board shall adopt bylaws as it may deem appropriate. In the event of any vacancies, the remaining members shall have the authority to fill such vacancies. In the event any position is vacant for more than thirty (30) days, the Liquidating Trust Administrator shall have the authority, without need of notice to the remaining members of the Advisory Board, to fill such vacancy. The Advisory Board shall be disbanded without need for further notice or action when the duties of the Liquidating Trust Administrator set forth in the Plan and in the Liquidating Trust Agreement have concluded.

**7.6    Rights and Powers of Advisory Board**

The Advisory Board shall be entitled to monitor the status and progress of Disputed Claims and Causes of Action. The Advisory Board may meet and/or consult periodically with the Liquidating Trust Administrator and keep itself apprised of the affairs of the Liquidating Trust. The Advisory Board shall have the authority to remove the Liquidating Trust Administrator and appoint a successor Liquidating Trust Administrator in accordance with the terms of the Liquidating Trust Agreement.

**7.7    Method of Distributions Under the Plan**

(a)    All distributions to holders of Allowed Claims against and Existing Equity Interests in the Debtors (other than those Allowed Claims designated in the Sale Consideration Allocation to be satisfied by the portion of the Sale Consideration transferred by VF to the Debtors) shall be made by the Liquidating Trust Administrator in accordance with the terms of the Plan.

(b)    At reasonable periodic intervals determined by the Liquidating Trust Administrator, in its sole discretion, the Liquidating Trust Administrator shall make payments to holders of Allowed Claims in accordance with the Plan, but in no event shall the first distribution occur later than the Initial Distribution Date. The Liquidating Trust Administrator shall maintain Net Available Cash sufficient to pay holders of Disputed General Unsecured Claims in the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed General Unsecured Claims and Cash sufficient to pay the amounts set forth in the Winddown Budget. Upon completion of all duties of the Liquidating Trust Administrator, and after the satisfaction of all outstanding obligations of the Liquidating Trust, the Winddown Budget shall be reset to provide solely for the final costs of dissolving the Liquidating Trust and all Net Available Cash at such time shall be distributed in accordance with the Plan.

NYC/559246.4

(c)     To the extent any of the assets associated with any of the Debtors' stores or locations have not been liquidated on or prior to the Effective Date, such assets shall be liquidated in accordance with the terms of the VF Asset Purchase Agreement, and the net proceeds shall be distributed to the holders of Allowed Claims (and, after the full and final satisfaction of all Allowed General Unsecured Claims and Allowed Subordinated Claims, to the holders of the Existing Equity Interests) as soon as practicable thereafter.  Except in the event of a determination by the Bankruptcy Court that an administrative error by the Liquidating Trust Administrator has occurred, all amounts paid to and received by the holders of the Claims or Equisting Equity Interests pursuant to the Plan shall not be subject to avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(d)     Notwithstanding anything in this Plan or the Disclosure Statement to the contrary, the Liquidating Trust Administrator shall have the authority to object to the allowance or payment of any Disputed Claims on any grounds in accordance with the procedures set forth herein; provided, however, that the Liquidating Trust Administrator shall make distributions in accordance with the Plan with respect to the undisputed portion of any Disputed General Unsecured Claims.

## 7.8     Closing of the Debtors' Chapter 11 Cases

When all Disputed Claims have become Allowed Claims or have been disallowed by Final Order, and all remaining Net Available Cash and Cash included in the Winddown Budget has been distributed in accordance with the Plan and the business and affairs of the Post Effective Date Debtors otherwise wound up, the Liquidating Trust Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## 7.9     Cancellation of Existing Agreements and Intercompany Interests

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed and assigned by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan (if any), on the date of closing of these Chapter 11 Cases in accordance with the Plan, all instruments evidencing any Claims against the Debtors or Post Effective Date Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors and Post Effective Date Debtors thereunder shall be discharged.

## 7.10     Cancellation of Liens

Except as otherwise provided for pursuant to the Plan, upon the occurrence of the Effective Date and prior to the consummation of the Sale Transaction, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any cash Collateral) held by such holder and to take such actions as may be requested by the Debtors or the Post Effective Date Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.

## 7.11     Compromise of Controversies

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

## ARTICLE VIII

## EFFECT OF CONFIRMATION

**8.1**     **Vesting of Assets**

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties, and their interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estates of the Debtors shall vest in the Post Effective Date Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  On the Effective Date, the Post Effective Date Debtors shall transfer all assets (other than the Purchased Assets, which shall be transferred to NewCo) to the Liquidating Trust.

**8.2**     **Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

**8.3**     **Discharge of Claims and Termination of Interests**

Except as otherwise provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made thereunder shall be in exchange for and in complete satisfaction and discharge of all existing debts and Claims, and shall terminate all Interests, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, on the Effective Date, all existing Claims against the Debtors and Interests in the Debtors, shall be, and shall be deemed to be satisfied and discharged, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Post Effective Date Debtors, or any of their respective assets or properties, or the Liquidating Trust, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest.

**8.4**     **Injunction or Stay on Claims**

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or such other order of the Bankruptcy Court that may be applicable, all Entities who have held, hold, or may hold Claims or other debt or liability that is discharged or Interests or other right of equity interest that is discharged pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors' Estates, the Post Effective Date**

Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust, (d) except to the extent provided, permitted, or preserved by sections 553, 555, 556, 559, 560, or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, and (e) taking any actions to interfere with the implementation or consummation of the Plan. Such injunction shall extend to all successors of the Debtors and the respective properties and interests in property of all of the successors.

**8.5    Terms of Existing Injunctions or Stays**

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

**8.6    Exculpation**

(a)    None of the Released Parties shall have or incur any liability for any Claim, Cause of Action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, or any contract, instrument, document, or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence or of any Person with respect to any act or omission prior to the Petition Date, except as otherwise expressly set forth elsewhere in the Plan. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b)    From and after the Effective Date, the Liquidating Trust Administrator, the members of the Advisory Board, and any professionals hired by the Advisory Board (including, but not limited to, attorneys, accountants, and financial advisors), all solely in their capacity as such, shall be exculpated by holders of Claims and Interests from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Liquidating Trust Administrator by the Plan, the Liquidating Trust Agreement, or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of the Liquidating Trust Administrator.

**8.7    Preservation of Causes of Action / Reservation of Rights**

Except with respect to Released Actions, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release, or the relinquishment of any Causes of Action that the Debtors or the Post Effective Date Debtors may have. The Causes of Action (including, but not limited to, Avoidance Actions) shall vest in the Liquidating Trust, and the Liquidating Trust Administrator may choose to assert any such Causes of Action on behalf of the Debtors, the Post Effective Date Debtors, or their Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law. For

33

purposes of clarity, the Liquidating Trust Administrator shall have, retain, reserve, and be entitled to asset all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors and the Post Effective Date Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted by the Liquidating Trust Administrator after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

## 8.8    Injunction on Causes of Action

Except as provided in the Plan, as of the Effective Date, all non-Debtor entities are permanently enjoined from commencing or continuing in any manner, any Causes of Action, whether directly, derivatively, on account of or respecting any debt or Cause of Action of the Debtors or the Post Effective Date Debtors which the Liquidating Trust Administrator retains sole and exclusive authority to pursue in accordance with the Plan and the Liquidating Trust Agreement or which have been released pursuant to the Plan.

## 8.9    Releases By The Debtors

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, to the extent permitted by applicable law, for good and valuable consideration, the Debtors and the Post Effective Date Debtors shall and shall be deemed to completely and forever release, waive, void, extinguish, and discharge all Released Actions (other than the rights to enforce the Plan and any right or obligation thereunder, and the securities, contracts, instruments, releases, indentures, and other agreements delivered thereunder or contemplated thereby), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Post Effective Date Debtors, the Chapter 11 Cases, or the Plan that may be asserted by or on behalf of the Debtors or the Post Effective Date Debtors or their respective Estates against the Released Parties; provided, however, that all Released Actions shall be retained in connection with the defense against any Claim asserted against the Debtors, provided that the retention of such Released Actions shall not result in any affirmative recovery for the Debtors or the Post Effective Date Debtors; provided, further, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, intentional fraud, or criminal conduct of any Entity as determined by a Final Order entered by a court of competent jurisdiction.**

## 8.10    Releases By The Holders of Claims and Interests

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, to the extent permitted by applicable law, for good and valuable consideration, each holder of a Claim or Interest that (a) votes to accept the Plan (or is deemed to accept the Plan) and (b) agrees to provide releases of the Released Parties under the Plan, shall be deemed to release, waive, void, extinguish, and discharge, unconditionally and forever, all Released Actions (other than the rights to enforce the Plan, and any right or obligation under the Plan, and the securities, contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder or contemplated thereby), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Post Effective Date Debtors, the Chapter 11 Cases, or the Plan, that otherwise may be asserted**

34

**against the Released Parties; _provided, however,_ that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, intentional fraud, or criminal conduct of any such person or entity as determined by a Final Order entered by a court of competent jurisdiction.**

**ARTICLE IX**

**CERTAIN RISK FACTORS**

THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN ANY DEBTOR SHOULD READ AND CAREFULLY CONSIDER THE FOLLOWING FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED HEREWITH OR INCORPORATED BY REFERENCE HEREIN BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.

**9.1      Nature of Financial Information**

Although the Debtors and Creditors' Committee used best efforts to ensure the accuracy of the financial information provided herein or attached hereto, such information has not been audited and is based upon an analysis of data provided by the Debtors at the time of preparation of the Plan and this Disclosure Statement. Although the Debtors and Creditors' Committee believe that such financial information fairly reflects the finances of the Debtors, the Debtors and Creditors' Committee do not represent or warrant that the information contained herein and attached hereto is without inaccuracies.

**9.2      Certain Bankruptcy Law Considerations–Alternatives to the Plan**

The Debtors and Creditors' Committee believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets. If, however, the Plan is not confirmed and/or consummated, the theoretical alternatives include (i) continuation of the Chapter 11 Cases, (ii) formulation of an alternative chapter 11 plan or plans, or (iii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed below.

(a)      *Continuation of Chapter 11 Cases*

If the Debtors remain in chapter 11, the Debtors could continue to operate their business and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as a viable going concern in protracted Chapter 11 Cases. The Debtors' Factoring Agreement expires on December 31, 2010; without an extension of the Factoring Agreement, the Debtors would be forced to find an alternate source of funding to continue operations. Further, assuming the Debtors obtain operating financing, if the Debtors remain in chapter 11 for an extended period of time, they could have difficulty operating with the high costs and the eroding confidence of their employees, customers and trade vendors.

35

**(b)** *Alternative Plans*

If the Plan is not confirmed, it is possible that the Debtors and/or Creditors' Committee could seek to restructure the Debtors' debts through a sale to an alternate buyer. However, the Debtors and Creditors' Committee cannot be certain whether the Debtors or Creditors' Committee would be able to effectuate a sale to another buyer or whether, if such a buyer existed, an alternative sale would yield sufficient proceeds to pay a significant distribution to the Debtors' creditors.

If the Plan is not confirmed, the Debtors and/or Creditors' Committee could attempt to formulate and propose a different chapter 11 plan or plans. Such a plan or plans might involve either a reorganization and continuation of the Debtors' business, including in connection with a sale of the Debtors' assets, or an orderly liquidation of the Debtors' assets.

With respect to an alternative plan, both the Debtors and Creditors' Committee have explored various alternatives in connection with the extensive marketing process and the development of the Plan. The Debtors and Creditors' Committee believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of reorganization or liquidation, the Plan has the greatest chance to be confirmed and consummated.

**(c)** *Liquidation under Chapter 7*

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee would be appointed to liquidate the assets of the Debtors in accordance with the priorities set forth in the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims and Interests in the Debtors.

The Debtors and Creditors' Committee believe that in a chapter 7 liquidation, additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee would cause a substantial diminution in the value of the Debtors' assets. Further, the Debtors and Creditors' Committee believe it is likely that the value received for the Debtors' intellectual property assets pursuant to a chapter 7 liquidation would be significantly less than the Purchase Price under the Sale Transaction.

After careful review and consideration of the Debtors' prospects and estimated recoveries, if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, the Debtors and Creditors' Committee concluded that the recovery to the Debtors' creditors will be maximized through the Plan proposed by the Plan Proponents. A chapter 7 liquidation analysis is attached as <u>Exhibit C</u> to this Disclosure Statement.

## 9.3  Possible Adverse Effects from Delay

Any delays of the Confirmation Date or the Effective Date could result in, among other things, increased Professional Compensation and Reimbursement Claims and other Administrative Expense Claims. Delay could further endanger the ultimate approval of the Plan by the Bankruptcy Court.

## 9.4  Possible Adverse Effects from Modification of the Plan

The Creditors' Committee and VF, in consultation with the Debtors, specifically have reserved in the Plan the right to modify its terms in order to obtain confirmation. Any such modifications could result

NYC/559246.4

in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes.

**9.5**     **Unknown Claims**

It is possible that there are Claims of which the Debtors are not aware at this time. There can be no assurance that recoveries by the Debtors' Creditors will not be materially and adversely affected by any such unknown Claims. Note, however, that the Bar Date for filing proofs of claim for "General Claims" in these Chapter 11 Cases was July 30, 2010, and September 28, 2010 for "Governmental Claims."

**9.6**     **Dilution**

No final determination has been made as to which Claims will be Disputed Claims, and it is possible that the number of Disputed Claims may be material and that the amounts allowed in respect of Disputed Claims may be materially in excess of the estimates of Allowed Claims used to develop the Plan. The holders of Allowed Claims are subject to the risk of dilution if actual Allowed Claims exceeds such estimates. Accordingly, distributions to the holders of Allowed Claims are at risk of being adversely affected by the total amount of Allowed Claims.

**ARTICLE X**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

A summary description of certain income tax consequences of the Plan is provided below. The description is for informational purposes only, and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal consequences of the Plan for certain Debtors and for holders of Claims or Interests who are entitled to vote to accept or reject the Plan are discussed below. This summary does not purport to address all of the federal income tax consequences that may be applicable to the Debtors or to any particular holder in light of such holder's own individual circumstances. This summary does not address the federal income tax consequences of the Plan to holders of Claims or Interests that may be subject to special rules, such as foreign persons, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations. This summary does not discuss foreign, state, local, estate or gift tax consequences of the Plan, nor does it discuss federal income tax consequences to a holder of Claims or Interests being satisfied in full or otherwise Unimpaired under the Plan or not receiving any recovery under the Plan. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service or any other tax authorities have been sought or obtained with respect to the tax consequences of the Plan, and the discussion below is not binding upon the Internal Revenue Service or such other authorities. The Debtors, the Creditors' Committee, and the Liquidating Trust Administrator are not making any representations regarding the particular tax consequences of the confirmation and consummation of the Plan as to the holder of any Claim or Interest, and are not rendering any form of legal opinion as to such tax consequences.

The discussion of federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the Treasury Regulations promulgated thereunder, judicial decisions, and published positions of the Internal Revenue Service and other applicable authorities, all as in effect on the date hereof and all of which is subject to change – e.g., legislative, judicial or administrative changes – possibly with retroactive effect. It assumes that each Debtor

37

maintains its status as a qualified Subchapter S Subsidiary and that its respective S corporation parent, the Existing Equity Holder, maintains its status as an S corporation.

EACH AND EVERY HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A PROFESSIONAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL, AND ANY FOREIGN, TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND THE PLAN.

## INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY UNITED STATES FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS AND CREDITORS' COMMITTEE OF THE SALE TRANSACTION OR MATTERS ADDRESSED HEREIN AND (C) HOLDER OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

### 10.1    Federal Tax Consequences to the Debtors and Existing Equity Holders

It is anticipated that the consummation of the Plan will not result in any federal income tax liability on the part of the Debtors provided that their status as qualified Subchapter S Subsidiaries is maintained. Because a qualified Subchapter S Subsidiary is not treated for federal income tax purposes as a corporation that is separate from its S corporation parent, cancellation of debt ("COD") income and other tax items incurred by a Debtor should be reported on the federal income tax return of its respective Existing Equity Holder, and such tax items should not result in any tax to such Existing Equity Holders, provided that their status as S corporations are maintained and that they are not subject to special taxes under Internal Revenue Code section 1374 (relating to "built-in-gain" on property once held by a "C" corporation) or Internal Revenue Code section 1375 (relating to tax on excess passive tax investment of an S corporation when it was a C corporation). In such circumstances, such Existing Equity Holders will report their tax items on Schedules K-1 issued to their shareholder. The Debtors and Creditors' Committee are unable to offer an opinion as to whether tax under Internal Revenue Code sections 1374 or 1375 will be triggered or, if such tax is triggered, the extent to which the Internal Revenue Service or other tax authorities could collect it from the assets of the Debtors (including those contributed to the Liquidating Trust). COD income is the amount by which the indebtedness of a taxpayer that is discharged exceeds any consideration given by the taxpayer in exchange therefor. Certain statutory or judicial exceptions can apply to limit the amount of COD income that is included in gross income for federal income tax purposes (such as where the discharge occurs in a bankruptcy case involving the taxpayer under certain circumstances or the payment of the canceled debt would have given rise to a tax deduction). Because the Debtors, as qualified Subchapter S Subsidiaries, are not treated as corporations that are separate from their respective S corporation parents, and because such S corporation parents are not in bankruptcy, the Debtors and Creditors' Committee do not offer any opinion as to the applicability of these statutory or judicial exceptions.

As a result of the discharge and satisfaction of Claims pursuant to the Plan, the Debtors may incur significant COD income. As noted above, such COD income must be reported on the federal income tax returns of the Existing Equity Holders. The Debtors and Creditors' Committee do not offer an opinion as to any federal, state, or local tax consequences to the Existing Equity Holders that may result from the

38

Debtors' COD income, the amount of such income, as between themselves, each will have, or from any other tax consequences to the them arising in connection with the Plan or otherwise.

Pursuant to the Plan, the transfer of the Liquidating Trust Assets to the Liquidating Trust will be made for the benefit of the beneficiaries thereof, but only to the extent such beneficiaries are entitled to distributions under the Plan. Upon completion of the transfer of the Liquidating Trust Assets into the Liquidating Trust, the Debtors will have no interest in, or with respect to, Liquidating Trust Assets, or the Liquidating Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trust Administrator and the beneficiaries) will treat the transfer of assets to the Liquidating Trust in accordance with the terms of the Plan as a transfer of assets (at a value as determined by the Liquidating Trust Administrator) to the beneficiaries, followed by a transfer by such beneficiaries to the Liquidating Trust, and the beneficiaries will be treated as the grantors and owners thereof.

The transfer of the Debtors' assets pursuant to the Plan will constitute a taxable disposition, for federal income tax purposes, of such assets for an amount equal to their respective fair market values, triggering gain or loss depending on each Debtor's adjusted tax basis in the respective assets, except that the federal income tax treatment of the portion, if any, of such distributed assets that are attributed to any residual interest of the Existing Equity Holders is uncertain. Under the Plan, the Liquidating Trust Administrator will determine the fair market value of the Liquidating Trust Assets and make those values available. All parties are bound by such determination. Consistent with the discussion above regarding COD income, provided that the Debtors maintain their status as qualified Subchapter S Subsidiaries and that the Existing Equity Holders maintain their status as S corporations, the gain or loss resulting from such taxable disposition, and from the sale of the Purchased Assets, will be included on the federal income tax returns of the Existing Equity Holders and on the Schedules K-1 issued by them to their shareholder. Since the sale of the Purchased Assets includes some contingent payments to the extent that gain was not recognized immediately with respect to those payments the distribution to the right thereto to the Liquidating Trust will constitute a taxable disposition of such right, triggering gain or loss determined by reference to its value and the adjusted tax basis (if any) attributable thereto. The Debtors and Creditors' Committee do not offer an opinion as to the federal, state or local tax consequences to the Existing Equity Holders of such gain or loss or the amount of such gain or loss as between R&R and Triple R, each will have.

EACH AND EVERY INTEREST HOLDER IS STRONGLY URGED TO CONSULT A PROFESSIONAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL, AND ANY FOREIGN, TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

## 10.2    Tax Treatment of the Liquidating Trust

The Liquidating Trust is intended to be treated for federal income tax purposes as a grantor trust. Assuming the Liquidating Trust qualifies as a grantor trust for federal income tax purposes, the Liquidating Trust's beneficiaries may be treated as the grantors of the Liquidating Trust, the Liquidating Trust should be disregarded for federal income tax purposes as an entity separate from the grantors, and the grantors would report the income and loss from the Liquidating Trust. Under the Plan, the transfer of cash and any remaining assets of the Debtors to the Liquidating Trust may be treated for federal income tax purposes as if the Debtors distributed an interest in each of the assets transferred directly to the Liquidating Trust beneficiaries in exchange for their outstanding claims against the Debtors. The Liquidating Trust beneficiaries would then be deemed to contribute their interest in the assets to the Liquidating Trust.

NYC/559246.4

If the Liquidating Trust is not treated for federal income tax purposes as a grantor trust, then the Liquidating Trust may be classified as a partnership for federal income tax purpose, in which case the Liquidating Trust beneficiaries would be treated as partners in the partnership. Unlike a grantor trust, the partnership would be treated as an entity required to compute income and loss, file tax returns, and make tax elections; but income and loss would pass through to the partners to be reported by them on their separate tax returns. If the Liquidating Trust is treated as a partnership for federal income tax purposes, the transfer of cash and any remaining assets of the Debtors to the Liquidating Trust under the Plan may be treated for federal income tax purposes as if the Debtors had distributed an interest in each of the assets so as transferred directly to the Liquidating Trust beneficiaries in exchange for their outstanding claims against the assets of the Debtors. The Liquidating Trust beneficiaries would then be deemed to contribute their interest in these assets to the Liquidating Trust for an interest in the Liquidating Trust.

**10.3    Consequences to Holders of Certain Allowed Claims**

(a)    *Gain or Loss*

Pursuant to the Plan, the Debtors will transfer all of their assets, either directly or indirectly, to holders of Allowed Claims and Interests in satisfaction and discharge of such Allowed Claims and Interests.

In general, beneficiaries of the Liquidating Trust should be treated as receiving from the Debtors their share of the respective assets transferred to the Liquidating Trust in satisfaction of each of their Claims and Interests and simultaneously transferring such assets to the Liquidating Trust. Assuming the Liquidating Trust is taxed as a grantor trust or as a partnership for federal income tax purposes, under the Plan, a beneficiary of the Liquidating Trust may recognize a taxable loss (or gain) to the extent the amount realized by such beneficiary in respect of its Claim or Interest, excluding accrued interest, is less (or greater) than its tax basis in such Claim or Interest, excluding any claim for accrued interest, except that the income tax treatment of the portion, if any, of such distributed assets that are attributed to any residual interest of the Existing Equity Holders is uncertain. The amount realized by such beneficiary should be equal to the amount of cash and the fair market value (determined as described above) of any other consideration received pursuant to the Plan (for example, such beneficiary's undivided beneficial interest in the assets of the Debtors, which are then deemed contributed by it to the Liquidating Trust). In general, any gain realized by a holder of a Claim or Interest will be recognized for federal income tax purposes, and will be treated as capital gain or ordinary income based on the particular circumstances of the holder. Whether any loss realized by a holder of a Claim or Interest is recognized for federal income tax purposes, and the treatment of such loss if recognized, depends on the particular circumstances of the holder of the Claim or Interest. Additionally, the Debtors and Creditors' Committee believe that beneficiaries of the Liquidating Trust should recognize their allocable share of taxable income on the assets transferred to the Liquidating Trust on an annual basis. Such taxable income will include, inter alia, interest earned on invested cash, gain or loss on sales of assets held by the Liquidating Trust, and recoveries with respect to other assets in excess of the values attributed thereto when such assets were contributed to the Liquidating Trust.

Notwithstanding the foregoing, it is possible that the Internal Revenue Service may assert that any income, gain or loss by holders of Claims or Interests should be deferred until the Liquidating Trust Administrator makes the final distributions from the Liquidating Trust. In addition, a holder's ultimate share of the assets of the Liquidating Trust based on its Claim or Interest may differ from the initial estimates thereof. This may result in a holder having to recognize additional or offsetting income or gain or loss if, and to the extent that, the aggregate amount of cash and the fair market value of property ultimately received by that holder from the Liquidating Trust differs from the amount used in initially determining that holder's income, gain or loss. Holders of Claims or Interests should consult their own

tax advisors regarding the possibility that the recognition of income, gain or loss may be accelerated or deferred.

The Debtors and Creditors' Committee do not offer an opinion as to any federal, state and local, or other tax consequences to holders of Claims as a result of the confirmation and execution of the Plan. HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT A PROFESSIONAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL, AND ANY FOREIGN, TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

(b)     *Distribution in Discharge of Accrued Unpaid Interest*

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims. A holder of an Allowed Claim generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income, although it is not clear whether such loss would be ordinary or capital. Holders of Allowed Claims are urged to consult with their tax advisors regarding the allocation of consideration and deductibility of unpaid interest.

(c)     *Information Reporting and Withholding*

All distributions to holders of Allowed Claims or Interests under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding," currently at a rate of 28% but subject to adjustment in future years. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fail properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Non-U.S. persons are subject to other withholding taxes with respect to their share of interest or other income allocable or paid to them.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY ENCOURAGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND ANY APPLICABLE FOREIGN, INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XI

## CONFIRMATION OF THE PLAN

In order to confirm the Plan, the Bankruptcy Court must make a series of determinations concerning the Plan, including that (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; (c) the Plan was proposed in good faith, and (d) the disclosures, as required by chapter 11 of the

41

Bankruptcy Code, have been adequate and have included information concerning all payments made or promised under the Plan. The Plan Proponents believe all of these conditions will be met by the Confirmation Hearing and will seek determinations to such effect at the Confirmation Hearing.

## 11.1 Classification of Claims and Interests

The Bankruptcy Code requires that each claim or interest in a class be "substantially similar" to the other claims or interests in such class. The Plan Proponents believe the Claims and Interests in each Class under the Plan are substantially similar and that the classifications proposed in the Plan are appropriate under the Bankruptcy Code.

## 11.2 Acceptance of the Plan

### (a) *Impaired Classes*

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept the Plan, except to the extent that a "cramdown" is available under section 1129(b) of the Bankruptcy Code. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote. Thus, a class will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting in such class cast their ballots in favor of acceptance. Holders entitled to vote who fail to vote are not counted as either accepting or rejecting a plan.

### (b) *Presumed Acceptances by Unimpaired Classes*

Under section 1126(f) of the Bankruptcy Code, the holders of claims in classes that are not impaired under a plan are deemed to have accepted the plan, and their votes on the plan need not be solicited. Holders of Allowed Claims in Classes 1, 2, 3, and 4 are Unimpaired under the Plan. Hence, such holders are conclusively presumed to have accepted the Plan, and votes in respect of such Claims will not be solicited.

### (c) *Classes Deemed to have Rejected the Plan*

Under section 1126(g) of the Bankruptcy Code, the holders of claims or interests who are not entitled to receive or retain property in respect thereof are deemed to have rejected the plan. Here, no Class of Claims or Interests is deemed to have rejected the Plan.

### (d) *Classes Entitled to Vote to Accept or Reject the Plan*

As a result of Sections 11.2 (b) and (c) above, votes to accept or reject the Plan will be solicited only from the holders of Claims or Interests in Classes 5, 6 and 7.

## 11.3 Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires that the court determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is

42

not less than the amount that such holder would recover under a hypothetical chapter 7 liquidation. The "best interests" test does not apply to the holders of unimpaired claims.

Pursuant to the Plan, the Debtors are selling the Purchased Assets and liquidating the remainder of their assets. In these circumstances, the chapter 7 scenario and the Plan are not very different. Nevertheless, the Debtors submit that the value of distributions in a liquidation pursuant to chapter 7 of the Bankruptcy Code would be substantially less than the value of the distributions required under the Plan. In a chapter 7 case, there would be additional administrative expenses that would need to be paid in advance of any distributions of unsecured claims, including the additional expenses involved in the appointment of a chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee. The chapter 7 trustee and his counsel and other professionals would need to become familiar with the Debtors, the Debtors' prior conduct of their operations and the Chapter 11 Cases and the Claims against the Debtors. Such a process would involve substantial time and expense. The chapter 7 trustee's professionals would be entitled to compensation at their normal hourly rates and to reimbursement of costs incurred in this process. These fees and expenses would be in addition to the allowed fees and expenses of the Debtors' and Creditors' Committee's professionals incurred during the Chapter 11 Cases. The additional fees and expenses attributable to the chapter 7 case would be deducted from assets of the Debtor otherwise available for distribution to holders of Allowed Claims under the Plan.

The Debtors and Creditors' Committee believe that members of Impaired Classes under the Plan would recover property of a value not less than what such holders would receive in liquidation under chapter 7. A chapter 7 liquidation analysis is attached as <u>Exhibit C</u> to this Disclosure Statement.

## 11.4    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation is not likely to be followed by a liquidation or need for further financial reorganization. The Plan Proponents submit that the requirement is not applicable in the liquidating plan context, and in any event they believe that the Liquidating Trust and the Liquidating Trust Administrator will be able to perform their duties under the Plan without requiring a further liquidation or financial reorganization.

## 11.5    Confirmation Without Acceptance by All Impaired Classes – Cramdown

Section 1129(b) of the Bankruptcy Code provides that, notwithstanding rejection of a plan by one or more impaired classes, the plan may still be confirmed, provided that the plan has been accepted by at least one impaired class of claims, the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired, non-accepting class, and the other requirements for confirmation (except acceptance by all impaired classes) are met.

The Plan Proponents reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by impaired Classes of Claims or Interests.

(a)    *Plan Does Not Discriminate Unfairly*

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if dissenting classes are treated equally with respect to classes of equal rank. The Plan Proponents believe that the Plan does not discriminate unfairly.

NYC/559246.4

(b)    ***Plan is Fair and Equitable as to Impaired, Non-Accepting Classes***

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides either: (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

A plan is fair and equitable as to a class of unsecured claims that rejects such plan if the plan provides either: (i) each impaired unsecured creditor receives or retains under the plan property of a value, measured as of the effective date of the Plan, equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

A plan is fair and equitable as to a class of interests that rejects such plan if the plan provides either: (i) each holder of an interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Plan Proponents believe that the Plan is "fair and equitable" as to each impaired Class.

## 11.6    Conditions Precedent to Effective Date

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)    Entry of the Confirmation Order.  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to each of the Plan Proponents, the effectiveness of which shall not have been stayed within fourteen (14) days following the entry thereof, and the Confirmation Order shall be a Final Order.

(b)    Consents Obtained.  The Debtors and all other parties to the VF Asset Purchase Agreement shall have received all authorizations, consents, legal and regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement and consummate the Plan and that are required by law, regulation, or order.

(c)    Sale Transaction.  All of the conditions to consummation of the VF Asset Purchase Agreement shall have been satisfied or waived.

(d)    Satisfaction of Conditions in Plan.  The Debtors shall have satisfied all other conditions set forth in the Plan.

(e)    Execution of Documents; Other Actions.  All other actions and documents necessary to implement the Plan and effectuate the Sale Transaction shall have been effected or executed.

NYC/559246.4

**11.7** **Retention of Jurisdiction**

The Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or that relates to the following purposes:

(a) to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(b) to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

(c) to determine any and all motions, adversary proceedings, applications, and contested or litigation matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trust Administrator prior to or after the Effective Date (which jurisdiction shall be non-exclusive as to any non-core matters);

(d) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(e) to hear and determine any timely objections to Claims and Interests, including any objections to the classification of any Claim or Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

(f) to resolve any Disputed Claims;

(g) to hear and determine any Retained Causes of Action;

(h) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(i) to hear and determine any and all disputes arising in connection with the Sale Transaction or implementation thereof (including, but not limited to, under the VF Asset Purchase Agreement or with respect to the obligations of the parties to comply with the terms of the VF Asset Purchase Agreement);

(j) to hear and determine any matters or disputes arising under or in connection with the Liquidating Trust Agreement;

(k) to hear and determine any matters or disputes relating to the formation of the Advisory Board or its activities;

(l) to issue such orders in aid of consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(m) to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

NYC/559246.4

(n)     to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date under sections 330, 331, and 503(b) of the Bankruptcy Code;

(o)     to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

(p)     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(q)     to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, or any other contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(r)     to hear and determine any actions to recover assets of the Debtors and property of the Debtors' Estates, wherever located;

(s)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(t)     to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

(u)     to enter a final decree closing the Chapter 11 Cases;

provided, however, that the foregoing is not intended to (1) expand the Bankruptcy Court's jurisdiction beyond that allowed by applicable law, (2) impair the rights of an Entity to (i) invoke the jurisdiction of a court, commission, or tribunal, including, without limitation, with respect to matters relating to a governmental unit's police and regulatory powers, and (ii) contest the invocation of any such jurisdiction; provided, however, that the invocation of such jurisdiction, if granted, shall not extend to the allowance or priority of Claims or the enforcement of any money judgment against a Debtor or a Post Effective Date Debtor, as the case may be, entered by such court, commission, or tribunal, and (3) impair the rights of an Entity to (i) seek the withdrawal of the reference in accordance with 28 U.S.C. § 157(d) and (ii) contest any request for the withdrawal of reference in accordance with 28 U.S.C. § 157(d).

NYC/559246.4

# ARTICLE XII

## RECOMMENDATION

The Debtors and Creditors' Committee believe that the Plan affords holders of Claims and Interests the potential for the greatest realization from the assets of the Debtors' Estates and, therefore, is in the best interests of all holders of Claims and Interests. Accordingly, the Debtors and Creditors' Committee recommend that all holders of Claims and Interests vote to accept the Plan.

Dated:  New York, New York
        December 20, 2010

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.

By:    */s/ Alex Spizz*
Alex Spizz, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.
425 Park Avenue
New York, New York 10022
Telephone: (212) 754-9400
Facsimile:  (212) 754-6262

*Attorneys for the Debtors and Debtors in Possession*

ARENT FOX LLP

By:    */s/ Robert M. Hirsh*
Robert M. Hirsh, Esq.
Jordana Renert, Esq.
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990

*Counsel for the Official Committee of Unsecured Creditors*

WEIL, GOTSHAL & MANGES LLP


By: _____*/s/ Joseph H. Smolinsky*_____
Joseph H. Smolinsky, Esq.
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for VF Corporation*