# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
: 
In re : **Chapter 11**
: 
**ROCK & REPUBLIC ENTERPRISES,** : **Case No. 10-11728 (AJG)**
**INC,** *et al.***,** : 
            **Debtors.** : **(Jointly Administered)**
: 
------------------------------------------------------------x


**JOINT CONSOLIDATED CHAPTER 11 PLAN FOR ROCK & REPUBLIC
ENTERPRISES, INC. AND ITS AFFILIATED DEBTOR AND DEBTOR IN
POSSESSION, PROPOSED JOINTLY BY THE DEBTORS, THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS, AND VF CORPORATION**


TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Alex Spizz
Arthur Goldstein
425 Park Avenue
New York, New York 10022
(212) 754-9400
*Attorneys for the Debtors and Debtors in Possession*

ARENT FOX LLP
Robert M. Hirsh
1675 Broadway
New York, New York 10019
(212) 484-3900
*Attorneys for the Official Committee of Unsecured Creditors*

WEIL, GOTSHAL & MANGES LLP
Joseph H. Smolinsky
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
*Attorneys for VF Corporation*


Dated: December 20, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS AND INTERPRETATION ................................................. 1

     A.      Definitions............................................................................................. 1

          1.1     503(b)(9) Claim ................................................................... 1

          1.2     Administrative Expense Claim ............................................ 1

          1.3     Advisory Board ................................................................... 1

          1.4     Allowed .............................................................................. 1

          1.5     Avoidance Actions.............................................................. 2

          1.6     Ball..................................................................................... 2

          1.7     Ballot.................................................................................. 2

          1.8     Bankruptcy Code ................................................................ 2

          1.9     Bankruptcy Court................................................................ 2

          1.10    Bankruptcy Rules................................................................ 2

          1.11    Business Day....................................................................... 2

          1.12    Cash.................................................................................... 2

          1.13    Causes of Action ................................................................ 2

          1.14    Chapter 11 Cases................................................................ 2

          1.15    Claim.................................................................................. 3

          1.16    Class................................................................................... 3

          1.17    Collateral............................................................................ 3

          1.18    Confirmation Date .............................................................. 3

          1.19    Confirmation Hearing ........................................................ 3

          1.20    Confirmation Order............................................................. 3

          1.21    Creditor .............................................................................. 3

          1.22    Creditors' Committee.......................................................... 3

          1.23    Debtors............................................................................... 3

          1.24    Disclosure Statement ......................................................... 3

          1.25    Disputed ............................................................................. 3

          1.26    Distribution Date................................................................ 3

          1.27    Distribution Record Date ................................................... 4

| | | |
|---|---|---|
| 1.28 | Effective Date | 4 |
| 1.29 | Entity | 4 |
| 1.30 | Estate | 4 |
| 1.31 | Estate Representative | 4 |
| 1.32 | Existing Equity Holder | 4 |
| 1.33 | Existing Equity Interests | 4 |
| 1.34 | Expense Reimbursement | 4 |
| 1.35 | Factor | 4 |
| 1.36 | Factoring Agreement | 4 |
| 1.37 | Factoring Agreement Claim | 4 |
| 1.38 | Factoring Agreement Order | 4 |
| 1.39 | Final Order | 5 |
| 1.40 | General Unsecured Claim | 5 |
| 1.41 | Governmental Unit | 5 |
| 1.42 | Impaired | 5 |
| 1.43 | Intercompany Claim | 5 |
| 1.44 | Intercompany Interest | 5 |
| 1.45 | Interest | 5 |
| 1.46 | Lien | 6 |
| 1.47 | Liquidating Trust | 6 |
| 1.48 | Liquidating Trust Administrator | 6 |
| 1.49 | Liquidating Trust Agreement | 6 |
| 1.50 | Liquidating Trust Assets | 6 |
| 1.51 | Net Available Cash | 6 |
| 1.52 | NewCo | 6 |
| 1.53 | Other Secured Claim | 6 |
| 1.54 | Petition Date | 6 |
| 1.55 | Plan | 6 |
| 1.56 | Plan Documents | 6 |

ii

1.57    Plan Proponents ........................................................................... 6

1.58    Plan Rate ..................................................................................... 6

1.59    Plan Supplement ........................................................................... 7

1.60    Post Effective Date Debtor ............................................................. 7

1.61    Priority Non-Tax Claim .................................................................. 7

1.62    Priority Tax Claim ........................................................................ 7

1.63    Pro Rata Share ............................................................................. 7

1.64    Professional Compensation and Reimbursement Claim........................... 7

1.65    Purchased Assets ........................................................................... 7

1.66    R&R ........................................................................................... 7

1.67    Released Actions........................................................................... 7

1.68    Released Parties ........................................................................... 7

1.69    Retained Causes of Action .............................................................. 7

1.70    RKF ........................................................................................... 7

1.71    RKF Loan Agreement...................................................................... 8

1.72    RKF Loan Claim ........................................................................... 8

1.73    Rock Holdings .............................................................................. 8

1.74    Sale Consideration ........................................................................ 8

1.75    Sale Consideration Allocation ......................................................... 8

1.76    Sale Order ................................................................................... 8

1.77    Sale Transaction ........................................................................... 8

1.78    Schedules .................................................................................... 8

1.79    Secured Claim .............................................................................. 8

1.80    Secured Tax Claim ........................................................................ 8

1.81    Subordinated Claim ....................................................................... 8

1.82    Tax Code..................................................................................... 9

1.83    Triple R ...................................................................................... 9

1.84    Unimpaired .................................................................................. 9

1.85    VF .............................................................................................. 9

NYC/559581.2

1.86    VF Asset Purchase Agreement ................................................................ 9

1.87    VF Breakup Protections .......................................................................... 9

1.88    Voting Deadline ...................................................................................... 9

1.89    Winddown Budget .................................................................................. 9

B.       Interpretation; Application of Definitions; Rules of Construction ...................... 9

ARTICLE II     TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS, AND PRIORITY TAX CLAIMS ................................................. 10

2.1    Administrative Expense Claims ............................................................ 10

2.2    Professional Compensation and Reimbursement Claims ....................... 10

2.3    Priority Tax Claims ............................................................................... 10

ARTICLE III    CLASSIFICATION OF CLAIMS AND INTERESTS ............................... 11

3.1    Substantive Consolidation .................................................................... 11

3.2    Classification of Claims and Interests ................................................... 11

ARTICLE IV    TREATMENT OF CLAIMS AND INTERESTS ...................................... 12

4.1    Priority Non-Tax Claims (Class 1) ........................................................ 12

4.2    Factoring Agreement Claims (Class 2) .................................................. 12

4.3    RKF Loan Claim (Class 3) .................................................................... 12

4.4    Other Secured Claims (Class 4) ............................................................ 12

4.5    General Unsecured Claims (Class 5) ..................................................... 13

4.6    Subordinated Claims (Class 6) .............................................................. 13

4.7    Existing Equity Interests (Class 7) ........................................................ 13

ARTICLE V     IMPLEMENTATION OF THE PLAN ..................................................... 14

5.1    Sale of the Purchased Assets .................................................................. 14

5.2    Substantive Consolidation of Debtors for Plan Purposes Only ............... 14

5.3    The Liquidating Trust Administrator ..................................................... 15

5.4    Duties and Powers of the Liquidating Trust Administrator ..................... 17

5.5    Dissolution of the Post Effective Date Debtors ...................................... 18

5.6    Appointment of Advisory Board ........................................................... 18

5.7    Rights and Powers of Advisory Board ................................................... 18

| | | |
|---|---|---|
| 5.8 | Method of Distributions Under the Plan | 18 |
| 5.9 | Closing of the Debtors' Chapter 11 Cases | 19 |
| 5.10 | Cancellation of Existing Agreements | 19 |
| 5.11 | Cancellation of Liens | 20 |
| 5.12 | Compromise of Controversies | 20 |
| ARTICLE VI | PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS UNDER THE PLAN | 20 |
| 6.1 | Voting | 20 |
| 6.2 | All Distributions by Liquidating Trust Administrator | 20 |
| 6.3 | Distributions on Allowed General Unsecured Claims | 20 |
| 6.4 | Date of Distributions | 21 |
| 6.5 | Delivery of Distributions | 21 |
| 6.6 | Time Bar to Cash Payments; Unclaimed Distributions | 21 |
| 6.7 | Distribution Record Date | 22 |
| 6.8 | Manner of Payment under the Plan | 22 |
| 6.9 | Distributions After Effective Date | 22 |
| 6.10 | Setoffs and Recoupment | 22 |
| 6.11 | Allocation of Plan Distributions Between Principal and Interest | 22 |
| ARTICLE VII | PROVISION FOR TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN | 23 |
| 7.1 | Objections to Claims; Filing of Late Claims | 23 |
| 7.2 | No Distributions Pending Allowance | 23 |
| 7.3 | Distributions After Allowance | 23 |
| 7.4 | Resolution of Claims | 23 |
| 7.5 | Estimation of Claims | 24 |
| 7.6 | Interest | 24 |
| ARTICLE VIII | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 24 |
| 8.1 | Rejection of Any Remaining Executory Contracts and Unexpired Leases | 24 |

8.2     Approval of Rejection of Executory Contracts and Unexpired Leases ........................................................................................ 25

8.3     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan ............. 25

8.4     Insurance Policies .................................................................... 25

ARTICLE IX     CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE .................................................................. 25

9.1     Conditions Precedent to Confirmation .................................... 25

9.2     Conditions Precedent to Effective Date .................................. 26

9.3     Waiver of Conditions ............................................................... 26

9.4     Satisfaction of Conditions ....................................................... 26

ARTICLE X     EFFECT OF CONFIRMATION ................................................. 27

10.1     Vesting of Assets .................................................................... 27

10.2     Binding Effect .......................................................................... 27

10.3     Discharge of Claims and Termination of Interests .................. 27

10.4     Injunction or Stay on Claims ................................................... 27

10.5     Terms of Existing Injunctions or Stays .................................... 28

10.6     Exculpation ............................................................................. 28

10.7     Preservation of Causes of Action / Reservation of Rights ...... 29

10.8     Injunction on Causes of Action ................................................ 29

10.9     Releases By The Debtors ........................................................ 29

10.10     Releases By The Holders of Claims and Interests .................. 30

ARTICLE XI     RETENTION OF JURISDICTION ............................................. 30

11.1     Retention of Jurisdiction ......................................................... 30

ARTICLE XII     MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................................................................................... 32

12.1     Modification of the Plan .......................................................... 32

12.2     Revocation or Withdrawal of the Plan ..................................... 33

ARTICLE XIII     MISCELLANEOUS PROVISIONS ........................................... 33

13.1     Effectuating Documents and Further Transactions ................. 33

**TABLE OF CONTENTS**
**(continued)**

13.2   Withholding and Reporting Requirements ............................................... 33

13.3   Plan Supplement ...................................................................................... 34

13.4   Payment of Statutory Fees ....................................................................... 34

13.5   Dissolution of Creditors' Committee ....................................................... 34

13.6   Expedited Tax Determination ................................................................... 34

13.7   Exemption from Transfer Taxes ............................................................... 34

13.8   Substantial Consummation ...................................................................... 35

13.9   Severability of Plan Provisions ............................................................... 35

13.10  Governing Law ........................................................................................ 35

13.11  Time ......................................................................................................... 35

13.12  Solicitation of the Plan ............................................................................ 35

13.13  Exhibits/Schedules .................................................................................. 36

13.14  Notices ..................................................................................................... 36

13.15  Section Headings ..................................................................................... 37

13.16  Inconsistencies ........................................................................................ 38

NYC/559581.2

Rock & Republic Enterprises, Inc. and Triple R, Inc., as debtors and debtors in possession in the above-referenced chapter 11 cases, the official committee of unsecured creditors in the above-referenced chapter 11 cases, and VF Corporation hereby together propose the following joint consolidated chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.     Definitions.**

As used in the Plan, the following terms shall have the respective meanings specified below:

1.1     ***503(b)(9) Claim*** means a Claim that has been timely and properly filed prior to July 30, 2010 and that is granted administrative expense priority treatment pursuant to section 503(b)(9) of the Bankruptcy Code.

1.2     ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases Allowed under and in accordance with, as applicable, sections 330, 364(c)(1), 365, 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to section 503(b) of the Bankruptcy Code, (d) 503(b)(9) Claims, and (e) any fees or charges assessed against the Debtors' Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

1.3     ***Advisory Board*** means an advisory board established on the Effective Date pursuant to Section 5.6 of the Plan, the members of which shall meet and/or consult periodically with the Liquidating Trust Administrator and keep themselves apprised of the affairs of the Liquidating Trust.

1.4     ***Allowed*** means, with reference to any Claim, (a) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim, objection, or request for estimation has been filed on or before any applicable objection deadline, if any, set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) any Claim that is not Disputed, (c) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors or the Reorganized Debtors, as the case may be, pursuant to a Final Order of the Bankruptcy Court, or (d) any Claim that has been allowed hereunder or by Final Order; provided, however, that Claims allowed or estimated solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the

Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

1.5 ***Avoidance Actions*** means Causes of Action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, Causes of Action arising under sections 502(d), 510, 542, 543, 547, 548, 549, 550, and 553 of the Bankruptcy Code.

1.6 ***Ball*** means Michael Ball.

1.7 ***Ballot*** means the document for accepting or rejecting the Plan in the form approved by the Bankruptcy Court and distributed with the Disclosure Statement.

1.8 ***Bankruptcy Code*** means chapter 11 of title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.9 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.10 ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any local rules of the Bankruptcy Court, as amended, as applicable to the Chapter 11 Cases.

1.11 ***Business Day*** means any day not designated as a legal holiday by Bankruptcy Rule 9006(a) and any day on which commercial banks in the city of New York, New York are open for business and not authorized, by law or executive order, to close.

1.12 ***Cash*** means legal tender of the United States of America.

1.13 ***Causes of Action*** means, without limitation, any and all actions, causes of action, proceedings, controversies, liabilities, obligations, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, suits, damages, judgments, Claims, objections to Claims, benefits of subordination of Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, now owned or hereafter acquired by the Debtors, whether arising under the Bankruptcy Code or other federal, state, or foreign law, equity or otherwise, including, without limitation, Avoidance Actions, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date, and the Cash and non-Cash proceeds of any of the foregoing.

1.14 ***Chapter 11 Cases*** means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, styled <u>In re Rock & Republic Enterprises, Inc., et al.</u>, Chapter 11 Case No. 10-11728 (AJG) (Jointly Administered), currently pending before the Bankruptcy Court.

2

1.15    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.16    ***Class*** means a category of Claims or Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.17    ***Collateral*** means any property, or interest in property, of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.18    ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases.

1.19    ***Confirmation Hearing*** means the hearing to consider confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

1.20    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.21    ***Creditor*** means "creditor" as such term is defined in section 101(10) of the Bankruptcy Code.

1.22    ***Creditors' Committee*** means the statutory committee of creditors holding Unsecured Claims appointed in the Chapter 11 Cases by the United States Trustee for Region 2 pursuant to section 1102(a)(1) of the Bankruptcy Code, as reconstituted from time to time.

1.23    ***Debtors*** means, collectively, R&R and Triple R.

1.24    ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code.

1.25    ***Disputed*** means, with reference to any Claim, including any portion thereof, (a) any Claim that is listed on the Schedules as unliquidated, disputed, or contingent, (b) any Claim as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or that is otherwise disputed by any Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been determined by a Final Order, or (c) any Claim with respect to which a proof of claim was required to be filed by order of the Bankruptcy Court but as to which such proof of claim was not timely or properly filed. A Claim that is Disputed as to its amount only shall be deemed Allowed in the amount agreed upon, if any, by the Liquidating Trust Administrator, and Disputed as to the excess.

1.26    ***Distribution Date*** means a date or dates, as determined by the Liquidating Trust Administrator, on which the Liquidating Trust Administrator makes a distribution to holders of Allowed Claims and Interests under the Plan.

NYC/559581.2

1.27    ***Distribution Record Date*** means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Interests, which date shall be two (2) Business Days prior to the Confirmation Date.

1.28    ***Effective Date*** means the first (1st) Business Day that is practicable following the Confirmation Date on which (a) the conditions to effectiveness of the Plan set forth in Section 9.2 of the Plan have been satisfied or otherwise waived in accordance with Section 9.3 or 9.4 of the Plan and (b) no stay of the Confirmation Order is in effect; provided, however, that such Business Day shall be no later than April 30, 2011, unless otherwise agreed to jointly by the Creditors' Committee and VF.

1.29    ***Entity*** means a person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the Office of the United States Trustee.

1.30    ***Estate*** means the estate of any Debtor created under section 541 of the Bankruptcy Code.

1.31    ***Estate Representative*** means a representative, other than Ball, appointed by the Debtors and designated prior to the Confirmation Hearing.

1.32    ***Existing Equity Holder*** means with respect to R&R, its sole shareholder Global Domination Enterprises, Inc. and with respect to Triple R, its sole shareholder Brick and Mortar Freestanding, Inc., as the holders of the Existing Equity Interests.

1.33    ***Existing Equity Interests*** means the Interests held by the Existing Equity Holders.

1.34    ***Expense Reimbursement*** means the right of reimbursement of VF as provided in the VF Asset Purchase Agreement, not to exceed $450,000, for VF's reasonable out-of-pocket expenses.

1.35    ***Factor*** means The CIT Group/Commercial Services, Inc.

1.36    ***Factoring Agreement*** means that certain Factoring Agreement, dated as of February 18, 2005, by and among R&R and the Factor, as modified, amended, or extended from time to time during the Chapter 11 Cases and any of the documents and instruments related thereto, including, but not limited to, that certain Inventory Security Agreement, dated as of August 18, 2006, and that certain Letter of Credit Agreement, dated as of June 27, 2006.

1.37    ***Factoring Agreement Claim*** means any Claim against the Debtors arising under, in connection with, or related to the Factoring Agreement and all agreements and instruments relating thereto.

1.38    ***Factoring Agreement Order*** means the Final Order Authorizing Debtor to Enter into Factoring Agreement and Authorizing the Purchase and Sale of Accounts with Priority

4

Over Administrative Expenses and Secured by Liens on Property of the Estate Pursuant to Sections 363 and 364 of the Bankruptcy Code, dated May 26, 2010, as may be amended from time to time during the Chapter 11 Cases.

1.39 ***Final Order*** means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

1.40 ***General Unsecured Claim*** means any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, Professional Compensation and Reimbursement Claim, Priority Tax Claim, Priority Non-Tax Claim, Other Secured Claim, Factoring Agreement Claim, RKF Loan Claim, or Subordinated Claim or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

1.41 ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.42 ***Impaired*** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.43 ***Intercompany Claim*** means any Claim held by one Debtor against any other Debtor(s) and any and all affiliates, subsidiaries, or interests of the Debtors, including, without limitation, (a) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor(s), (b) any Claim not reflected in intercompany book entries that is held by such Debtor, and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor(s).

1.44 ***Intercompany Interest*** means any Interest in any of the Debtors held by any other Debtor.

1.45 ***Interest*** means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any right to acquire any such equity security or instrument, including any option, warrant, or other right, contractual or otherwise, to acquire, sell, or subscribe for any such security or instrument.

1.46 ***Lien*** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.47 ***Liquidating Trust*** means the trust established under the Plan in accordance with the Liquidating Trust Agreement.

1.48 ***Liquidating Trust Administrator*** means the administrator of the Liquidating Trust appointed pursuant to Section 5.3 of the Plan.

1.49 ***Liquidating Trust Agreement*** means that certain Liquidating Trust Agreement which shall govern the operation of the Liquidating Trust, substantially in the form contained in the Plan Supplement.

1.50 ***Liquidating Trust Assets*** means the portion of the Sale Consideration transferred to the Liquidating Trust pursuant to the Sale Consideration Allocation and all other property of the Estates transferred to the Liquidating Trust on the Effective Date (other than the Purchased Assets).

1.51 ***Net Available Cash*** means, at any time, the Cash held by the Liquidating Trust that is available for distribution to holders of Claims and Interests in accordance with the Plan. For purposes of clarity, "Net Available Cash" shall not include an amount of Cash necessary to fully fund the Winddown Budget.

1.52 ***NewCo*** means an entity wholly owned by VF.

1.53 ***Other Secured Claim*** means any Secured Claim, other than the Factoring Agreement Claims and the RKF Loan Claim, that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of the setoff, pursuant to section 553 of the Bankruptcy Code.

1.54 ***Petition Date*** means April 1, 2010, the date on which each of the Debtors filed a voluntary petition for relief commencing the Chapter 11 Cases.

1.55 ***Plan*** means this chapter 11 plan (including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto or thereto), either in its present form or as the same may be altered, amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof.

1.56 ***Plan Documents*** means the documents to be executed, delivered, assumed and/or performed in conjunction with the consummation of the Plan on the Effective Date, each in form and substance acceptable in all respects to the Creditors' Committee and VF.

1.57 ***Plan Proponents*** means the Debtors, the Creditors' Committee, and VF.

1.58 ***Plan Rate*** means the federal judgment rate in effect as of the Petition Date.

6

1.59    **Plan Supplement** means a supplemental appendix to the Plan, to be filed with the Bankruptcy Court no later than ten (10) days prior to the Voting Deadline (except as may otherwise be agreed jointly by the Plan Proponents) that will contain, among other things, the Plan Documents, substantially in the form they will be entered into as of the Effective Date.

1.60    **Post Effective Date Debtor** means any of the Debtors on and after the Effective Date.

1.61    **Priority Non-Tax Claim** means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than an Administrative Claim or a Priority Tax Claim).

1.62    **Priority Tax Claim** means any Claim of a governmental unit against the Debtors entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.63    **Pro Rata Share** means the proportion that a Claim bears to the sum of all Claims (including Disputed Claims) within such Class or group of Classes for which an allocation is being determined, unless the Plan provides otherwise with respect to such Claim or Claims.

1.64    **Professional Compensation and Reimbursement Claim** means an Administrative Claim under section 330(a), 331, or 503 of the Bankruptcy Code for compensation of a professional or other Entity for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Confirmation Date.

1.65    **Purchased Assets** has the meaning ascribed to such term in the VF Asset Purchase Agreement.

1.66    **R&R** means Rock & Republic Enterprises, Inc.

1.67    **Released Actions** means the Causes of Action, if any, against the Released Parties.

1.68    **Released Parties** means, collectively, each of (a) the Debtors, (b) the Creditors' Committee and each of the members of the Creditors' Committee (solely in that capacity), (c) VF, (d) NewCo, and (e) each of the respective officers, directors, employees, representatives, attorneys, advisors, investment bankers, consultants, managers, members, partners, agents, accountants, and other professionals of the parties listed in clauses (a) through (d), and their predecessors, successors, assigns, present and former affiliates (whether by operation of law or otherwise), and equity holders, in each case, in their respective capacities as such.

1.69    **Retained Causes of Action** means all Causes of Action other than the Released Actions.

1.70    **RKF** means RKF, LLC.

NYC/559581.2

1.71    ***RKF Loan Agreement*** means that certain loan agreement, dated on or about November 14, 2007, as amended, among R&R, as borrower, and RKF, as lender, and any of the documents and instruments relating thereto or referred to therein.

1.72    ***RKF Loan Claim*** means any Claim for principal or interest arising under, in connection with, or related to the RKF Loan Agreement.

1.73    ***Rock Holdings*** means Rock Holdings, Inc.

1.74    ***Sale Consideration*** means the consideration paid by VF under the Sale Transaction.

1.75    ***Sale Consideration Allocation*** means the allocation determined jointly by the Debtors and the Creditors' Committee prior to the Effective Date that determines the portion of the Sale Consideration that shall be paid not to the Liquidating Trust but to the Debtors for purposes of satisfying certain Allowed Claims identified therein.

1.76    ***Sale Order*** means that certain order of the Bankruptcy Court, which may be the Confirmation Order, approving the Sale Transaction and authorizing and directing, *inter alia*, the sale of the Purchased Assets, free and clear of Liens, claims, obligations, encumbrances, and other interests, to NewCo.

1.77    ***Sale Transaction*** means the sale by the Debtors of the Purchased Assets to NewCo pursuant to the VF Asset Purchase Agreement.

1.78    ***Schedules*** means the schedules of assets and liabilities, the lists of holders of Interests, and the statements of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented on or prior to the Confirmation Date.

1.79    ***Secured Claim*** means a Claim against the Debtors (a) secured by a Lien on Collateral, to the extent of the value (as of the Effective Date or such other date as may be established by the Court) of such Collateral (i) as set forth in the Plan or (ii) as determined by a Final Order of the Court pursuant to section 506 of the Bankruptcy Code, or (b) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff; provided, however, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim.

1.80    ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

1.81    ***Subordinated Claim*** means a Claim, if any, subject to subordination under section 510 of the Bankruptcy Code.

8

1.82    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.83    ***Triple R*** means Triple R, Inc.

1.84    ***Unimpaired*** means, with respect to a Claim, Class, or Interest, a Claim, Class, or Interest that is not Impaired.

1.85    ***VF*** means VF Corporation.

1.86    ***VF Asset Purchase Agreement*** means that certain Asset Purchase Agreement between the Creditors' Committee, the Debtors, Rock Holdings, the Existing Equity Holders, Ball, and VF, a copy of which is annexed hereto as <u>Exhibit A</u> (as may be modified from time to time by agreement of the parties thereto), providing, among other things, for the purchase by NewCo of the Purchased Assets.

1.87    ***VF Breakup Protections*** means the aggregate of (a) a breakup fee equal to $2,300,000 and (b) the Expense Reimbursement payable to VF under the terms of the VF Asset Purchase Agreement.

1.88    ***Voting Deadline*** means the date by which a holder of a Claim or Interest must deliver a Ballot voting to accept or reject the Plan as set forth in the order of the Bankruptcy Court approving the instructions and procedures relating to the solicitation of votes with respect to the Plan.

1.89    ***Winddown Budget*** means the initial line-item budget formulated by the Creditors' Committee in consultation with the Debtors and reasonably acceptable to the proposed Liquidating Trust Administrator, which shall be included in the Plan Supplement and set forth the estimated cost of fulfilling all of the Liquidating Trust Administrator's duties under the Plan and the Liquidating Trust Agreement, including, without limitation, the winddown of the Post Effective Date Debtors and the pursuit of Avoidance Actions and other Causes of Action on behalf of the Post Effective Date Debtors and subsequently modified budgets as proposed by the Liquidating Trust Administrator and approved by the Advisory Committee from time to time.

**B.      Interpretation; Application of Definitions; Rules of Construction.**

Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in the Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, (a) all article, section, schedule, or exhibit references in the Plan are to the respective article of, section in, schedule to, or exhibit to the Plan, as the same may be altered, amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof and (b) all references to dollars are to the lawful currency of the United States of America. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of

9

the Bankruptcy Code shall apply to the construction of the Plan. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

**ARTICLE II**

**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS, AND PRIORITY TAX CLAIMS**

2.1     *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or has already been paid in respect of such claim, on the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as practicable, the Liquidating Trust shall pay to each holder of an Allowed Administrative Expense Claim, in full and final satisfaction of such Allowed Administrative Expense Claim, an amount in Cash equal to the Allowed amount of such Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtors during the Chapter 11 Cases shall be paid or performed when due in the ordinary course of business by the Debtors in accordance with the terms and conditions of the particular transaction and any agreements relating thereto.

2.2     *Professional Compensation and Reimbursement Claims.*

All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503, or 1103 of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date on which the order relating to any such Professional Compensation and Reimbursement Claim is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such a Professional Compensation and Reimbursement Claim and the Liquidating Trust Administrator. Holders of Professional Compensation and Reimbursement Claims that do not file and serve such application by the required deadline shall be forever barred from asserting such Professional Compensation and Reimbursement Claims against the Debtors, the Post Effective Date Debtors, their properties, or the Liquidating Trust, and such Claims shall be deemed discharged as of the Effective Date. Objections to Professional Compensation and Reimbursement Claims shall be filed no later than five (5) Business Days prior to the hearing on such Claims.

2.3     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall receive, on account of and in full and complete settlement, release, and discharge of, and in

10

exchange for, such Allowed Priority Tax Claim, one of the following treatments: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (ii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, or (iii) upon such other terms as may be agreed to by the Liquidating Trust Administrator and the holder of such Allowed Priority Tax Claim.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1 *Substantive Consolidation.*

As set forth more fully below, the Debtors' Estates are being deemed to be substantively consolidated for purposes of the Plan only. Accordingly, for purposes of the Plan, the assets and liabilities of the Debtors are deemed the assets and liabilities of a single, consolidated entity.

### 3.2 *Classification of Claims and Interests.*

Claims (other than Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims) and Interests are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Factoring Agreement Claims | Unimpaired | No (deemed to accept) |
| 3 | RKF Loan Claim | Unimpaired | No (deemed to accept) |
| 4 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Subordinated Claims | Impaired | Provisionally entitled to vote |
| 7 | Existing Equity Interests | Impaired | Provisionally entitled to vote |

11

# ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

4.1     *Priority Non-Tax Claims (Class 1).*

(a)     Impairment and Voting.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim.

4.2     *Factoring Agreement Claims (Class 2)*

(a)     Impairment and Voting.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Factoring Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Except to the extent that a holder of an Allowed Factoring Agreement Claim has been paid by the Debtors prior to the Effective Date and unless otherwise agreed to by the Plan Proponents, on or as soon as practicable after the Effective Date, each holder of an Allowed Factoring Agreement Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Factoring Agreement Claim, Cash in an amount equal to such Allowed Factoring Agreement Claim.

4.3     *RKF Loan Claim (Class 3).*

(a)     Impairment and Voting.  Class 3 is unimpaired by the Plan.  The holder of the Allowed RKF Loan Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  The RKF Loan Claim shall be an Allowed Claim and shall accrue interest at the rate set forth in the RKF Loan Agreement until paid in full in Cash, which shall occur on or as soon as practicable after the Effective Date except to the extent that the holder of the Allowed RKF Loan Claim has been paid by the Debtors prior to the Effective Date.

4.4     *Other Secured Claims (Class 4).*

(a)     Impairment and Voting.  Class 4 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Unless otherwise agreed to by the Plan Proponents and the holder of an Allowed Other Secured Claim, on the Effective Date, or as soon thereafter as is practicable, each holder of an Allowed Other Secured Claim shall receive, in full satisfaction and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following distributions:  (i) reinstatement of any such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (ii) the payment of such holder's Allowed Other Secured Claim in full in Cash; (iii) the surrender to the holder or holders of any Allowed Other Secured Claim of the property securing such Claim; or (iv) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code.

4.5     *General Unsecured Claims (Class 5).*

(a)     Impairment and Voting.  Class 5 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim shall receive from the Liquidating Trust its Pro Rata Share of the Net Available Cash after full and final satisfaction of or release of all Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims, Priority Non-Tax Claims, Factoring Agreement Claims, the RKF Loan Claim, and Other Secured Claims, in accordance with the terms of the Liquidating Trust and the Liquidating Trust Agreement.  The Liquidating Trust shall make subsequent distributions to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed in accordance with the terms of the Liquidating Trust and the Liquidating Trust Agreement.  In no event shall holders of Allowed General Unsecured Claims receive distributions in excess of 100% of the Allowed General Unsecured Claims.

4.6     *Subordinated Claims (Class 6).*

(a)     Impairment and Voting.  Class 6 is impaired by the Plan.  Each holder of an Allowed Subordinated Claim is provisionally entitled to vote to accept or reject the Plan.

(b)     Distributions.  On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of an Allowed Subordinated Claim shall receive from the Liquidating Trust any and all amounts remaining from the Net Available Cash after full and final satisfaction of or release of all Allowed General Unsecured Claims as provided for in Section 4.5 of the Plan.  In no event shall holders of Allowed Subordinated Claims receive distributions in excess of 100% of the Allowed Subordinated Claims.

4.7     *Existing Equity Interests (Class 7).*

(a)     Impairment and Voting.  Class 7 is impaired by the Plan.  Each holder of an Allowed Existing Equity Interest is provisionally entitled to vote to accept or reject the Plan.

(b)     Distributions.  On or as soon as practicable after the Effective Date (but no earlier than the first (1st) Business Day following the Distribution Record Date), each holder of

an Allowed Existing Equity Interest shall receive from the Liquidating Trust any and all amounts remaining from the Net Available Cash after full and final satisfaction of or release of all Allowed General Unsecured Claims as provided for in Section 4.5 of the Plan and all Allowed Subordinated Claims as provided for in Section 4.6 of the Plan, such distributions to the holders of Allowed Existing Equity Interests to be apportioned among them in such a fashion as will not cause a disqualification for federal income tax purposes of the Debtors as qualified sub-chapter S subsidiaries or of the Existing Equity Holders as S corporations.

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

### 5.1    *Sale of the Purchased Assets.*

(a)    On or prior to the Effective Date, the Debtors and the other parties to the VF Asset Purchase Agreement shall execute such other documents and take such actions as are necessary and appropriate to consummate the sale of the Purchased Assets to NewCo pursuant to the terms thereof.

(b)    On the Effective Date (and thereafter with respect to any Sale Consideration that remains contingent as of the Effective Date) following transfer of the Purchased Assets to NewCo by the Debtors and the other holders of rights and claims therein, the Sale Consideration, subject to the Sale Consideration Allocation, shall be deposited into the Liquidating Trust for application pursuant to the terms of the Plan and the Liquidating Trust Agreement.  The VF Breakup Protections shall be paid in accordance with the VF Asset Purchase Agreement.  The VF Breakup Protections shall constitute a first priority Lien in the proceeds of the an Alternative Transaction, if any, and shall be satisfied prior to any distributions to holders of Claims and Interests under the Plan.

### 5.2    *Substantive Consolidation of Debtors for Plan Purposes Only.*

(a)    As set forth in Section 3.1 of the Plan, the Plan contemplates and is predicated upon substantive consolidation of the Debtors into a single entity solely for purposes of all actions and distributions under the Plan.  Entry of the Confirmation Order shall constitute approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distribution.  On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be deemed merged so that all of the assets of the Debtors (other than the Purchased Assets and a portion of the Sale Consideration in accordance with the Sale Consideration Allocation) shall be transferred to the Liquidating Trust and available to pay all of the liabilities under the Plan as if it were one company, (ii) no monetary distributions shall be made under the Plan on account of Intercompany Claims among the Debtors, (iii) no distributions will be made under the Plan on account of any Intercompany Interests of the Debtors, (iv) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed to be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtors shall be deemed one obligation of the consolidated Debtors, and (v) each and

every Claim filed or to be filed in the Chapter 11 Case of any of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against and obligation of the consolidated Debtors.

(b)     For the avoidance of doubt, the limited substantive consolidation contemplated herein shall not be construed as substantive consolidation for any other purpose than that described in subpart (a) of this Section.

(c)     In this regard, to the extent it should appear, in light of the relative value of the assets held by each Debtor compared to the amount of Allowed Claims, that an amount of the assets attributable to one Debtor were or will be applied to Allowed Claims against the other Debtor, such amount shall be treated for federal income tax purposes as if it has been distributed by the first Debtor to its Existing Equity Holder (i.e., Global Domination Enterprises, Inc. or Brick and Mortar Freestanding, Inc., as the case may be), then distributed by that entity to the common shareholder of both Existing Equity Holders, then contributed by such shareholder to the Existing Equity Holder of the other Debtor, and then contributed by such Existing Equity Holder to the other Debtor and transferred by such Debtor to the Liquidating Trust.

### 5.3     *The Liquidating Trust Administrator.*

(a)     The Liquidating Trust Agreement shall govern the rights and responsibilities of the Liquidating Trust Administrator, who shall be selected from candidates proposed by the Creditors' Committee.  Prior to appointment, the Creditors' Committee shall submit a list containing the names of three (3) potential administrators to the Debtors, with the Debtors choosing the Liquidating Trust Administrator from such list.  The Liquidating Trust Administrator shall be named either in the Plan Supplement or in open court no later than the Confirmation Hearing.

(b)     The salient terms of the Liquidating Trust Administrator's employment, including the Liquidating Trust Administrator's duties under the Liquidating Trust Agreement and compensation shall be set forth in the Plan Supplement and the Confirmation Order and shall be consistent with that of similar functionaries in similar types of bankruptcy proceedings.

(c)     On the Effective Date, (i) the authority, power, and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned, (ii) the Liquidating Trust Administrator shall have the powers of an officer of the Post-Effective Date Debtors, and (iii) the Post Effective Date Debtors shall be authorized to be (and, by the conclusion of the winding up of their affairs, shall be) dissolved.

(d)     On the Effective Date, the Debtors shall assign and transfer absolutely and unconditionally to the Liquidating Trust all of their assets (other than the Purchased Assets, which shall be transferred to NewCo prior to the transfer of assets to the Liquidating Trust and the portion of the Sale Consideration remaining with the Debtors pursuant to the Sale Consideration Allocation).

NYC/559581.2

(e) In the event the Liquidating Trust Administrator dies, is terminated, or resigns for any reason, or is terminated for cause, a successor shall be designated by the Advisory Board.

(f) The Liquidating Trust Administrator shall carry out the duties set forth in Section 5.4 of the Plan and in the Liquidating Trust Agreement. The fees and expenses of the Liquidating Trust Administrator will be paid in accordance with the Winddown Budget. At any time after the Effective Date, the Liquidating Trust Administrator, in its reasonable judgment, may revise the Winddown Budget downward, thus creating more Net Available Cash for distribution to holders of Claims and Interests under the Plan. The Liquidating Trust Administrator shall be authorized to retain professionals necessary to carry out its duties and to compensate such professionals in accordance with the Winddown Budget.

(g) For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation section 301.7701-4 and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Liquidating Trust and then contributed such interests to the Liquidating Trust. The Liquidating Trust Agreement shall (i) state that the primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within six (6) months of the beginning of the extended term.

(h) The Liquidating Trust Administrator shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust. The Liquidating Trust Administrator shall file all federal tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4 unless otherwise required by applicable law. The Liquidating Trust Administrator also will annually send to each holder of a Liquidating Trust beneficiary a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidating Trust Administrator shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(i) As soon as practical after the Effective Date, the Liquidating Trust Administrator shall determine the fair market value, as of the Effective Date, of all the Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trust Administrator, and Liquidating Trust beneficiaries) for all United States federal income tax purposes.

(j)     Allocations of Liquidating Trust taxable income among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the holders of the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.  No allocation of income or loss shall be made to VF or NewCo.

(k)     Interests in the Liquidating Trust shall be non-transferrable and any such transfer shall be disregarded by the Liquidating Trust Administrator, except with respect to a transfer by will or under laws of descent and distribution; provided, however, that such transfer will not be effective until and unless the Liquidating Trust Administrator receives written notice of such transfer under the law of descent and distribution.

5.4     ***Duties and Powers of the Liquidating Trust Administrator.***

(a)     <u>General Authority</u>.  The Liquidating Trust Administrator, together with its representatives and professionals, shall administer the Plan.  In such capacity, the powers of the Liquidating Trust Administrator, set forth more fully in the Liquidating Trust Agreement, shall include any and all powers necessary to implement the Plan and to administer and distribute the assets and wind up the business and affairs of the Debtors and Post Effective Date Debtors, including, but not limited to (i) overseeing the Claims resolution, distribution, and objection process (including, but not limited to, the ability to object to, seek to subordinate, compromise, or settle any or all Claims against the Post Effective Date Debtors other than Claims that are Allowed under the Plan) in accordance with the terms of the Liquidating Trust Agreement, (ii) evaluating and, if appropriate, commencing and prosecuting on behalf of the Debtors' Estates the Avoidance Actions and other Causes of Action, (iii) winding down the affairs of the Debtors, including through the sale or abandonment of the Estate's remaining assets (which, with the exception of the Purchased Assets, shall be transferred to the Liquidating Trust), (iv) dissolving the Post Effective Date Debtors at the appropriate time, (v) maintaining books and records, and (vi) investing and managing Cash of the Liquidating Trust.  The Liquidating Trust Administrator shall, after the Effective Date, take all actions necessary to comply with the VF Asset Purchase Agreement; provided, however, that the costs of such actions shall be borne by VF.

(b)     <u>Tax Obligations</u>.  The Liquidating Trust Administrator shall be further authorized to (i) administer and pay any domestic and foreign taxes, including filing domestic and foreign tax returns for the Post Effective Date Debtors and the Liquidating Trust, as applicable, (ii) request an expedited determination of any unpaid tax liability of the Post Effective Date Debtors or the Estates under section 505 of the Bankruptcy Code for all taxable periods of the Debtors through the liquidation of the Post Effective Date Debtors as determined

17

under applicable tax laws, and (iii) represent the interest and account of the Post Effective Date Debtors or the Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit.

### 5.5  *Dissolution of the Post Effective Date Debtors.*

The Post Effective Date Debtors shall be dissolved after the liquidation, administration, and distribution of the Cash and any other assets of the Debtors in accordance with the Plan and their material completion of all other duties and functions set forth herein as soon as practicable after the Effective Date.  The Liquidating Trust Administrator shall cause to be filed with the State of California and any other governmental authority such certificate of dissolution or cancellation and other certificates or documents as may be or become necessary to implement the termination of the legal existence of the Post Effective Date Debtors.

### 5.6  *Appointment of Advisory Board.*

An "Advisory Board" shall be created on the Effective Date which shall consist of three (3) members (two (2) members selected by the Creditors' Committee and one (1) member selected by the Debtors); provided, however, that upon the payment in full in Cash of all Allowed General Unsecured Claims, the Advisory Board shall be reconstituted to consist of one (1) member selected by the Creditors' Committee and two (2) members selected by the Ball Representative.  The Advisory Board shall adopt bylaws as it may deem appropriate.  In the event of any vacancies, the remaining members shall have the authority to fill such vacancies.  In the event any position is vacant for more than thirty (30) days, the Liquidating Trust Administrator shall have the authority, without need of notice to the remaining members of the Advisory Board, to fill such vacancy.  The Advisory Board shall be disbanded without need for further notice or action when the duties of the Liquidating Trust Administrator set forth in the Plan and in the Liquidating Trust Agreement have concluded.

### 5.7  *Rights and Powers of Advisory Board.*

The Advisory Board shall be entitled to monitor the status and progress of Disputed Claims and Causes of Action.  The Advisory Board may meet and/or consult periodically with the Liquidating Trust Administrator and keep itself apprised of the affairs of the Liquidating Trust.  The Advisory Board shall have the authority to remove the Liquidating Trust Administrator and appoint a successor Liquidating Trust Administrator in accordance with the terms of the Liquidating Trust Agreement.

### 5.8  *Method of Distributions Under the Plan.*

(a)  All distributions to holders of Allowed Claims against and Existing Equity Interests in the Debtors (other than those Allowed Claims designated in the Sale Consideration Allocation to be satisfied by the portion of the Sale Consideration transferred by VF to the Debtors) shall be made by the Liquidating Trust Administrator in accordance with the terms of the Plan.

(b)  At reasonable periodic intervals determined by the Liquidating Trust Administrator, in its sole discretion, the Liquidating Trust Administrator shall make payments to

NYC/559581.2

holders of Allowed Claims in accordance with the Plan, but in no event shall the first distribution occur later than the Initial Distribution Date. The Liquidating Trust Administrator shall maintain Net Available Cash sufficient to pay holders of Disputed General Unsecured Claims in the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed General Unsecured Claims and Cash sufficient to pay the amounts set forth in the Winddown Budget. Upon completion of all duties of the Liquidating Trust Administrator, and after the satisfaction of all outstanding obligations of the Liquidating Trust, the Winddown Budget shall be reset to provide solely for the final costs of dissolving the Liquidating Trust and all Net Available Cash at such time shall be distributed in accordance with the Plan.

(c)      To the extent any of the assets associated with any of the Debtors' stores or locations have not been liquidated on or prior to the Effective Date, such assets shall be liquidated in accordance with the terms of the VF Asset Purchase Agreement, and the net proceeds shall be distributed to the holders of Allowed Claims (and, after the full and final satisfaction of all Allowed General Unsecured Claims and Allowed Subordinated Claims, to the holders of the Existing Equity Interests) as soon as practicable thereafter. Except in the event of a determination by the Bankruptcy Court that an administrative error by the Liquidating Trust Administrator has occurred, all amounts paid to and received by the holders of Claims or Existing Equity Interests pursuant to the Plan shall not be subject to avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(d)      Notwithstanding anything in this Plan or the Disclosure Statement to the contrary, the Liquidating Trust Administrator shall have the authority to object to the allowance or payment of any Disputed Claims on any grounds in accordance with the procedures set forth herein; provided, however, that the Liquidating Trust Administrator shall make distributions in accordance with the Plan with respect to the undisputed portion of any Disputed General Unsecured Claims.

5.9      *Closing of the Debtors' Chapter 11 Cases.*

When all Disputed Claims have become Allowed Claims or have been disallowed by Final Order, and all remaining Net Available Cash and Cash included in the Winddown Budget has been distributed in accordance with the Plan and the business and affairs of the Post Effective Date Debtors otherwise wound up, the Liquidating Trust Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.10      *Cancellation of Existing Agreements.*

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed and assigned by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan (if any), on the date of closing of these Chapter 11 Cases in accordance with the Plan, all instruments evidencing any Claims against the Debtors or Post Effective Date Debtors shall be deemed automatically cancelled

NYC/559581.2

without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors and Post Effective Date Debtors thereunder shall be discharged.

### 5.11 *Cancellation of Liens*.

Except as otherwise provided for pursuant to the Plan, upon the occurrence of the Effective Date and prior to the consummation of the Sale Transaction, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any cash Collateral) held by such holder and to take such actions as may be requested by the Debtors or the Post Effective Date Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.

### 5.12 *Compromise of Controversies.*

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

# ARTICLE VI

# PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS UNDER THE PLAN

### 6.1 *Voting.*

Each holder of an Allowed Claim or Interest in an impaired class of Claims or Interests that is entitled to vote on the Plan pursuant to Articles III and IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan or any other order of the Bankruptcy Court.

### 6.2 *All Distributions by Liquidating Trust Administrator.*

All distributions designated to be made under the Plan by the Liquidating Trust Administrator shall be made from the Net Available Cash in the Liquidating Trust (and, if funds remain in the Winddown Budget after the Liquidating Trust Administrator has completed all duties set forth in the Liquidating Trust Agreement, from the remaining Cash included in the Winddown Budget). The Liquidating Trust Administrator shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive same. The Liquidating Trust Administrator shall not hold an economic or beneficial interest in such property.

### 6.3 *Distributions on Allowed General Unsecured Claims.*

All Allowed General Unsecured Claims held by a single creditor shall be aggregated and treated as a single Claim. At the written request of the Liquidating Trust Administrator, any creditor holding multiple Allowed General Unsecured Claims shall provide to

the Liquidating Trust Administrator, as the case may be, a single address to which any distributions shall be sent.

### 6.4 *Date of Distributions.*

Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is reasonably practicable. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day and shall be deemed to have been made on the date due.

### 6.5 *Delivery of Distributions.*

(a) <u>Last Known Address</u>. Subject to the provisions of Bankruptcy Rule 9010, distributions and deliveries to holders of Allowed Claims or Existing Equity Interests shall be made at the address of such holders as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on proofs of claim filed by such holders, or at the last known address of such holders if no proof of claim is filed or if the Debtors, the Post Effective Date Debtors, or the Liquidating Trust Administrator have been notified in writing of a change of address.

(b) <u>Undeliverable Distributions</u>. In the event that any distribution to any holder of a Claim or Existing Equity Interest is returned to the Liquidating Trust Administrator as undeliverable, no further distributions shall be made to such holder unless and until the Liquidating Trust Administrator is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Liquidating Trust Administrator until such time as a distribution becomes deliverable; <u>provided</u>, <u>however</u>, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of twelve (12) months from the Effective Date. After such date, all unclaimed property or interest in property shall become Net Available Cash for distribution pursuant to the terms of the Plan, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Liquidating Trust Administrator to attempt to locate any holder of an Allowed Claim.

### 6.6 *Time Bar to Cash Payments; Unclaimed Distributions.*

Checks issued by the Liquidating Trust on account of Allowed Claims shall be null and void if not negotiated within 180 days from and after the date of issuance thereof. Requests for re-issuance of any check shall be made directly to the Liquidating Trust Administrator by the holder of the Allowed Claim with respect to which such check originally was issued. All distributions under the Plan that are unclaimed for a period of twelve (12) months after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred. Subject to the conditions set forth in the Plan, any distributions

21

that remain unclaimed after the expiration of the twelve (12) month period set forth in the immediately preceding sentence shall be redistributed to holders of Claims and Interests pursuant to the terms of the Plan.

### 6.7    *Distribution Record Date.*

With respect to holders of all Claims, on the Distribution Record Date, the Claims register shall be closed and any transfer of any Claim thereafter shall be prohibited. The Debtors, the Post Effective Date Debtors, and the Liquidating Trust Administrator shall have no obligation to recognize any transfer of any such Claims occurring after the close of business after such date.

### 6.8    *Manner of Payment under the Plan.*

Unless otherwise specified herein or unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Liquidating Trust Administrator shall be made, at the election of the Liquidating Trust Administrator, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that for administrative convenience, the Liquidating Trust Administrator shall not be required to make distributions in an amount less than One Hundred Dollars ($100.00).

### 6.9    *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.10   *Setoffs and Recoupment.*

Other than with respect to Claims Allowed hereunder, the Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Post Effective Date Debtors of any such Claim it may have against such claimant.

### 6.11   *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

# ARTICLE VII

## PROVISION FOR TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN

### 7.1 *Objections to Claims; Filing of Late Claims.*

(a)     As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Liquidating Trust Administrator, except as otherwise may be provided for in the Liquidating Trust Agreement. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of:  (i) the later of one hundred and eighty (180) days after the Effective Date or sixty (60) days after the date on which such Claim was filed (provided that any Claims filed after the Effective Date shall be deemed null and void and no further action shall be required by the Debtors in respect thereof) or (ii) such later date as may be fixed by the Bankruptcy Court.

(b)     Except for timely-filed damage claims arising from the rejection of executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan, any holder of a Claim or Interest shall be barred from filing a proof of claim after the Confirmation Date without first seeking and obtaining leave from the Bankruptcy Court to do so after notice to the Liquidating Trust Administrator and a hearing on notice.

### 7.2 *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.  The Liquidating Trust Administrator shall make appropriate reserves for Disputed Claims in accordance with the Liquidating Trust Agreement.

### 7.3 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim becomes a Final Order (which date may be, at the option of the Liquidating Trust Administrator, the next Distribution Date to holders of Allowed General Unsecured Claims), the Liquidating Trust Administrator will provide to the holder of such Allowed Claim the distribution to which such holder is entitled under the Plan.

### 7.4 *Resolution of Claims.*

On and after the Effective Date, and subject to the terms of the Liquidating Trust Agreement, the Liquidating Trust Administrator shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

### 7.5 *Estimation of Claims.*

The Debtors, the Post Effective Date Debtors, or the Liquidating Trust Administrator may at any time request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors, the Post Effective Date Debtors, or the Liquidating Trust Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection (for the avoidance of doubt, however, to the extent a Claim has been Allowed by a Bankruptcy Court order, such Claim is no longer subject to estimation), and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Post Effective Date Debtors, or the Liquidating Trust Administrator may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 7.6 *Interest*.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon that accrued after the Effective Date.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1 *Rejection of Any Remaining Executory Contracts and Unexpired Leases.*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between any of the Debtors and any Entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (a) that has been rejected by a Final Order of the Bankruptcy Court prior to the Effective Date, (b) that has been assumed or assumed and assigned pursuant to the Sale Transaction, (c) as to which a motion for approval of the assumption or assumption and assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (d) that is listed by the Debtors in the Plan Supplement. With respect to those executory contracts and unexpired leases set forth in the Plan Supplement, the period for the assumption, assumption and assignment, or rejection of such executory contracts and unexpired leases shall be extended until the date of closing of the Chapter 11 Cases in accordance with Section 5.9 herein.

8.2     ***Approval of Rejection of Executory Contracts and Unexpired Leases.***

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval by the Bankruptcy Court, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption or rejection of the executory contracts and unexpired leases as of the Effective Date that are assumed or rejected pursuant to Section 8.1 of the Plan.

8.3     ***Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.***

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors (or, on and after the Effective Date, the Post Effective Date Debtors and the Liquidating Trust Administrator) no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease and (ii) notice of entry of the Confirmation Order.  All such Claims not filed within such time will be forever barred from assertion against the Debtors, their Estates, the Post Effective Date Debtors, and their respective property (including the property in the Liquidating Trust).

8.4     ***Insurance Policies.***

Unless specifically assumed or rejected by order of the Bankruptcy Court, or unless listed in the Plan Supplement as set forth in Section 8.1 of the Plan, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan and shall be rejected in accordance with Section 8.1 of the Plan.  Nothing contained in this section shall constitute or be deemed a waiver of the right to assert and collect on claims relating to the period prior to the Effective Date or any cause of action that the Debtors may hold against any Entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance, and all such rights and causes of action shall be assigned and shall vest in the Liquidating Trust on the Effective Date.

# ARTICLE IX

# CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

9.1     ***Conditions Precedent to Confirmation.***

The occurrence of the Confirmation Date is subject to satisfaction of the following conditions precedent:

(a)     <u>Entry of the Disclosure Statement Order</u>.  The Clerk of the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance acceptable to each of the Plan Proponents, the effectiveness of which shall not have been stayed fourteen (14) days following the entry thereof.

(b)     <u>Proposed Confirmation Order</u>.  The proposed Confirmation Order shall be in form and substance acceptable to each of the Plan Proponents.

25

(c)     Plan Documents.  All Plan Documents shall be in form and substance acceptable to both the Creditors' Committee and VF.

(d)     Sale Transaction.  The VF Asset Purchase Agreement shall not have been terminated.

9.2     **Conditions Precedent to Effective Date.**

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)     Entry of the Confirmation Order.  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to each of the Plan Proponents, the effectiveness of which shall not have been stayed within fourteen (14) days following the entry thereof, and the Confirmation Order shall be a Final Order.

(b)     Consents Obtained.  The Debtors and all other parties to the VF Asset Purchase Agreement shall have received all authorizations, consents, legal and regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement and consummate the Plan and that are required by law, regulation, or order.

(c)     Sale Transaction.  All of the conditions to consummation of the VF Asset Purchase Agreement shall have been satisfied or waived.

(d)     Satisfaction of Conditions in Plan.  The Debtors shall have satisfied all other conditions set forth in the Plan.

(e)     Execution of Documents; Other Actions.  All other actions and documents necessary to implement the Plan and effectuate the Sale Transaction shall have been effected or executed.

9.3     **Waiver of Conditions.**

The Plan Proponents may, to the extent not prohibited by applicable law, jointly waive one or more of the conditions precedent to Confirmation or to the Effective Date set forth in Sections 9.1 and 9.2 of the Plan.

9.4     **Satisfaction of Conditions.**

Except as expressly provided or permitted in the Plan or waived by all necessary parties, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in Section 9.2 of the Plan has not been satisfied or waived by thirty (30) days after the Confirmation Date, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) the Debtors' obligations with respect to Claims and Interests shall remain unchanged and nothing

26

contained herein shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## ARTICLE X

## EFFECT OF CONFIRMATION

### 10.1    *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties, and their interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estates of the Debtors shall vest in the Post Effective Date Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  On the Effective Date, the Post Effective Date Debtors shall transfer all assets (other than the Purchased Assets, which shall be transferred to NewCo) to the Liquidating Trust.

### 10.2    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

### 10.3    *Discharge of Claims and Termination of Interests.*

Except as otherwise provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction and discharge of all existing debts and Claims, and shall terminate all Interests, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, on the Effective Date, all existing Claims against the Debtors and Interests in the Debtors, shall be, and shall be deemed to be satisfied and discharged, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Post Effective Date Debtors, or any of their respective assets or properties, or the Liquidating Trust, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest.

### 10.4    *Injunction or Stay on Claims.*

**Except as otherwise expressly provided in the Plan, the Confirmation Order, or such other order of the Bankruptcy Court that may be applicable, all Entities who have held, hold, or may hold Claims or other debt or liability that is discharged or Interests or**

other right of equity interest that is discharged pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust, (d) except to the extent provided, permitted, or preserved by sections 553, 555, 556, 559, 560, or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the against the Debtors, the Debtors' Estates, the Post Effective Date Debtors, properties or interests in properties of the Debtors or the Post Effective Date Debtors, or the Liquidating Trust with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, and (e) taking any actions to interfere with the implementation or consummation of the Plan. Such injunction shall extend to all successors of the Debtors and the respective properties and interests in property of all of the successors.

10.5     *Terms of Existing Injunctions or Stays.*

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

10.6     *Exculpation.*

(a)     None of the Released Parties shall have or incur any liability for any Claim, Cause of Action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, or any contract, instrument, document, or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence or of any Person with respect to any act or omission prior to the Petition Date, except as otherwise expressly set forth elsewhere in the Plan.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

NYC/559581.2

(b)     From and after the Effective Date, the Liquidating Trust Administrator, the members of the Advisory Board, and any professionals hired by the Advisory Board (including, but not limited to, attorneys, accountants, and financial advisors), all solely in their capacity as such, shall be exculpated by holders of Claims and Interests from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Liquidating Trust Administrator by the Plan, the Liquidating Trust Agreement, or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of the Liquidating Trust Administrator.

### 10.7     *Preservation of Causes of Action / Reservation of Rights.*

Except with respect to Released Actions, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release, or the relinquishment of any Causes of Action that the Debtors or the Post Effective Date Debtors may have.  The Causes of Action (including, but not limited to, Avoidance Actions) shall vest in the Liquidating Trust, and the Liquidating Trust Administrator may choose to assert any such Causes of Action on behalf of the Debtors, the Post Effective Date Debtors, or their Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  For purposes of clarity, the Liquidating Trust Administrator shall have, retain, reserve, and be entitled to asset all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors and the Post Effective Date Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted by the Liquidating Trust Administrator after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.8     *Injunction on Causes of Action.*

Except as provided in the Plan, as of the Effective Date, all non-Debtor entities are permanently enjoined from commencing or continuing in any manner, any Causes of Action, whether directly, derivatively, on account of or respecting any debt or Cause of Action of the Debtors or the Post Effective Date Debtors which the Liquidating Trust Administrator retains sole and exclusive authority to pursue in accordance with the Plan and the Liquidating Trust Agreement or which have been released pursuant to the Plan.

### 10.9     *Releases By The Debtors.*

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, to the extent permitted by applicable law, for good and valuable consideration, the Debtors and the Post Effective Date Debtors shall and shall be deemed to completely and forever release, waive, void, extinguish, and discharge all Released Actions (other than the rights to enforce the Plan and any right or obligation hereunder, and the securities, contracts, instruments, releases, indentures, and other agreements delivered hereunder or contemplated hereby), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the**

Effective Date in any way relating to the Debtors, the Post Effective Date Debtors, the Chapter 11 Cases, or the Plan that may be asserted by or on behalf of the Debtors or the Post Effective Date Debtors or their respective Estates against the Released Parties; provided, however, that all Released Actions shall be retained in connection with the defense against any Claim asserted against the Debtors, provided that the retention of such Released Actions shall not result in any affirmative recovery for the Debtors or the Post Effective Date Debtors; provided, further, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, intentional fraud, or criminal conduct of any Entity as determined by a Final Order entered by a court of competent jurisdiction.

10.10 *Releases By The Holders of Claims and Interests.*

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, to the extent permitted by applicable law, for good and valuable consideration, each holder of a Claim or Interest that (a) votes to accept the Plan (or is deemed to accept the Plan) and (b) agrees to provide releases of the Released Parties under the Plan, shall be deemed to release, waive, void, extinguish, and discharge, unconditionally and forever, all Released Actions (other than the rights to enforce the Plan, and any right or obligation under the Plan, and the securities, contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder or contemplated hereby), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Post Effective Date Debtors, the Chapter 11 Cases, or the Plan, that otherwise may be asserted against the Released Parties; provided, however, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, intentional fraud, or criminal conduct of any such person or entity as determined by a Final Order entered by a court of competent jurisdiction.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1 *Retention of Jurisdiction.*

The Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or that relates to the following purposes:

(a) to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(b)     to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

(c)     to determine any and all motions, adversary proceedings, applications, and contested or litigation matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trust Administrator prior to or after the Effective Date (which jurisdiction shall be non-exclusive as to any non-core matters);

(d)     to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(e)     to hear and determine any timely objections to Claims and Interests, including any objections to the classification of any Claim or Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

(f)     to resolve any Disputed Claims;

(g)     to hear and determine any Retained Causes of Action;

(h)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(i)     to hear and determine any and all disputes arising in connection with the Sale Transaction or implementation thereof (including, but not limited to, under the VF Asset Purchase Agreement or with respect to the obligations of the parties to comply with the terms of the VF Asset Purchase Agreement);

(j)     to hear and determine any matters or disputes arising under or in connection with the Liquidating Trust Agreement;

(k)     to hear and determine any matters or disputes relating to the formation of the Advisory Board or its activities;

(l)     to issue such orders in aid of consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(m)     to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(n)     to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date under sections 330, 331, and 503(b) of the Bankruptcy Code;

(o)     to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

(p)     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(q)     to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, or any other contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(r)     to hear and determine any actions to recover assets of the Debtors and property of the Debtors' Estates, wherever located;

(s)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(t)     to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

(u)     to enter a final decree closing the Chapter 11 Cases;

provided, however, that the foregoing is not intended to (1) expand the Bankruptcy Court's jurisdiction beyond that allowed by applicable law, (2) impair the rights of an Entity to (i) invoke the jurisdiction of a court, commission, or tribunal, including, without limitation, with respect to matters relating to a governmental unit's police and regulatory powers, and (ii) contest the invocation of any such jurisdiction; provided, however, that the invocation of such jurisdiction, if granted, shall not extend to the allowance or priority of Claims or the enforcement of any money judgment against a Debtor or a Post Effective Date Debtor, as the case may be, entered by such court, commission, or tribunal, and (3) impair the rights of an Entity to (i) seek the withdrawal of the reference in accordance with 28 U.S.C. § 157(d) and (ii) contest any request for the withdrawal of reference in accordance with 28 U.S.C. § 157(d).

## ARTICLE XII

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### 12.1     *Modification of the Plan.*

The Creditors' Committee and VF, in consultation with the Debtors, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to jointly amend or modify the Plan, the Plan Supplement, or any exhibits to the Plan at any time prior to entry of the Confirmation Order. Upon entry of the Confirmation Order, the Creditors' Committee and VF, in consultation with the Debtors, may, upon order of the Bankruptcy Court, jointly amend or

modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of a Claim that has adopted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 12.2 *Revocation or Withdrawal of the Plan.*

(a) The Plan may be revoked or withdrawn jointly by the Creditors' Committee and VF prior to the Effective Date.

(b) The Plan shall be revoked and withdrawn if the VF Asset Purchase Agreement terminates by its terms.

(c) If the Plan is revoked or withdrawn prior to the Effective Date, the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

### 13.1 *Effectuating Documents and Further Transactions.*

On or before the Effective Date, and without the need for any further order or authority, the Plan Proponents and the other parties to the VF Asset Purchase Agreement shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Post Effective Date Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

### 13.2 *Withholding and Reporting Requirements.*

In connection with the consummation of the Plan and all instruments issued in connection herewith and distributed hereunder, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Existing Equity Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the

33

obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### 13.3  *Plan Supplement.*

Each of the documents contained in the Plan Supplement shall be acceptable in all respects to the Plan Proponents.  Except as may otherwise be agreed by both the Creditors' Committee and VF after consultation with the Debtors, the Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan; provided, however, that the Plan Proponents may jointly amend the documents contained in the Plan Supplement, subject to Section 12.1 of the Plan, through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Interests may obtain a copy of the Plan Supplement on the website of the Debtors' claims agent at www.donlinrecano.com/cases/caseinfo/rr.

### 13.4  *Payment of Statutory Fees.*

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid as and when due or otherwise pursuant to an agreement between the Liquidating Trust Administrator and the United States Department of Justice, Office of the United States Trustee, until such time as a Chapter 11 Case for a Debtor shall be closed in accordance with the provisions of Section 5.9 of the Plan.

### 13.5  *Dissolution of Creditors' Committee.*

Upon the Effective Date, the Creditors' Committee shall dissolve automatically (except with respect to the resolution of Professional Compensation and Reimbursement Claims, for which counsel to the Creditors' Committee shall be entitled to reasonable fees and out-of-pocket expenses, to be paid by the Liquidating Trust in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court), and members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to the Chapter 11 Cases and under the Bankruptcy Code.

### 13.6  *Expedited Tax Determination.*

The Liquidating Trust Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, such Debtors for all taxable periods through the Effective Date.

### 13.7  *Exemption from Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the transfer of the Purchased Assets, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets

34

contemplated by the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 13.8  *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 13.9  *Severability of Plan Provisions.*

If, prior to the Confirmation Date, any term or provision of the Plan shall be held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the joint request of the Plan Proponents, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.10  *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or document contained in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the law of any other jurisdiction.

### 13.11  *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 13.12  *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date, the Plan Proponents shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, section 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

NYC/559581.2

13.13 *Exhibits/Schedules.*

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.14 *Notices.*

All notices, requests, and demands to or upon the Creditors' Committee, VF, and the Debtors shall, to be effective, be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

Rock & Republic Enterprises, Inc.
3525 Eastham Avenue
Culver City, CA 90232
Facsimile: (310) 424-3892
Telephone: (310) 839-3330
Attn:   Michael Ball, Chief Operating Officer
        Geoff Lurie, Chief Restructuring Officer

with a copy to:

Todtman, Nachamie, Spizz & Johns, P.C.
425 Park Avenue
New York, New York 10022
Facsimile: (212) 754-6262
Telephone: (212) 754-9400
Attn:   Alex Spizz, Esq.
        Arthur Goldstein, Esq.

-and-

Manderson, Schafer & McKinlay LLP
4695 MacArthur Court, Suite 1270
Newport Beach, California 92660
Facsimile: (949) 743-8310
Telephone: (949) 788-1036
Attn:   Chris Manderson, Esq.

If to the Creditors' Committee, to:

Arent Fox LLP
1675 Broadway
New York, New York 10019
Facsimile:  (212) 484-3990
Telephone:  (212) 484-3900
Attn:   Robert M. Hirsh, Esq.

If to VF, to:

VF Services, Inc.
40 West 57th Street, 7th Floor
New York, New York 10019
Facsimile:  (212) 841-7265
Telephone:  (212) 887-8129
Attn:   David Conn

-and-

VF Corporation
105 Corporate Center Boulevard
Greensboro, North Carolina 27408
Facsimile:  (336) 424-7696
Telephone:  (336) 424-6145
Attn:   Laura C. Meagher, Esq.

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Facsimile:  (212) 310-8007
Telephone:  (212) 310-8000
Attn:   Joseph H. Smolinsky, Esq.

13.15   *Section Headings.*

The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

NYC/559581.2

### 13.16 *Inconsistencies.*

To the extent of any inconsistencies between the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern. To the extent of any inconsistencies between the terms and provisions of the VF Asset Purchase Agreement and the terms and provisions of the Plan, the terms and provisions of the VF Asset Purchase Agreement shall govern.

Dated: New York, New York
        December 20, 2010

DEBTORS AND DEBTORS IN POSSESSION

By: _____*/s/ Michael Ball*_____
    Name: Michael Ball
    Title: Chief Executive Officer


OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: _____*/s/ Arnold Rosenstein*_____
    Co-Chair of the Creditors' Committee
    Name: Arnold Rosenstein


VF CORPORATION

By: _____*/s/ Franklin L. Terkelsen*_____
    Name: Franklin L. Terkelsen
    Title: Vice President, Mergers and Acquisitions

NYC/559581.2

**<u>Exhibit A</u>**

ASSET PURCHASE AGREEMENT

AMONG

THE CREDITORS' COMMITTEE

(as hereinafter defined)

ROCK & REPUBLIC ENTERPRISES, INC.

TRIPLE R, INC.

ROCK HOLDINGS, INC.

GLOBAL DOMINATION ENTERPRISES, INC.

BRICK & MORTAR, INC.

MICHAEL BALL

AND

VF CORPORATION

_____

Dated as of December 20, 2010

ARTICLE I       DEFINITIONS ................................................................... 2

    1.1    Certain Definitions ................................................................. 2

    1.2    Terms Defined Elsewhere in this Agreement ........................... 6

    1.3    Other Definitional and Interpretive Matters ............................ 7

ARTICLE II     PURCHASE AND SALE; ASSUMPTION OF LIABILITIES .......... 9

    2.1    Pre-Closing Transfer of Purchased Intellectual Property .......... 9

    2.2    Purchase and Sale of Assets ..................................................... 9

    2.3    Excluded Assets ..................................................................... 9

    2.4    Excluded Liabilities ................................................................ 9

    2.5    Further Conveyances and Assumptions .................................. 10

    2.6    Free and Clear Transfers ....................................................... 10

    2.7    License ................................................................................ 10

ARTICLE III    CONSIDERATION .......................................................... 11

    3.1    Consideration ...................................................................... 11

ARTICLE IV    CLOSING AND TERMINATION ...................................... 12

    4.1    Closing Date ........................................................................ 12

    4.2    Deliveries by Sellers ............................................................ 13

    4.3    Deliveries by Purchaser ........................................................ 13

    4.4    Termination of Agreement .................................................... 13

    4.5    Procedure Upon Termination ................................................ 15

    4.6    Effect of Termination ........................................................... 15

    4.7    Termination Payment ........................................................... 15

    4.8    Expenses ............................................................................. 16

ARTICLE V     REPRESENTATIONS AND WARRANTIES REGARDING THE SELLERS ................................................................... 17

    5.1    Organization and Good Standing ........................................... 17

    5.2    Authorization of Agreement .................................................. 17

    5.3    Conflicts; Consents of Third Parties ...................................... 17

    5.4    Title to Purchased Assets ...................................................... 18

    5.5    Taxes .................................................................................. 18

    5.6    Intellectual Property ............................................................. 20

| 5.7 | Compliance with Laws | 21 |
|---|---|---|
| 5.8 | Financial Advisors | 21 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 21 |
| 6.1 | Organization and Good Standing | 21 |
| 6.2 | Authorization of Agreement | 21 |
| 6.3 | Conflicts; Consents of Third Parties | 22 |
| 6.4 | Litigation | 22 |
| 6.5 | Financial Advisors | 22 |
| ARTICLE VII | BANKRUPTCY COURT MATTERS | 23 |
| 7.1 | The Confirmation Order | 23 |
| 7.2 | Bankruptcy Court Approval | 23 |
| 7.3 | Creditors' Committee Assurances | 23 |
| ARTICLE VIII | COVENANTS | 23 |
| 8.1 | Conduct of Business of the Sellers | 23 |
| 8.2 | Regulatory Approvals | 24 |
| 8.3 | Further Assurances | 26 |
| 8.4 | Confidentiality | 26 |
| 8.5 | Publicity | 26 |
| 8.6 | Use of Name | 27 |
| 8.7 | Notification of Certain Matters | 27 |
| 8.8 | Intercompany Obligations | 28 |
| 8.9 | Tax Filings | 28 |
| 8.10 | Registration and Use of Abandoned Intellectual Property | 28 |
| ARTICLE IX | CONDITIONS TO CLOSING | 28 |
| 9.1 | Conditions Precedent to Obligations of Purchaser | 28 |
| 9.2 | Conditions Precedent to Obligations of Sellers | 29 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and the Sellers | 30 |
| 9.4 | Frustration of Closing Conditions | 30 |
| ARTICLE X | NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES | 30 |
| 10.1 | Non-Survival of Representations and Warranties | 30 |

ARTICLE XI       TAXES AND TRANSFER COSTS; HOLDBACK ........................ 31

    11.1    Transfer Taxes and Transfer Costs ...................................................... 31

    11.2    Property and Similar Recurring Taxes................................................... 31

    11.3    Filing of Tax Returns; Payment of Taxes ............................................ 32

    11.4    Tax Clearance Certificates ................................................................... 32

    11.5    Tax Proceedings ................................................................................... 32

    11.6    Cooperation on Tax Matters ................................................................. 32

    11.7    Rock Holdings Expenses; Holdback Release ........................................ 33

ARTICLE XII      MISCELLANEOUS ............................................................ 33

    12.1    Specific Performance ........................................................................... 33

    12.2    Submission to Jurisdiction; Consent to Service of Process .................... 34

    12.3    Waiver of Right to Trial by Jury........................................................... 34

    12.4    Entire Agreement; Amendments and Waivers ....................................... 34

    12.5    Governing Law ..................................................................................... 35

    12.6    Notices ................................................................................................. 35

    12.7    Severability ......................................................................................... 36

    12.8    Binding Effect; Assignment.................................................................. 36

    12.9    Non-Recourse ...................................................................................... 36

    12.10   Counterparts ........................................................................................ 37

Schedules
2.3               Excluded Assets
2.7(d)           Rock Racing Agreements
                      Annex A to Schedule 2.7(d)   Permitted Logo
                      Annex B to Schedule 2.7(d)   Non-Permitted Logos
5.5(g)           Taxes
5.6(a)(i)        Purchased Intellectual Property
5.6(a)(ii)       License Agreements
5.6(a)(iii)      Excluded Marks
5.8               Financial Advisors
8.10             Abandoned Intellectual Property


Exhibits
A                Form of Assignment of Intellectual Property

ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of December 20, 2010 (this "Agreement"), between VF Corporation, a Pennsylvania corporation (or its designated Affiliate in accordance with Section 12.8, "Purchaser"), Rock & Republic Enterprises, Inc., a California corporation ("R&R"), Triple R, Inc. a California corporation ("Triple R" and together with R&R, the "Debtors"), Rock Holdings, Inc., a California corporation ("Rock Holdings"), Global Domination Enterprises, Inc., a California corporation ("GDE"), Brick & Mortar, Inc. ("Brick & Mortar") and Michael Ball ("Ball", and together with R&R, Triple R, Rock Holdings, GDE, Brick & Mortar, and after the Effective Date, the Liquidating Trust (each as hereinafter defined), the "Sellers" and each, a "Seller") and, solely for purposes of Article VII and Sections 8.5 and 8.7 hereof, the statutory committee of unsecured creditors of the Sellers (the "Creditors' Committee") appointed in the Chapter 11 Cases pursuant to section 1102(a)(i) of the Bankruptcy Code, as reconstituted from time to time.

W I T N E S S E T H:

WHEREAS, the Debtors are engaged in the business of designing, manufacturing and marketing apparel and accessories to the consumer sector in North America, South America, Asia and Europe utilizing the Purchased Intellectual Property (as hereinafter defined) (collectively, the "Business");

WHEREAS, on April 1, 2010 (the "Petition Date") the Debtors commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, (the "Bankruptcy Code"), In re Rock & Republic Enterprises, Inc. et al., Chapter 11 Case No. 10-11728 (AJG) (Jointly Administered), currently pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, the Sellers desire to sell, transfer and assign or cause to be sold, transferred and assigned to Purchaser or its designated Affiliate or Affiliates, and Purchaser desires to (or to cause its designated Affiliate or Affiliates to) acquire and assume from the Sellers, pursuant to a chapter 11 plan of liquidation jointly proposed by Purchaser, the Debtors and the Creditors' Committee (the "Plan"), the Purchased Assets (as hereinafter defined), as more specifically provided herein; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

# ARTICLE I

## DEFINITIONS

1.1     Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means the Assignment of Intellectual Property and any other certificate, instrument or agreement contemplated by this Agreement or the foregoing.

"Assignment of Intellectual Property" means the assignment agreements in respect of the Purchased Intellectual Property to be executed and delivered by the Debtors and Purchaser at the Closing, substantially in the form attached hereto as Exhibit A.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Claim" shall have the meaning set forth in the Plan.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confirmation Date" shall have the meaning set forth in the Plan.

"Confirmation Order" shall have the meaning set forth in the Plan.

"Contract" means any contract, agreement, indenture, note, bond, loan, instrument, lease, commitment or other arrangement or agreement, whether written or oral.

"Disclosure Statement" shall have the meaning set forth in the Plan.

"Effective Date" shall have the meaning set forth in the Plan.

"Excluded Intellectual Property" means the trademarks of the Sellers set forth on Schedule 2.3.

"Excluded Leases" means (i) 102 Greene Street, New York, New York; (ii) 319 North Rodeo Drive, Beverly Hills, California and (iii) 144 Spring Street, New York, New York.

"Expenses" means the amount of Purchaser's reasonable out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisers), incurred in connection with Purchaser's evaluation, consideration and negotiation of a possible transaction with the Sellers and in connection with the transactions contemplated hereby, including without limitation, the preparation and implementation of the Plan, up to a maximum amount of $450,000.

"Final Order" shall have the meaning set forth in the Plan.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) (including the Bankruptcy Court).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intercompany Obligations" means any intercompany obligation or Liability of any kind or nature whatsoever between any Seller, on the one hand, and the other Seller, or any Subsidiary or Affiliate of the Sellers, on the other hand, whether or not evidenced by promissory notes, written Contracts and/or recorded in the books and records of such Sellers, Subsidiaries or Affiliates.

"IRS" means the U.S. Internal Revenue Service.

"Knowledge of Sellers" means the knowledge, after reasonable inquiry, of the following officers of the Sellers:  Michael Ball, Andrea Bernholtz, and Geoffrey Lurie.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement (including the Bankruptcy Code).

"Lease Rejection Claims" means any damage claims of landlords arising from the rejection of unexpired leases rejected pursuant to Section 8.1 of the Plan of the Debtors; provided, that in no event shall such claims include claims of landlords under the Excluded Leases or leases that have been rejected prior to the date of this Agreement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"<u>Liability</u>" means any debt, loss, damage, adverse claim, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), and including all costs and expenses relating thereto.

"<u>Lien</u>" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, license, obligation, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or other encumbrance.

"<u>Liquidating Trust</u>" shall have the meaning set forth in the Plan.

"<u>Liquidating Trust Administrator</u>" shall have the meaning set forth in the Plan.

"<u>Material Adverse Effect</u>" means a material adverse effect on the Purchased Assets, or a material adverse effect on the ability of any Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement or the Seller Documents.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business from the Petition Date through the date hereof; <u>provided</u> <u>that</u> in no event shall Ordinary Course of Business include the direct or indirect sale of Products to any "mid-tier" department stores or through the "mass channel".

"<u>Permits</u>" means any approvals, authorizations, consents, licenses, permits or certificates.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Products</u>" means any and all products developed, manufactured, marketed or sold by any Debtor or any of its Affiliates that incorporate the Purchased Intellectual Property.

"<u>Purchase Price</u>" means the Base Consideration, together with the Holdings Payment paid pursuant to <u>Section 3.1(b)</u>, any Contingent Lease Consideration paid pursuant to <u>Section 3.1(c)</u> and any Holdback amount paid or applied for payment pursuant to <u>Sections 11.1</u> and <u>11.7</u>, which amount shall in no event exceed $57,000,000.

"<u>Purchased Intellectual Property</u>" means:

(I) with respect to all Sellers other than Ball, all right, title and interest in or relating to intellectual property and other similar proprietary rights, whether protected, created or arising under the Laws of the United States or any other jurisdiction, whether owned, used or held for use at any time by the Sellers and/or any of their Affiliates (other than Ball), whether registered or unregistered, including: (i) all trademarks, trademark applications, service marks, design marks, trade names, service names, brand names, trade dress rights, logos, slogans, signs, insignias, and other brand or source identifiers, Internet domain names, design archives, corporate names, pocket designs and general intangibles of a like nature, that include, in whole or in part, the elements "*ROCK*" or "*REPUBLIC*" or any combination or variation thereof, including without limitation (a) "*ROCK & REPUBLIC*", "*ROCK*", "*REPUBLIC*", "*R&R*", "*RR*", "*R*" (stylized), *ROCK IS KING*, *LIVE TO ROCK*, *ROCK THE CURE*, *ROCK RACING*, *ROCK STUDIOS*, *R3*, (b) any derivative marks of the elements "*ROCK*" and/or "*REPUBLIC*" and any marks confusingly similar thereto; and (c) the trademarks and designs specified on Schedule 5.6(a)), together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof ((a), (b), and (c), collectively, the "Non-Ball Seller Marks"); (ii) copyrights and registrations and applications therefor, works of authorship and mask work rights including those relating to goods sold bearing the Marks (collectively, "Non-Ball Copyrights"); (iii) all technology, including all designs, design and fit, patterns, methods, techniques, ideas, know-how, research and development, technical data, materials, specifications, processes, inventions (patentable or unpatentable), patents, creations, improvements, and other similar materials, and all drawings, reports, analyses, and other writings, and other tangible embodiment of the foregoing, in any form, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the design development, reproduction, maintenance or modification of, any of the products developed, manufactured, marketed or sold by the Sellers using the Marks, whether work in progress, pending application or in final form (collectively, "Non-Ball Technology"); (iv) at the option of the Purchaser (not to be exercised later than the Confirmation Date (as defined in the Plan)), grants of licenses of the Marks from a third party, including oral or written license agreements together with any amendments thereto; and (v) all claims and rights to damages and profits by reason of the infringement of any of the foregoing as they exist anywhere in the world, and

(II) with respect to Ball, all right, title and interest in or relating solely to the following intellectual property and other similar proprietary rights, whether protected, created or arising under the Laws of the United States or any other jurisdiction, whether owned, used or held for use at any time by the Sellers and/or any of their Affiliates, whether registered or unregistered: (i) all trademarks, trademark applications, service marks, design marks, trade names, service names, brand names, trade dress rights, logos, slogans, signs, insignias, and other brand or source identifiers, Internet domain names, design archives, corporate names, pocket designs and general intangibles of a like nature, that include, in whole or in part, the elements "*ROCK*" or "*REPUBLIC*" or any combination or variation thereof, including without limitation (a) "*ROCK & REPUBLIC*", "*ROCK*", "*REPUBLIC*", "*R&R*", "*RR*", "*R*" (stylized), *ROCK IS KING*,

*LIVE TO ROCK*, *ROCK THE CURE*, *ROCK RACING*, *ROCK STUDIOS*, *R3*, (b) any derivative marks of the elements "*ROCK*" and/or "*REPUBLIC*" and any marks confusingly similar thereto; and (c) the trademarks and designs specified on Schedule 5.6(a)), together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof ((a), (b), and (c), collectively, the "<u>Ball Seller Marks</u>" and together with the Non-Ball Seller Marks, the "<u>Marks</u>"); (ii) copyrights and registrations and applications therefor, works of authorship and mask work rights including those relating to goods sold bearing the Ball Marks (collectively, "<u>Ball Copyrights</u>" and together with the Non-Ball Copyrights, the "<u>Copyrights</u>"); (iii) all technology unique to the Marks or to the business of the Debtors documented in writing or otherwise in tangible form, including designs, design and fit, patterns, methods, techniques, ideas, know-how, research and development, technical data, materials, specifications, processes, inventions (patentable or unpatentable), patents, creations, improvements, and other similar materials, and all drawings, reports, analyses, and other writings, and other tangible embodiment of the foregoing, in any form, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the design development, reproduction, maintenance or modification of, any of the products developed, manufactured, marketed or sold by the Sellers using the Marks, whether work in progress, pending application or in final form (collectively, "<u>Ball Technology</u>" and together with the Non-Ball Technology, the "<u>Technology</u>"); (iv) at the option of the Purchaser (not to be exercised later than the Confirmation Date (as defined in the Plan)), grants of licenses of the Marks from a third party, including oral or written license agreements together with any amendments thereto; (v) all claims and rights to damages and profits by reason of the infringement of any of the foregoing as they exist anywhere in the world; and (vi) all ideas and know how that comprise Purchased Intellectual Property pursuant to clause (I) above and in respect of which Ball has any ownership or other interest; <u>provided</u> that Purchased Intellectual Property described in this clause (II) shall not include any marks, copyrights, technology or other intellectual property other than those described in this clause (II); and

<u>provided</u>, <u>however</u>, that the trademarks set forth on <u>Schedule 5.6(a)(iii)</u> shall not constitute Purchased Intellectual Property (either under clause (I) or (II) of this definition).

"<u>Restructuring Transaction</u>" means (a) a recapitalization transaction involving, in whole or in part, the Sellers and any of their existing security holders or creditors, (b) any merger, consolidation, share exchange, business combination or other similar transaction with the Sellers including pursuant to a plan of reorganization under the Bankruptcy Code, (c) any sale of all or a substantial portion of the Business or the Purchased Assets including pursuant to a plan of reorganization under the Bankruptcy Code, (d) any tender offer or exchange offer for more than 10% of the outstanding shares of R&R's or Triple R's common stock, or (e) the acquisition of beneficial ownership or a right to acquire beneficial ownership of, or the formation of any "group" (as defined under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) which

beneficially owns or has the right to acquire beneficial ownership of more than 10% of the then outstanding shares of any class of R&R's or Triple R's common stock.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by a Seller.

"Tax" or "Taxes" means (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i), and (iii) any liability in respect of any items described in clauses (i) and/or (ii) payable by reason of contract, assumption, transferee liability, operation of law, Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

"Taxing Authority" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"Tax Return" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof) including, but not limited to, any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes the Debtors, any of their Subsidiaries, or any of their Affiliates.

"Termination Fee" means an amount in cash equal to $2,300,000.

"Termination Payment" means the aggregate amount of the Termination Fee and the Expenses.

1.2     Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Alternative Transaction | 4.4(h) |
| Antitrust Division | 8.2(a) |
| Antitrust Laws | 8.2(b) |
| Ball | Preamble |
| Ball Entities | 2.1 |
| Bankruptcy Code | Recitals |

| | |
|---|---|
| Bankruptcy Court | Recitals |
| Base Consideration | 3.1(a) |
| Brick & Mortar | Preamble |
| Business | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Confidential Information | 8.4(a) |
| Contingent Lease Consideration | 3.1(b) |
| Copyrights | 1.1 (in Purchased Intellectual Property definition) |
| Creditors' Committee | Preamble |
| Debtors | Preamble |
| Deposit | 3.1(d) |
| Escrow Agent | 3.1(d) |
| Escrow Agreement | 3.1(d) |
| Excluded Assets | 2.3 |
| Execution Date | 5.2 |
| Expense Date | 4.8(a) |
| FTC | 8.2(a) |
| GDE | Preamble |
| Holdback | 3.1(d) |
| Holdings Payment | 3.1(b) |
| License | 2.7(a) |
| License Period | 2.7(a) |
| Marks | 1.1 (in Purchased Intellectual Property definition) |
| Petition Date | Recitals |
| Plan | Recitals |
| Pre-Closing Transfers | 2.1 |
| Purchased Assets | 2.2 |
| Purchaser | Preamble |
| Purchaser Documents | 6.2 |
| Qualifying Claims | 11.7 |
| R&R | Preamble |
| Rock Holdings | Preamble |
| Seller | Preamble |
| Seller Documents | 5.2 |
| Seller Marks | 8.6 |
| Tax Clearance Certificate | 11.4 |
| Tax Proceeding | 11.5 |
| Technology | 1.1 (in Purchased Intellectual Property definition) |
| Termination Date | 4.4(a) |
| Transfer Taxes | 11.1 |

1.3      Other Definitional and Interpretive Matters

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)      <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)      <u>Dollars</u>.  Any reference in this Agreement to "$" shall mean U.S. dollars.

(iii)      <u>Exhibits/Schedules</u>.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)      <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)      <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)      <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>," and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)      <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)      <u>Customary</u>.  In the event that with respect to any provision of this Agreement that refers to a document, instrument or agreement being in "<u>customary</u>" form there is a dispute as to whether such document, instrument or agreement is in such customary form, such dispute shall be resolved, and such customary

form shall be determined, by the Bankruptcy Court (taking into account the laws of the jurisdiction governing such document, instrument or agreement).

(b)　　The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE; ASSUMPTION OF LIABILITIES

2.1　　<u>Pre-Closing Transfer of Purchased Intellectual Property</u>.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date and immediately prior to the Closing, Ball, Rock Holdings, GDE, Brick & Mortar (the "<u>Ball Entities</u>") shall sell transfer, assign, convey and deliver to the Debtors, and the Debtors shall purchase, acquire and accept from the Ball Entities all of such Ball Entities' right, title and interest in, to and under the Purchased Assets, other than the Excluded Assets, free and clear of all Liens; <u>provided</u> that upon not less than five (5) Business Days' prior written notice from Purchaser, Sellers shall abandon and not transfer to the Debtors, those items of registered Purchased Intellectual Property requested to be abandoned by Sellers (in which case, such items of registered Purchased Intellectual Property shall not be Purchased Assets or Purchased Intellectual Property transferred to Purchaser pursuant to Section 2.2) (such transactions, the "<u>Pre-Closing Transfers</u>").

2.2　　<u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, the Plan and the Confirmation Order, at the Closing Purchaser shall (or shall cause its designated Affiliate or Affiliates to) purchase, acquire and accept from the Debtors, and the Debtors shall sell, transfer, assign, convey and deliver to Purchaser (or its designated Affiliate or Affiliates) the Purchased Assets and all of the Debtors' rights therein, free and clear of all Liens.  "<u>Purchased Assets</u>" shall mean all of the each of the following assets:

(a)　　the Purchased Intellectual Property;

(b)　　all books and records related to the Purchased Intellectual Property; and

(c)　　all goodwill and other intangible assets associated with the Purchased Intellectual Property.

2.3　　<u>Excluded Assets</u>.  Purchaser expressly does not, and shall not, assume or be deemed to have assumed under this Agreement or by reason of any transaction contemplated hereunder or otherwise, any assets other than Purchased Assets.  All assets

of the Sellers, other than the Purchased Assets, shall be deemed to be "Excluded Assets" hereunder.

2.4     Excluded Liabilities.  Except as expressly provided by this Agreement, Purchaser does not, and shall not, assume or be deemed to have assumed by reason of this Agreement or by reason of any transaction contemplated hereunder or otherwise, any debts, liabilities (contingent or otherwise) or obligations of the Sellers or obligations in respect of the Purchased Assets or the Excluded Assets of any nature whatsoever, whether the same are direct or indirect, fixed or contingent, or known or unknown, whether arising under an agreement or contract or otherwise (including, without limitation, for any Taxes).

2.5     Further Conveyances and Assumptions.  From time to time following the Closing, the Sellers, Purchaser and, following the Confirmation Date (as defined in the Plan), the Liquidating Trust Administrator (on behalf of the Liquidating Trust) shall, and the Sellers, Purchaser and following the Confirmation Date the Liquidating Trust Administrator (on behalf of the Liquidating Trust) shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be necessary or appropriate to complete the Pre-Closing Transfers and to assign and convey fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to otherwise make effective the transactions contemplated hereby and thereby.

2.6     Free and Clear Transfers.  The transfer of the Purchased Assets shall be free and clear of any and all security interests, including any Liens arising out of the bulk transfer Laws and free of any liabilities in respect of the Purchased Assets under applicable Law, to the maximum extent permissible under the Bankruptcy Code, and the parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order.

2.7     License;  Rock Racing Agreements.

(a)     As of the Closing, for a period of one hundred twenty (120) days thereafter (the "License Period"), Purchaser grants to the Debtors an irrevocable, worldwide, non-exclusive, sublicensable, fully paid-up, royalty-free license to use the Purchased Intellectual Property solely in connection with the marketing and sale of inventory of the Debtors in existence and owned by the Debtors on the Closing Date consistent with the Ordinary Course of Business (the "License").  In addition, the Debtors, upon agreement with Purchaser, may utilize entities commonly used as liquidators in bankruptcy proceedings to liquidate inventory during the License Period; provided that nothing herein shall be deemed to permit any Debtor to market or sell Products, directly or indirectly, to any "mid-tier" department stores or through the "mass channel".

(b)     The Debtors shall maintain quality control (including such quality control as is necessary to ensure that their use under the License does not adversely affect the Purchased Intellectual Property) consistent with the Ordinary Course of Business and to a degree necessary to maintain the validity of the Purchased Intellectual Property and to protect the goodwill associated therewith. Purchaser shall have the sole right to ensure quality control consistent with that required.  The Debtors shall, in their sale, marketing, advertising, disposition and distribution of the inventory bearing or incorporating the Purchased Intellectual Property, adhere to a level not less than and consistent with the Ordinary Course of Business.  In the event that Purchaser reasonably finds that the Debtors' use of the Purchased Intellectual Property deviates from such level of quality, the Debtors shall, upon notice from Purchaser, immediately take steps which are necessary to cause its use to be in compliance with such levels of quality; provided, however, that in the event Purchaser reasonably determines that a deficiency poses a threat to the validity of the Purchased Intellectual Property or to the goodwill associated therewith, the Debtors shall, upon notice from Purchaser, immediately cease and desist distribution, sale, advertising, disposition and marketing of the specific nonconforming items until such deficiency is rectified.  The Bankruptcy Court shall retain jurisdiction to determine any violation of the provisions of this Section 2.7; provided that pending such determination, the Debtors shall comply with such cease and desist demand.

(c)     To the extent licensed inventory remains unsold at the end of the License Period, the Debtors shall destroy unsold licensed inventory; provided that the Purchaser shall pay for the cost of such destruction. Purchaser shall not hold the Debtors liable for damages to the Purchased Intellectual Property based on such destruction. Notwithstanding the foregoing, Purchaser and the Liquidating Trust Administrator may agree to sell such inventory to Purchaser or donate such inventory to charity.

(d)     Purchaser and Ball agree that, from and after Closing, Ball shall be permitted to use the trademark "ROCK RACING" solely in those limited circumstances described in Schedule 2.7(d) hereto.

ARTICLE III

CONSIDERATION

3.1     Consideration.

(a)     In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement and the entry and effectiveness of the Confirmation Order, at the Closing, the Debtors direct Purchaser to, and Purchaser shall, pay by wire transfer of immediately available funds to an account designated by the Debtors and the Creditors' Committee prior to the Closing, an amount in cash equal to $55,000,000 *less* the Holdback (the "Base Consideration").  The Base Consideration shall be allocated as among the Debtors and the Liquidating Trust in accordance with the Plan.

(b)     In consideration for the Purchased Assets transferred pursuant to Section 2.1, and subject to the terms and conditions of this Agreement and the entry and effectiveness of the Confirmation Order, at the Closing, the Debtors direct Purchaser to, and Purchaser shall, pay to Rock Holdings or its designee $1,000,000 by wire transfer of immediately available funds to an account designated by Rock Holdings (the "Holdings Payment").

(c)     After the Closing Date, upon written notice from the Liquidating Trust Administrator to Purchaser of allowance by the Bankruptcy Court, of any Lease Rejection Claims, the Debtors direct Purchaser to, and Purchaser shall, pay to the Liquidating Trust Administrator, by wire transfer of immediately available funds to an account designated by the Liquidating Trust Administrator, an amount equal to such Lease Rejection Claims; provided that in no event shall Purchaser be required to pay amounts in excess of $1,000,000 in the aggregate pursuant to this Section 3.1(c) (the "Contingent Lease Consideration").

(d)     An amount equal to $500,000 (as may be reduced pursuant to the provisions of Sections 11.1 and 11.7, the "Holdback") shall be held back by Purchaser for payment of Transfer Taxes and Qualifying Claims as contemplated by Sections 11.1 and 11.7 respectively.  Subject to Sections 11.1 and 11.7 hereof, the unapplied portion of the Holdback (if any) remaining on the first anniversary of the Closing shall be shall be released to the Liquidating Trust within ten (10) Business Days after such first anniversary.

(e)     Subject to the execution of a mutually agreeable Escrow Agreement (as hereinafter defined), within two (2) Business Days after the execution of this Agreement, Purchaser shall deposit in readily available funds $2,750,000 (including any interest earned thereon, the "Deposit") with an escrow agent (the "Escrow Agent").  The terms of the investment of the Deposit by Escrow Agent and the release of the Deposit from escrow shall be governed by the terms of an escrow agreement (the "Escrow Agreement") by and among Purchaser, the Sellers, and Escrow Agent in a form acceptable to Purchaser and the Sellers.  At the Closing, the Deposit shall be applied to the Purchase Price and retained by the Liquidating Trust Administrator as a component of the Purchase Price.  The Deposit will become non-refundable in the event this Agreement is terminated pursuant to Section 4.4(f); provided that the Sellers acknowledge and agree that the Sellers' retention of the Deposit in accordance with the preceding sentence shall constitute payment of liquidated damages and not a penalty and shall be the sole and exclusive remedy of the Sellers in connection with any such termination (including the facts, circumstances or occurrences giving rise to such right of termination).  Pursuant to the terms of the Escrow Agreement, the Deposit shall be refunded to Purchaser upon any termination of this Agreement (other than pursuant to Section 4.4(f)) within two (2) Business Days after such termination.

# ARTICLE IV

## CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets provided for in Article II hereof (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10:00 a.m. (New York City time) on a date to be specified by the parties, which date shall be no later than the second (2nd) Business Day after satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York City time) on the Closing Date.

4.2     <u>Deliveries by Sellers</u>.  At the Closing, Sellers shall deliver to Purchaser:

(a)     evidence of the completion of the Pre-Closing Transfers, including delivery of assignment agreements in the form of the Assignment of Intellectual Property, duly executed by each of Rock Holdings, GDE, Brick & Mortar and Ball and covering the transfer of the Purchased Intellectual Property owned, used or held for use by any of them, together with such other documentation in respect thereof as may be reasonably requested by Purchaser, including such other assignments, powers of attorney and other documentation (in proper form for filing in jurisdictions outside of the United States) as shall be reasonably necessary (in Purchaser's view) to transfer and convey to the Debtors good and valid title to the Purchased Assets owned by Rock Holdings, GDE, Brick & Mortar and Ball, free and clear of all Liens;

(b)     the Assignment of Intellectual Property duly executed by the Sellers, together with such other assignments, powers of attorney and other documentation (in proper form for filing in jurisdictions outside of the United States) as shall be reasonably necessary (in Purchaser's view) to transfer and convey to Purchaser good and valid title to the Purchased Assets, free and clear of all Liens;

(c)     a certified copy of the Confirmation Order;

(d)     the books and records comprising the Purchased Assets; and

(e)     the officer's certificate required to be delivered pursuant to Sections 9.1(a) and 9.1(b).

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to the Sellers:

(a)     the Assignment of Intellectual Property duly executed by Purchaser;

(b)     the officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b); and

(c)     the Purchase Price (to the extent due and payable at Closing) in accordance with Section 3.1.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or the Sellers if the Closing shall not have occurred by the close of business on April 15, 2011 (the "Termination Date"); provided, however, that, if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Confirmation Order, and the Plan is capable of being confirmed, and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no party may terminate this Agreement prior to April 30, 2011; provided, further, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or any Seller, then Purchaser (if it is so in breach) or any Seller (if any Seller is in breach) may not terminate this Agreement pursuant to this Section 4.4(a);

(b)     by mutual written consent of the Sellers and Purchaser;

(c)     by Purchaser, if any of the conditions to the obligations of Purchaser set forth in Sections 9.1 and 9.3 (i) shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any representation, warranty, covenant or agreement contained in this Agreement and (ii) is not waived by Purchaser;

(d)     by the Sellers, if any condition to the obligations of the Sellers set forth in Sections 9.2 and 9.3 (i) shall have become incapable of fulfillment other than as a result of a breach by a Seller of any representation, warranty, covenant or agreement contained in this Agreement, and (ii) such condition is not waived by the Sellers;

(e)     by Purchaser, if there shall be a breach by any Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 9.1 or 9.3 and which breach cannot be cured or has not been cured by the earlier of (i) thirty (30) calendar days after the giving of written notice by Purchaser to the Sellers of such breach and (ii) the Termination Date;

(f)     by the Sellers, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 9.2 or 9.3 and which breach cannot be cured or has not been cured by the earlier of (i) thirty (30) calendar days after the giving of written notice by the Sellers to Purchaser of such breach and (ii) the Termination Date;

(g)     by the Sellers or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(h)     by the Sellers or Purchaser, if the Bankruptcy Court approves a Restructuring Transaction (an "Alternative Transaction") or the sale of all or substantially all of the assets of the Sellers (taken as a whole) or any material part of the Purchased Assets to a Person (or group of Persons) other than Purchaser or an Affiliate of Purchaser;

(i)     by Purchaser, if the Plan is modified in any respect that adversely impacts Purchaser without the consent of Purchaser;

(j)     by Purchaser, if the Plan is not approved by the Bankruptcy Court, pursuant to a Final Order, by April 15, 2011;

(k)     by Purchaser, if, without the consent of Purchaser (i) the Bankruptcy Court enters an order appointing a trustee, examiner with expanded powers or responsible officer in the Chapter 11 Cases, (ii) the Chapter 11 Cases are converted to a case under chapter 7 of the Bankruptcy Code or (iii) the Chapter 11 Cases are dismissed;

(l)     by Purchaser, if the Disclosure Statement is not filed with the Bankruptcy Court by December 22, 2010;

(m)     by Purchaser if the Bankruptcy Court does not approve the provisions of Sections 4.7 and 4.8 of this Agreement by January 21, 2011; or

(n)     by Purchaser, if any secured creditor of any Seller obtains relief from the stay to foreclose on any of the Purchased Assets.

4.5     Procedure Upon Termination.  In the event of termination of this Agreement by Purchaser or the Sellers pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or the Sellers.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material

of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or the Sellers; provided, however, that the obligations of the parties set forth in Sections 4.5, 4.6, 4.7 and 4.8 hereof shall survive any such termination and shall be enforceable hereunder; provided, further, however, that nothing in this Section 4.6 shall relieve Purchaser or the Sellers of any liability for a breach of this Agreement prior to the effective date of such termination.

4.7     Termination Payment.

(a)     If definitive documentation in respect of an Alternative Transaction is executed prior to the date that is twelve (12) months after the date of any termination of this Agreement (other than following a termination of this Agreement pursuant to Sections 4.4(b), 4.4(d), 4.4(f) or 4.4(g) (other than termination of this Agreement as a result of the inability to consummate the transactions contemplated hereby which consummation would violate a Final Order)), and any Seller or Affiliate of any Seller subsequently consummates such Alternative Transaction, then the Sellers shall pay to Purchaser the Termination Payment on the second (2nd) Business Day after the consummation of such transaction.  For the avoidance of doubt the Termination Payment payable under this Section 4.7 shall be reduced by the amount of any Expenses previously paid pursuant to Section 4.8.

(b)     The Termination Payment shall be made by wire transfer of immediately available funds to an account designated by Purchaser.

(c)     The claim of Purchaser in respect of the Termination Payment shall constitute a super-priority administrative expense claim, senior to any Lien or all other administrative expense claims of the Sellers (including any administrative expense claims relating to any debtor-in-possession financing of the Sellers or adequate protection), under sections 503 and 507(b) of the Bankruptcy Code in the Chapter 11 Cases.  The Sellers shall cause Purchaser to be granted a first-priority senior lien (senior to any liens or security interests granted in connection with any debtor-in-possession financing or adequate protection) on the Sellers' Purchased Intellectual Property to secure payment of the Termination Payment.

4.8     Expenses.

(a)     Within two (2) Business Days following the date this Agreement is terminated pursuant to Section 4.4 (other than in connection with any termination by the Purchaser or Sellers pursuant to Section 4.4(b) or 4.4(g) (other than termination of this Agreement as a result of the inability to consummate the transactions contemplated hereby which consummation would violate a Final Order), or any termination by Sellers

pursuant to Section 4.4(d) or 4.4(f)) (the "Expense Date"), the Seller shall pay to Purchaser an amount equal to the Expenses through the Expense Date; provided that no amount shall be payable to Purchaser pursuant to this Section 4.8 if the Termination Payment (including the Expenses) has previously been paid to the Buyer in accordance with Section 4.7.

(b)      All reasonable costs and expenses payable in connection with obtaining any required consent shall be paid by the Sellers.

(c)      Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs and expenses.

ARTICLE V

REPRESENTATIONS AND WARRANTIES REGARDING THE SELLERS

Each Seller hereby, jointly and severally, represents and warrants to Purchaser that:

5.1      Organization and Good Standing.

Each Seller that is not a natural person is a corporation or limited liability company duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each Seller that is not a natural person is duly qualified or authorized to do business as a corporation or limited liability company, as applicable, and is in good standing under the Laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect.  True, complete and correct copies of each such Seller's certificate of incorporation and by-laws, certificate of formation and limited liability company agreement or comparable organizational documents as in effect on the date hereof have been delivered or made available to Purchaser.

5.2      Authorization of Agreement.  Subject to the entry of the Confirmation Order, each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and at and as of such dates such Seller will have all requisite power, authority and legal capacity to execute and deliver each Ancillary Agreement to be executed by such Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby

have been duly authorized by all requisite action on the part of each Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) following the approval of this Agreement and the transactions contemplated by the Plan, this Agreement will constitute, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller enforceable in accordance with the terms hereof and thereof, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Conflicts; Consents of Third Parties.

(a)     Except as a result of the Chapter 11 Cases, as contemplated by Section 5.3(b), and subject to the entry of the Confirmation Order, none of the execution and delivery by each Seller of this Agreement or by such Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by such Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of such Seller or its Subsidiaries to make any payment under, or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens (other than Liens arising under this Agreement), upon any of the material properties or material assets of such Seller or its Subsidiaries under any provision of (i) the certificate of incorporation and by-laws, certificate of formation and limited liability agreement or comparable organizational documents of such Seller or any Subsidiary; (ii) subject to entry of the Confirmation Order, any Contract or Permit to which such Seller or any Subsidiary is a party or by which any of the properties or assets of such Seller or any Subsidiary are bound; (iii) any material Order of any court, Governmental Body or arbitrator applicable to such Seller or any Subsidiary or any of the properties or assets of such Seller or any Subsidiary or (iv) any applicable Law other than, solely in the case of clause (ii) above, as would not result in a Material Adverse Effect.

(b)     Other than in connection with the commencement, administration or prosecution of the Chapter 11 Cases, entry of the Confirmation Order, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of each Seller or any Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by such Seller or any Subsidiary with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by such Seller or any Subsidiary of any other action contemplated hereby,

except for compliance with the applicable requirements of the HSR Act and any applicable Antitrust Laws.

5.4     Title to Purchased Assets.  As of the date hereof, the Sellers own and have good title to, and at the Closing the Debtors will have good title to, and to each of the Purchased Assets, and, subject to the terms and conditions of this Agreement and the Plan, and the entry of the effectiveness of the Confirmation Order and at the Closing, the Debtors shall convey to Purchaser good and valid title to the Purchased Assets, free and clear of all Liens.

5.5     Taxes.

(a)     (i) All material Tax Returns required to be filed by or on behalf of the Sellers have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and (ii) all material amounts of Taxes due and payable by or on behalf of the Sellers have been fully and timely paid or are being contested in good faith with appropriate reserves set forth on the Sellers' books and records.

(b)     All deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority of the Tax Returns related to the Purchased Assets or the Business of which the Sellers have actual notice have been fully paid, and there are no other audits or investigations by any Taxing Authority in progress of which  the Sellers have actual notice, nor has any Seller or any of its Affiliates received any written notice from any Taxing Authority that it intends to conduct such an audit or investigation related to the Purchased Assets or the Business.

(c)     The Sellers have made available complete copies of material Tax Returns relating to the Purchased Assets and the Business relating to taxable periods that ended after December 31, 2007.

(d)     The Sellers have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and have duly and timely withheld and paid over to the appropriate Taxing Authorities all material amounts required to be so withheld and paid over under all applicable Laws.

(e)     No written claim has been made by a Taxing Authority within the two years preceding the date hereof in a jurisdiction in which none of the Sellers currently file a Tax Return that such Seller is or may be subject to taxation by that jurisdiction.

(f)     No agreement, waiver or other document or arrangement extending, or having the effect of extending, beyond the date hereof the period for assessment or collection of Taxes (including, but not limited to, any applicable statute of

limitation) or the period for filing any Tax Return, has been executed or filed with any Taxing Authority by or on behalf of any Sellers. No Seller has requested any extension of time within which to file any Tax Return beyond the date hereof.

(g) Schedule 5.5(g) sets forth a list of: (i) all types of income Taxes and other material Taxes paid, and all types of material Tax returns filed by or on behalf of any of the Sellers, in connection with, or with respect to, the Business or the Purchased Assets since December 31, 2005 and (ii) all of the jurisdictions that impose such Taxes and/or the duty to file such Tax returns.

(h) No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets or the Business that would, in any manner, bind, obligate, or restrict Purchaser.

(i) No Seller has executed or entered into any agreement with, or obtained any consents or clearances from, any Taxing Authority, or has been subject to any ruling guidance specific to any Seller, that would be binding on Purchaser for any taxable period (or portion thereof) ending after the Closing Date.

(j) Each Seller is a "United States person" as such term is defined in Section 7701(a)(30) of the Code.

5.6 Intellectual Property.

(a) Schedule 5.6(a)(i) sets forth a list of each item of registered Purchased Intellectual Property and Purchased Intellectual Property subject to a pending application for registration and each jurisdiction in which such item of Purchased Intellectual Property has been issued or registered or in which any such application for such issuance and registration has been filed. Schedule 5.6(a)(ii) sets forth a list of all agreements and Contracts pursuant to which any Seller is a licensor or licensee of intellectual property or intellectual property rights.

(b) On the date hereof the Sellers are the sole and exclusive owners of all right, title and interest in and to all of the registered Marks and pending applications for registration of Marks, the registered Copyrights and pending applications for registration of Copyrights filed by the Sellers (including, with respect to any Seller, the registered Marks and registered Copyrights reflected as registered by it on Schedule 5.6(a)(i)). On the date hereof the Sellers are the sole and exclusive owners of all other Purchased Intellectual Property, free and clear of all Liens. On the Closing Date, and immediately prior to the Closing, the Debtors will be the sole and exclusive owners of all right, title and interest in and to the Purchased Intellectual Property.

(c) To the Knowledge of the Sellers, the use by the Sellers and the Subsidiaries of the Sellers, of the Purchased Intellectual Property owned, used, practiced or otherwise commercially exploited by the Sellers and their respective Subsidiaries (i) does not constitute an unauthorized use or misappropriation of any patent, trademark,

copyright, trade secret or other similar right, of any Person (ii) and does not infringe, constitute an unauthorized use of, or violate any other right of any Person (including pursuant to any non-disclosure agreements or obligations to which any Seller or any of their respective Subsidiaries is a party).

(d)     As of the date hereof, no Seller is the subject of any pending or, to the Knowledge of Sellers, threatened Legal Proceedings against any Seller or any of its Subsidiaries which involves a claim of infringement, unauthorized use, or violation with respect to the Purchased Intellectual Property by any Person against any Seller or any of its Subsidiaries or challenging the ownership, use, validity or enforceability of, any Purchased Intellectual Property.  No Seller and no Subsidiary of a Seller has received written (including by electronic mail) notice of any such threatened claim.  To the Knowledge of Seller, as of the date hereof all of Sellers' rights in and to the Purchased Intellectual Property owned by the Sellers are, and as of the Closing Date all of the Debtors' rights in and to the Purchased Intellectual Property will be, valid and enforceable.

(e)     To the Knowledge of the Sellers, no Person is (x) infringing, violating, misusing or misappropriating any Purchased Intellectual Property, and no such claims have been made against any Person by the Sellers or their respective Subsidiaries or (y) using any intellectual property that is confusingly similar to the Purchased Intellectual Property.

(f)     There are no Orders to which any Seller is a party or by which any Seller or any Subsidiary of the Sellers is bound which restrict, in any material respect, the rights of any Seller to use any of the Purchased Intellectual Property.

(g)     The consummation of the transactions contemplated hereby will not result in the loss or impairment of Purchaser's right to own or use any of the Purchased Intellectual Property.

(h)     No present or former employee has any right, title, or interest, directly or indirectly, in whole or in part, in any Purchased Intellectual Property.  To the Knowledge of Sellers, no employee, consultant or independent contractor of any Seller is, as a result of or in the course of such employee's, consultant's or independent contractor's engagement by a Seller or its Subsidiary, in default or breach of any material term of any employment agreement, non-disclosure agreement, assignment of invention agreement or similar agreement to which any Seller or any of its Subsidiaries is a party.

5.7     <u>Compliance with Laws</u>.  Each of the Purchased Assets are held, owned and used in all material respects in compliance with applicable Law.

5.8     <u>Financial Advisors</u>.  Except as set forth on <u>Schedule 5.8</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller or any of its Subsidiaries in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers that:

6.1     <u>Organization and Good Standing</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation.

6.2     <u>Authorization of Agreement</u>.  Subject to the receipt of the approval of the Board of Directors of VF Corporation as contemplated by <u>Section 9.3(a)</u>, (a) Purchaser has full corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby; (b) the execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser; and (c) this Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     Neither of the execution and delivery by Purchaser of this Agreement and of the Purchaser Documents, nor the compliance by Purchaser with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the certificate of incorporation or by-laws of Purchaser, (ii) conflict with, violate, result in the breach of, or constitute a default under any note, bond, mortgage, indenture, license, agreement or other obligation to which Purchaser is a party or by which Purchaser or its properties or assets are bound or (iii) violate any statute, rule, regulation or Order by which Purchaser is bound, except, in the case of clauses (ii) and (iii), for such violations, breaches or defaults as would not, individually or in the aggregate, have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this

Agreement or Purchaser Documents or the compliance by Purchaser with any of the provisions hereof or thereof, except for compliance with the applicable requirements of the HSR Act and the entry of the Confirmation Order.

      6.4     <u>Litigation</u>.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened that are reasonably likely to prohibit or restrain the ability of Purchaser to enter into this Agreement or consummate the transactions contemplated hereby.

      6.5     <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

ARTICLE VII

BANKRUPTCY COURT MATTERS

      7.1     <u>The Confirmation Order</u>.  The Sellers and the Creditors' Committee shall use their respective reasonable efforts to cause the Bankruptcy Court to enter the Confirmation Order.

      7.2     <u>Bankruptcy Court Approval</u>.  The Sellers and the Creditors' Committee shall cooperate with Purchaser and its representatives in connection with the bankruptcy proceedings and the approval of the Plan.  Such cooperation shall include, but shall not be limited to, consulting with Purchaser at Purchaser's reasonable request concerning the status of such proceedings and providing Purchaser with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  The Sellers and the Creditors' Committee further covenant and agree that the terms of any plan they submit to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

      7.3     <u>Creditors' Committee Assurances</u>.  The Creditors' Committee shall take all reasonably necessary or appropriate actions to cause all of the conditions to Closing set forth in <u>Article IX</u> to be satisfied.

ARTICLE VIII

COVENANTS

      8.1     <u>Conduct of Business of the Sellers</u>.  Except (w) as required by any order of the Bankruptcy Court (or as reasonably necessary in connection with the Bankruptcy Case), (x) as required by applicable Law, (y) as required by any Ancillary Document or

(z) as otherwise consented to in writing by Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)     each of the Sellers shall (i) operate the Business in the Ordinary Course of Business and (ii) use its reasonable efforts to preserve, maintain, defend and continue (including by making such periodic statements and filings as are necessary with applicable Governmental Bodies) the Purchased Assets; and

(b)     without limiting the generality of Section 8.1(a), without the prior written consent of Purchaser, the Sellers shall not:

(i)     sell, assign, transfer, license, abandon or convey any of the Purchased Intellectual Property;

(ii)     purchase, acquire or produce inventory inconsistent with historical volumes or otherwise inconsistent with the Ordinary Course of Business;

(iii)     enter into any distribution or agency agreement that will continue to be in effect after the Effective Date;

(iv)     abandon any Purchased Intellectual Property or permit any registrations or applications for registrations for any Purchased Intellectual Property to lapse; or

(v)     authorize or enter into any written agreement or otherwise make any commitment to do any of the foregoing.

8.2     Regulatory Approvals.

(a)     The parties do not expect that there will be any filing under the HSR Act or any other Antitrust Laws in connection with the consummation of the transactions contemplated by this Agreement.  To the extent that the parties agree that such filings are required, Purchaser shall (i) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the HSR Act or the Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within five (5) Business Days after the parties hereto agree that such filing is necessary, with the fees for all such filings being paid by (A) Purchaser, to the extent such fees are required to be paid prior to Closing, and (B) Purchaser, to the extent required to be paid from and after the Closing, (ii) comply at the earliest practicable date with any request under the HSR Act or such Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Body in respect of such filings or such transactions, and (iii)

cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. The Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.2 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (the Sellers or Purchaser, as the case may be). Notwithstanding anything to the contrary provided herein, neither Purchaser nor any of its Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, or any of the Purchased Assets, (ii) to agree to any limitation on the operation or conduct of the Business, or (iii) to waive any of the conditions to this Agreement set forth in Sections 9.1 or 9.3.

      (b)    Each of Purchaser and the Sellers shall use commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, the Sellers shall use reasonable best efforts, and Purchaser shall cooperate with the Sellers, to the contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether

temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and the Sellers decide that litigation is not in their respective best interests.  Each of Purchaser and the Sellers shall use commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement. Notwithstanding anything to the contrary provided herein, neither Purchaser nor any of its Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, or any of the Purchased Assets, (ii) to agree to any limitation on the operation or conduct of the Business, or (iii) to waive any of the conditions to this Agreement set forth in Sections 9.1 or 9.3.

8.3     Further Assurances.    Subject to Section 8.2, each of the Sellers (and, after the Closing, the Liquidating Trust Administrator), the Creditors' Committee and Purchaser shall use their respective commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.4     Confidentiality.

(a)     From and after the earlier of the Confirmation Date or the date the Sellers join this Agreement, none of the Sellers shall and shall cause its Affiliates and their respective officers, and directors not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors and employees of Purchaser or use or otherwise exploit for its own benefit or for the benefit of anyone other than Purchaser except within the Ordinary Course of Business, any Confidential Information (as hereinafter defined).  None of the Sellers nor any of its officers, directors and Affiliates shall have any obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by Law or the Bankruptcy Court; provided, however, that in the event disclosure is required by applicable Law, the Sellers shall, to the extent reasonably possible, provide Purchaser with prompt notice of such requirement prior to making any disclosure so that Purchaser may seek an appropriate protective order.  For purposes of this Section 8.4(a), "Confidential Information" shall mean any confidential information with respect to the Business or the Purchased Assets, including, methods of operation, customers, customer lists, Products, prices, fees, costs, technology, inventions, trade secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.  "Confidential Information" does not include, and there shall be no obligation hereunder with respect to, information that (i) is generally available to the public on the date of this Agreement, (ii) becomes generally available to the public other than as a result of a disclosure not otherwise permissible thereunder, or (iii) relates exclusively to the Excluded Assets.  This Section 8.4 shall not

in any way limit the disclosure of information by any Seller in connection with the administration and prosecution of the Chapter 11 Cases.

(b)     The covenants and undertakings contained in this Section 8.4 relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Section 8.4 will cause irreparable injury to the parties, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated.  Therefore, Purchaser will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 8.4.  The rights and remedies provided by this Section 8.4 are cumulative and in addition to any other rights and remedies which Purchaser may have hereunder or at law or in equity.

8.5     Publicity.  The initial press release with respect to execution of this Agreement shall be a press release of the Purchaser reasonably agreed upon by the Sellers and the Creditors' Committee, and the Sellers and the Creditors' Committee shall obtain Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) before issuing any other press releases or otherwise making public announcements with respect to Purchaser, this Agreement and the transactions contemplated hereby; provided, that the Sellers may, without the prior written consent of Purchaser, issue such press release or make such public announcement as may upon the advice of counsel be required by applicable Law.

8.6     Use of Name.  Subject to the terms of the license granted pursuant to Section 2.7, the Sellers hereby agree that upon the consummation of the transactions contemplated hereby, Purchaser shall have the sole right to the use of any and all of the trademarks and trade names used in connection with the Business (including "Rock & Republic," "ROCK", "REPUBLIC", "R&R," "RR," "ROCK IS KING," "LIVE TO ROCK," "ROCK THE CURE," "ROCK RACING," "ROCK STUDIOS," "R3") and all similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including any name or mark similar thereto (collectively, the "Seller Marks") and the Sellers shall not, and shall not permit any Affiliate to, use such name or any variation or simulation thereof.  In furtherance thereof, as promptly as practicable but in no event later than one hundred twenty (120) days following the Closing Date, the Sellers shall remove, strike over or otherwise obliterate all Seller Marks from all materials owned by the Sellers and used or displayed publicly including any sales and marketing materials, displays, signs, promotional materials and other materials.  In furtherance thereof, as promptly as practicable but in no event later than one hundred twenty (120) days following the Closing Date, the Sellers shall change each applicable Seller's name to exclude Seller Marks.

8.7     Notification of Certain Matters.

(a)     The Debtors and the Creditors' Committee shall provide Purchaser with at least three (3) Business Days' advance written notice of such party's filing of any

pleading relating, either directly or indirectly, to the Plan, together with a copy of any such pleading; provided, that to the extent such advance notice is not practicable or legally permissible, the Debtors or the Creditors' Committee, as applicable, shall provide such notice, together with a copy of any such pleading, as soon as reasonably practicable under the circumstances.

(b) Except with respect to the actions required by this Agreement, the Sellers shall give prompt notice to Purchaser, on the one hand, and Purchaser shall give prompt notice to the Sellers, on the other hand, of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of the representations or warranties in this Agreement of any Seller or Purchaser, respectively, to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any material failure of any Seller or Purchaser, respectively, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; provided, however, the delivery of any notice pursuant to this Section 8.7 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

8.8　　Intercompany Obligations.　Prior to the Closing, the Sellers shall, and shall cause each of their Affiliates to, take whatever steps may be necessary to release and discharge all Intercompany Obligations with respect to the Purchased Assets.

8.9　　Tax Filings.　Following the Effective Date, the Liquidating Trust Administrator shall make such filings (including filing Tax Returns) and pay such Taxes (in the United States and in any other applicable jurisdiction) as may be necessary or appropriate to release any and Liens on the Purchased Assets which may be in existence on the Closing Date, or which may otherwise be imposed on the Purchased Assets with respect to periods prior to the Closing.

8.10　　Registration and Use of Abandoned Intellectual Property.

(a) Until the Closing, upon the request and at the sole cost and expense of Purchaser, Sellers shall take such action as may be reasonably required to re-file and cause to be registered, to the extent possible under the Law, in the name of a Debtor, (x) any Marks previously registered by any Seller or its Affiliates (including those Marks set forth on Schedule 8.10) that has lapsed or been abandoned prior to the Closing and (y) any applications for registration of any Marks by any Seller or its Affiliates that has been abandoned prior to the Closing.　Sellers shall keep Purchaser reasonably apprised of the status of any registrations or re-registrations filed or made by Sellers pursuant to this Section 8.10(a).

(b) From and after the date hereof, no Seller that is not a Debtor shall (or shall permit any of its Affiliates to) register or file an application for registration of any Marks or Copyrights, and shall cease any and all uses of any Marks or Copyrights other than in connection with the conduct of the Business by the Debtors.

# ARTICLE IX

## CONDITIONS TO CLOSING

9.1  <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)  each of the representations and warranties of the Sellers contained in this Agreement qualified or limited by materiality or Material Adverse Effect shall be true and correct in all such respects, and all representations and warranties not qualified or limited by materiality or Material Adverse Effect shall be true and correct in all material respects, when made and as of the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each of the Sellers, signing on behalf of each of the Sellers and not individually, dated the Closing Date, consistent with the foregoing;

(b)  the Sellers shall have performed and complied with <u>Section 8.1</u> and in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each of the Sellers dated the Closing Date, to such effect and copies of such corporate resolutions and other documents evidencing the performance thereof as Purchaser may reasonably request;

(c)  the Sellers shall have obtained all necessary governmental approvals and any related waiting periods shall have expired or otherwise been terminated;

(d)  there shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since November 1, 2010;

(e)  Purchaser shall have received all of the deliverables of the Sellers as set forth in <u>Section 4.2</u>;

(f)  the Effective Date shall have occurred substantially contemporaneous with the Closing Date; and

(g)  the Pre-Closing Transfers shall have been completed as contemplated by <u>Section 2.1</u>.

9.2     <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Sellers in whole or in part to the extent permitted by applicable Law):

(a)     each of the representations and warranties of Purchaser contained in this Agreement qualified or limited by materiality or Material Adverse Effect shall be true and correct in all such respects, and all representations and warranties not qualified or limited by materiality or Material Adverse Effect shall be true and correct in all respects, when made and as of the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to the Sellers), dated the Closing Date;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, signing on behalf of Purchaser and not individually, dated the Closing Date, to such effect; and

(c)     The Sellers shall have received all of the deliverables of Purchaser as set forth in <u>Section 4.3</u>.

9.3     <u>Conditions Precedent to Obligations of Purchaser and the Sellers</u>.  The respective obligations of Purchaser and the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     no Legal Proceedings (including, without limitation, any proceeding over which the Bankruptcy Court has jurisdiction under 28 U.S.C. § 157(b) and (c)) shall have been instituted or threatened or claim or demand made by any Governmental Authority against the Sellers or Purchaser that challenge the legality of the transactions contemplated hereunder or that allege violation of Law, and there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     the Bankruptcy Court shall have entered a confirmation order that is a Final Order.

9.4     <u>Frustration of Closing Conditions</u>.  Neither the Sellers nor Purchaser may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE X

## NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES

10.1    <u>Non-Survival of Representations and Warranties</u>.  The representations and warranties of the parties hereto contained in this Agreement and in any Ancillary Agreement or other instruments delivered in connection herewith shall terminate at the Closing, or upon termination of this Agreement pursuant to <u>Section 4.4</u> and, following the Closing or the termination of this Agreement, as the case may be, no party hereto shall make any claim whatsoever for any breach of any such representation or warranty.

## ARTICLE XI

## TAXES AND TRANSFER COSTS; HOLDBACK

11.1    <u>Transfer Taxes and Transfer Costs</u>.  Any and all Liabilities for any sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, stock transfer, personal property transfer, gross receipts, registration, duty, securities transactions or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any Taxing Authority in connection with the transactions contemplated by this Agreement (together with the reasonable legal fees and other expenses of the Sellers incurred in connection with the Pre-Closing Transfers, "<u>Transfer Taxes</u>"), to the extent such Transfer Taxes are required to be paid to the applicable Taxing Authority at or prior to, or in connection with the Closing (or are incurred in connection with the Pre-Closing Transfers), shall be borne *first* by the Sellers to the extent of the Holdback (which the Sellers hereby authorize, empower and direct the Purchaser to apply and utilize for and reduce in respect of, the payment of such Transfer Taxes) and *second* by the Purchaser, to the extent in excess of the Holdback (it being agreed that Purchaser's sole recourse for any amounts payable by Sellers in respect of any Transfer Taxes pursuant to the provisions of this <u>Section 11.1</u> shall be as against the Holdback).  Regardless of the Person liable for such Transfer Taxes under applicable Law Sellers shall timely file or caused to be filed all necessary documents (including all Tax Returns) with respect to such Transfer Taxes. Notwithstanding the foregoing, the Confirmation Order shall contain a provision that the Sellers' sale, transfer, assignment and conveyance of the Purchased Assets to Purchaser hereunder shall be entitled to the protections afforded under Section 1146(c) of the Bankruptcy Code.  The parties will reasonably cooperate to minimize any such Transfer Taxes, including with respect to delivery location.

11.2    <u>Property and Similar Recurring Taxes</u>.

(a)    All real property taxes, personal property taxes, or ad valorem obligations and similar recurring Taxes and fees on the Purchased Assets for taxable periods ending on or before the Closing Date are responsibility of and shall be paid by the Sellers.

(b)     All real property taxes, personal property taxes, or ad valorem obligations and similar recurring Taxes and fees on the Purchased Assets for taxable periods beginning before, and ending after, the Closing Date, shall be prorated between Purchaser and the Sellers as of 12:01 a.m. eastern standard time on the Closing Date. With respect to Taxes described in this Section 11.2(b), each Seller shall timely file all Tax Returns due on or before the Closing Date with respect to such Taxes and Purchaser shall prepare and timely file all Tax Returns due after the Closing Date with respect to such Taxes.  If one party remits to the appropriate Taxing Authority payment for Taxes, which are subject to proration under this Section 11.2(b) and such payment includes the any other party's or parties' share of such Taxes, such other party or parties shall promptly reimburse the remitting party for its share of such Taxes.

11.3     Filing of Tax Returns; Payment of Taxes.  The Sellers shall prepare and file or cause to be prepared and file all Tax Returns with respect to the Purchased Assets and the Business for all Tax periods ending on or prior to the Closing Date.  Unless otherwise required by applicable Law, all such Tax Returns shall be prepared in a manner consistent with prior practice.  Tax Returns with respect to the Purchased Assets or the Business which could reasonably be expected to have a Material Adverse Effect on Purchaser shall be provided for Purchaser to review and comment twenty (20) days prior to its due date.

11.4     Tax Clearance Certificates.  The Sellers shall notify the applicable Governmental Body and/or request any available tax clearance certificate ("Tax Clearance Certificate") for all jurisdictions in which the Sellers are required to withhold and remit sales and use taxes and other withholdings in connection with the Business or any of the Purchased Assets if failure to provide such notice or obtain such Tax Clearance Certificate could subject Purchaser to any Taxes of the Sellers or subject the Purchased Assets to any Taxes, Liens or security interests.  If, in respect to any application for a Tax Clearance Certificate made pursuant to this Section 11.4, any Governmental Body asserts that a Seller is liable for any Tax, such Seller shall promptly pay any and all such amounts.  To the extent such Tax is paid by the Seller, Seller shall provide evidence to Purchaser that such liabilities have been paid in full or otherwise satisfied.

11.5     Tax Proceedings.  Purchaser shall be allowed to participate in any audit, contest, claim, proceeding or inquiry in respect of Taxes (each, a "Tax Proceeding") of the Sellers with respect to the Purchased Assets or the Business, if such Tax Proceedings could reasonably have a Material Adverse Effect on Purchaser following the Closing. Each party shall promptly notify the other party in writing of the commencement of any Tax Proceeding of which such party or any of its respective Affiliates has been informed in writing by any Taxing Authority relating to Tax Returns of any Seller for any period beginning prior to the Closing Date.  Such notice shall describe the asserted Tax Proceeding in reasonable detail and shall include copies of any notices and other documents received from any Taxing Authority in respect thereof.

11.6     Cooperation on Tax Matters.

(a)     Purchaser and the Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

(b)     Purchaser shall retain possession of all accounting, business, financial and Tax records and information relating to the Purchased Assets that are in existence on the Closing Date and transferred to Purchaser hereunder for a period of at least three (3) years from the Closing Date.  Purchaser shall give the Sellers notice and an opportunity to retain any such records in the event that Purchaser determines to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Purchaser shall provide access to the Sellers (after reasonably detailed prior notice and during normal business hours), to the books, records, documents and other information relating to the Purchased Assets as is reasonably necessary for Sellers to properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.

11.7    Rock Holdings Expenses; Holdback Release.

(a)     Following payment of any Transfer Taxes from the Holdback as contemplated by Section 11.1, the remaining amount of the Holdback shall be available for payment and satisfaction of the debts, claims and payment obligations of Rock Holdings, to the extent such debts, claims and payment obligations are (i) owed to un-Affiliated third parties and (ii) incurred by Rock Holdings prior to the date of the Pre-Closing Transfers (such debts, claims or payment obligations, the "Qualifying Claims"). Upon request therefor by Rock Holdings, Purchaser shall apply the amount of any remaining Holdback to the satisfaction of, and shall pay, such Qualifying Claims (it being agreed that Purchaser shall have no obligation to satisfy any Qualifying Claims to the extent that the sum of (x) the amount of any Transfer Taxes required to be paid in connection with the consummation of the transactions contemplated by this Agreement (up to $500,000) *plus* (y) the amount of such Qualifying Claims, would exceed $500,000).

(b)     The amount of any Holdback remaining on the first anniversary of the Closing Date (after application of the provisions of (and after giving effect to any reductions contemplated by) Sections 11.1 and 11.7 hereof, and after taking into account the amount of any Transfer Taxes or Qualifying Claims that remain to be applied against the Holdback at such time) shall be paid to the Liquidating Trust within ten (10) Business Days of such first anniversary.

ARTICLE XII

MISCELLANEOUS

12.1 <u>Specific Performance</u>.  The Sellers, on the one hand, and Purchaser, on the other hand, acknowledge and agree that the breach of this Agreement would cause irreparable damage to Purchaser and the Sellers, respectively, and that Purchaser and the Sellers, respectively, will not have an adequate remedy at law.  Therefore, the obligations of Sellers and Purchaser under this Agreement, including Sellers' obligation to sell the Purchased Assets, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.  Such remedies shall, <u>however</u>, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement or otherwise.

12.2 <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a) The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in the Bankruptcy Court; <u>provided</u>, <u>however</u>, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this sentence or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the mailing of a copy thereof in accordance with the provisions of <u>Section 12.6</u>.

12.3 <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.4 <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party

against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

12.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York applicable to contracts made and performed in such State.

12.6    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

> If to the Sellers, to:
>
> Rock & Republic Enterprises, Inc
> 3525 Eastham Drive
> Culver City, California 90232
> Facsimile:  (____) _____-_____
> Attention:  Michael Ball, CEO
>                  Geoffrey Lurie, Chief Restructuring Officer
>
> With copies to:
>
> Manderson, Schafer & McKinlay LLP
> 4695 MacArthur Court, Suite 1270
> Newport Beach, California 92660
> Facsimile: (949) 743-8310
> Attention:  Chris Manderson, Esq.
>
> Todtman, Nachamie, Spizz & Johns
> 425 Park Avenue
> New York, New York 10022
> Facsimile: (212) 754-6262

Attention:  Alex Spizz, Esq.
            Arthur Goldstein, Esq.

If to Purchaser, to:

VF Corporation
105 Corporate Center Blvd.
Greensboro, North Carolina 27408
Facsimile: (336) 424-7696
Attention:  General Counsel

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Facsimile: (212) 310-8007
Attention:  Jon-Paul Bernard, Esq.
            Joseph Smolinsky, Esq.

If to the Creditors' Committee, to:

Arent Fox LLP
1675 Broadway
New York, New York 10019
Facsimile: (212) 484-3990
Attention:  Robert M. Hirsh, Esq.

12.7    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.8    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below. This Agreement shall not be assignable or delegable by the Sellers without the prior written consent of Purchaser and by Order of the Bankruptcy Court.  Purchaser may assign this Agreement or any of its rights or obligations hereunder to any of its

Subsidiaries or Affiliates without the consent of the Sellers and Purchaser shall have no further liability in respect of the rights or obligations so assigned; provided that such assignee shall assume all such rights or obligations of Purchaser hereunder.  The Sellers and Purchaser agree to enter into such amendments to, or restatements of, this Agreement and the exhibits hereto as may be reasonably required to give effect to this Section 12.8, so long as such amendments or restatements do not adversely affect the rights of Sellers hereunder or thereunder.

12.9   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner, equityholder, Affiliate, agent, attorney or representative of Purchaser, the Creditors' Committee or the Sellers, or their respective Affiliates shall have any liability for any obligations or liabilities of Purchaser or the Sellers, respectively, under this Agreement or the Ancillary Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.10   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

VF CORPORATION

By: _Franklin L. Torkelsen_
Name: Franklin L. Torkelsen
Title: Vice President, Mergers and Acquisitions

ROCK & REPUBLIC ENTERPRISES, INC.

By: _____
Name:
Title:

TRIPLE R, INC.

By: _____
Name:
Title:

ROCK HOLDINGS, INC.

By: _____
Name:
Title:

GLOBAL DOMINATION ENTERPRISES, INC.

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

VF CORPORATION

By: _____
Name:
Title:

ROCK & REPUBLIC ENTERPRISES, INC.

By: _____
Name: Michael Ball
Title: Chief Executive Officer

TRIPLE R, INC.

By: _____
Name: Michael Ball
Title:

ROCK HOLDINGS, INC.

By: _____
Name: Michael Ball
Title:

GLOBAL DOMINATION ENTERPRISES, INC.

By: _____
Name: Michael Ball
Title:

BRICK & MORTAR, INC.

By:
Name: Michael Ball
Title:


MICHAEL BALL


Solely for purposes of Article VII and
Sections 8.5 and 8.7 hereof

CREDITORS' COMMITTEE


By: _____
Name:
Title:

BRICK & MORTAR, INC.

By: _____
Name:
Title:


MICHAEL BALL


_____


Solely for purposes of Article VII and
Sections 8.5 and 8.7 hereof

CREDITORS' COMMITTEE

By: _Arnold Rosenstein_____
Name: ARNOLD ROSENSTEIN
Title: CO-CHAIR