Hearing Date: January 19, 2011
Objection Deadline: January 12, 2011

ARENT FOX LLP
1675 Broadway
New York, New York  10019
Telephone: (212) 484-3900
Facsimile:  (212) 484-3990
Robert M. Hirsh, Esq.
Jordana Renert, Esq.

*Attorneys for Official Committee of
Unsecured Creditors*

TODTMAN, NACHAMIE, SPIZZ & JOHNS P.C.
425 Park Avenue
New York, New York 10022
Telephone: (212) 754-9400
Facsmile: (212) 754-6262
Alex Spizz, Esq.
Arthur Goldstein, Esq.

*Attorneys for the Debtors*


**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                              :
**In re**                                                     :     Chapter 11
                                                              :
**ROCK & REPUBLIC ENTERPRISES, <u>et</u> <u>al</u>.,**        :     Case No. 10-11728 (AJG)
                                                              :     **(Jointly Administered)**
                                                    **Debtors.** :
-------------------------------------------------------------x

**JOINT MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS AND THE DEBTORS FOR
ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2002 APPROVING
<u>CERTAIN BUYER PROTECTIONS AND GRANTING RELATED RELIEF</u>**


TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

    The Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>") of

Rock & Republic Enterprises, Inc. ("<u>R&R</u>") and Triple R, Inc. ("<u>Triple R</u>" and together with

NYC/558393.11

R&R, the "Debtors") and the Debtors jointly submit this motion (the "Motion") and respectfully represent as follows:

I.

**PRELIMINARY STATEMENT**

1. On November 15, 2010, the Creditors' Committee obtained the co-exclusive right with the Debtors to file a chapter 11 plan and solicit acceptances thereon. Since that time, the Creditors' Committee and its professionals have worked diligently with VF Corporation ("VF" or the "Purchaser") to negotiate a transaction for the sale of the Debtors' intellectual property rights. During the co-exclusivity period, the Creditors' Committee advised the Debtors that negotiations with the Purchaser were positive and progressing.

2. The Creditors' Committee and the Purchaser then formally approached the Debtors to determine their interest in the transaction and a consensual chapter 11 plan. Discussions with the Debtors revealed an extremely complicated web of intellectual property owned domestically and internationally by the Debtors and also by non-debtors Rock Holdings, Inc. ("Rock Holdings"), Global Domination Enterprises, Inc., ("GDE"), Brick & Mortar, Inc. ("Brick & Mortar") and Michael Ball ("Ball," and together with Rock Holdings, GDE, Brick & Mortar the "Ball Entities"). The Purchaser and Creditors' Committee then conducted further due diligence and negotiated the terms of a four-way transaction with the Debtors and the Ball Entities (together, the "Sellers").

3. After intense arms-length negotiations, on December 17, 2010 the Debtors, the other Sellers, the Creditors' Committee and VF executed an asset purchase agreement (the "VF Asset Purchase Agreement"), a copy of which is annexed hereto as Exhibit A without schedules, for the sale of all of the Debtors intellectual property rights and all right,

2

title and interest of the other Sellers' to certain intellectual property (the "Purchased Intellectual Property") to VF (the "Sale Transaction"). In connection therewith and in order to implement the Sale Transaction, the Debtors, the Creditors' Committee and VF also negotiated the *Joint Consolidated Chapter 11 Plan for Rock & Republic Enterprises, Inc. and Its Affiliated Debtor and Debtor in Possession, Proposed Jointly By the Debtors, Official Committee of Unsecured Creditors and VF Corporation* (the "Plan"), annexed hereto as Exhibit B[1], and will seek approval of the VF Asset Purchase Agreement at the hearing to confirm the Plan (the "Confirmation Hearing").

4. It is contemplated that the consideration paid under the Sale Transaction will be used to fund the Plan. As a result of the Sale Transaction, creditors and holders of interests of the Debtors' estates will receive a significant distribution on their claims and interests.

5. The Creditors' Committee and the Debtors believe that the process and timeline negotiated in the Sale Transaction and Plan provide an orderly sale and wind-down of the Debtors' business while preserving the Debtors most valuable asset – its intellectual property. The process also eases concerns regarding liquidity, the imminent expiration of postpetition financing, and the Debtors' ability to operate through the Confirmation Hearing to preserve the value of its assets.

6. As discussed in further detail below, the VF Asset Purchase Agreement provides that the Purchaser will pay approximately $57,000,000 in consideration in the Sale Transaction. The VF Asset Purchase Agreement requires the Purchaser to pay a deposit in the amount of $2,750,000 (the "Deposit") to be held in escrow. Additionally, subject to this Court's

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan and VF Asset Purchase Agreement.

approval, the VF Asset Purchase Agreement provides the Purchaser with standard protections such as the right to receive a termination fee in the amount of $2,300,000 (the "Termination Fee") and expense reimbursement in an amount not to exceed $450,000 (the "Expenses" and together with the Termination Fee, the "Buyer Protections") in the event the VF Asset Purchase Agreement is terminated under certain circumstances as outlined in the VF Asset Purchase Agreement.

7. As demonstrated below, approval of the Buyer Protections is in the best interest of the Debtors' estates and will foster a plan process to secure the best result for all constituents of the Debtors' estates and will ensure therefore maximum value for unsecured creditors.

## II.

## BACKGROUND

8. On April 1, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors continue to operate and manage their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9. On April 12, 2010, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee.

10. The Debtors are a wholesale and retail apparel company specializing in an avant-garde and distinctive line of clothing. The Debtors' lines include high fashion clothing for men, women, and children as well as shoes, cosmetics and accessories. The Debtors'

merchandise can be found in most high end retail stores such as Nordstrom, Neiman Marcus, Bergdorf Goodman, Bloomingdales, Lord & Taylor, Harvey Nichols and Saks Fifth Avenue as well as in small upscale boutiques.

A.     **The Debtors' Marketing Process**

11.     After the Petition Date, the Debtors and their advisors began a marketing process to find a strategic or financial partner to invest in the Debtors' business through a potential sale of certain of the Debtors' assets. The Debtors' advisors oversaw the creation of a data room and solicited over sixty-six (66) potential strategic and financial parties that they believed would be interested or capable of pursuing a transaction. Approximately thirty (30) of these parties executed non-disclosure agreements and engaged in various levels of due diligence. Nine (9) parties submitted non-binding bids. After receiving the indications of interest, the Debtors engaged in preliminary discussions with a select number of bidders that had submitted the most attractive initial indication of interest. As a result of these efforts and negotiations with multiple parties, the Debtors' determined that GR Acquisition LLC ("GR"), a newly formed subsidiary of Bluestar Alliance LLC was the best available bidder.

12.     The Debtors and GR entered into a Letter of Intent, dated September 16, 2010 (the "GR LOI") that outlined the principal terms of the non-binding proposal pursuant to which GR would acquire certain assets of the Debtors free and clear of all liens, claims and encumbrances for a purchase price of $33,000,000 which potentially could have been increased to $48,000,000 plus the issuance of certain equity interests. The GR LOI also contained an exclusivity and stand-still provision providing GR with the exclusive right to acquire the Debtors' assets from the date of execution of the GR LOI through and including November 15, 2010 or February 28, 2010 (in the event that final deal documents were executed by November

5

15, 2010) (the "GR Exclusivity Provision"). This Court granted the Debtors' motion authorizing the Debtors to commit to the GR Exclusivity Provision.

**B.**     **Creditors' Committee's Co-Exclusivity**

13. On or about September 14, 2010, the Debtors also filed a motion seeking a forty-five (45) day extension of their exclusive periods to file a chapter 11 plan and solicit acceptances. The Creditors' Committee had certain issues and concerns about the requested extension. As a result of negotiations between the Debtors and Creditors' Committee, the parties revised the proposed order to include certain benchmarks for the proposed transaction with GR and the successful completion of the Debtors' cases which, if not met by the Debtors, would result in the Creditors' Committee automatically obtaining the co-exclusive right with the Debtors to file a chapter 11 plan.

14. On September 28, 2010, the Bankruptcy Court entered the order granting the Debtors an extension of the exclusive filing period through and including November 15, 2010 and their exclusive solicitation period through and including January 14, 2011 and approving the benchmarks outlined in the order (the "Second Exclusivity Order").

15. On November 15, 2010, the Debtors failed to meet a significant benchmark outlined in the Second Exclusivity Order as the Debtors and GR were unable to execute an asset purchase agreement. As a result, pursuant to the Second Exclusivity Order, the Creditors' Committee obtained the co-exclusive right with the Debtors to file and solicit acceptances to a chapter 11 plan.

16. On November 17, 2010, the Court entered an agreed order granting both the Debtors and Creditors' Committee an extension of the co-exclusive filing period through and

including December 17, 2010 and their co-exclusive solicitation period through and including February 17, 2011.

17. On December 15, 2010, the Court extended the co-exclusive filing period through and including January 15, 2011 and co-exclusive solicitation period through and including March 15, 2011.

C. **VF Sale Transaction**

18. Shortly after the Creditors' Committee obtained the co-exclusive right to file a chapter 11 plan, it began to work towards the Sale Transaction and formulation of the Plan with the Purchaser while concurrently advising the Debtors that such negotiations were taking place. When it was clear that a transaction with GR would not be effectuated, the Creditors' Committee and VF stepped up their discussions.

19. After reaching an agreement with VF, the Creditors' Committee approached the Debtors about the Sale Transaction and Plan. The Debtors expressed a strong interest in participating in negotiations upon learning of the principle terms of the agreements.

20. The Creditors' Committee and VF sought to achieve a consensual transaction and worked diligently to understand and untangle the web of asserted right, title and interest of the Sellers to the intellectual property. Together they conducted extensive due diligence of the Sellers' domestic and international trademarks and put together numerous charts identifying and categorizing the Sellers' various trademarks. It was clear that without the participation of Ball and Rock Holdings, a transaction would not be possible without extensive and protracted litigation.

21. Negotiations among the Sellers, Creditors' Committee and VF continued and the parties ultimately finalized the terms of the VF Asset Purchase Agreement and Plan and

7

will continue to work together through the Confirmation Hearing to consolidate and transfer the trademarks from the Ball Entities to the Debtors. Despite the difficulty of these discussions, the Debtors and Creditors' Committee were able to secure an agreement from VF that provides significantly more cash consideration for potential creditors than the GR transaction would have.

22. The Creditors' Committee and the Debtors believe that the VF Asset Purchase Agreement and Plan create the greatest value for the Debtors' estates and is in the best interest of the Debtors' stakeholders.

### III.
### JURISDICTION

23. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409.

### IV.
### RELIEF REQUESTED

24. By this joint Motion, the Creditors' Committee and the Debtors seek an order substantially in the form attached hereto as Exhibit C (the "Buyer Protections Order"), pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 2002, approving reimbursement of Expenses and the Termination Fee and granting related relief.

### V.
### THE VF ASSET PURCHASE AGREEMENT

25. As set forth above, on December 17, 2010, the VF Asset Purchase Agreement for the sale of the Purchased Intellectual Property pursuant to the Plan was executed. The principle terms are summarized below. The description is only a summary of the key

8

provisions and the terms of the VF Asset Purchase Agreement control in the event of any inconsistency.

(a) **Purchase Price**. The aggregate consideration paid by the Purchaser shall not exceed $57,000,000 and will consist of: (i) $55,000,000 in Cash *less* the Holdback of up to $500,000 for payment of Transfer Taxes and Qualifying Claims against Rock Holdings as provided for in Sections 11.1 and 11.7 of the VF Asset Purchase Agreement (the "Base Consideration"); (ii) $1,000,000 to Rock Holdings in consideration for the transfer of the Purchased Intellectual Property from the Ball Entities to the Debtors (the "Holdings Payment"); and (iii) an amount equal to the Lease Rejection Claims not to exceed $1,000,000 ("Contingent Lease Consideration" and together with the Base Consideration and Holdings Payment, the "Purchase Price").

(b) **Purchased Assets**. Includes (i) the Purchased Intellectual Property (as defined in the VF Asset Purchase Agreement); (ii) all books and records related to the Purchased Intellectual Property; and (iii) all goodwill and other intangible assets associated with the Purchased Intellectual Property.

(c) **Excluded Assets**. All assets of the Sellers other than the Purchased Assets.

(d) **License**. As of the Closing Date, for a period of one hundred twenty (120) days thereafter, the Purchaser grants to the Debtors an irrevocable, worldwide, non-exclusive, sublicensable, fully paid-up, royalty-free license to use the Purchased Intellectual Property solely in connection with the marketing and sale of inventory of the Debtors in existence and owned by the Debtors on the Closing Date consistent with the Ordinary Course of Business.

(e) **Closing Date**. Shall take place no later than the second (2nd) Business Day after satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 of the VF Asset Purchase Agreement which include, among others:

1. the Purchaser and each of the Sellers have performed or complied with all covenants, obligations and agreements required of such party under the VF Asset Purchase Agreement;

2. this Court shall have entered a confirmation order that is a Final Order;

3. there shall not have been or occurred any event, change, occurrence or circumstance that has had or which could reasonably be expected to have a Material Adverse Effect since November 1, 2010;

9

4. the pre-closing transfer of Purchased Intellectual Property from the Ball Entities to the Debtors immediately prior to Closing (the "Pre-Closing Transfers").

(f) **Representations and Warranties**. Articles V and VI of the VF Asset Purchase Agreement contain standard representations and warranties for a transaction of this nature.

(g) **Termination Fee**. $2,300,000 is to be paid to the Purchaser if the VF Asset Purchase Agreement is terminated (other than as a result of a breach by Purchaser) and the Debtors enter into an Alternative Transaction within twelve (12) months of such termination.

(h) **Expenses**. Up to a maximum of $450,000 is to be paid in the event that the VF Asset Purchase Agreement is terminated (other than as a result of a breach by the Purchaser), whether or not the Debtors have entered into an Alternative Transaction at the time of such termination.

## VII.

## BASIS FOR RELIEF REQUESTED

A. **Sound Business Reasons Exist to Approve the Buyer Protections**

26. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the [Debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

27. Courts in the Second Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him … a good business reason to grant such an application."); Official Comm. of Subordinated

10

Bondholders v. Integrated Resources, Inc. (In re Integrated Resources), 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Enron Corp., 2003 WL 1562202, at *19 (Bankr. S.D.N.Y. Mar. 21, 2003). Accordingly, courts in the Second Circuit "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." In re Global Crossing, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing Paramount Commc'n Inc. v. QVC Network Inc., 637 A.2d 34, 45 n.17 (Del. 1994)); accord In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

28. The Debtors and Creditors' Committee submit that sound business reasons justify approval of the Buyer Protections. The Plan does not establish a competitive process for the Purchased Assets. Therefore, it is highly unlikely that the Buyer Protections will be paid. Nevertheless, it was critical to VF that the Debtors, Ball Entities and the Creditors' Committee provide some certainty that they will continue to prosecute the Plan. VF has expended substantial funds over the last eight months and will continue to do so in its efforts to consolidate the Purchased Assets from the Debtors as well as the Ball Entities. The Buyer Protections provide VF with that security. The Debtors and the Creditors' Committee are receiving substantial value in exchange for the Buyer Protections. When the GR LOI was terminated, VF could have waited for an eventual auction to purchase the Debtors' assets at firesale prices. In stark departure from that devastating scenario, the VF Transaction provides the constituents with approximately $7,000,000 of additional consideration than the maximum purchase price contemplated in the failed GR transaction. The terms of the Buyer Protections were agreed to

11

after extensive negotiations among the Debtors, Creditors' Committee and VF over the protection to be provided to VF in consideration for its commitment to the Sale Transaction through confirmation of the Plan.

29. A commitment from the Purchaser prior to the confirmation of the Plan will also help the Debtors address liquidity concerns and extend postpetition financing so they may operate through the Confirmation Hearing and by extension, preserve the value of the Debtors' most valuable asset, the Debtors' intellectual property. The Debtors and Creditors' Committee believe, especially in light of the Debtors' eight month marketing process and non-competitive potential transaction with GR, that the Buyer Protections contemplated in the VF Asset Purchase Agreement are necessary to complete the Sale Transaction and confirm a Plan and thus benefit all constituencies of the Debtors' estates.

B. **The Buyer Protections are Reasonable and Appropriate**

30. The proposed Buyer Protections are reasonable and appropriate for the proposed Sale Transaction. Typically, agreements to provide breakup fees are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers. In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001). Specifically, breakup fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. In re Integrated Res., Inc., 147 B.R. at 661-62. Courts in this district have held that break-up fees should be approved as long as (a) the relationship between the parties is not tainted by self dealing; (b) the fee does not hamper bidding and (c) the amount of the fee is reasonable in relation to the size of the transaction. In re Integrated Res., Inc., 147 B.R. at 657. A breakup fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." Cottle v. Storer Communication Inc., 849 F.2d

570, 578 (11th Cir. 1988). While the Buyer Protections here are not designed to attract higher and better offers, the principle is the same; in exchange for the Bankruptcy Protections, the Debtors are receiving substantially higher value for their assets than would otherwise be available.

31. The Creditors' Committee and the Debtors negotiated with the Purchaser in good faith and at arm's length. Furthermore, the Purchaser in this instance has invested substantial time and resources to become a Plan Proponent and an integral part of the plan process. This has required VF to negotiate acceptable terms of the Plan with the Creditors' Committee and the Ball Entities, extend the duration of its commitment and expose itself to the potential risks that arise in a plan process, including potential litigation over sale consideration to various constituencies. The Debtors and Creditors Committee believe that the proposed Termination Fee of $2,300,000 or approximately 4% of the Purchase Price is fair and reasonable, particularly in view of the efforts that have been expended by Purchaser and the Purchaser's commitment going forward to effectuate the Sale Transaction and Plan.

32. Unlike in a non-bankruptcy transaction where damages for noncompliance can be sought, here, there is no meaningful way to restrict the Debtors and Creditors' Committee from abandoning the VF transaction prior to the Confirmation Hearing. Should the Debtors and Creditors' Committee decide to pursue an Alternative Transaction, the Purchaser should at minimum, be compensated for its efforts. Further, the Purchaser should be reimbursed for Expenses in the event the VF Asset Purchase Agreement is terminated. The work that has been done in the analysis of the intellectual property could absolutely be critical in any transaction involving the Purchased Assets. The Termination Fee and reimbursement of Expenses are well within the market for such fees and are not excessive compared to fees approved in other cases.

For the forgoing reasons, the Creditors Committee and the Debtors submit that approval of the Termination Fee is justified and appropriate.

**C.     The Buyer Protections are Requirements of the VF Asset Purchase Agreement and Should Be Allowed as an Administrative Expense Fee Under Section 503(b) of the Bankruptcy Code**

33.     The Buyer Protections should be approved as an administrative expense under section 503(b) of the Bankruptcy Code. Section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including— (1)(A) the actual, necessary costs and expenses of preserving the estate …." Further, section 507(a)(2) of the Bankruptcy Code provides that "administrative expenses allowed under section 503(b)" are entitled to priority.

34.     VF has indicated that it was not prepared to sign the VF Asset Purchase Agreement without the Buyer Protections. Therefore, the Buyer Protections are necessary and critical to secure a firm purchaser committed to the Sale Transaction and Plan and in effect, preserve the value of the Debtors' estates. Moreover, the Buyer Protections negotiated are fair and reasonable in light of the time already invested by VF and its continued commitment as a Plan Proponent. For these reasons, the Creditors' Committee and Debtors request that the Breakup Fee and reimbursement of Expenses be approved.

## IX.

## NOTICE

No trustee or examiner has been appointed in these Chapter 11 Cases. The Creditors' Committee and Debtors have served notice of this Motion on: (i) the U.S. Trustee; (ii) counsel to the Debtor; (iii) counsel to VF and (iv) parties entitled to receive notice in these Chapter 11

Cases pursuant to Bankruptcy Rule 2002. The Debtors and the Creditors' Committee submit that no other or further notice need be provided.

WHEREFORE the Debtors and Creditors' Committee respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: December 20, 2010      Respectfully submitted

ARENT FOX LLP

By */s/ Robert M. Hirsh*
    Robert M. Hirsh, Esq.
    Jordana Renert, Esq.
    1675 Broadway
    New York, New York 10019
    (212) 484-3990
    *Attorneys for the Official Committee of Unsecured Creditors*

-AND-

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Alex Spizz, Esq.
Arthur Goldstein, Esq.
425 Park Avenue
New York, NY 10022
(212) 754-9400
*Attorneys for the Debtors*