**UNITED STATES BANKRUPTCY COURT**       <u>**NOT FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

In re:

                                Chapter 11

ROCK & REPUBLIC ENTERPRISES, INC., *et al.*,

                                 Case No. 10-11728 (AJG)

                          Debtors.        (Jointly Administered)

-------------------------------------------------------------------x

## <u>POST-TRIAL MEMORANDUM OF OPINION</u>

A P P E A R A N C E S:

MORGAN LEWIS & BOCKIUS LLP
Counsel to New Pacific Rodeo, LLC
  By:  Charles Malaret, Esq.
300 South Grand Avenue
Los Angeles, California 90071

  By:  Wendy S. Walker, Esq.
        Patrick D. Fleming, Esq.
101 Park Avenue
New York, New York 10178-0600

COLEMAN FROST LLP
Special Litigation Counsel to Rock & Republic Enterprises, Inc.
  By:  Bruce A. Armstrong, Esq.
        Daniel L. Alexander, Esq.
429 Santa Monica Blvd., Ste 700
Santa Monica, California 90401

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
Counsel to Rock & Republic Enterprises, Inc., *et al.*
  By:  Arthur Goldstein, Esq.
425 Park Avenue
New York, New York 10022

ARENT FOX LLP
Counsel to the Official Committee of Unsecured Creditors for
 Rock & Republic Enterprises, Inc., *et al.*
  By:  Michael S. Cryan, Esq.
        Robert M. Hirsh, Esq.
1675 Broadway
New York, New York 10019

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the objection (the "Objection") (ECF Doc. No. 197) of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") to the claim of New Pacific Rodeo, LLC ("New Pacific").[1] The Objection seeks to expunge the New Pacific Claim or, in the alternative, estimate the New Pacific Claim at zero.

The New Pacific Claim is based on a series of commercial real estate leases and related state court litigation. The Debtors argue that Rock & Republic Enterprises, Inc. ("R&R"), one of the Debtors, had no obligation to begin making rental payments because landlord New Pacific failed to complete certain work on the leased premises. New Pacific counters that it completed all required work and that the failure of tenant R&R to pay rent constituted a breach of contract. The Court held a three day trial on this matter. For the reasons set forth in the findings of fact and conclusions of law below, the Objection is denied.[2]

## **BACKGROUND**

The Debtors are a wholesale and retail apparel company, whose merchandise is carried in numerous stores throughout the country. The Debtors also directly operate several retail locations. New Pacific is a real estate investment and development company located in Beverly Hills, California.

In 2007, R&R entered into discussions with New Pacific to lease property for a flagship store at 319 North Rodeo Drive in Beverly Hills, California (the "Premises"). New

---

[1] New Pacific filed claim number 25, dated May 12, 2010, in an unliquidated amount (the "New Pacific Claim").

[2] The Debtors' chapter 11 case is assigned to the Honorable Arthur J. Gonzalez. However, as of October 2010, all issues related to the Objection have been referred to the Honorable Sean H. Lane.

Pacific owned the Premises and had already leased it to Biba International, Limited ("Biba"), a wholesale and retail apparel company headquartered in London, United Kingdom, pursuant to a commercial lease agreement, dated September 6, 2007 (the "Master Lease"). Before taking possession of the Premises, however, Biba decided to sublet the space to R&R and requested that New Pacific consent to the sublease. Accordingly, Biba and R&R entered into a sublease on December 7, 2007 (the "Sublease"), together with a consent to Sublease by New Pacific that was executed the same day (the "Consent"). The terms of the Master Lease, the Sublease and the Consent (collectively, the "Lease Agreements") are all relevant to resolution of the New Pacific Claim.

A.    **The Master Lease**

The Master Lease between New Pacific and Biba provided that "Base Rent shall commence to be due and payable on the Rent Commencement Date, and each subsequent payment of Base Rent shall be due and payable on the first day of the first calendar month following the Rent Commencement Date . . . ." (Trial Ex. 4, § 30.10.) The "Rent Commencement Date" was defined as "[t]he earlier of (i) four (4) months from the Possession Date, or (ii) the date Tenant opens the Premises for Business." (*Id.*, § 1.4.) The "Possession Date" was the date that "Landlord substantially completes Landlord's Work . . . and delivers possession of the Premises to Tenant . . . ." (*Id.*, § 1.3.) Thus, under the Master Lease, the payment of rent was scheduled to begin four months after completion of Landlord's Work and delivery of the Premises, unless the tenant opened for business beforehand.

"Landlord's Work" was described on Exhibit B to the Master Lease, which stated that "Landlord shall demolish the space, furnish and install demising walls consistent with the approved Preliminary Space Plans (insulated and sheet-rocked, taped and spackled, ready to

receive Tenant's finishes) and otherwise deliver the Premises to Tenant in [ ] as-is

condition." (*Id.*, Ex. B.)  The Master Lease did not obligate New Pacific to perform any

additional work prior to the tenant occupying the Premises:

> Tenant agrees to accept the Premises in their 'as is' condition and state of repair . . . . All work other than Landlord's Work to be carried out and completed in the Premises is the responsibility of Tenant and except as otherwise expressly set forth herein, Landlord shall have no duty to perform any work or repairs to the Premises prior to Tenant's occupancy . . . .

(*Id.*, § 3.1.)  It was the express responsibility of the tenant to complete any work that fell

outside the scope of Landlord's Work.[3]  The Master Lease gave the landlord some flexibility

as to when Landlord's Work must be completed:

> Landlord shall use commercially reasonable efforts to cause such Landlord's Work to be completed by September 1, 2008, provided that failure to do so shall not be a default by Landlord or entitle Tenant to terminate this Lease.  In the event Landlord's Work is not completed by April 1, 2009 (subject to Force Majeure delays), or Landlord has not delivered possession of the Premises to Tenant by April 1, 2009 (subject to Force Majeure delays) . . . or Landlord has not commenced Landlord's Work within thirty (30) days of the current tenant vacating the Premises, then Tenant, at any time thereafter until Landlord completes the Landlord's Work, has the right to terminate this Lease, without penalty, upon ten (10) days written notice to Landlord.

(*Id.*, § 3.1.)  The Master Lease also provided that the "Tenant shall accept the Premises when

Landlord has completed all of Landlord's Work as set forth in Section 3.2 below."  (*Id.*)

---

[3] The Master Lease stated:

> Tenant agrees, following the Possession Date, at tenant's sole cost and expense, to diligently perform all work of whatever nature necessary to prepare for the opening to the public of Tenant's store at the Premises ("Tenant's Work").  Within thirty (30) days after the date hereof, Tenant, at Tenant's sole cost and expense, shall deliver to Landlord preliminary plans and specifications for all Tenant's Work, including but not limited to, a layout of the space, the demising walls, the entrances and exits, parking and loading dock (the "Preliminary Space Plans").  Such Preliminary Space Plans shall be prepared by a competent person qualified to do so.

(Trial Ex. 4, § 3.3.1.)

Section 3.2 of the Master Lease set forth how the Premises was to be delivered to the tenant:

> 'Completion' of Landlord's Work in the Premises shall be certified to Tenant in writing by Landlord's architect or subcontractor, and the delivery of such certificate of completion to Tenant shall constitute delivery of the Premises hereunder and Landlord's obligations under this Lease with respect to Landlord's Work shall be deemed satisfied in all respects . . . . Within five (5) days after delivery of possession, Tenant shall deliver to Landlord a letter confirming the Possession Date and confirming acceptance of the Premises in every respect, except as specifically noted in said letter; provided, however, that the failure to timely deliver such letter shall not affect any of the terms of this Lease.

(*Id.*, § 3.2.)

Biba's obligations under the Master Lease were guaranteed by Manny Mashouf ("Mashouf"), a shareholder of Biba and Chair of Biba's board of directors (the "Mashouf Guaranty").[4]

## B.    The Sublease and the Consent

The Sublease between Biba and R&R incorporated the terms of the Master Lease:

> upon and subject to all of the terms and conditions of the Master Lease with respect to the Premises, all of which terms and conditions are incorporated herein as terms and conditions of this Sublease with respect to the Premises (with each reference therein to 'Landlord' and "Tenant' to be deemed to refer to Sublessor and Sublessee, respectively) and such terms and conditions, along with the additional terms set forth herein, shall be the complete terms and conditions of this Sublease.

---

[4] Mashouf guaranteed to New Pacific:

> the full and prompt payment of all rent and additional rent and any and all other sums (including, without limitation, interest and late charges) and charges payable by Tenant, its successors and assigns, under the Lease, and the full, faithful and prompt performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by Tenant, its successors and assigns; and Guarantor does hereby become surety to Landlord, its successors and assigns for and with respect to all of the aforesaid obligations of Tenant under the Lease.

(Trial Ex. 5, at 1.)

(Trial Ex. 17, § 3(a).)  Under the Sublease, R&R became responsible for all Tenant work to

the Premises as set forth in the Master Lease.  (*See id.*, § 5.)  Furthermore, the Sublease

stated:

> Sublessee warrants and represents that it has inspected the Premises and
> the condition thereof and Sublessee agrees to accept the Premises 'as is'
> and Sublessor shall have no obligation to improve the Premises in any
> way; provided, however, that the foregoing shall not constitute a waiver of
> the Landlord's obligations to perform the 'Landlord's Work' to the
> Premises pursuant to the terms of the Master Lease.

(Trial Ex. 17, § 11.)[5]  Both the Sublease and the Consent required R&R to pay rent directly

to New Pacific on the same schedule set forth in the Master Lease.  (*See* Trial Ex. 17, § 4(a);

Trial Ex. 18, § 6.)  The Consent further provided that Biba and Mashouf remained liable

under the Master Lease and the Mashouf Guaranty.  (*See* Trial Ex. 18, § 2(a).)

On December 7, 2007, Michael Ball ("Ball"), the Chief Executive Officer and

Creative Director of R&R, executed a guaranty of R&R's obligations under the Sublease (the

"Ball Guaranty").  (*See* Trial Ex. 16, at 2.)

## C.    The Premises

New Pacific owned a large building on Rodeo Drive, which was subdivided into the

Premises and an adjacent commercial retail space leased to Montblanc North America, LLC

("Montblanc") pursuant to a commercial lease agreement dated August 28, 2007 (the

"Montblanc Lease").  The Premises and the Montblanc space were to be divided by a

demising wall of approximately 113 feet, the construction of which was required as part of

Landlord's Work in both the Master Lease and the Montblanc Lease.

---

[5] Relatedly, the Sublease stated that "Sublessee acknowledges that neither Sublessor nor Landlord, nor
any agent nor any employee of Sublessor or Landlord, has made any representation or warranty with
respect to either the Premises or the suitability of them for the conduct of Sublessee's business."  (Trial
Ex. 17, § 11.)

New Pacific hired Illig Construction Company ("Illig") to complete Landlord's Work in both the Premises and the Montblanc space. The contract between Illig and New Pacific, dated October 1, 2008, provided that Illig would "perform and complete the soft demolition and construction of a full length demising wall . . . ." (Trial Ex. 81.) "'Soft demolition' is a term of art in the construction industry. It involves stripping the inside of a building (including the finishes, partitions, ceilings, floor coverings, ductwork, electrical circuiting), securing the utilities back to their port of origin, leaving the core structural elements intact and delivering the building as a shell." (Williams Decl., ¶ 8.)

Illig began construction at the Premises on October 1, 2008. (*See* Decl. of John D. Williams, Oct. 19, 2010, ¶ 18.) That same month, while Illig performed Landlord's Work, it came to the attention of Montblanc that the positioning of the demising wall would leave it without rear access to the Montblanc space. (*See* Decl. of Robert Kaden, Oct. 19, 2010, ¶ 3.) Without rear access, Montblanc would only have access to the Montblanc space from the front of the building during the construction phase of its build out. Under the Montblanc Lease, Montblanc was responsible for establishing rear access. Nonetheless, Montblanc approached New Pacific, Illig and Barteluce Architect & Associates, Montblanc's architect,[6] to request that a space would be left in the back of the constructed demising wall (the "Rear Gap") to provide Montblanc with rear access during the build out of its space until it could construct a rear exit. (*See* Kaden Decl., ¶ 4.) They agreed. (*Id.*)

Upon completion of the demising wall, the Rear Gap measured less than four feet wide and, given its small size, could have been closed in as little as two days, if necessary. (*See* Williams Decl., ¶ 28.) In the real estate industry, spaces like the Rear Gap are common

---

[6] Barteluce had also been retained by R&R to work on one if its retail stores located nearby on Robertson Boulevard (the "Robertson Store").

accommodations between adjacent tenants performing simultaneous build outs of their spaces.  (*See* Kaden Decl., ¶ 5; Williams Decl. ¶¶ 17, 23.)

On October 20, 2008, David Margulies ("Margulies"), the CEO of New Pacific, sent a letter to Biba, Mashouf, outside counsel to R&R, and Ayse Jourdan, Vice President of retail at R&R, which delivered the Premises and stated that the Possession Date under the Master Lease would be October 20, 2008 (the "Delivery Letter").  The Delivery Letter attached a certification from Illig, dated October 20, 2008, which stated that it had performed Landlord's Work set forth on Exhibit B to the Master Lease.  Under the terms of the Master Lease, the Rent Commencement Date would occur four months from the Possession Date, or February 20, 2009.

On November 26, 2008, Anna-Emily Gaupp ("Gaupp"), general counsel to R&R, emailed a letter to Anthony Ciasulli ("Ciasulli"), outside counsel to New Pacific (the "Acceptance Letter").  The Acceptance Letter stated:

> Sublessee has had the opportunity to inspect the subleased premises. Sublessee hereby confirms the Possession Date, and confirms acceptance of the subleased premises; *provide[d], that* Landlord shall extend the demising wall to the rear of the subleased premises as soon as reasonably practicable once the adjacent tenant has established rear access to the adjacent premises.

(Trial Ex. 125.)  The Acceptance Letter provided that "[w]hile not currently anticipated, [R&R] does hereby reserve the right to toll the Rent Commencement Date for each and every day that [R&R] is delayed in performing its work in the subleased premises as a result of having to accommodate adjacent tenant's access."  (*Id.*)  The Acceptance Letter also stated that, "[w]hile adjacent tenant has access to the subleased premises, Landlord shall ensure that adjacent tenant does not use, damage, obstruct or otherwise interfere with [R&R's] possession of the subleased premises."  (*Id.*)

8

Notwithstanding the Acceptance Letter, R&R had begun trying several months earlier to extricate itself from the Sublease. On September 15, 2008, R&R retained Jay Luchs ("Luchs"), a real estate broker with CB Richard Ellis, Inc., to market the Premises under an exclusive listing agreement. (*See* Trial Ex. 84.) That same day, Luchs contacted New Pacific in writing regarding a possible sublease of the Premises. (*See* Trial Ex. 69.) R&R subsequently confirmed to New Pacific in writing that it was seeking to sublease the Premises. (*See* Trial Ex. 72.) On October 7, 2008, Luchs met with the Chief Executive Officer of Tod's USA Group ("Tod's") to discuss a potential sublease of the Premises. On November 7, 2008, Luchs received a proposal from Tod's. (*See* Trial Ex. 115.) Several counterproposals were exchanged between R&R and Tod's, but no agreement was reached. By January 24, 2009, R&R decided to terminate the exclusive listing agreement with Luchs, though Luchs was free to continue pursuing the sublease with Tod's on behalf of R&R. (*See* Trial Ex. 147; Trial Ex. 149.)

R&R next hired Jim Travers ("Travers"), a tenant-side commercial real estate broker. (*See* Gaupp Trial Test., Hr'g Tr. 178:15-25, Jan. 25, 2011.) Travers and Gaupp requested that Mashouf, as a principal of the original tenant and guarantor under the Master Lease, contribute to the rent on the Premises. (*See* Gaupp Trial Test., Hr'g Tr. 196:14-16, Jan. 25, 2011; Trial Ex. 152; Trial Ex. 187, ¶ 21.) Mashouf declined. R&R also discussed rent concessions with New Pacific, but New Pacific ended the discussions when R&R offered nothing in exchange for such concessions. (*See* Decl. of David P. Margulies, Oct. 20, 2010, ¶ 54.) By mid-February 2009, R&R also considered splitting the Premises and subleasing half of its space. (*See* Trial Ex. 165.)

**D.    State Court Litigation**

On March 2, 2009, Anthony Ciasulli, New Pacific's counsel, sent a notice of default to Gaupp (the "Default Notice"), stating that R&R was in breach of the Sublease and the Master Lease for failure to pay the rent of $268,774.20 due on March 1, 2009.  (*See* Trial Ex. 168.)[7]  The Default Notice provided that if the payment was not made within ten days, New Pacific was entitled to exercise all its rights and remedies.

R&R did not make any rent payment.  On March 13, 2009, New Pacific filed a complaint (as amended, the "Complaint") against Biba, Mashouf, R&R, and Ball, in the Superior Court of the State of California, County of Los Angeles (the "State Court"), Case No. BC 409639 (the "State Court Action").  The Complaint asserted claims for, among other things, breach of the Master Lease, Sublease, the Mashouf Guaranty and the Ball Guaranty.[8]  The State Court Action was scheduled for trial on April 28, 2010.

In May 2009, Mashouf met with Ball and Luchs.  According to Mashouf, Ball stated during the meeting:

> [Ball] 'had a way to get out of the lease.'  When Ball presented his theory that R&R never accepted the Premises, Jay Luchs showed Ball the acceptance letter from R&R.  Ball stated that the letter did not matter as his lawyers created an argument to get out of the lease even though R&R accepted the Premises and tried to sublease it.

---

[7] Section 26.1.1 of the Master Lease provided that an "Event of Default" would occur if "[t]enant does not pay in full within ten (10) days of when due any installment of Rent or any other charge or payment whether or not herein included as Rent."  (Trial Ex. 4, § 26.1.1.)

[8] On May 8, 2009, R&R and Ball filed a cross-complaint in the State Court Action which sought declaratory relief and awarding their costs of suit, disbursements and attorney fees and expenses.  On June 4, 2009, Biba and Mashouf filed a cross-complaint in the State Court Action against R&R and Ball, which asserted causes of action for express indemnity, implied indemnity, contribution, apportionment of fault and declaratory relief against R&R and Ball.  On August 6, 2009, R&R and Ball filed a cross-complaint in the State Court Action against Biba and Mashouf, which asserted causes of action for comparative equitable indemnity, total equitable indemnity, contribution and declaratory relief against Biba and Mashouf.

(Trial Ex. 187, ¶ 32.)  Two months after New Pacific filed its Complaint, outside litigation

counsel to R&R sent a letter dated May 21, 2009 (the "Rejection Letter") to New Pacific and

Ciasulli which stated that R&R was "exercising its option to terminate for not completing

your obligations regarding the Premises by April 1, 2009 as agreed upon by the parties.  The

termination shall be effective ten (10) days from the date of this letter."  (Trial Ex. 175.)

During the first week of June 2009, Montblanc established rear access, and the Rear Gap was

closed within one week of that time.  (*See* Kaden Decl., ¶ 8.)

On July 16, 2009, a notice was filed in the State Court Action, staying the

proceedings with respect to Biba.  Attached to the notice was a document titled Notice of

Appointment of an Administrator by Company or Director(s), dated April 29, 2008, which

indicated that an insolvency proceeding had been commenced by Biba in the United

Kingdom.  On April 1, 2010 (the "Petition Date"), R&R filed for relief under chapter 11 of

the Bankruptcy Code.  The State Court subsequently stayed the State Court Action in its

entirety.  On April 21, 2010, this Court entered an order (the "Rejection Order") (ECF Doc.

No. 64.) authorizing, among other things, R&R's rejection of the Lease Agreements effective

*nunc pro tunc* to the Petition Date.  The Rejection Order provided that parties with claims

resulting from the rejection of the Lease Agreements should file proofs of claim within thirty

days.

New Pacific, Biba and Mashouf each timely filed claims against R&R for damages

relating to the Lease Agreements.[9]  On, June 28, 2010, the Debtors filed the Objection,

seeking to expunge the Claims or, alternatively, estimate the Claims at zero.  On August 12,

---

[9] As noted above, New Pacific filed the New Pacific Claim in an unliquidated amount.  Biba filed
claim number 18, dated May 17, 2010, in the amount of $5,528,356.21 (the "Biba Claim").  Mashouf
filed claim number 17, dated May 13, 2010, in the amount of $5,528,356.21 (the "Mashouf Claim,"
and together with the New Pacific Claim and the Biba Claim, the "Claims").

2010, the Mashouf and Biba Claims were transferred to New Pacific (ECF Doc. Nos. 283-84), pursuant to a Settlement Agreement and General Release, dated July 23, 2010, between New Pacific, Mashouf and Biba in the State Court Action (the "Settlement Agreement").[10] Under the Settlement Agreement, Biba and Mashouf jointly and severally agreed to pay New Pacific past-due rent, interest and other amounts owed under the Master Lease through October 31, 2010 and legal fees incurred through June 30, 2010, in the total amount of $4,715,811.31.   (*See* Trial Ex. 188, § 1.1(A)(i).)[11]  Biba and Mashouf also agreed to pay rent, interest and other amounts under the Master Lease due after November 1, 2010, and all legal fees incurred after July 1, 2010.  (*See* Trial Ex. 188, § 1.1(A)(ii).)  In exchange, Biba and Mashouf assigned and transferred to New Pacific any and all claims, counterclaims, defenses and/or rights they had under the Sublease and the Ball Guaranty, "including all judgments, proceeds, offsets, amounts collected in the California Action and/or Bankruptcy Action and/or remedies afforded under the Lease Agreements and Guarantees . . . ."  (*Id.*, § 1.1(D).)  Under the Settlement Agreement, New Pacific was responsible for prosecuting such claims.   (*See id.*, § 1.1(E).)

In December 2009, New Pacific filed a motion for summary adjudication (the "Adjudication Motion") in the State Court Action with respect to its first cause of action for rent against R&R.  During a hearing on September 24, 2010, the State Court denied the Adjudication Motion because it concluded that a triable issue of fact existed.  Thereafter, the parties agreed to a trial in this Court of the underlying issues raised by the Objection.  A trial on this matter was held January 24, 2011 to January 26, 2011.

---

[10] On September 12, 2010, New Pacific amended the Biba and Mashouf Claims to reflect damages of $7,041,437.00.  (*See* Trial Ex. 202.)

[11] These amounts accrued interest at the default rate and were made due and payable on May 31, 2011. (*See* Trial Ex. 188, § 1.1(B).)

## DISCUSSION

**A.    Motions *in Limine***

Before turning to the merits of the dispute, the Court must resolve two pretrial

motions *in limine* filed by the Debtors and taken under advisement at the trial.  (*See* ECF

Doc. Nos. 496 and 499.)[12]  For the reasons set forth below, the Court now denies both of

these motions.

### 1.    Motion Relying on Law of the Case Doctrine

Under the law of the case doctrine, R&R seeks to prohibit New Pacific from

introducing evidence inconsistent with what it contends are two rulings of the State Court

made during oral argument on the Adjudication Motion:  1) that the Master Lease required a

fully-completed demising wall and 2) that the Acceptance Letter was expressly conditioned

upon New Pacific's completion of Landlord's Work.

The law of the case doctrine provides that "when a court has ruled on an issue, that

decision should generally be adhered to by that court in subsequent stages in the same case

unless cogent and compelling reasons militate otherwise." *De Johnson v. Holder*, 564 F.3d

95, 99 (2d Cir. 2009) (internal citations and quotations omitted).  It also applies to the "re-

litigation of an issue at the appellate level." *Mui v. United States*, 614 F.3d 50, 53 (2d Cir.

2010).  "[T]he law of the case doctrine is, at best, a discretionary doctrine which does not

constitute a limitation on the court's power but merely expresses the general practice of

refusing to reopen what has been decided." *Brody v. Vill. of Port Chester*, 345 F.3d 103, 110

(2d Cir. 2003) (internal citations and quotations omitted).

---

[12] In addition, New Pacific filed a motion *in limine* seeking to categorically exclude a variety of
evidence, (ECF Doc. No. 493), which was decided on the record during trial.

Under California law, a party may move for summary adjudication if a cause of action has no merit or there is no affirmative defense to the action. *See* Cal. Code. Civ. Proc. § 437c(f)(1). Such motion is granted "only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." Cal. Code. Civ. Proc. § 437c(f)(1). A motion for summary adjudication is to be treated for all procedural purposes as a motion for summary judgment. *See* Cal. Code. Civ. Proc. § 437c(f)(2). As the State Court noted during oral argument, inferences are to be drawn in favor of the non-moving party. (*See* ECF Doc. No. 496, Ex. A, Hr'g. Tr. 25:2-4, Sept. 24, 2010.)

R&R argues that application of the law of the case doctrine is appropriate because the trial held in this Court is simply "a different phase" of the State Court Action. For support, R&R cites to *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988), which states that the law of the case doctrine should be applied to "transfer decisions of coordinate courts." *Id.* at 816. R&R's argument is procedurally flawed, however, as the State Court Action has never been removed to this Court pursuant to 28 U.S.C. § 1452, and the matter before this Court is not a "transfer" of the State Court Action. Furthermore, this Court lifted the stay in the State Court Action, and it was never reimposed. Thus, as far as this Court is aware, the State Court Action is still active and pending. Rather than a continuation of the State Court Action, the trial before this Court was an evidentiary hearing on a claim objection.

Moreover, R&R's argument is flawed given the manner in which the Adjudication Motion was resolved by the State Court. While the State Court made certain remarks regarding the Lease Agreements, its ultimate ruling was simply that there was "a triable issue of material fact as to when or if the rent commencement date ever occurred, and the motion for summary adjudication . . . is denied." (*See* ECF Doc. No. 496, Ex. A, Hr'g. Tr. 15:3-6,

Sept. 24, 2010.)  It is improper to hold the State Court's observations, made during a hearing that is treated akin to a summary judgment proceeding and during which inferences were drawn in favor of R&R and against New Pacific, to be binding legal conclusions for purposes of these proceedings.

For all these reasons, the Court concludes that R&R's request to apply the law of the case doctrine should be denied.

### 2.   <u>Motion Alleging Lack of Privity</u>

Invoking a variety of theories, R&R seeks to prohibit the introduction of any evidence that R&R is liable to New Pacific for lease obligations that run through Biba.  R&R argues first that the Settlement Agreement purporting to transfer Biba's claims to New Pacific is invalid because of the Biba U.K. insolvency proceeding, which R&R alleges concluded prior to the execution of the Settlement Agreement.  R&R also contends that New Pacific's remedies under the Lease Agreements run not to R&R but to Biba and, therefore, privity of contract between New Pacific and R&R does not exist.  Thus, R&R argues that "until Claimant establishes that it has a valid claim – one either with contractual privity or with a validly assigned claim from Biba – Rock & Republic has *no obligation to provide any basis for denying liability*."  (ECF Doc. No. 519, ¶ 7) (emphasis in original.)  The Court disagrees for three reasons.

As a threshold procedural matter, R&R's motion relating to Biba is not a motion *in limine*, but instead a poorly disguised summary judgment motion.  "The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal citations and quotations omitted); *see also Wechsler v. Hunt*

*Health Sys., Ltd.*, 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003) (citing *Luce v. United States*,

469 U.S. 38, 41 n.4 (1984)). "Evidence should be excluded on a motion *in limine* only when

the evidence is clearly inadmissible on all potential grounds." *Wechsler*, 381 F. Supp. 2d at

140 (citing *Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, 1998 U.S. Dist. LEXIS 15093,

at *11 (S.D.N.Y. Sept. 25, 1998)). "A motion *in limine* may properly be denied where it is

too sweeping in scope." *Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 293 F. Supp.

2d 397, 407-08 (S.D.N.Y. 2003) (denying motion *in limine* that sought to "dismiss all

evidence regarding other policy holders, lacks sufficient specificity with respect to the

evidence to be excluded . . . No particular documents or testimony have been identified in

this motion."); *see also Baxter Diagnostics*, 1998 U.S. Dist. LEXIS 15093, at *10; *Nat'l*

*Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 286-87 (S.D.N.Y. 1996).

R&R's motion relating to Biba does not cite a single federal rule of evidence as a

basis for the exclusion of evidence at trial. It does not relate to particular documents or

testimony, but rather fundamentally seeks to exclude New Pacific from presenting any

evidence in support of its claim. Thus, the motion is not aimed at "aiding the trial process,"

but instead seeks to bar the New Pacific Claim in its entirety. It is inappropriate for the Court

to entertain such a dispositive motion on the eve of trial.[13]

Second, R&R's motion fails because it does not establish a basis to deny the New

Pacific Claim. A properly filed proof of claim constitutes "prima facie evidence of the

---

[13] Although R&R argues that it first received notice that Biba's insolvency proceeding had concluded
when it took the deposition of Mashouf on October 8, 2010, this assertion is disingenuous at best.
Counsel to R&R was aware of the Biba insolvency proceeding over a year prior to Mashouf's
deposition, since it too received notice of the stay against Biba in the State Court Action. The proof of
service, attached as Exhibit F to the motion *in limine*, shows that service was made on Derrick F.
Coleman, Esq., of Coleman Frost, on July 15, 2009. Since R&R had notice of Biba's insolvency
proceeding, it could have sought any appropriate relief at the early stages of this proceeding.

   In addition, this motion was brought in derogation of Local Bankruptcy Rule 7056-1(a), which states
that "[u]nless the Court orders otherwise, no party shall file a motion for summary judgment without
first seeking a pre-motion conference."

validity and amount of the claim." Fed. R. Bankr. P. 3001(f). The burden is on the party objecting to the claim to come forward with "evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)). "Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim." *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

Against these standards, R&R's motion is defective because it fails to present evidence that the U.K. insolvency, in fact, bars New Pacific's claims. The undisputed evidence is that Mashouf entered into an agreement to transfer Biba's claim to New Pacific, and that Mashouf was the chair of the board of Biba prior to the insolvency. R&R does not dispute the existence of that agreement but rather contends it is ineffective because of Biba's U.K. insolvency proceeding. But R&R does not provide any facts or law to support its position. It cites only the deposition testimony of Mashouf, a lay person who had no involvement in the U.K. proceedings. Mashouf's testimony establishes only the existence of the U.K. insolvency proceeding and his limited conjecture on the status of the proceeding. R&R does not provide any facts or rulings from the U.K. insolvency proceeding that would explain how it impacted the ability of Biba to transfer its claim to New Pacific. Similarly, R&R does not provide any legal authority regarding U.K. insolvency proceedings generally or how the rights and responsibilities of a debtor such as Biba are ordinarily addressed during such a proceeding. Without such facts or law, the Court declines to speculate in R&R's favor on this issue.

Third and finally, the Court rejects R&R's motion because there is privity of contract between New Pacific and R&R. Biba, New Pacific and R&R each executed the Consent to Sublease. R&R assumed obligations to New Pacific related to the Master Lease under both the Sublease and the Consent to Sublease. Specifically, R&R agreed to pay rent directly to New Pacific. (*See* Trial Ex. 17, §§ 4, 9; Trial Ex. 18, § 6.) "A subtenant who expressly assumes the obligations of the prime lease, with the consent of the landlord, comes into privity of contract with the landlord, and the latter can enforce the assumption agreement as a third party beneficiary." *Vallely Invs. v. Bancamerica Commercial Corp.*, 88 Cal. App. 4th 816, 823 (4th Dist. 2001) (citing *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal. 2d 232, 244-45 (1937); *Marchese v. Standard Realty & Dev. Co.*, 74 Cal. App. 3d 142, 147 (3d Dist. 1977)).

Moreover, New Pacific can pursue its claim because it obtained rights against R&R directly through Mashouf, who guaranteed the obligations of Biba under the Master Lease. California law provides that the distinction between guarantors like Mashouf and sureties is abolished, meaning that Mashouf as a surety would have the right to seek recovery under the Master Lease. *See* Cal Civ. Code § 2787.[14] "No rule of law is more firmly established than that a surety upon payment of the principal obligation succeeds to all the rights of the principal in and to said obligation." *Sanders v. Magill*, 9 Cal. 2d 145, 150 (1937). Under the

---

[14] The California Civil Code provides:

> The distinction between sureties and guarantors is hereby abolished. The terms and their derivatives, wherever used in this code or in any other statute or law of this state now in force or hereafter enacted, shall have the same meaning as defined in this section. A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor. Guaranties of collection and continuing guaranties are forms of suretyship obligations, and except in so far as necessary in order to give effect to provisions specially relating thereto, shall be subject to all provisions of law relating to suretyships in general.

Cal Civ. Code § 2787.

Settlement Agreement, Mashouf assumed responsibility to pay for Biba's obligations under

the Master Lease and succeeded to the rights of Biba under the Master Lease.  By doing so,

Mashouf assumed Biba's ability to sue under that Master Lease and, therefore, was able to

assign those rights to New Pacific and those rights are separate and apart from any rights

obtained by New Pacific directly through Biba.[15]

## B.    The Trial

Having resolved the threshold legal issues, the Court turns to the merits of the

Debtors' Objection.  R&R has asserted two related theories as to why it was not obligated to

pay rent.  First, R&R argued that New Pacific failed to complete Landlord's Work as

required by the Master Lease and, therefore, the Rent Commencement Date never occurred.

In support of this theory, R&R relied primarily upon the existence of the Rear Gap in the

demising wall but also cited three other purported defects in the Premises: (i) a column

located towards the front of the Premises (the "Column"); (ii) a concrete wall in the rear of

the Premises (the "Wall"); and (iii) a space of approximately sixteen inches left in the front

between the demising wall and the façade of the Premises (the "Front Gap").  As a second

alternative theory, R&R argued that its Acceptance Letter was not an unqualified acceptance

of the Premises but instead was an acceptance conditioned on completion of Landlord's

Work, which it contends was not complete until the Rear Gap was closed in June 2009.

Accordingly, R&R disputes New Pacific's contention that the Possession Date occurred on

---

[15] There is precedent for the notion that a claimant must establish its standing to seek relief based on its claim.  *See In re Minbatiwalla*, 424 B.R. 104, 119-20 (Bankr. S.D.N.Y. 2010) (holding that in the context of an assigned mortgage, the mortgage assignee had failed to attach adequate documentation to establish the prima facie validity of the claim); *Feinberg v. Bank of New York (In re Feinberg)*, 442 B.R. 215, 221 (Bankr. S.D.N.Y. 2010) (holding that, in the mortgage assignment context, even if the creditor "failed to establish the prima facie validity of its proof of claim, it corrected this non-fatal error in the instant adversary proceeding by providing enough documentation to comply with the requirements of Fed. R. Bankr. P. 3001(c)").  These cases do not afford relief to R&R because New Pacific has come forward with evidence establishing, as a prima facie matter, that Biba assigned its claim to New Pacific and that New Pacific has an independent contractual right to sue.

October 20, 2008 and the Rent Commencement Date took place four months later on February 20, 2009.  The Court will address each of R&R's arguments separately.

### 1.    <u>Completion of Landlord's Work</u>

The Court finds that the accommodation of Montblanc by permitting the Rear Gap was commercially reasonable and rejects R&R's argument that existence of the Rear Gap constituted a failure to complete Landlord's Work.  "A 'demising wall' is defined in the construction industry as a wall that defines the boundaries between tenants and/or the common spaces."  (Williams Decl., ¶16.)  Here, the Rear Gap measured less than four feet wide in a wall that was 113 feet long and up to 25 feet high in certain places.  (*See* Trial Ex. 4, Ex. A.)  Thus, the Rear Gap was small enough so that the demising wall as constructed constituted a boundary between the Montblanc space and the Premises.  (*See* Williams Decl., ¶ 20.)

Furthermore, the credible evidence at trial – including testimony from third party witness Robert Kaden – establishes that such an accommodation is common in the industry between adjacent tenants performing simultaneous build outs of their spaces.  (*See* Kaden Decl., ¶ 5; Williams Decl. ¶¶ 17, 23.)  Indeed, the evidence establishes that, at the time of these events, R&R felt the accommodation of Montblanc was acceptable.  (*See* Trial Exs. 96, 98; Margulies Decl. ¶ 26.)  R&R specifically provided for the accommodation in its Acceptance Letter.  The build outs for both Montblanc and R&R were to take several months, (*see* Trial Ex. 31), and the Rear Gap could be closed in as little as two days.  (*See* Williams Decl., ¶ 28.)  Thus, the Acceptance Letter stated that R&R did not anticipate that tolling of the Rent Commencement Date would be necessary because the Rear Gap was not expected to interfere in any way with the construction or opening of R&R's store.

20

R&R retained an architect, Tom Rael ("Rael"), who concluded that the existence of the Rear Gap, together with the Front Gap, rendered Landlord's Work incomplete. (*See* Trial Exs. 106 and 111.) Rael, however, did not speak with Montblanc or Illig prior to preparing his report and did not have knowledge as to why the space was left open or how it would be closed. (*See* Rael Trial Test., Hr'g Tr. 101:22-102:23, Jan. 25, 2011.) Alan Herd, an expert witness for R&R, stated that the issues with the demising wall constituted a "mega defect." The testimony of R&R's experts was not credible given that R&R offered no evidence that the Rear Gap ever interfered with its possession of the Premises or prevented it from completing Tenant's Work or performing any other obligations under the Lease Agreements. (*See* Herd Trial Test., Hr'g Tr. 125:8-12, Jan. 25, 2011.)

Nor do the other defects identified by R&R constitute a failure to complete Landlord's Work. The Master Lease states that R&R "shall deliver to Landlord a letter confirming the Possession Date and confirming acceptance of the Premises *in every respect, except as specifically noted in said letter . . . .*" (Trial Ex. 4, § 3.2) (emphasis added.) Although the Acceptance Letter references extending the demising wall to the rear of the Premises – i.e., the Rear Gap– it does not mention the Wall, the Column or the Front Gap. "'A contracting party may waive provisions placed in a contract solely for his benefit.'" *Doryon v. Salant*, 75 Cal. App. 3d 706, 712 (2d Dist. 1977) (quoting *Spellman v. Dixon*, 256 Cal. App. 2d 1, 4 (2d Dist. 1967)). The Court therefore finds that R&R's failure to reference the Wall, the Column or the Front Gap in the Acceptance Letter constitutes a waiver of these issues.

In any event, the evidence demonstrates that it was commercially reasonable for New Pacific to leave the Wall, the Column, the Front Gap and the Rear Gap in place and that it did not constitute a failure to complete Landlord's Work. Landlord's Work required New Pacific

to "demolish the space, furnish and install demising walls consistent with the approved Preliminary Space Plans (insulated and sheet-rocked, taped and spackled, ready to receive Tenant's finishes) and otherwise deliver the Premises to Tenant in its as-is condition." (Trial Ex. 4, Ex. B.)  In order to complete this work, New Pacific hired Illig to perform a "soft demolition" on the Premises.[16]  (*See* Trial Ex. 81.)  As noted above, "'[s]oft demolition' is a term of art in the construction industry [that] involves stripping the inside of a building [and] *leaving the core structural elements intact* and delivering the building as a shell."  (Williams Decl., ¶ 8) (emphasis added.)  The credible evidence at trial was that the Landlord presented the Premises to R&R in as-is condition consistent with a soft demolition.

Leaving the Front Gap in place was commercially reasonable because it prevented the demolition and reconstruction of the demising wall during R&R's build out.  When closed, the demising wall would need to be anchored to the façade of the Premises.  (*See* Williams Decl., ¶ 25.)  It was contemplated that the façade would be removed and reconstructed by Montblanc and R&R as part of Tenant's Work.  This could not be done at the time of Landlord's Work, as neither Montblanc nor R&R had received approval for their plans for a new façade from the city of Beverly Hills.  (*See id.*, ¶ 25.)  If the demising wall had been extended to the front of the façade while Landlord's Work was being completed, it would have ended up being demolished and reconstructed again after Tenant's Work began on the façade.

---

[16] R&R was on notice that a soft demolition would be performed on the Premises.  On December 3, 2007, Brent Ball, an agent for R&R, emailed to New Pacific a detailed list of questions regarding the state in which the Premises would be delivered.  (*See* Trial Ex. 14.)  Margulies and Arnold Rosenstein, a principal of New Pacific, informed Brent Ball that the issues raised in his email, including demolition of the restrooms and construction of the store front façade, were the responsibility of R&R.  (*See* Margulies Decl., ¶ 12; Rosenstein Decl., ¶ 6.)  New Pacific would perform a soft demolition of the Premises and no other work but the demising wall would be done because Exhibit B to the Master Lease provided that the Premises was to be delivered in "as is" condition.  (*See* Margulies Decl., ¶ 12; Rosenstein Decl., ¶ 6.)

As for the Column and the Wall, the clear weight of the evidence at trial is that these were structural elements of the Premises.  As noted above, a soft demolition leaves the core structural elements intact.  (*See id.*, ¶ 8)  The Column "was a moment resisting space frame which is a structural frame and part of the building's foundation system."  (*See id.*, ¶ 30.)  The Wall was also a structural element that supported the weight of the mezzanine level above.  (*See* Williams Trial Test., Hr'g Tr. 53:6-54:7, Jan. 25, 2011.)  It was therefore commercially reasonable for New Pacific to leave the Wall and the Column in place during the soft demolition.

The Court's conclusions are further confirmed by testimony from Ball and from Andrea Bernholtz ("Bernholtz"), the President of R&R, regarding their views of the Landlord's obligations when providing the Premises to R&R.  Ball testified at his deposition that the Premises was to be tendered in "Vanilla Box" condition:[17] with white walls, new paint, glass doors and a rear door.  (*See* Ball Trial Test., Hr'g. Tr. 64:11-65:8, Jan. 26, 2011.)  Bernholtz testified that the Premises was not provided in "move-in" condition, because there were issues relating to the floors, the walls, the façade and the columns.  (*See* Bernholtz Trial Test., Hr'g Tr. 9:9-25, Jan. 26, 2011.)  Of note, Bernholtz testified that she believed New Pacific was responsible for structural changes to the Premises, modifications to the then-existing façade of the Premises, and finishing the walls within the Premises.  (*See id.* at 10:1-11:1.)  However, the concept of a "Vanilla Box" had been raised and rejected prior to R&R signing the Sublease.  While in negotiations with New Pacific to sublease the Premises, R&R delivered a Non-Binding Letter of Intent, dated November 9, 2007 (the "Letter of Intent").  The Letter of Intent requested delivery of the Premises in "Vanilla Shell" condition,

---

[17] *See* Ball Dep. Test. 136:5-138:16, Aug. 11, 2010; Ball Trial Test., Hr'g Tr. 65:5-8, Jan. 26, 2011 ("Q. And that was one of the reasons you rejected these premises, is because you never got the vanilla box you wanted, correct? A. This is true.").

including new carpeting, paint and handicapped bathrooms. (Trial Ex. 7, ¶¶ 8, 13.) Margulies informed R&R that New Pacific would not agree to perform such work and would only carry out Landlord's Work as set out on Exhibit B to the Master Lease. (*See* Margulies Decl., ¶ 10.)

R&R's suggestion that Landlord's Work was incomplete on a "Vanilla Box" theory is entirely inconsistent with the terms of the Master Lease. Under the Master Lease, R&R agreed to "accept the Premises in their 'as is' condition and state of repair." (Trial Ex. 4, § 3.1.) Although Ball testified that "the reason [he] rejected these premises, is because [he] never got the vanilla box [he] wanted," (Ball Trial Test., Hr'g Tr. 65:5-8, Jan. 26, 2011), he also testified that he did not know that R&R had agreed to accept the Premises in "as-is" condition. (Ball Dep. Tr. 136:16-138:9, Aug. 11, 2010.) In fact, Ball testified that he never read the terms of the Master Lease. (*See id*. at 138:10-16.) The Lease Agreements did not require New Pacific to deliver the Premises in "Vanilla Box" condition or "move-in" condition and Landlord's Work did not include structural changes to the Premises, modifications to the then-existing façade of the Premises, or finishing the walls within the Premises. It also did not include providing R&R with white walls, new paint, glass doors or a rear door. Therefore, the Court disregards the views of Ball and Bernholtz regarding completion of Landlord's Work.

### 2. **Acceptance of the Premises**

The Court now turns to whether R&R's letter of November 26, 2008 constituted an acceptance of the Premises under the Lease Agreements. Under California law, a lease agreement is subject to the general rules of contract interpretation. *See Bill Signs Trucking, LLC v. Signs Family Ltd. P'ship*, 157 Cal. App. 4th 1515, 1521 (4th Dist. 2007). "The construction of a contract, unless it turns on disputed facts, is a question of law." *Armstrong*

*Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388 (5th Dist. 2004)

(citing *Parsons v. Bristol Development Co.*, 62 Cal.2d 861, 865–66 (1965). Contracts are to

be interpreted so as to give effect to the mutual intention of the parties at the time the contract

was made. *See* Cal. Civ. Code § 1636. "The language of a contract is to govern its

interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal.

Civ. Code § 1638. The words of a contract should be construed in their "ordinary and

popular sense . . . unless used by the parties in a technical sense, or unless a special meaning

is given to them by usage . . . ." Cal. Civ. Code § 1644. A contract must be considered as a

whole, so as to give effect to each of its parts. *See* Cal. Civ. Code § 1641. Furthermore, the

California parol evidence rule provides that extrinsic evidence cannot be used to contradict

the terms of an integrated contract. *See* Cal. Code Civ. Proc. § 1856(a).

Applying these principles in this case, the Court concludes that R&R accepted the

Premises by delivering its Acceptance Letter dated November 26, 2008. Under the Master

Lease, the "Possession Date" is defined as the date that "Landlord substantially completes

Landlord's Work . . . and delivers possession of the Premises to Tenant . . . ." (Trial Ex. 4, §

1.3.) Completion of Landlord's Work "shall be certified to Tenant in writing . . . and the

delivery of such certificate of completion to Tenant shall constitute delivery of the Premises

hereunder and Landlord's obligations under this Lease with respect to Landlord's Work shall

be deemed satisfied in all respects . . . ." (Trial Ex. 4, § 3.2.)

The Master Lease further provides that "[w]ithin five (5) days after delivery of

possession, Tenant shall deliver to Landlord a letter confirming the Possession Date and

confirming acceptance of the Premises in every respect, except as specifically noted in said

letter . . . ." (Trial Ex. 4, § 3.2) Thus, R&R had five days within which it could reject

25

delivery of the Premises.  (*See* Gaupp Trial Test., Hr'g Tr. 173:9-14, Jan. 25, 2011.)[18]  If

R&R chose instead to accept the Premises, it was required to send a letter stating it was

accepting in every respect, *except as specifically noted*.  The Master Lease therefore

contemplates acceptance in conjunction with a "punch list" of issues that were to be

addressed by the parties.  Acceptance in this manner is consistent with the definition of

Possession Date in the Master Lease, which takes place when "Landlord *substantially*

*completes* Landlord's Work . . . and delivers possession of the Premises to Tenant . . . ."

(Trial Ex. 4, § 1.3) (emphasis added.)  Such acceptance is not, as R&R contends, a

conditional acceptance.

The only exception noted by R&R in the Acceptance Letter was the requirement that

the demising wall be extended to the rear of the Premises "as soon as reasonably practicable

once the adjacent tenant has established rear access." (Trial Ex. 125.)  The Acceptance Letter

also clearly states, however, that R&R inspected the Premises, and "hereby confirms the

Possession Date, and confirms acceptance of the subleased premises . . . ."  (Trial Ex. 125.)

The Master Lease provides that "the delivery of [the] certificate of completion to Tenant

shall constitute delivery of the Premises hereunder *and Landlord's obligations under this*

*Lease with respect to Landlord's Work shall be deemed satisfied in all respects . . . .*"  (Trial

Ex. 4, § 3.2) (emphasis added.)  Thus, New Pacific's obligation to substantially complete

Landlord's Work was satisfied under the Master Lease at the time the certificate of

completion was delivered and R&R confirmed its acceptance of the Premises.

---

[18] Gaupp asserts that if R&R had refused to accept the Premises, default litigation on the part of New Pacific would have been imminent.  This ignores the obligation of the Landlord to deliver the Premises in acceptable condition, including the completion of Landlord's Work.  If the Landlord failed to meet this obligation then R&R could sue it for breach.  But so long as the Landlord had complied with its obligations, the Tenant had an obligation to accept the Premises.

Nothing in the Acceptance Letter provides that failure to close the Rear Gap in the demising wall would result in revocation of (i) the status of Landlord's Work as complete, (ii) the acceptance of the Premises, or (iii) the occurrence of the Possession Date. Nor did the Acceptance Letter somehow give R&R the right to terminate the Master Lease. Rather, the only remedy reserved by R&R in the Acceptance Letter was to "toll the Rent Commencement Date for each and every day that Sublessee is delayed in performing its work in the subleased premises as a result of having to accommodate the adjacent tenant's access." (Trial Ex. 125.) Thus, the Acceptance Letter did not condition R&R's acceptance of the Premises upon the closing of the Rear Gap, but merely allowed R&R to delay the occurrence of the Rent Commencement Date if, due to Landlord's failure to close the Rear Gap, R&R could not perform its build out work in the Premises.

Having accepted the Premises subject only to this one condition, nothing occurred that resulted in the tolling of the Rent Commencement Date. The Acceptance Letter did not impose a specific deadline for closing the Rear Gap, stating only that it be done "as soon as reasonably practicable." (Trial Ex. 125.) The Master Lease required that "[e]ach notice, demand, request or other communication required or permitted under the terms of this Lease shall be in writing." (Trial Ex. 4, § 25.1.) R&R, however, never sent New Pacific or Montblanc written notice that the Rent Commencement Date was being tolled or that the Rear Gap should be closed immediately. It was only after New Pacific commenced the State Court Action that counsel to R&R sent the Rejection Letter, and that Rejection Letter was sent several months after R&R was obligated to start paying rent. Under California law, the obligation of a tenant to pay rent cannot be avoided simply by refusing to take possession or by abandoning the premises after the tenant has taken possession. *Reynolds v. McEwen*, 111 Cal. App. 2d 540, 543 (3d Dist. 1952). Furthermore, "[a] lease may be terminated by a non-

27

breaching party upon the other's default, but cannot be terminated unilaterally by the breaching party." *Mid-Wilshire Assocs. v. Lomax (In re Lomax)*, 194 B.R. 862, 865 (B.A.P. 9th Cir. 1996).

Even assuming that R&R was permitted to provide oral rather than written notice of the need to close the Rear Gap, R&R still is not entitled to relief based on the evidence presented at trial. There is conflicting testimony on whether R&R provided oral notice to New Pacific that the Rear Gap needed to be closed immediately. The witnesses presented by New Pacific uniformly testified that subsequent to sending the Acceptance Letter, R&R did not request that New Pacific or Montblanc close the Rear Gap. (*See* Margulies Decl., ¶¶ 57-58; Kaden Decl., ¶ 8; Decl. of Troy Louis Jackson, Oct. 20, 2010, ¶27; Decl. of Anthony Ciasulli, Oct. 19, 2010, ¶ 40; Decl. of Arnold Rosenstein, Oct. 20, 2010, ¶ 32.) In contrast, Gaupp testified on behalf of R&R at trial that she had numerous conversations with Margulies and Ciasulli after sending the Acceptance Letter, in which she referenced issues with the demising wall. (*See* Gaupp Trial Test., Hr'g Tr. 176:2-15; 199:7-200:12; 204:19-22, Jan. 25, 2011.) Gaupp's statements at trial, however, contradicted her deposition testimony, in which she claimed that she did not recall communicating with Margulies or Ciasulli between November 26, 2008 and June 2009 regarding the Acceptance Letter. (*See* Gaupp Dep. Test. 86:14-89:4, Feb. 25, 2010.) Furthermore, Gaupp ultimately testified during cross examination that after sending the Acceptance Letter, she did not make a specific request that New Pacific close the demising wall. (*See id.* at 175:12-14.) She also could not recall if she had requested that rent be tolled. (*See id.* at 175:9-11.) When asked whether she had communicated to New Pacific in writing that the demising wall was not complete, she stated only that she "allowed the November 26th letter to stand." (*See id.* at 206:17-21.) Gaupp's testimony indicates at best that she expressed displeasure with the lack of progress on the

demising wall after sending the Acceptance Letter, but nothing that rose to the level of a demand that the demising wall be closed immediately or that the Rent Commencement Date was being tolled.

Indeed, if such a request had been made by R&R, it is unlikely that New Pacific would have risked defaulting on the Master Lease.  The Rear Gap was not a requirement under the Montblanc Lease, but merely an accommodation until Montblanc could establish rear access in the Montblanc space.  Montblanc acknowledged that establishing rear access was their responsibility and that they would have accepted the Montblanc space even if an accommodation had not been made.  (*See* Kaden Trial Test., Hr'g Tr. 18:6-19:14, Jan. 25, 2011.)  A build out by Montblanc without rear access would have been difficult, but not impossible.  (*See id.* at 18:6-19:14.)  In addition, there was testimony that closing the Rear Gap would have taken only two days – one of which was necessary to allow the wall to dry. (*See* Williams Decl., ¶ 28.)  It is highly improbable that New Pacific would jeopardize the Master Lease worth millions of dollars over an issue that Montblanc had admitted was their responsibility and which could have been so easily remedied.

R&R also did not establish at trial that it was "delayed in performing its work in the subleased premises as a result of having to accommodate adjacent tenant's access."  (Trial Ex. 125.)  Indeed, the evidence indicates that R&R had no intention of building out the Premises and chose to focus its efforts instead on its nearby Robertson Store.  From the very beginning of the Sublease, R&R delayed moving ahead with Tenant's Work on the Premises by continually delaying in providing plans to New Pacific for the space, as required by the Master Lease.  (*See* Trial Exs. 32, 37.)  As of July 2008, R&R still had not provided Preliminary Space Plans to New Pacific.

As of August 2008, R&R still had not hired an architect or a contractor to design or complete Tenant's Work under the Master Lease. (*See* Bernholtz Trial Test., Hr'g Tr., 20:10-21:5, Jan. 26, 2011.) Indeed, R&R stated internally that it was delaying providing architectural plans on the Premises because "[o]ur lawyer is looking at ways to get out of Rodeo . . . ." (Trial Ex. 33.) Internal communications also indicate that, by this time, R&R had decided to "prioritize" the Robertson Store at the expense of the Rodeo Premises. (*Id.*) Ball publically admitted that he had reconsidered locations for freestanding stores and Rodeo Drive was no longer important. (*See* Trial Ex. 124.) This decision is consistent with the fact that R&R was actively looking to sublease the space even prior to delivery of the Premises.

Finally, R&R's course of conduct in the months following the Acceptance Letter indicates that it accepted delivery of the Premises and considered the Rent Commencement Date to be imminent. Internal communications among R&R employees make clear that R&R believed rent payments would commence in February 2009:

- On October 25, 2008, Ms. Jourdan sent an email to other R&R employees, in which she states, "Rent starts running in February." (Trial Ex. 90.)

- On December 11, 2008, Ms. Cainkar sent an email to Ms. Bernholtz that stated, in part, "Remember we are not out of the rodeo lease yet and rent becomes due feb 2009 and its $183,333.33 a month! Bottom line no salaries are going to be able to be paid out of R&R." (Trial Ex. 135.)

R&R also took certain steps that were required by the Master Lease only after the Possession Date. Section 8.4 of the Master Lease provided that "Tenant shall make all appropriate applications to the local utility companies as shall be necessary to insure utilities being available at the Premises *no later than the Possession Date* and pay all required deposits, connection and tap-in fees and or [sic] charges for service and meters within the applicable time period set by the local utility company." (Trial Ex. 4, § 8.4) (emphasis

added.)  When informed by New Pacific on January 9, 2009 that Southern California Edison

would disconnect power unless the current tenant of the Premises contacted them by the end

of the day, Gaupp responded that R&R would call and request a transfer of service into its

name that same day.  (*See* Trial Ex. 141.)  By January 14, 2009, R&R had established utility

service on the Premises.  (*See* Trial Ex 143.)  On January 15, 2009, New Pacific also

delivered a rent letter to R&R, including a rent schedule that identified the Rent

Commencement Date as February 20, 2009.  (*See* Trial Ex. 144.)  R&R received the rent

letter and there was no evidence that it contested the Rent Commencement Date or that the

first regularly scheduled rent payment was due on March 1, 2009.  (*See* Gaupp Trial Test.,

Hr'g Tr. 177:3-9, Jan. 25, 2011; Herd Trial Test., Hr'g Tr. 130:6-131:11, Jan. 25, 2011.)

**C.**      **<u>Damages</u>**

Having established R&R's liability under the Lease Agreements, the Court turns to

damages, which are capped by section 502(b)(6) of the Bankruptcy Code.  Section 502(b)(6)

provides that a lessor's claim for damages resulting from the termination of a lease of real

property is allowed except to the extent that such claim exceeds

> (A) the rent reserved by such lease, without acceleration, for the greater of one
> year, or 15 percent, not to exceed three years, of the remaining term of
> such lease, following the earlier of—
>
>> (i) the date of the filing of the petition; and
>>
>> (ii) the date on which such lessor repossessed or the lessee
>> surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier
> of such dates . . . .

Thus, the rejection by a debtor of a lease for real property confers two distinct claims to the

lessor; one claim for pre-petition unpaid rent pursuant to section 502(b)(6)(B) of the

Bankruptcy Code and a second claim for post-petition future damages pursuant to section

502(b)(6)(A).  *See RM 18 Corp. v. Aztex Assocs., LP (In re Malease 14fk Corp.)*, 351 B.R. 34, 41 (E.D.N.Y. 2006).

While there is no cap with respect to the amount of prepetition unpaid rent that a landlord can recover, *see In re Andover Togs*, 231 B.R. 521, 544 (Bankr. S.D.N.Y. 1999), section 502(b)(6) limits postpetition future damages "to the rent reserved under the lease for one year, without acceleration, or 15 percent of the remaining term of the lease for a total period not to exceed three years, whichever amount is greater."  *Id.* (citing *In re Ames Dep't Stores, Inc.*, 209 B.R. 627, 630 (S.D.N.Y. 1997)).  The limitation is "designed to compensate the landlord for his loss while not permitting a claim so large as to prevent other general unsecured creditors from recovering a dividend from the estate."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 353 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 63 (1978).  For both components, a landlord, like any other claimant, must substantiate its claim as to the incidence and measure of damages.  *See* 11 U.S.C. § 502(b)(1); Collier on Bankruptcy, ¶ 502.03[7][c].

The Court divides its discussion into the three distinct categories of damages requested.  The first addresses prepetition unpaid rent pursuant to section 502(b)(6)(B) of the Bankruptcy Code, the second covers postpetition damages relating to rent under section 502(b)(6)(A) of the Bankruptcy Code, and the third deals with other amounts unrelated to rent for which the parties dispute whether section 502(b)(6) is applicable.

### 1.    Prepetition Unpaid Rent

Under the Master Lease, "Rent" is defined as "Base Rent" and "Additional Rent." (Trial Ex. 4, § 6.4.)[19]  The Master Lease states that "annual Base Rent shall be

---

[19] Under the Sublease, R&R agreed to pay Base Rent and Additional Rent directly to New Pacific. (Trial Ex. 17, § 4.)

$1,800,000.00, payable in equal monthly installments of $150,000.00, subject to adjustment. . . ." (*Id.*, § 1.8.) Additional Rent consists of "all other sums (exclusive of Base Rent) payable by Tenant to Landlord under [the Master] Lease . . . " (*Id.*, § 6.4), and includes "Tenant's Proportionate Share of Operating Expenses." (*Id.*, § 6.3.2(a).)[20] "Operating Expenses" is defined as "all expenses, costs and amounts of every kind and nature which Landlord pays or accrues during any Lease Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Building, or any portion thereof." (*Id.*, § 6.3.2(b).) The Master Lease also provides a representative sample of the type of charges that constitute Operating Expenses, and the parties appear to concede that these expenses include common area maintenance charges ("CAM").

New Pacific asserts that it is entitled to a claim under section 502(b)(6)(B) for prepetition rent in the aggregate amount of $2,716,868.00, comprised of: (i) Base Rent for the period of the Rent Commencement Date of February 20, 2009 through the Petition Date of March 31, 2010, in the amount of $2,449,591.00; and (ii) Additional Rent, including CAM, for the same period in the amount of $267,277.00.

R&R disputes these numbers, arguing first that any prepetition rent calculation requires New Pacific to factor in a credit for the fair rental value of the vacant Premises. Section 26.1.1 of the Master Lease provides that a failure to pay rent constitutes an event of default. (*See* Trial Ex. 4, § 26.1.1.) Upon an event of default, the Master Lease gives New Pacific two alternatives with respect to damages. First, New Pacific may terminate the Master Lease and repossess the Premises. (*See id.* at § 26.1.6(i).) In such cases, New Pacific's recovery must take into account the fair rental value that could have been obtained:

---

[20] "Tenant's Proportionate Share" is defined as 54%, subject to adjustment. (Trial Ex. 4, § 1.9.)

> [t]he worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss *that Tenant proves could have been reasonably avoided*; plus . . . [t]he worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss *that Tenant proves could have been reasonably avoided . . .*

(*See id.* at § 26.1.6(i).)  By contrast, the second alternative does not require consideration of the fair rental value:

> the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations).  Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

(*Id.* at § 26.1.6(ii).)[21]  New Pacific has made clear that it has chosen this second alternative treatment of damages.  The Court therefore finds that New Pacific has no obligation to credit R&R for the fair rental value against the rent that was due and owing as of the Petition Date.

R&R and the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the "Committee")[22] also dispute the Rent Commencement Date asserted by New

---

[21] This second alternative is consistent with Section 1951.4 of the California Civil Code, which states:

> Even though a lessee of real property has breached the lease and abandoned the property, the lease continues in effect for so long as the lessor does not terminate the lessee's right to possession, and the lessor may enforce all the lessor's rights and remedies under the lease, including the right to recover the rent as it becomes due under the lease, if any of the following conditions is satisfied . . . (3) The lease permits the lessee to sublet the property, assign the lessee's interest in the lease, or both, with the consent of the lessor, and the lease provides that the consent shall not be unreasonably withheld or the lease includes a standard implied by law that consent shall not be unreasonably withheld.

Cal. Civ. Code § 1951.4(b).  The Master Lease here provides for sublet or assignment of the Premises upon the written consent of New Pacific, which consent shall not be unreasonably withheld.  (Trial Ex. 4, § 20.1.)

[22] Subsequent to the post-trial briefing submitted in this matter, a plan has been confirmed in the Debtors' cases.  While the Committee has since been disbanded, the Court has nonetheless considered the merits of the Committee's post-trial briefing.

Pacific of February 20, 2009.  Under the Master Lease, the Rent Commencement Date was

four months after the Possession Date, unless the tenant opened for business beforehand.

(Trial Ex. 4, § 1.4.)  R&R and the Committee argue that the obligation to pay rent did not

commence until four months after the Rear Gap was closed in June 2009.  For the reasons set

forth above, however, the Court concludes the Acceptance Letter constituted both an

acceptance of the Premises and a confirmation of the Possession Date of October 20, 2008.

As the Rent Commencement Date took place four months after the Possession Date of

October 20, 2008, prepetition Rent and Additional Rent should therefore be calculated from

February 20, 2009 through the Petition Date.

### 2. Postpetition Damages Relating to Rent

New Pacific asserts a claim for post-petition damages in the amount of

$4,106,460.90, comprised of (a) Base Rent from the Petition Date of March 31, 2010 through

the balance of the remaining term, in the amount of $3,603,415.05;[23] and (b) Additional Rent

for the same period in the amount of $503,045.85, including CAM charges.[24]

### a. Credit for Fair Rental Value

R&R again argues that a credit must be given for the fair rental value of the Premises.

To support this argument in the postpetition context, R&R relies on the Supreme Court's

decision in *City Bank Farmers Trust Co, v. Irving Trust Co.*, 299 U.S. 433 (1937) ("Farmer's

Trust").  In *Farmers Trust*, the Supreme Court stated that "[t]he amount of the landlord's

claim for the loss of his lease necessarily is the difference between the rental value of the

remainder of the term and the rent reserved, both discounted to present worth." *Id.* at 443.

R&R cites to numerous cases from this Circuit which it claims support the use of the

---

[23] This figure is 15% of the total base rent of $24,022,767.00.

[24] This figure is 15% of the total additional rent of $3,353,639.00.

*Farmers Trust* rule in these circumstances.  Each of the cases cited by R&R, however, state only that they are relying on the *Farmers Trust* rule where – unlike here – there is an absence of state law or contract provisions that provide the measure of damages.  *In re W.T. Grant Co.*, 36 B.R. 939, 941 (S.D.N.Y. 1984) ("*[A]bsent a specific damage provision in a lease*, courts apply the rule enunciated by the Supreme Court in *City Bank Farmers Trust Co. v. Irving Trust Co. . . .*") (emphasis added); *In re Child World*, 161 B.R. 349, 352 (Bankr. S.D.N.Y. 1993) ("*Absent any specific provision in a lease*, the general rule is that the measure of damages which a landlord may recover as a result of a tenant's rejection of the lease is the difference between the rental value of the remainder of the term and the rent reserved, both discounted to present worth.") (emphasis added); *D.H. Overmyer Co. v. Irving Trust Co.*, 60 B.R. 391, 394-95 (S.D.N.Y. 1986) ("*[P]arties are free to create their own formulas for calculating damages in the lease provisions* . . . If parties fail to insert a damages provision in their lease agreement, or if such provision is unenforceable, the federal courts, as noted by the bankruptcy court, apply an established formula for calculating damages . . . Under this formula, the landlord's damages are 'the difference between the present lease value for the remainder of the term and the present fair rental value for the remainder of the term.'") (emphasis added.); *see In re Andover Togs, Inc.*, 231 B.R. 521, 533 (Bankr. S.D.N.Y. 1999) ("Because the measure of damages found in Section 13.04 of the Lease is similar to the standard enunciated in *Farmers Trust*, I may apply either to determine whether Mid-City sustained actual damages from Andover's rejection.").

While the Master Lease provides two alternatives relating to damages in the event of a default, New Pacific has made clear that it is pursuing the remedy set forth in paragraph 26.1.6(ii).  This provision of the Master Lease contains no requirement that the landlord credit for rental value when calculating damages.  Instead, it specifically provides for the

recovery of rent as it becomes due consistent with California Civil Code section 1951.4,
which "allows the parties to contract away the landlord's duty to relet under § 1951.2." *Mid-
Wilshire Assocs. v. Lomax (In re Lomax)*, 194 B.R. 862, 865 (B.A.P. 9th Cir. 1996).[25]  Under
California Civil Code section 1951.4:

> [t]he landlord is permitted to treat the lease as continuing after the tenant's
> abandonment and sue for rent as it becomes due under the lease.  The
> lease must contain language providing for this remedy and must also grant
> the tenant a right to sublet the premises which will not be unreasonably
> withheld.  Section 1951.4 thus returns responsibility for avoiding the
> consequences of the vacancy to the tenant.

*Id.* at 865-66.[26]

### b.    Calculation of Damages

The parties dispute the proper method for calculating postpetition rent damages.  New
Pacific argues that the appropriate method for calculating such damages is to use the "total
rent approach."[27]  Under that approach, section 502(b)(6)(A)  "limits a landlord's claim for
damages to the rent reserved under the lease for one year, without acceleration, or 15 percent
of the remaining term of the lease for a total period not to exceed three years, whichever

---

[25] This result is contrary to the general rule that California imposes the duty on the landlord to avoid
the consequences of abandonment.  *See In re Lomax,* 194 B.R. at 865 (citing Cal. Civ. Code § 1951.2).

[26] Notably, rejection of a lease "is not the same as termination.  A rejected lease is treated as if the
debtor breached it immediately prior to the petition date, and the parties are generally left with the
rights and remedies available outside of bankruptcy law.  *Stoltz v. Battleboro Housing Auth. (In re
Stoltz)*, 315 F.3d 80, 86 n.1 (2d Cir. 2002) (internal citations omitted); *see also Med. Malpractice Ins.
Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir. 1997) ("The Bankruptcy Code treats
rejection as a breach so that the non-debtor party will have a viable claim against the debtor.  However,
the Code does not determine parties' rights regarding the contract and subsequent breach.  To
determine these rights, we must turn to state law.") (internal citations omitted).  "California law
provides that a breach of a lease is not synonymous with the termination of that lease.  Where a
California lease so provides, California Civil Code § 1951.4 permits a lessor to treat the lease as
continuing in effect even though its lessee has breached the lease and abandoned the property."  *Blue
Barn Assoc. v. Picnic' n Chicken, Inc. (In re Picnic' n Chicken, Inc.)*, 58 B.R. 523, 525 (Bankr. S.D.
Cal. 1986) (internal citations omitted).

[27] While New Pacific argues that the Lease was never terminated either pre- or post-petition, it
concedes that, as a result of the Rejection Order, among other things, section 502(b)(6) applies to the
Claims.  (*New Pacific's Proposed Findings of Fact and Conclusions of Law*, dated February 14, 2011,
¶ 75.)

amount is greater." *In re Andover Togs, Inc.*, 231 B.R. 521, 544 (Bankr. S.D.N.Y. 1999)

(citing *In re Ames Dep't Stores, Inc.*, 209 B.R. 627, 630 (S.D.N.Y. 1997)).  It has long been

held in this jurisdiction that the 15 percent referenced in the statute is meant to be "15 percent

of the total rents due under the lease, through the expiration date of the lease." *In re Andover

Togs*, 231 B.R. at 547; *see also In re Financial News Network, Inc.*, 149 B.R. 348, 351

(Bankr. S.D.N.Y. 1993).

While recognizing that the test adopted in *Andover Togs* is the authority in this

jurisdiction, R&R and the Committee propose that this Court adopt the alternative "time

approach" to rejection damages, pursuant to which the rent calculation is a function of time.

Under the "time approach", damages are calculated as 15% of the remaining term of the

Lease.  While R&R cites to several jurisdictions that have adopted the "time approach," this

Court declines to depart from the long standing authority adopted in this jurisdiction, and

holds that the damages calculation is subject to the "total rent approach."

c.  Management Fees and Yearly Increases to Additional Rent

While management fees are included in the Master Lease as Additional Rent, (*see*

Trial Ex. 4, § 6.3.2(b)(vi)), R&R and the Committee argue that such a charge cannot be

awarded as "rent reserved" under section 502(b)(6)(A) of the Bankruptcy Code.  In

evaluating whether a charge qualifies as "rent reserved," this Court previously has adopted

the test set out in *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91 (B.A.P. 9th Cir.

1995).  Under *McSheridan*,

> an expense found in a lease may be properly considered part of the 'rent
> reserved' under the lease if:
>
> 1) the charge is: (a) designated as 'rent' or 'additional rent' in the lease, or
> (b)    provided    as    the    tenant's    obligation    in    the    lease;

2) the charge is related to the value of the property or the lease thereon; and

3) the charge is properly classifiable as rent because it is a fixed, regular or periodic charge.

*In re Andover Togs, Inc.*, 231 B.R. at 540 (citing *In re McSheridan*, 184 B.R. at 99).

Both the Debtors and the Committee argue that the management fees fail to satisfy the second prong of the *McSheridan* test because the charge is not related to the value of the property or the lease thereon. New Pacific disagrees, arguing that the management fee "is designed to compensate the landlord for repair, maintenance and other services which maintain the value of the property." (*New Pacific's Proposed Findings of Fact and Conclusions of Law*, ¶ 148.)

The relevant evidence supports R&R's view. At trial, Troy Jackson, the Controller of New Pacific ("Jackson"), testified that the management fee was calculated as 3% of gross rents that were charged to R&R. (*See* Jackson Trial Test., Hr'g Tr. 206:23-25, Jan. 24, 2011.) When asked what New Pacific had done to earn the management fee, Jackson's response was that it was a contractual fee allowed for by the Master Lease and that it was doing the same things as it did for Montblanc. (*Id.* at 207:11-16.) Jackson later clarified that it related to "preparing rent letters, the operating expense true-ups, and handling . . . repair and maintenance issues . . . ." (*Id.* at 229:21-24.) However, Jackson also testified that no one had occupied the Premises from October 2008 to the present, while the Montblanc space had been occupied since June 2009. (*Id.* at 207:11-16.) While Jackson testified that the management fees related to preparing rent letters, the operating expense true-ups, and repair and maintenance, the Committee correctly points out that repair and maintenance are already

accounted for as charges under Operating Expenses.[28]  The Court concludes that the evidence is insufficient to justify including the management fee in the calculation of Additional Rent and therefore finds that maintenance fees cannot be recovered by New Pacific.  *See In re New Valley Corp.*, 2000 U.S. Dist. LEXIS 12663, at \*42 (D.N.J. Aug. 31, 2000) ("[W]here a charge relates more to the management of a property, the second prong is not met. Indeed, a landlord's management of a property does not directly relate to the value of the property; nor is it the type of charge commonly associated with a tenant's expenses. While it relates to value indirectly, it is unlike security services or common area maintenance fees which are direct and actual expenses of maintenance and preservation.").

New Pacific also seeks the inclusion of an annual 3% increase in the amount of Additional Rent to which it is entitled.  As noted above, the Master Lease provides that Additional Rent includes "Tenant's Proportionate Share of Operating Expenses."  (Trial Ex. 4, § 6.3.2(a).)  New Pacific argues that it is entitled to a 3% increase in Additional Rent because "[i]t is reasonable to assume that such [Operating Expenses] would increase year-over-year for the balance of the remaining term of the Lease Agreements."  (*New Pacific's Postpetition Findings of Fact and Conclusions of Law*, ¶ 85.)  New Pacific, however, does not cite to anything in the Lease Agreements that automatically entitles it to annual increases for Additional Rent.  In fact, the Master Lease provides only for estimates of relevant expenses and their adjustment – either positive or negative – of the tenant's share of the Operating Expenses at the end of each year:

---

[28] For example, Operating Expenses includes "the cost of supplying all utilities, the cost of operating, repairing, maintaining, and renovating the utility, telephone, mechanical, sanitary, storm drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith."  (Trial Ex. 4, § 6.3.2(b)(i).)  They also specifically include "the cost of landscaping, relamping, and all supplies, tools, equipment and materials used in the operation repair and maintenance of the Building, or any portion thereof."  (Trial Ex. 4, § 6.3.2(b)(iv).)

> Tenant's Proportionate Share [of Operating Expenses] shall be paid by
> Tenant in monthly installments in such amounts as are reasonably
> estimated by Landlord at the Possession Date and at the beginning of each
> successive Lease Year, each such installment being due on the first day of
> each calendar month. Within one hundred twenty (120) days after the end
> of each Lease Year, Landlord shall deliver to Tenant a statement of
> Operating Expenses for such Lease Year and Tenant's Proportionate Share
> thereof paid or payable with respect thereto shall be adjusted between
> Landlord and Tenant. Tenant shall pay to Landlord, or, provided that
> Tenant is not then in default, beyond any applicable cure or grace period,
> under any of the terms or covenants of this Lease, Landlord shall credit
> Tenant's account, to be applied to the next following installments of Base
> Rent and Taxes, or (if such adjustment is at the end of the Lease Term)
> pay Tenant, as the case may be, within ninety (90) days of receipt of such
> statement, such amounts as may be necessary to effect such adjustment.

(Trial Ex. 4, § 6.3.2(a).) Moreover, New Pacific failed to introduce evidence establishing the

requested 3% as an appropriate proxy for future changes to the operating expenses as

contemplated by paragraph 6.3.2(a).

New Pacific cites to *Andover Togs* as support for the requested 3% annual increase in

expenses. *In re Andover Togs, Inc.*, 231 B.R. at 541-42 (awarding increase in operating

expenses pursuant to *McSheridan*). The *Andover Togs* decision is easily distinguishable,

however, because the lease in that case specifically provided that the tenant "shall pay to

Landlord, as additional rent, tax escalation and operating expense escalation." *Id.* at 541.

The Master Lease in this case does not have a corresponding provision allowing for

automatic increases in Additional Rent.

Accordingly, the Court finds that the 3% increase in Additional Rent fails to meet the

first prong of the *McSheridan* test because it is not "(a) designated as 'rent' or 'additional

rent' in the lease, or (b) provided as the tenant's obligation in the lease . . . ." *Id.* at 540

(citing *In re McSheridan*, 184 B.R. at 99).

### 3.     Damages Unrelated to Rent

New Pacific asserts a claim for additional damages in the amount of $4,933,424.00

for a wide variety of other expenses, including (a) the cost of Tenant's Work to build out the

Premises, in the amount of $3,087,000.00; (b) prepetition interest in the amount of

$136,738.00 and the cost of New Pacific's unpaid prepetition and postpetition legal fees and

expenses in the amount of $615,538.83 and $1,021,059.50, respectively;[29] and (c) Biba and

Mashouf's prepetition legal fees and expenses in the amount of $73,087.75.  The Court

addresses each of these in turn.

### a.     Build Out Costs

New Pacific requests the costs relating to R&R's failure to perform the build out of

the Premises.  Section 3.3 of the Master Lease provides that "Tenant agrees, following the

Possession Date, at Tenant's sole cost and expense, to diligently perform all work of

whatever nature necessary to prepare for the opening to the public of Tenant's store at the

Premises ("Tenant's Work")."  (Trial Ex. 4, § 3.3.1.)  The Master Lease further provides that

"[u]pon Tenant's acceptance of the Premises, Tenant shall use its best efforts to commence

Tenant's Work shall be commenced [sic] promptly on the Possession Date and thereafter

continued with due diligence to the end that it shall be fully completed, and the Premises

shall be open for business in accordance with the provisions hereof, as soon as commercially

possible."  (Trial Ex. 4, § 3.3.3.)  The Sublease states that "[n]otwithstanding anything to the

---

[29] New Pacific reserved the right to supplement its claim for attorneys' fees and expenses from January 1, 2011 through the date of final judgment.  Furthermore, New Pacific came to an agreement with the Committee to reduce its claim for legal fees and expenses by an amount equal to the legal fees incurred by New Pacific in relation to (i) its representation of Mr. Rosenstein in his capacity as a member of the Committee, and (ii) services rendered in connection with the California Case, which relate solely to causes of action against Mr. Ball, Mr. Mashouf or Biba and have no relationship to the Debtors. As the parties have agreed to work in good faith to reach an agreed amount of such reduction, the Court will wait to hear from the parties on this issue.

contrary, Sublessee shall be responsible for all Tenant work to the Premises, pursuant to the Master Lease." (Trial Ex. 17, § 5.)

New Pacific argues that the build-out costs do not fall within the purview of section 502(b)(6) of the Bankruptcy Code because they are unrelated to the termination of the Lease Agreements. Were section 502(b)(6) applicable to such damages, they would clearly be disallowed under the *McSheridan* test. Several courts have disallowed similar tenant construction obligations because they do not relate to the value of the property or the lease or they are not fixed, regular or periodic charges under the lease. *See In re Edwards Theatres Circuit, Inc.*, 281 B.R. 675, 684-85 (Bankr. C.D. Cal. 2002); *Smith v. Sprayberry Square Holdings, Inc. (In re Smith)*, 249 B.R. 328, 339 (Bankr. S.D. Ga. 2000); *In re Gantos, Inc.*, 181 B.R. 903, 907 (Bankr. W.D. Mich. 1995).

Even if such costs are unrelated to termination of the Lease Agreements, the Court rejects New Pacific's request for build-out costs because it runs counter to the trial testimony presented by New Pacific regarding the Front Gap. As New Pacific's witnesses noted, each successive tenant has a different preference as to how to configure the space. Thus, New Pacific has consistently argued that the Front Gap was necessary to prevent the demolition and reconstruction of the demising wall during R&R's build out, as the demising wall would need to be anchored to the façade of the Premises. (*See* Williams Decl., ¶ 25.) It was contemplated that the façade would be removed and reconstructed by Montblanc and R&R as part of Tenant's Work, since each tenant would want its own unique build out in the Premises. (*See id.* at ¶¶ 25-6.) If the demising wall had been extended to the front of the façade while Landlord's Work was being completed, it would have ended up being demolished and reconstructed again after Tenant's Work began on the façade. Applying this same logic to the build out, there is every reason to expect that any build out by R&R would

also need to be demolished to accommodate the wishes and designs of whatever future tenant would next occupy the Premises.  The Court will not grant damages of such a speculative nature.  *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir. 1988); *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.2d 631, 637 (2d Cir. 1946) ("The rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain.") (internal citations and quotations omitted); *Scott v. Pacific Gas & Electric Co.*, 11 Cal. 4th 454, 473 (1995) ("It is fundamental that [contract] damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.") (internal citations and quotations omitted).

> b.    Prepetition Interest and Attorneys' Fees

R&R argues that the prepetition interest and attorneys fees requested by New Pacific fail the *McSheridan* test.  Under the Master Lease, default interest is included in the definition of Additional Rent.  (Trial Ex. 4, § 6.4.)  Specifically, the Master Lease states that "all sums to be paid under this Lease, if not paid within ten (10) days after due, shall bear interest on the unpaid portions thereof at the rate of five percent (5%) per annum in excess of the announced prime rate from time to time of Bank of America, N.A., or its successor, from the date when due, but not in excess of the highest legal rates."  (Trial Ex. 4, § 6.4.)

With respect to attorneys' fees, section 26.7 of the Master Lease states that

> Tenant shall pay upon demand all Landlord's costs, charges and expenses including the fees and out-of-pocket expenses of counsel (even in house counsel), agents and others retained by Landlord incurred in enforcing Tenant's obligations under this Article 26 (and regardless of whether any lawsuit, action or other proceeding is commenced) or incurred by Landlord in any litigation.

(Trial Ex. 4, § 26.7.)  The Master Lease further provides that "[i]f either party institutes a suit against the other for violation of or to enforce any covenant or condition of this Lease, or if either party intervenes in any suit in which the other is a party to enforce or protect its interest or rights, the prevailing party shall be entitled to all of its costs and expenses, including, without limitation, reasonable attorneys' fees."  (Trial Ex. 4, § 30.12.); (*see also* Trial Ex. 17, § 10(a) (sublease provision providing that sublessee R&R is responsible for costs, fees and other damages arising from the failure to pay rent.)

R&R and the Debtors view interest and attorneys' fees in a fundamentally different manner.  R&R believes these damages are encompassed by section 502(b)(6) of the Bankruptcy Code, and are disallowed under the applicable *McSheridan* test.  New Pacific counters that these damages are unrelated to the termination of the Master Lease and are therefore not subject to section 502(b)(6) and *McSheridan*.  Specifically, New Pacific argues that because it chose to treat lease damages under California Civil Code Section 1951.4, the Lease Agreements were not terminated by New Pacific or R&R as of the Petition Date.  As a result, all of New Pacific's damages incurred prior to the Petition Date are not subject to the cap under Bankruptcy Code section 502(b)(6) because they did not result from the termination of the Lease Agreements.  New Pacific further argues that any postpetition claims which do not result from the termination of the Lease Agreements are properly included as part of New Pacific's claim and are not subject to the cap.

The Court agrees with R&R that to the extent interest and attorneys' fees are covered by section 502(b)(6) of the Bankruptcy Code, they should be disallowed under the *McSheridan* test.[30]  These amounts clearly do not relate to the value of the property, as

---

[30] While *In re McSheridan* specifically dealt with whether certain damages constituted "rent reserved" under section 502(b)(6)(A) of the Bankruptcy Code,  the *McSheridan* test has also been found to apply

required by the second prong of *McSheridan*.  Furthermore, neither interest nor attorneys'

fees can be considered a fixed, regular or periodic charge, and they therefore fail to meet the

third prong of *McSheridan*.  Numerous courts have held likewise.  *See*, *e.g.*, *In re PPI Enters.*

*(U.S.), Inc.*, 228 B.R. 339, 349 (Bankr. D. Del. 1998), *aff'd,* 324 F.3d 197 (3rd Cir. 2003);

*Sprayberry*, 249 B.R. 328, 340 (Bankr. S.D. Ga 2000); *In re Pacific Arts Pub'g, Inc.*, 198

B.R. 319, 324 (C.D Cal. 1996); *Blatstein*, 1997 WL 560119, 1997 U.S. Dist. LEXIS 13376

*16 (E.D. Pa. Aug. 26, 1997); *In re Storage Tech. Corp.*, 77 B.R. 824, 825 (Bankr. D. Colo.

1986); *In re WD Ins. Servs.*, 2005 Bankr. LEXIS 567, *13-4 (Bankr. E.D. Va. Feb. 28, 2005).

However, the Court also concurs with the position taken by the Debtors and the

Committee that prepetition interest and attorneys' fees related to the litigation in the State

Court Action do not constitute damages resulting from the "termination" of the Lease

Agreements.  Damages that do not result from the termination of a lease are not subject to the

cap imposed under Bankruptcy Code section 502(b)(6).  *See In re Best Products Co,. Inc*.

229 B.R. 673, 678 (Bankr. E.D.Va. 1998); *In re Farley, Inc*., 146 B.R. 739, 746 (Bankr. N.D.

Ill. 1992); *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229, 232 (Bankr. D.N.D. 1992); *In re*

*Atlantic Container Corp.*, 133 B.R. 980, 988 (Bankr. N.D. Ill. 1991)  In so ruling, the court

is mindful of the distinctions recognized by the Ninth Circuit in applying the section

502(b)(6) cap:

> To limit their recovery for collateral damages only to a portion of their lost
> rent would leave landlords in a materially worse position than other
> creditors.   In contrast, capping rent claims but allowing uncapped claims
> for collateral damage to the rented premises will follow congressional
> intent by preventing a potentially overwhelming claim for lost rent from

---

to section 502(b)(6)(B) of the Bankruptcy Code.  *See*, *e.g.*, *In re Edwards Theatres Circuit, Inc.*, 281
B.R. 675, 684 (Bankr. C.D. Cal. 2002) (citing *Sprayberry*, 249 B.R. at 337; *Fifth Avenue Jewelers, Inc.*
*v. Great East Mall, Inc. (In re Fifth Avenue Jewelers, Inc.)*, 203 B.R. 372, 380-81 (Bankr. W.D. Pa.
1996)).

> draining the estate, while putting landlords on equal footing with other
> creditors for their collateral claims. The statutory language supports this
> interpretation. The cap applies to damages "resulting from" the rejection
> of the lease. 11 U.S.C. § 502(b)(6) . . . A simple test reveals whether the
> damages result from the rejection of the lease: Assuming all other
> conditions remain constant, would the landlord have the same claim
> against the tenant if the tenant were to assume the lease rather than
> rejecting it?

*Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.)*, 504

F.3d 978, 980-981 (9th Cir. 2007).

Under the terms of this lease agreement, prepetition interest and attorneys' fees would

fit under the definition of allowable expenses, as would any postpetition attorneys' fees that

relate solely to the State Court Action. Accordingly, the Court permits recovery of these

damages by New Pacific. With respect to the majority of the postpetition attorneys' fees that

relate to litigation in the Debtors' bankruptcy proceeding, however, the Court finds those to

be closely associated to the rejection of the Lease Agreements and therefore barred by

section 502(b)(6) and the *McSheridan* test.

        c.    <u>Biba and Mashouf Attorneys' Fees</u>

R&R contends that any claim for Biba and Mashouf's attorneys' fees must be

disallowed under section 502(b)(1) of the Bankruptcy Code because the Consent to Sublease

provided that "[a]ll amounts to be paid by Subtenant [R&R] pursuant to the Sublease,

including all 'Base Rent' and 'Additional Rent', shall be paid directly and entirely to

Landlord [New Pacific] and Tenant [Biba] waives any rights thereto." (Trial Ex. 18, § 6.)

As a threshold matter, this argument is directly contrary to the position taken by R&R in its

motion *in limine* that New Pacific has no rights to pursue it directly and that any rights to

purse R&R flowed through Biba. In any event, the Sublease specifically provides that Biba,

the sublessor, is indemnified by R&R, the sublessee, for non-payment of rent and other

resulting damages, including attorneys' fees.  (*See* Trial Ex. 17, § 10(a).)  The Court

therefore concludes that Biba has a basis to seek reimbursement from R&R for its attorneys'

fees relating to the State Court Action.[31]

Similarly, R&R argues that the Mashouf Claim must be disallowed under section

502(b)(1) of the Bankruptcy Code because Mashouf was not in privity of contract with, and

had no contractual rights against, R&R.  For the reasons set forth above, the Court finds that

Mashouf does indeed have rights against R&R, and therefore Mashouf can pursue R&R for

the allowance of its attorneys' fees relating to the State Court Action.

## **CONCLUSION**

As set forth above, R&R's objections are denied in part and granted in part.  New

Pacific's claim is hereby allowed consistent with this Memorandum Opinion.  New Pacific is

to settle an order on five days' notice.


Dated: New York, New York
       June 20, 2011

                                    _____
                                         */s/ Sean H. Lane*
                                    UNITED STATES BANKRUPTCY JUDGE

---

[31] Finally, R&R relies on its expert Bjorn Malmlund ("Malmlund") to argue generally that New Pacific
has not proven any of its damages, and that its claim should be greatly reduced under section 502(b)(1)
of the Bankruptcy Code.  In light of the Court's analysis on damages above, the Court finds
Malmlund's opinion to be unpersuasive and rejects his contentions, which are conclusory in nature.